# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION


DOROTHY ANDERSON and DEMARQUION
MERRILL, as Co-Personal
Representatives of the Estate of
BOBBY MERRILL, deceased,

        Plaintiffs,

-v-                              Case No. 13-11159

                                     HON. THOMAS LUDINGTON

OFFICER JEFF MADAJ,
individually, OFFICER JUSTIN
SEVERS, individually, OFFICER
BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA,
individually,

        Defendants.
_____/


        The Deposition of JUSTIN L. SEVERS, taken before Timothy J. Boroski, RPR/CSR-2378 and Notary Public in and for the County of Clinton, State of Michigan, at the offices of Progressive Insurance Company, 1 Tuscola Street, Suite 301, Saginaw, Michigan, on Thursday, April 24, 2014, commencing at or about 1:40 p.m.

## Page 10

| # | | |
|---|---|---|
| 1 | A | Handcuffing, stuff like that. |
| 2 | Q | I'm interested in the stuff like that. What is the stuff |
| 3 | | like that? |
| 4 | A | Just the handcuffings, the pressure points, the -- just |
| 5 | | gun control. Like if somebody is trying to get it from |
| 6 | | you, how to -- how to retain it. That's about it I |
| 7 | | think. |
| 8 | Q | Okay. The handcuffing, hobble restraints? |
| 9 | A | (No audible response). |
| 10 | Q | Is that something that was part of the academy? |
| 11 | A | No. |
| 12 | Q | Do you know what hobble restraints are? |
| 13 | A | A restraint from, basically, hands to feet. |
| 14 | Q | Did you learn about hobble restraints at any department? |
| 15 | A | No. |
| 16 | Q | Does Saginaw, or did Saginaw while you were there, have |
| 17 | | any policies or procedures regarding hobble restraints? |
| 18 | A | No. |
| 19 | Q | Had you ever used them as a police officer? |
| 20 | A | No. |
| 21 | Q | Talking about Bobby Merrill on April 10th 2012, you were |
| 22 | | involved in that incident? |
| 23 | A | Yes. |
| 24 | Q | Were hobble restraints used? |
| 25 | A | His hands and feet were restrained, yes. |

## Page 11

| # | | |
|---|---|---|
| 1 | Q | Whose decision was it to use a hobble restraint? |
| 2 | A | I saw Officer Madaj trying to tie a shoelace. I had a |
| 3 | | rope. I tied it around his feet and then I handed the |
| 4 | | rope to him. |
| 5 | Q | Where was the rope? |
| 6 | A | In my patrol car that was parked next to us. |
| 7 | Q | How far was it parked next to you? Or how far away was |
| 8 | | it? |
| 9 | A | Maybe here to the end of the table; ten feet. |
| 10 | Q | Where was it in your patrol car? |
| 11 | A | My passenger side door. Right in my bag. |
| 12 | Q | Was it a dog leash? |
| 13 | A | It was a device given to us by animal control. I guess |
| 14 | | you could use it for that. But it was a rope. |
| 15 | Q | Was it like one of those -- like I usually see them as |
| 16 | | being yellow and I don't know what color it was, but like |
| 17 | | a plastic or rope type of material with a little ring on |
| 18 | | it so you could make a noose for a dog? |
| 19 | A | It had a -- one end had a ring and the other end was just |
| 20 | | a straight rope. |
| 21 | Q | Okay. And it was in a bag in your passenger seat? |
| 22 | A | It was just sitting on my passenger seat in my patrol |
| 23 | | bag, correct. |
| 24 | Q | Now, the patrol bag, was it -- is that something that you |
| 25 | | zipped up or -- |

## Page 12

| # | | |
|---|---|---|
| 1 | A | No, it was open. |
| 2 | Q | Your car was locked? |
| 3 | A | At that time I'm not sure. I had a key fob right on me, |
| 4 | | so... |
| 5 | Q | When would you have unlocked it? |
| 6 | A | Sometime walking to the car or at the car. |
| 7 | Q | You mean from the -- where Mr. Merrill was -- |
| 8 | A | Correct. |
| 9 | Q | -- you would have unlocked it, walked to the car? |
| 10 | A | Had to have, yeah. |
| 11 | Q | All right. The incident involving Mr. Merrill, did that |
| 12 | | happen near the driver's side of your car or the |
| 13 | | passenger side? |
| 14 | A | Which incident? |
| 15 | Q | The whole tasing, arresting or cuffing. |
| 16 | A | It happened on the entire side of my car, both sides. |
| 17 | Q | Which side? |
| 18 | A | The passenger and driver, front side. |
| 19 | Q | When you went to get the rope -- |
| 20 | A | Okay. |
| 21 | Q | -- where was Mr. Merrill in relation to your car? |
| 22 | A | To the passenger door. |
| 23 | Q | So he was near the passenger door? |
| 24 | A | Correct. |
| 25 | Q | How was your car facing? What direction? |

## Page 13

| # | | |
|---|---|---|
| 1 | A | I believe it was facing about southwest direction at that |
| 2 | | point. |
| 3 | Q | Where was it positioned? |
| 4 | A | The middle of the road. |
| 5 | Q | The middle of what road? |
| 6 | A | Washington. Right in the turn lane. |
| 7 | Q | Had you moved the car after getting out and giving |
| 8 | | commands to Mr. Merrill? |
| 9 | A | I moved it at one point at the very beginning of it. At |
| 10 | | the very beginning of the incident. |
| 11 | Q | Where did you move it? From where to where? |
| 12 | A | When I first originally pulled on scene, I was right in |
| 13 | | the middle. He took off running towards Gilmore. So I |
| 14 | | got in my car. I backed it up to start to turn down |
| 15 | | Gilmore and then he stopped, so... |
| 16 | Q | How far did he run? |
| 17 | A | Twenty, 25 feet maybe. |
| 18 | Q | All right. So he ran 20 to 25 feet. You were in the car |
| 19 | | when he ran? |
| 20 | A | I was like beside my car and then I seen him take off |
| 21 | | running. So I jumped in the car real quick. |
| 22 | Q | Did you give him any commands before he took off? |
| 23 | A | I told him many times to stop. |
| 24 | Q | Many times over the course of 20 to 25 feet? |
| 25 | A | Well, the whole time he was coming towards me, so... |

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax(810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 46

1  Q  Were you taught anything, either following this incident
2     in the City of Saginaw or at the township, regarding the
3     effect of tasing a person that is under the influence of
4     narcotics? And what I'm specifically talking about is
5     cardiac arrest. Has that ever come up?
6  A  They said it's a possibility.
7  Q  Who said that?
8  A  Taser, in their power point.
9  Q  Which power point are you talking about?
10 A  Whichever power point the township prepared. They had a
11    taser power point.
12 Q  So that was at the township?
13 A  Correct.
14 Q  When you were at the City of Saginaw, was there ever any
15    discussion about the use of a taser potentially causing
16    cardiac arrest in a person that had been under the
17    influence of narcotics?
18 A  As I recall offhand, not offhand, no.
19        MR. FELTY: Excuse me. I need to step out for
20    a second.
21        (Off the record from 2:45 - 2:50)
22 Q  (BY MR. FELTY) Regarding the use of force, I understand
23    that the policy, accepted policy in Saginaw, was plus
24    one; is that right?
25 A  Yes.

Page 47

1  Q  Now, as a police officer, were you trained to -- or
2     strike that.
3        The purpose of the use of force is an attempt
4     to de-escalate and lower it down as much as possible; is
5     that correct?
6  A  Correct.
7  Q  So the fact that force escalates doesn't -- your goal is
8     to keep it from continuing to escalate?
9  A  Yes.
10 Q  And the level of force necessary or appropriate might
11    vary at various times during the incident; is that fair?
12 A  Yes.
13 Q  Like it can escalate, de-escalate, and then even escalate
14    again; is that fair?
15 A  Correct.
16 Q  On April 10th of 2012, you were somewhere near the area,
17    as I understand it, of Glenwood and Washington where
18    there was a breaking and entering?
19 A  I was on my way there.
20 Q  You were on your way there?
21 A  Correct.
22 Q  How did that occur? How did that arise? You were out on
23    patrol?
24 A  I was -- I was just out on patrol. Central put out a
25    call for a possible breaking and entering in progress. I

Page 48

1     was not dispatched to that, but I was just heading that
2     way.
3  Q  Okay. I understand that there were community police
4     officers, is that the right word?
5  A  Correct.
6  Q  And then patrolmen?
7  A  Correct.
8  Q  And you were a patrol officer?
9  A  Yes.
10 Q  Did you have a particular area that you were responsible
11    for that day?
12 A  I did.
13 Q  What was your area?
14 A  It's area 2, which is the southwest side of the city. It
15    would be west of the river, south of Mackinac.
16 Q  So you got the call for the breaking and entering in
17    progress -- or you heard the call?
18 A  Correct.
19 Q  And started to head that direction?
20 A  Yes.
21 Q  What there a specific dispatch for you to go that
22    direction, or was it like all units?
23 A  They sent two cars, I believe. Possibly two, maybe
24    three. I'm not sure. But I wasn't doing anything so I
25    just started heading that way.

Page 49

1  Q  Had there been a shooting at that time?
2  A  No.
3  Q  When did you learn, or did you learn about a shooting at
4     that location?
5  A  A couple seconds before the first tasing.
6  Q  Did you know who was shot?
7  A  I did not.
8  Q  You didn't know if it was an officer hit or a subject
9     hit?
10 A  As I was -- in my incident I heard, "We're okay. Suspect
11    is down."
12 Q  Was that before or after you used the taser?
13 A  Almost simultaneously.
14 Q  Were you concerned that an officer that you knew had been
15    shot?
16 A  Absolutely.
17 Q  Was it a stressful situation just hearing that there was
18    a shooting going on, or a shooting had occurred?
19 A  Well, it's stressful, but, yeah. It was -- I mean, it
20    was different. You don't hear that on the radio.
21 Q  Are you aware of any -- other than Mr. Merrill, are you
22    aware of any deaths within, say, an hour or two of a
23    taser being used in the City of Saginaw?
24        MR. REISING: I'm sorry, I don't understand
25    that question.

(Pages 46 to 49)

Page 50

1   Q   (BY MR. FELTY) I said, are you aware of any subject,
2       other than Mr. Merrill, dying within an hour or two of
3       the use of a taser?
4   A   In Saginaw?
5   Q   Yes, in Saginaw.
6   A   Not that I have ever heard of.
7   Q   Okay. Just wondered.
8   A   Oh.
9   Q   All right. So you were heading towards that incident
10      when what happened?
11  A   As I was -- I was -- it would be going east on Hess
12      Street right at -- basically, almost right at Washington.
13      Central put out a call for a male in the street jumping
14      in front of cars on Washington.
15  Q   Is that what you heard?
16  A   Yes.
17  Q   Okay. So you heard central dispatch -- and you didn't
18      have a partner, correct?
19  A   Correct.
20  Q   You were riding alone in your car?
21  A   Correct.
22  Q   Was your car video equipped?
23  A   I know it had one in there, but I know my car also the
24      video was down for a long time. So I don't remember
25      whether it was down this time or when the times it was

Page 51

1       down.
2   Q   Did you use the same car every day?
3   A   Yes.
4   Q   How long had you used that car?
5   A   I'd say the beginning of the year is when we change cars.
6       But I'm trying to think. I think I had it the year
7       before that, too.
8   Q   Did other officers vary in the cars that they used?
9   A   Um-hum.
10  Q   Is that yes?
11  A   Yes, sorry.
12  Q   Why did you have one that you always used?
13  A   We typically always used the same ones. But if your car
14      was down, you had to use another one. Community police
15      would use whatever was available. So patrol generally
16      had their own vehicle.
17  Q   If your video wasn't working, were you required to submit
18      any documentation or make a report to the department that
19      the video was down?
20  A   We would have had to tell somebody.
21  Q   How did you do that?
22  A   It was either verbally to the sergeant or -- let's see,
23      at that time I'm not sure if we had an email system that
24      we could write up, too. I'm not sure if that was
25      implemented at that time or if it was --

Page 52

1   Q   Would you do before your shift started or -- I shouldn't
2       say that -- before you went out on the read, would you do
3       an inspection of your vehicle? Is that something that
4       you had to do?
5   A   Um-um.
6   Q   Is that yes?
7   A   Yes. Sorry.
8   Q   And did the vehicle inspection include checking to see if
9       video was working?
10  A   Yes.
11  Q   Would you have any check lists that you followed?
12  A   No.
13  Q   Just routine and custom?
14  A   Yes.
15  Q   And if you noticed that the video or audio or something
16      wasn't working, is that when you would report it?
17  A   The first time. If this was weeks into it, I wouldn't,
18      because they knew it was down already.
19  Q   Did you have occasions where one day the video would work
20      and the next day it wouldn't?
21  A   Not in my car, no.
22  Q   Did other cars have that situation that you're aware of?
23  A   I would imagine.
24  Q   How did the video --
25      MR. REISING: Don't imagine, please. Don't

Page 53

1       guess.
2   Q   (BY MR. FELTY) How would the video -- how did the video
3       camera in your car work?
4   A   How would it turn on?
5   Q   Yes.
6   A   Either with my overhead lights or by manually flipping it
7       on.
8   Q   Did you have more than one camera in your car?
9   A   No.
10  Q   What would your camera videotape?
11  A   Out my -- well, I might have had two. I'm not sure. One
12      would be in the back seat and then one would be out the
13      front window.
14  Q   Do you know if they both operated at the same time?
15  A   You had to turn on the back seat one.
16  Q   Have you ever seen any video from your car on that day?
17  A   Not from my car, no.
18  Q   I just don't know if I asked this. Do you know if video
19      was working in your car?
20  A   I don't know.
21  Q   Have you ever seen any video from your taser?
22  A   Yes.
23  Q   When did you see the video from your taser?
24  A   Whatever day the reports were written. The day we came
25      back I seen it.

(Pages 50 to 53)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 58

1   toward you?
2   A   He was walking my way.
3   Q   All right. So you didn't need to tell him to come your
4       direction?
5   A   I needed to tell him to come to me. So that way he came
6       directly to me rather than going anywhere else.
7   Q   All right. So when you got out of the car, had he at
8       least -- you hadn't asked him to do anything yet; is that
9       correct?
10  A   When I got out of the car?
11  Q   Yes.
12  A   No.
13  Q   Is it correct?
14  A   Correct.
15  Q   So you got out of the car, he's turning around and
16      walking toward you?
17  A   Correct.
18  Q   Was this in any threatening manner?
19  A   No, except for he had his left hand in his pocket, which
20      I didn't know what he had in there.
21  Q   But you hadn't told him anything at that point?
22  A   I kept telling him to take his hand out of his pocket.
23  Q   At that immediate point? You get out of the car, he's
24      walking toward you, which is what you intend --
25  A   I kept telling him to come here.

Page 59

1   Q   You intend for him to come toward you?
2   A   Correct.
3   Q   I'm talking before you say anything, he's already walking
4       in your direction?
5   A   Yes.
6   Q   All right. He has his hand in his left pocket?
7   A   (No audible response).
8   Q   That's right?
9   A   Um-hum.
10          MR. REISING: You have to answer out loud.
11          THE WITNESS: Yes.
12  Q   (BY MR. FELTY) And you haven't said anything?
13  A   I have been telling him to come over to me.
14  Q   Well, when did you start telling him to come to you?
15  A   Right when I got out of the car.
16  Q   All right. Had he already started toward you --
17  A   Yes.
18  Q   -- is what I'm getting at?
19          All right. When he started toward you, before
20      you said anything to him, was the hand in his pocket?
21  A   Yes.
22  Q   All right. So you got out and you told him to come
23      toward you first, or you told him to get the hand out of
24      the pocket first?
25  A   I said, "Come over here. Take your hand out of your

Page 60

1   pocket."
2   Q   Why did he need to come over to you?
3   A   So I could find out why he was in the middle of the road.
4       Because he was in the center lane. If he went left he
5       was going to run into traffic. If he went right he was
6       going to run into traffic. I had the center lane
7       blocked.
8   Q   Was he committing a crime when you pulled up?
9   A   Yes.
10  Q   What crime?
11  A   Walking in the streets.
12  Q   That's an ordinance violation?
13  A   City of Saginaw, yes.
14  Q   Is it a misdemeanor or infraction?
15  A   I believe it's just a civil infraction in the city.
16  Q   Have you ever written that?
17  A   Yes.
18  Q   When is the last time you wrote one of those before this
19      incident?
20  A   I couldn't tell you.
21  Q   How many times before that incident would you say you
22      wrote one of those?
23          MR. REISING: Objection to relevance.
24          But go ahead and answer the question.
25          THE WITNESS: A handful.

Page 61

1   Q   (BY MR. FELTY) All right. So you tell him to come
2       toward you and take his hand out of his pocket?
3   A   Correct.
4   Q   Does he take his hand out of his pocket?
5   A   No.
6   Q   Never?
7   A   No -- well, when he takes off running he did.
8   Q   All right. And he ran like 20 to 25 feet?
9   A   Correct.
10  Q   Where did he run to?
11  A   He ran right toward the intersection of Washington and
12      Gilmore on the west side of the road. And there was an
13      SUV that was turning onto Gilmore from Washington. He
14      ran to the driver's side door of that car -- of that SUV.
15  Q   What geographic direction did he run?
16  A   Northwest, yes.
17  Q   Okay. So -- all right. And he ran toward a what?
18  A   An SUV that was turning onto Gilmore.
19  Q   Okay. Do you know who was driving the SUV?
20  A   No clue. It was, I believe, a female. But other than
21      that, I don't -- I didn't get no names or anything, no.
22  Q   Did that person stick around?
23  A   No.
24  Q   They just drove off?
25  A   Well, they -- after he tried getting into the car, when

(Pages 58 to 61)

Page 62

1  he turned around, they took off.
2  Q  Where -- was the SUV moving?
3  A  She stopped once he started tugging on the door handle.
4     It was moving, yes.
5  Q  So it was turning?
6  A  Correct.
7  Q  Turning off of Washington?
8  A  Turning west, which would be a right from Washington onto
9     Gilmore.
10 Q  And she's driving and he starts tugging on the door?
11 A  And she stopped.
12 Q  And then she stopped?
13 A  Correct.
14 Q  And the door was locked?
15 A  Must have been.
16 Q  Didn't open?
17 A  Didn't open.
18 Q  And then she drove off?
19 A  Correct.
20 Q  Did you think that perhaps Mr. Merrill was confused at
21    that point in time?
22 A  No.
23 Q  What did you think he was doing?
24 A  Trying to get that car. Take the car.
25 Q  You thought he was trying to take the car in your

Page 63

1     presence?
2  A  Correct.
3  Q  What led you to believe he was trying to take that car?
4  A  Why else would he try to get into the front seat of a
5     driver's seat?
6  Q  He was confused? By this time he had run 20 to 25
7     feet --
8  A  Correct.
9  Q  -- is that right?
10 A  Yes.
11 Q  And his hands were then -- or his left hand was out of
12    his pocket?
13 A  As I recall, yes.
14 Q  And his right hand was out of his pocket?
15 A  Correct.
16 Q  You didn't see any weapons in his hands?
17 A  No.
18 Q  Did you think he was trying to carjack a moving car? Is
19    that what you're saying?
20 A  Possibly, yes.
21 Q  Is that something you observed as a police officer,
22    people trying to steal a moving car?
23 A  I haven't observed it, but I have seen -- or heard of it
24    happening a lot in the city.
25 Q  And that's what you thought he was going to do?

Page 64

1  A  Yes.
2  Q  Okay. But that person, they stopped, he tugged on the
3     door --
4  A  He couldn't get in so she drove away.
5  Q  Did it appear that she recognized him?
6  A  No.
7  Q  And then she just drove away?
8  A  Correct.
9  Q  And then what happens next?
10 A  Then there was a car that was east on Gilmore at the
11    intersection of Washington and he went and jumped on the
12    trunk of that car.
13 Q  How did he jump on the trunk of that car?
14 A  Ran over and jumped on the trunk.
15 Q  Like when you say jump on it, he got up on his feet and
16    was jumping on the trunk?
17 A  No, he jumped and was kind of like sitting on the back of
18    the trunk on his hands and knees.
19 Q  So he climbed all the way up onto the trunk of the car?
20 A  Correct.
21 Q  And that car was stopped at a light?
22 A  At the stop sign.
23 Q  At the stop sign?
24 A  Yes.
25 Q  And what did that car do?

Page 65

1  A  It stopped.
2  Q  Did it stay there?
3  A  Yes.
4  Q  For the entire incident?
5  A  For most of it. Because then he tried to get into that
6     car.
7  Q  So he gets on the trunk of that car?
8  A  Correct.
9  Q  On his knees?
10 A  Correct.
11 Q  And how long does he stay on the trunk of this car?
12 A  A couple seconds until the car stopped.
13 Q  So he got onto the trunk of a moving car?
14 A  Correct.
15 Q  All right. So he gets on it and it stops?
16 A  Correct.
17 Q  At the stop sign?
18 A  Correct.
19 Q  And then he gets off once it stops?
20 A  Correct.
21 Q  Then what does the guy that is driving the car do?
22 A  I believe it was his driver's side window, he like tugged
23    on the back door, and then he reached through the
24    driver's side window trying to unlock the back door of
25    that car.

(Pages 62 to 65)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 66

1   Q   I asked what the driver did.
2   A   He was sitting there.
3   Q   Sitting there waiting for the stop sign?
4   A   No, just sitting there because Bobby was on his car so he
5       didn't want to move. And then he was trying to get in
6       the car, so he didn't want to move because his arm was in
7       the car.
8   Q   So he didn't like take off in --
9   A   Not at that point.
10  Q   -- fear anything?
11  A   He did in a minute.
12  Q   How long does he sit there?
13  A   I'm not sure. It's -- I believe it's on the video. So
14      whatever -- however long the video shows him there.
15  Q   Did you see that video where that happens?
16  A   Yeah.
17  Q   What was that video taken with?
18  A   The taser camera.
19  Q   All right. So you already had your taser out at that
20      point?
21  A   Um-hum.
22  Q   Is that yes?
23  A   Yes.
24  Q   Had you made any commands to him at that point?
25  A   To get down on the ground.

Page 67

1   Q   When did you make that command?
2   A   Right as I started pulling out my taser.
3   Q   Okay. So when did you started pulling out your taser?
4   A   Right as he was trying to get into the -- he was reaching
5       through the door of the car trying to unlock the back
6       door.
7   Q   And you've watched the video --
8   A   Um-hum.
9   Q   -- right?
10  A   Yes.
11  Q   And it has audio?
12  A   Yes.
13  Q   All right. So what are you saying to him on that video?
14  A   Get down on the ground now.
15  Q   All right. And he doesn't get down?
16  A   Correct.
17  Q   And are you thinking that you're protecting this driver
18      of the car at that point in time?
19  A   Yes.
20  Q   Before you tase -- before you deploy your cartridges,
21      does the individual in the car drive off?
22  A   No.
23  Q   When does he drive off?
24  A   I believe it's in the report somewhere here. It would be
25      after I deployed the taser the second time it looks like.

Page 68

1       The second cartridge.
2   Q   What color was the SUV that he went up to?
3   A   I don't recall.
4   Q   Was it a man or a woman?
5   A   A female driver, I believe.
6   Q   What race?
7   A   I don't recall.
8   Q   And then the car, do you remember what the man looked
9       like?
10  A   Whatever is on the taser video.
11  Q   All right. Was there any video of the -- do you have any
12      video of the SUV?
13  A   No.
14  Q   Is him on -- him on the trunk of the car is not on the
15      taser video; is that right?
16  A   It would not be, no.
17  Q   Could you tell if he knew the guy that was driving the
18      car?
19  A   I knew he didn't, because the driver kept pushing him
20      away eventually and telling him to get away.
21  Q   Did you hear what the driver was saying to him?
22  A   No.
23  Q   So you don't know if he said, "Bobby, get away"?
24  A   (No response).
25  Q   No?

Page 69

1   A   No, sorry.
2   Q   The person obviously wasn't concerned enough to stick
3       around to make a report to you of this gentleman trying
4       to get into his car?
5   A   I don't know if he did or not.
6   Q   Did you ever talk to this individual?
7   A   I didn't, because he sped away.
8   Q   At any point in time as this is going on, did you think
9       that perhaps Mr. Merrill was either under the influence
10      or had some type of mental disorder?
11  A   I don't know if I would say if I thought he had a mental
12      disorder. Maybe under the influence of something.
13  Q   Did you have any thoughts of what he might be under the
14      influence of?
15  A   No.
16  Q   How far away were you from Mr. Merrill when you pulled
17      your taser?
18  A   When I pulled it, I was still next to my car in the
19      center lane. So two lanes.
20  Q   And a lane is, what, 18 feet or something like that?
21  A   I'm not sure what they are.
22  Q   Sixteen?
23          MR. REISING: You mean you're talking about
24      width?
25          MR. FELTY: Yes.

(Pages 66 to 69)

Page 74

1  Q  I have the video, but not with me. And that's not really
2     what I want to see. I don't really want to see the
3     video. I want to see where you were, if you're capable
4     of sketching it. Actually, probably you should use a
5     pen.
6        I know as a police officer you're capable of
7     sketching an intersection.
8  A  (Indicating).
9        MR. REISING: Make sure you mark the north on
10    there, too.
11       MR. FELTY: You can certainly look at it before
12    I look at it.
13       THE WITNESS: (Indicating).
14       MR. REISING: So what are these two -- what
15    does that represent?
16       THE WITNESS: Me.
17       MR. REISING: That's you. So I want you to put
18    your initials -- print your initials right next to that.
19       THE WITNESS: (Indicating).
20       MR. REISING: There you go.
21       (Exhibit Number 1 marked for identification by
22       the reporter).
23 Q  (BY MR. FELTY) All right. Looking at what has been
24    marked a Exhibit 1, you have labeled north? You have
25    labeled Washington, right?

Page 75

1  A  Correct.
2  Q  And this is your patrol car?
3  A  In the turn lane, yes.
4  Q  All right. So your patrol car is heading northeast?
5  A  It would be facing that way.
6  Q  Okay. Your patrol car is facing southwest?
7  A  Southwest, yes, sir.
8  Q  And over here off to the west is Gilmore?
9  A  Correct.
10 Q  You have written the car that Bobby was by trying to get
11    in?
12 A  Correct.
13 Q  And this is you out in what lane?
14 A  I would say the curb lane, if I remember, or middle.
15    Right around the middle or the curb lane.
16 Q  All right. So the middle of the southbound lane?
17 A  Correct.
18 Q  And Bobby is looking what direction along the car?
19 A  The car is going that way. Bobby is facing that way.
20 Q  All right. And you're walking up to him?
21 A  That way, correct.
22 Q  And so that -- if I draw -- I'll let you draw a little
23    arrow.
24 A  (Indicating).
25 Q  And is that where you are when you deployed the taser?

Page 76

1  A  Yes.
2  Q  All right. How long are the leads on the --
3  A  Twenty-five.
4  Q  All right. Do you know about how far away you were when
5     you deployed it?
6  A  Twenty, maybe.
7  Q  All right. And what I was trying to establish is whether
8     Mr. Merrill, Bobby, was in any way facing you. And it
9     doesn't appear, based upon the sketch, that he was facing
10    you; is that correct?
11 A  No. He was facing the back of the car, but he was
12    looking at me.
13 Q  All right. So he had his head turned looking at you?
14 A  Correct.
15 Q  But his shoulder and right side was kind of toward you?
16 A  Correct.
17 Q  At any time had you seen him pick up anything, or have
18    anything in his hand up to this point?
19 A  No.
20 Q  Has he made any threat to you?
21 A  No.
22 Q  So what was your purpose of deploying the taser? Was
23    that to protect the driver from something?
24 A  To keep him from getting into that car.
25 Q  Okay. Did you hit Bobby with your probes?

Page 77

1  A  Obviously not, because it had no affect on him.
2  Q  What happened to your probes?
3  A  They -- I don't know. They must have got stuck in his
4     coat, because he had a coat on.
5  Q  And what did you aim at? His right side?
6  A  His right side, yes.
7  Q  Like his -- what area? Like the --
8  A  Upper torso.
9  Q  Okay. Did you see the probes go into his coat?
10 A  No.
11 Q  Are you aware of anybody else shooting probes into his
12    right side?
13 A  Not that I remember, no.
14 Q  So you shoot the probes. Do you find probes on the
15    ground?
16 A  I don't remember.
17 Q  Okay. And you said, obviously, it didn't work?
18 A  Correct.
19 Q  Why is it obvious that it didn't work?
20 A  Because it didn't have the desired effect of
21    incapacitating him and making him --
22 Q  All right. Now, when you say it didn't work, do you mean
23    that it didn't make a contact and didn't cycle?
24 A  Correct. Well, it cycled, but it didn't have contact
25    with him.

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 78

1  Q  Because he didn't --
2  A  The probes didn't make contact.
3  Q  Because it didn't have the desired effect?
4  A  Correct.
5  Q  Now, are you aware of probes making contact and being
6     properly cycled and not having the desired effect --
7  A  Yes.
8  Q  -- on individuals?
9  A  Yes.
10 Q  How are you -- you have used the word obviously, and
11    that's why I'm asking you. So why are you saying
12    obviously it didn't work? Is it possible that they made
13    contact, that you cycled it and it just didn't cause him
14    to go down?
15 A  It didn't have the desired effect, that's why I put
16    obviously. It obviously didn't have the desired effect.
17 Q  Are you saying -- I just want to be clear. Are you
18    saying obviously the probes did not make contact?
19 A  No.
20 Q  Okay. So you don't know?
21 A  I don't know.
22 Q  It's possible that they made contact?
23 A  They could have.
24 Q  How many times did you cycle?
25 A  That taser cartridge?

Page 79

1  Q  Yes?
2  A  Twice.
3  Q  All right. You cycled that one twice, so that's ten
4     seconds?
5  A  Yes.
6  Q  Because it goes for five, shuts off, starts again, right?
7  A  Um-hum.
8  Q  Yes?
9  A  Yes, I'm sorry.
10 Q  How much, if any, time between -- well, let me clarify
11    this first. Once you cycle it the first time, how do you
12    know that its stopped cycling?
13 A  There is a countdown on it, and it also just stops. The
14    arcing of the electricity stops.
15 Q  Okay. So you can hear it?
16 A  Correct.
17 Q  And I'm guess at this point in time you're more listening
18    than looking at a countdown, right?
19 A  Exactly.
20 Q  So you know at some point in time it stops, right?
21 A  Um-hum. Yes.
22 Q  And then you pull it a second time?
23 A  Yes.
24 Q  And that goes for another five seconds?
25 A  I believe.

Page 80

1  Q  Did you wait any time between doing it?
2  A  I don't know.
3  Q  Were you trained to wait any time between?
4  A  No.
5  Q  Okay. So at that point you have cycled it twice?
6  A  Correct.
7  Q  You take that cartridge off?
8  A  Correct.
9  Q  And what do you do with that cartridge?
10 A  Drop it on the ground.
11 Q  All right. What is left of the cartridge? What does it
12    look like once you've shot the probes, the darts out?
13 A  It's just a plastic cartridge with wires coming out of
14    it.
15 Q  You throw that on the ground?
16 A  Correct.
17 Q  And you have another spare cartridge on your duty belt?
18 A  Correct.
19 Q  And you load the gun again?
20 A  Correct.
21 Q  What is Bobby doing while you load the gun?
22 A  I don't remember. I'd have to see the video.
23 Q  Why did you write Bobby as opposed to Mr. Merrill in your
24    report?
25 A  I typically just use first names.

Page 81

1  Q  Did you know him?
2  A  No.
3  Q  Was that your regular area?
4  A  No.
5  Q  So the vehicle -- he still is trying to get into this car
6     when you pull out the second probe?
7  A  I don't remember. I would have to see the video and
8     compare it.
9  Q  All right. At some point you do put the other -- you put
10    a new cartridge in?
11 A  Correct.
12 Q  And are there leads or anything? How does this work?
13    The first one you fire, there is a wire connected to your
14    gun and --
15 A  To the cartridge.
16 Q  To the cartridge, and then that goes to the probes
17    connected to him?
18 A  Correct, yes.
19 Q  So when you threw that on the ground, do you know where
20    the other end of it was?
21 A  No.
22 Q  And so you put the next one in?
23 A  Correct.
24 Q  And do you immediately fire it?
25 A  Yes.

(Pages 78 to 81)

Page 82

1  Q  All right. Now, before you fired the first time, did you
2     say anything to Bobby about, "I'm going to tase you"?
3  A  Before I fired the first time?
4  Q  Yes.
5  A  Not that I recall.
6  Q  Is that something you customarily do, warn somebody, "I
7     have got a taser. I'm going to tase you"?
8  A  Not necessarily.
9  Q  Why?
10 A  Because they can visually see it. And the presence alone
11    typically makes them comply.
12 Q  All right. Presence alone typically makes them comply.
13    That's presence of you?
14 A  Of the taser.
15 Q  Of the taser. Your effort is to de-escalate?
16 A  Correct.
17 Q  Do you take every reasonable approach to try to
18    de-escalate the situation?
19 A  At that point, I felt I did. I told him to get down. He
20    refused. He was not complying -- or listening to
21    commands.
22 Q  When did you tell him to get down?
23 A  I'd say while I was tasing him I told him.
24 Q  Before you started tasing him, did you tell him to get
25    down?

Page 83

1  A  I don't recall. I would have to see the video. It's on
2     the video.
3  Q  What did you aim for when you deployed the second
4     cartridge?
5  A  I believe just his front torso.
6  Q  All right. So like the chest?
7  A  Yes.
8  Q  Was he facing you at that point?
9  A  I believe so.
10 Q  So he's facing you. Does that mean he's not trying to
11    get into the car?
12 A  I don't remember at what point, but I do remember he
13    turned with his back towards the car and was reaching
14    through facing me trying to unlock the back door. But I
15    don't remember where.
16 Q  Had you moved your position by the time you fired the
17    second cartridge?
18 A  Possibly a couple feet, but nothing --
19 Q  Pretty much you're still in that --
20 A  I believe so, yes.
21 Q  -- lane?
22        All right. So you deploy the second cartridge?
23 A  Correct.
24 Q  How many times did you cycle?
25 A  Cycled the second cartridge? I don't recall. I know a

Page 84

1     couple, a few.
2  Q  Did anybody tell you how many times you cycled it?
3  A  No.
4  Q  All right. Now, when you say a couple, you mean two?
5  A  I would say more than that.
6  Q  How many do you think?
7  A  Four, five maybe.
8  Q  Had you an understanding that it would be appropriate to
9     cycle a cartridge five times if it was engaged in a
10    person?
11 A  But it had no affect on him, so it wasn't --
12 Q  All right. Well, let me ask you this: The first one you
13    threw off because you didn't believe it had a contact,
14    right?
15 A  Correct.
16 Q  So there is no point in continuing to cycle it unless you
17    believe there is a contact, right?
18 A  Correct.
19 Q  So when you cycled that four or five, or however many
20    times the report says that, you thought there was a
21    contact, right?
22 A  No.
23 Q  Why would you continue cycling it if you didn't think
24    there was a contact?
25 A  Because he was moving and I hoped a movement of -- maybe

Page 85

1     fell into his coat or something. I thought maybe a
2     movement that he was making could have made it have a
3     contact.
4  Q  So is it just very light contact, to your understanding,
5     that just needs to touch the skin?
6  A  I believe so.
7  Q  All right. So because the -- if you're in drive stun
8     mode, it's just a little metal prong that touches the
9     body, right?
10 A  Just the end of the taser.
11 Q  It doesn't penetrate the skin?
12 A  Correct.
13 Q  So sometimes, if I'm understanding, when the darts are
14    fired, sometimes they will actually penetrate and leave
15    marks in the skin?
16 A  Correct.
17 Q  And then other times they don't penetrate and leave marks
18    but can still make contact?
19 A  Correct.
20 Q  That's what you were hoping was happening?
21 A  Correct.
22       MR. REISING: Or would happen.
23       THE WITNESS: Or would, correct, by his
24    movements.
25 Q  (BY MR. FELTY) And you're assuming that contact wasn't

(Pages 82 to 85)

Page 86

1  made because he didn't go down?
2  A  Correct.
3  Q  At the time that you're cycling the taser, is there any
4     other officer on the scene that you're aware of?
5  A  No.
6  Q  Okay. So what is Bobby doing while you're cycling this
7     four or five times? Is he staying in place?
8  A  No, he's trying to get into my driver's side of my patrol
9     car.
10 Q  How does he make it from this car over in this area to
11    your patrol car?
12 A  Walked.
13 Q  What are you doing while he's walking?
14 A  At that time I started backing up, getting on the
15    passenger side of my car to keep the car between us.
16 Q  And you have locked the doors?
17 A  I must have. I don't know when, but I must have.
18 Q  And what does he do?
19 A  Keeps trying to pull on the door handle to get in the
20    car.
21 Q  All right. Was he in anyway threatening you?
22 A  No.
23 Q  So were you protecting property at that point in time
24    when he's walking over to your car?
25 A  What do you mean?

Page 87

1  Q  What is your role at this point in time? I mean, what is
2     your goal?
3  A  To get him out of traffic.
4  Q  Okay. Is he threatening anybody?
5  A  Yes.
6  Q  Who is he threatening?
7  A  The two peoples' car that he tried to get into.
8  Q  All right. But is that done with?
9  A  At that point, yes.
10 Q  All right. Is there anybody else around that is in
11    danger other than himself?
12 A  Me.
13 Q  What was your danger?
14 A  Because I'm in the middle of traffic.
15 Q  Was he presenting a danger to you?
16 A  Yes, because he wasn't complying -- or he wasn't
17    listening to my commands.
18 Q  All right. What was the danger that he was presenting to
19    you by not listening to a command?
20 A  As in what?
21 Q  Is there one? He was putting you in danger you said
22    because he wasn't listening to your commands. So what
23    was the danger that he was putting you in?
24 A  Because I'm in the middle of traffic trying to get him to
25    comply and he wouldn't.

Page 88

1  Q  All right. Was traffic driving by?
2  A  I believe it was stopped, but I don't know. I know the
3     cars off Gilmore were going. Like the guy -- the first
4     car he tried to get into, or the second car, they were
5     going. So traffic was moving, but I don't know if it was
6     moving in the lanes.
7  Q  At this point in time, do you think he's -- what are your
8     thoughts about his mental state?
9  A  Mental? I don't know about mental.
10 Q  Do you think he's acting normally?
11 A  Under the influence of something.
12 Q  Does that play any role in what you're doing at that
13    point in time?
14 A  No.
15 Q  Were you afraid for yourself?
16 A  Yes.
17 Q  What were you afraid of?
18 A  Him coming after me.
19 Q  How far are you keeping between you and him?
20 A  Just the length or the width of the car.
21 Q  But you've got the car between you?
22 A  Correct.
23 Q  And you don't think he's got a weapon on him?
24 A  I'm not sure. Because I still don't know what is in his
25    left pocket.

Page 89

1  Q  Did you ever see him go back into the left pocket?
2  A  No.
3  Q  Where are his hands when he's going around the car?
4  A  Trying the door handles.
5  Q  All right. So is he using both hands?
6  A  I don't know. Whatever the video says.
7  Q  Did you keep his hands in your view?
8  A  Tried.
9  Q  And were you able to?
10 A  Yes and no.
11 Q  Was there at any time that you thought that he had
12    acquired a weapon and was posing a threat to you?
13 A  Still didn't know, because I don't know what's in his
14    left pocket. Why was he in his left pocket earlier?
15 Q  That was earlier?
16 A  Correct.
17 Q  Are you continuing to give him commands as you're walking
18    around the car?
19 A  I would imagine.
20 Q  Do you recall what you were commanding him?
21 A  No.
22 Q  Were you watching the video as you were writing the
23    report?
24 A  I would imagine.
25 Q  Were you trying to write down the commands that you were

(Pages 86 to 89)

Page 90

1  giving him as he was walking around the car?
2  A  Not that I recall. I don't know.
3  Q  How are you radioing in? You radioed a request for
4     assistance?
5  A  Correct.
6  Q  And what is he doing while you're radioing in?
7  A  He was still, I believe, on the passenger -- or driver's
8     side of my car.
9  Q  You had a radio, obviously, attached --
10 A  Right to my chest area on the buttons of my shirt.
11 Q  Had you holstered the taser?
12 A  No.
13 Q  What hand is the taser in? Do you use your right hand
14    with your taser?
15 A  Yeah, I use both.
16 Q  What do you usually use for your mic, both?
17 A  Whichever one, yeah.
18 Q  How long after you radioed for assistance was it that you
19    observed another officer on-scene?
20 A  I couldn't tell you the exact time. I don't know. They
21    would have the records of that.
22 Q  What do you describe his level of resistance at as he is
23    walking around your car?
24 A  Assaultive.
25 Q  How is it assaultive?

Page 91

1  A  Because at one point he starts chasing me around the car.
2  Q  When does he start chasing you?
3  A  Let me check the report. It was after the second taser
4     attempt. After them cycles.
5  Q  Where did you write that he was chasing you?
6  A  In the report.
7  Q  Where?
8  A  Right there.
9         MR. REISING: What page?
10        THE WITNESS: Page 2 of 3, paragraph --
11    starting to count from the top, one, two, three, second
12    line up from the bottom.
13 Q  (BY MR. FELTY) "As Bobby continued to walk around my
14    vehicle, I kept retreating and using the vehicle as a
15    barrier because I was still the only officer on the
16    scene. He then took off running around the front of the
17    vehicle toward the driver's side where I was apparently
18    trying to chase me."
19 A  Or "he". Mistake in my writing.
20 Q  How was it -- he was apparently trying to chase you?
21 A  Because I was standing on the front -- why else would he
22    come around, I guess? Why would he take off running
23    towards me? And then I retreated to the back of the
24    vehicle and he continued to go back around towards me
25    again.

Page 92

1  Q  "I again retreated to the rear of the vehicle and Bobby
2     turned and went around the front of the vehicle back
3     toward the passenger side."
4        So you're saying you retreated to rear of the
5     vehicle, and Bobby turned and went to the front of the
6     vehicle?
7  A  Took off running around the front of the vehicle back
8     towards the passenger.
9  Q  Opposite where you were?
10 A  The way I was running. I was running from the driver's
11    side to the back of the car. He was going from the front
12    of the car around to the passenger side.
13 Q  You retreated to the rear of what side of the vehicle?
14 A  At that time I was on the driver's side and I went to the
15    back. Because he came around the front of the car
16    towards the driver's side.
17 Q  And it says he went around to the front toward the
18    passenger?
19 A  Once he came around, then he went back towards the
20    passenger once I went to the back of the car to try to
21    get away.
22 Q  Was he saying anything to you?
23 A  No.
24 Q  So then you hear sirens approaching from the north and
25    they catch Bobby's attention?

Page 93

1  A  Correct.
2  Q  He is standing at the front passenger side corner of your
3     vehicle with his back toward you?
4  A  Correct.
5  Q  Where are you at this point?
6  A  Driver's side door area.
7  Q  Isn't that where you were when he was going to the back
8     of the passenger side?
9  A  Once he went around the front, I went to the back. Then
10    he turned and looked towards the sirens. So then I went
11    back up to the front of the car on the driver's side
12    keeping the car between us.
13 Q  When does he turn -- when does he -- he's standing at the
14    front passenger side with his back toward you?
15 A  When he hears the sirens coming.
16 Q  All right. So he turns around and he's paying attention
17    to the sirens?
18 A  Correct.
19 Q  At this point in time, his attention is directed to that?
20 A  Correct.
21 Q  Is he done chasing you at this point?
22 A  Yes.
23 Q  Are you saying anything to him when his back is towards
24    you and he's looking at the sirens?
25 A  I don't know. Whatever the video shows.

(Pages 90 to 93)

Ripka, Boroski & Associates, LLC                    email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660      Firm Registration No. 008139

Page 94

1  Q  Did you have another taser cartridge?
2  A  Yes.
3  Q  So you put in another taser cartridge?
4  A  Correct.
5  Q  And you fire it at him?
6  A  Correct.
7  Q  This is while his back is toward you?
8  A  Correct.
9  Q  Are you telling him, "I'm putting in a taser cartridge
10    and I'm shooting it at you"?
11 A  No.
12 Q  He's standing in place --
13 A  Yup.
14 Q  --right?
15 A  Yes.
16 Q  He's not running off?
17 A  Correct.
18 Q  He doesn't have any weapons is his hands?
19 A  No.
20 Q  He's not saying anything to you?
21 A  Nope.
22 Q  He's listening to sirens because he hears police officers
23    are coming?
24 A  Correct.
25 Q  At that point in time, does it occur to you, okay, he's

Page 95

1  hearing sirens. Perhaps this situation is de-escalated?
2  A  No.
3  Q  Why?
4  A  Because it hasn't de-escalated yet, so why would it now?
5  Q  What was your goal in all of this? Was it to get him to
6    stop?
7  A  Yes.
8  Q  All right. You wanted to get him to stop so you could
9    talk to him?
10 A  Well, at that point -- at that point or in the whole in
11    general?
12 Q  At that point, you wanted to get him to stop?
13 A  At that point, we needed to get him to stop and he's
14    going -- I mean, he's going to be put into custody.
15 Q  Okay. So you want him to stop and you want to try to
16    make an arrest?
17 A  Correct.
18 Q  What did you -- he stopped, right? He's not looking at
19    you?
20 A  Correct.
21 Q  He's not threatening you?
22 A  Correct.
23 Q  He's not threatening anybody?
24 A  Nope.
25 Q  He's not in the middle of the road?

Page 96

1  A  He is.
2  Q  Is he in danger of being hit by a car at this point in
3    time?
4  A  We're right in the middle of traffic so --
5  Q  But --
6  A  -- if traffic starts moving, then, yes.
7  Q  You're saying you're in the middle of traffic, and that
8    makes it sounds like there are cars going back and forth.
9  A  Okay.
10 Q  On the video there are not cars going back and forth, are
11    there?
12 A  I don't know. I don't remember.
13 Q  Do you remember, as you're out there, cars going back and
14    forth by you guys?
15 A  I wasn't really paying attention to the vehicles.
16 Q  All right. Okay. So he's stopped there and what do you
17    say to him, anything?
18 A  I don't recall.
19 Q  Bobby, come here?
20 A  No.
21 Q  Bobby, you're under arrest?
22 A  No.
23 Q  Put your hands-on your head?
24 A  No.
25 Q  How much time is he standing there with his back toward

Page 97

1  you?
2  A  Five seconds maybe, if that.
3  Q  So that's like 1001, 1002, 1003, 1004, 1005?
4  A  But his back wasn't towards me the whole time, because I
5    was making my way from the front of their -- from the
6    back of the car.
7  Q  But he's not posing a threat to you then?
8  A  No, not directly.
9  Q  Okay. So you attempt to deploy your final taser
10    cartridge in an attempt to subdue him?
11 A  Correct.
12 Q  And avoid a physical confrontation due to size?
13 A  Correct.
14 Q  So you fire it at his back?
15 A  Correct.
16 Q  Does it hit his back?
17 A  I don't know.
18 Q  Did you miss?
19 A  I don't know how.
20 Q  They go pretty fast?
21 A  Correct.
22 Q  Typically, penetrate leather?
23 A  No.
24 Q  Did you think it -- did he have a leather jacket on at
25    that point?

(Pages 94 to 97)

### Page 98

1  A  It wasn't leather, I don't believe.
2  Q  Was it cloth?
3  A  I think it -- it was not leather, but, yeah.
4  Q  So you think the probes hit him?
5  A  No. Oh, I think the probes hit his jacket. I don't
6     think it hit him, no.
7  Q  Did you cycle?
8  A  Um-hum.
9  Q  Is that yes?
10 A  Yes.
11 Q  Okay. Now, you deployed a probe. Does it automatically
12    cycle when it makes contact?
13 A  It automatically cycles when you pull the trigger. When
14    you shoot the probes.
15 Q  Okay. So you've got five seconds?
16 A  Correct.
17 Q  And did you recycle it?
18 A  I don't know.
19 Q  Do you know how many times you pulled the trigger with
20    that cartridge in?
21 A  I don't know.
22 Q  Does he move after he's hit with the probes?
23 A  I don't remember.
24 Q  Does he turn toward you?
25 A  I don't know. Whatever the video shows. I don't

### Page 99

1     remember what he did.
2  Q  What do you remember doing next?
3  A  I remember Officer Wietecha and somebody else coming up.
4  Q  So are you facing and watching Wietecha come up?
5  A  Correct.
6  Q  And is Bobby facing Officer Wietecha?
7  A  Yes.
8  Q  You're still behind him then --
9  A  Yes.
10 Q  -- as Officer Wietecha --
11 A  I'm coming around the front of my car.
12 Q  Are you positioning yourself, the two of you, to take him
13    down?
14 A  Just to get out of the way. Just to --
15 Q  Get out of the way of what?
16 A  -- get over by them to help them if they need anything.
17    To get with the other officers that are showing up.
18 Q  Are they both coming at the same time?
19 A  Down the road?
20 Q  Is Wietecha out of his car?
21 A  He's out, yes.
22 Q  Okay. It's Wietecha and Guest?
23 A  Yes.
24 Q  Are they walking or approaching together?
25 A  I don't remember when Officer Guest was there. Wietecha,

### Page 100

1     yes.
2  Q  Okay. And you see him coming?
3  A  Correct.
4  Q  Is there any contact, communication that you have with
5     Officer Wietecha as he's walking up?
6  A  Yes.
7  Q  What contact do you have?
8  A  I told him that my -- I had no more taser cartridges and
9     they were unsuccessful on him.
10 Q  Okay. And he is not running at this point?
11 A  No.
12 Q  Standing in place?
13 A  Correct.
14 Q  Facing Wietecha?
15 A  Correct.
16 Q  He's not threatening?
17 A  Well, his hands come down into a fighting stance.
18 Q  His hands come down from what?
19 A  He was standing like this as they came up. As they were
20    approaching, when they get out of his car -- or when they
21    get out of their cars, then he came down and balled his
22    fists up.
23 Q  You say they?
24 A  Wietecha and Guest.
25 Q  Okay. So they are both approaching together?

### Page 101

1  A  Wietecha, I guess. There was another car coming. I
2     don't know when it got there.
3  Q  All right. So are you telling him to put his hands up?
4  A  I'm sure somebody was. I don't know.
5  Q  Is he doing it in a surrender position? Is that what you
6     interpreted it as?
7  A  At first, yes.
8  Q  So did you think he was being compliant? Like this is a
9     de-escalation when his hands are going up?
10 A  Could be.
11 Q  And then Wietecha comes?
12 A  Correct.
13 Q  And he pulled his hands down and balled his fists?
14 A  Correct.
15 Q  Where does he pull his hands down to?
16 A  Like right chest area. Kind of to his side.
17 Q  And balled means he pulled them to his chest area and
18    he's got fists?
19 A  Fists correct.
20 Q  Is he clenching his teeth?
21 A  I don't know.
22 Q  Well, you wouldn't, because he's got his back to you,
23    right?
24 A  Well, kind of more to the side, because I was at the
25    front of my car at that time.

(Pages 98 to 101)

Page 110

1  A  Basically, anywhere but the neck or the genitals.
2  Q  Did you observe him try to -- or deploy the drive stun?
3  A  I heard it.
4  Q  And what were you doing when you heard it?
5  A  Trying to get his right arm out from underneath him.
6  Q  Okay. And that's because they are tucked under his body?
7  A  Correct.
8  Q  Would, based upon your experience, using the drive stun
9     mode release his arms or tighten them back up?
10 A  Tighten them.
11 Q  So does that mean like in a resistive method?
12 A  Yes.
13 Q  Do you know how many times Madaj used the drive stun?
14 A  No clue.
15 Q  How many times did you hear it?
16 A  I only heard it once, but I don't know how many he did.
17 Q  So if you're down trying to get his hands out from under
18    his body, it sounds to me like, based upon your
19    experience, the drive stun mode would actually inhibit
20    what you were trying to do?
21 A  Yes and no. Because we couldn't get his arms out. He
22    was not listening prior to being drive stunned, so...
23 Q  ==Who is telling him to do things while he's on the ground?==
24 A  ==We all were. We were all telling him to give us his==
25    ==arms. Stop resisting, you know.==

Page 111

1  Q  All right. At some point there is an indication that his
2     hands are going toward his back pockets?
3  A  Correct.
4  Q  Is he putting his hands back behind his back so they can
5     be cuffed?
6  A  That was after he was already cuffed.
7  Q  All right. So how long does it take you guys to get his
8     arms out?
9  A  It seemed like awhile. I mean, but it probably -- 45
10    seconds, a minute, maybe. I don't know.
11 Q  So what is he doing that you believe justifies going
12    beyond hands-on to the use of the drive stun while he's
13    on the ground?
14 A  The resistance.
15 Q  And that's active resistance?
16 A  Yeah.
17 Q  So if he's actively resisting, what did you describe on
18    the level of force to taser?
19 A  Anything above verbal commands.
20 Q  So anytime anything above verbal commands, it's
21    appropriate to use the taser?
22 A  When they are active or passive resistant, yes.
23 Q  So it's okay even passive resisting?
24 A  Um-hum.
25    MR. REISING: Is your answer yes?

Page 112

1     THE WITNESS: Yes.
2     MR. REISING: I just want to make sure he got
3     it in the record. That's all.
4  Q  (BY MR. FELTY) Had you applied knee strikes before Madaj
5     used the stun gun, or the drive stun mode?
6  A  I think it was after.
7  Q  Did the drive stun mode do anything?
8  A  No, not that I recall.
9  Q  Did an officer get a jolt?
10 A  Yes.
11 Q  Who got jolted?
12 A  Officer Guest.
13 Q  Was that surprising, or something that you were aware
14    could happen if an officer's hands are on a person that
15    is being stunned?
16 A  I've seen it happen before.
17 Q  Are there any directives or policies within the
18    department that you were aware of that suggested that
19    drive stun not be used while actively engaging in
20    hands-on?
21 A  No.
22 Q  So the concern of shocking an officer is not something --
23    is that something that is considered when using this
24    drive stun?
25 A  I guess it's not the common thing. It can happen, but

Page 113

1     it's not every time, so...
2  Q  You said you were shocked or hit with the probes before?
3  A  Correct.
4  Q  And that was at Birch Run?
5  A  Correct.
6  Q  How did that go? I mean, what were the circumstances?
7     Did you have an officer on each side holding you?
8  A  Yes.
9  Q  And the device was shot at you?
10 A  Correct.
11 Q  And where were you struck?
12 A  In my back.
13 Q  Did you have any type of protective device or jacket on?
14 A  T-shirt.
15 Q  So did these probes go into your skin?
16 A  Yes.
17 Q  Did they leave puncture holes?
18 A  Yes.
19 Q  How long did it take them to heal, do you know?
20 A  A few days.
21 Q  And you fell down?
22 A  I was held up, but I would have, yes.
23 Q  What did it feel like?
24 A  I'll say kind of like charlie horses throughout my entire
25    body.

(Pages 110 to 113)

Page 114

1  Q  So is that painful?
2  A  Uncomfortable. I wouldn't say it was painful.
3  Q  Did you get a full five seconds?
4  A  Yes.
5  Q  And then once it was done, was there any recovery period
6     for you to get your bearings?
7  A  No.
8  Q  So just as soon as it stopped, you're fine and stand back
9     up?
10 A  Correct.
11 Q  Other than knee strikes and attempting to gain control of
12    Bobby's hands, did you have any other physical contact
13    with him?
14 A  Not that I remember, no.
15 Q  Did anybody hit him in the back of the head?
16 A  I have no clue.
17 Q  Did you see anybody else use physical methods?
18 A  I remember Officer Wietecha doing the baton strikes.
19 Q  What were you doing when the baton strikes were going
20    on?
21 A  I believe still trying to get his hand out from
22    underneath him.
23 Q  That was on the right side?
24 A  I was on the right side, correct.
25 Q  Wietecha was on the left side?

Page 115

1  A  The left side, correct.
2  Q  Where in relation to Bobby's head was Wietecha standing?
3  A  He was, I believe, to his left torso area.
4  Q  So down on the side of his shoulder as opposed to being
5     over the top of him?
6  A  I believe.
7  Q  Over the top of his head?
8  A  I believe, yes.
9  Q  He was not over the top of his head?
10 A  Correct.
11 Q  Did you see where the baton struck?
12 A  No.
13 Q  Did you see anybody else knee Mr. Merrill?
14 A  No.
15 Q  Did anybody punch him?
16 A  I don't know. Not that I know of.
17 Q  Are you aware of any other physical methods that were
18    used on Mr. Merrill?
19 A  No.
20 Q  Was there any blood?
21 A  Not that I remember, no.
22 Q  Did you ever remember seeing blood on Mr. Merrill's face?
23 A  I don't remember it, no.
24 Q  What was it that you believe resulted in successfully
25    cuffing Mr. Merrill?

Page 116

1  A  What do you mean?
2  Q  Well, at some point in time you guys were able to get his
3     hands and get them cuffed, correct?
4  A  Correct.
5  Q  Was there something that you believe was effective?
6  A  Just believe that there was enough of us there to finally
7     be able to take control of him.
8  Q  Do you believe that there was enough of you there to take
9     control of him before Officer Wietecha tased him?
10 A  No.
11 Q  Why?
12 A  Size difference. Just the way he was acting.
13 Q  Do you believe that there was enough of you present once
14    he was on the ground without Officer Madaj tasing him?
15 A  No, because he still wasn't listening, and there was four
16    of us then.
17 Q  All right. He's tased. I think Officer Madaj thought
18    that there were -- that he cycled it multiple times and
19    only a couple were effective. And I may be wrong. I
20    don't remember. But it appears that after Officer Madaj
21    deployed the taser, there was still a period of time
22    where you guys were trying to get his hands; is that
23    right?
24 A  From what I remember, yes.
25 Q  And you had had at least some experience before he was

Page 117

1     tased by Officer Madaj with it appearing that the taser
2     was not effective?
3  A  Correct.
4  Q  And you communicated that to Wietecha before he deployed
5     it?
6  A  Yes. But I -- that was because I didn't know if I made
7     contact. Not that I --
8  Q  You didn't tell him that, did you?
9  A  Correct, no.
10 Q  You just said it wasn't effective?
11 A  Correct.
12 Q  ==All right. You said in your report that, after Bobby was==
13    ==placed in handcuffs, he continued to flare his feet?==
14 A  ==Kicking his feet.==
15 Q  All right. He's face down?
16 A  Correct.
17 Q  Is he kicking at anybody?
18 A  Me and Guest were both down by his feet, so...
19 Q  Was he trying to kick you?
20 A  For all I knew, yeah. I mean --
21 Q  Or was he just sliding around?
22 A  Kicking his feet.
23 Q  Did he ever contact you with his feet?
24 A  I don't think so.
25 Q  Was the situation where he was laying on his chest, and

(Pages 114 to 117)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 122

1  in the car, of kicking?
2  A  Yes.
3  Q  Was that the purpose of the rope?
4  A  Yes.
5  Q  He was under control on the ground when you went and got
6     the rope?
7  A  Not really.
8  Q  Did you think he was able to get up and run with the four
9     of you there?
10 A  Oh, no.
11 Q  Did you think he was able to get up and hurt anybody?
12 A  No.
13 Q  All right. And I guess that the rope was not really
14    intended for any reason directly at that immediate scene;
15    is that fair?
16 A  Just to stop from kicking and for the transport purposes.
17 Q  Was he able to stand up?
18 A  Yes.
19 Q  Did he walk?
20 A  Could have. He didn't.
21 Q  How do you know he could have?
22 A  Because he was able to stand up and he refused to walk.
23    He went to dead weight.
24 Q  Did he stand up on his own?
25 A  No, we helped him.

Page 123

1  Q  Did you hold him up?
2  A  We were with him holding him, yes.
3  Q  Did he have a seizure?
4     MR. REISING: Did he have a what?
5     MR. FELTY: Seizure.
6     THE WITNESS: Not that I know of.
7  Q  (BY MR. FELTY) You're familiar with what they are?
8  A  Yes.
9  Q  Did it ever occur to you that he might had one?
10 A  No.
11 Q  The MMR, that's the Mobile Medical Response?
12 A  Correct.
13 Q  That was requested by Officer Guest?
14 A  Correct.
15 Q  Why was Mobile Medical Response requested?
16 A  Just to come check him out after the tasing incident,
17    after the physical altercation, just to make sure he was
18    okay.
19 Q  Whose idea was it to call Mobile Medical Response?
20 A  Either Guest or Madaj. I think Madaj was.
21 Q  Was there a protocol that required Mobile Medical
22    Response under these circumstances?
23 A  Not that I'm aware of, no.
24 Q  Did you think that it was appropriate to call Mobile
25    Medical Response?

Page 124

1  A  Um-hum.
2  Q  Is that yes?
3  A  Yes.
4  Q  Was it a suggestion that you made?
5  A  No.
6  Q  Did you just agree with it because somebody else
7     suggested it?
8  A  Yes.
9  Q  Did you guys talk about why Mobile Medical Response would
10    be requested?
11 A  Just said we needed MMR to come check him out.
12 Q  Who called it in? Who called?
13 A  Called who?
14 Q  You did it through dispatch, right?
15 A  911 or MMR?
16 Q  MMR.
17 A  Officer Guest did. He requested it through central
18    dispatch.
19 Q  Did you hear him make the request?
20 A  I'm sure I did, but...
21 Q  So it wasn't because, at the time that he was on the
22    ground, that there was a medical emergency?
23 A  No.
24 Q  Was there more than one call made for MMR?
25 A  I just heard -- or remember the one.

Page 125

1  Q  Did you go anywhere from the scene, or did you all stay
2     together --
3  A  (No audible response).
4  Q  -- the four of you?
5  A  During the entire time?
6  Q  Yeah.
7  A  After he was placed in the car, I started -- I left and
8     started picking up the tasers.
9  Q  Okay. But that was after Mobile Medical Response was
10    already called; is that correct?
11 A  Correct.
12 Q  Did you hear the call for Mobile Medical Response?
13 A  I believe. Like I said, I don't remember. I believe it
14    was right there. But I remember hearing Officer Madaj
15    telling them to call for 9 -- or call for MMR.
16 Q  Did you hear him say anything else?
17 A  Not that I remember.
18 Q  You didn't hear him say it's an emergency?
19 A  No.
20 Q  He didn't say when he called that the subject was
21    unresponsive?
22 A  Not at that time, no.
23 Q  Did he ever call and say the subject was unresponsive?
24 A  I think once they were on-scene. Once MMR was already
25    there.

(Pages 122 to 125)

Page 126

1  Q  But you certainly didn't hear a radio call?
2  A  I didn't hear one, no.
3  Q  Saying that he was unresponsive?
4  A  No.
5  Q  You indicated that you have a different type of training
6     now, the medical response training. Did you say that?
7  A  I don't know.
8  Q  Or that must have been your prior -- the prior
9     deposition. I'm confusing the two.
10        MR. REISING: Prior deposition? I don't know
11    what you mean by that, Counsel.
12        THE WITNESS: This is my first one.
13        MR. FELTY: The deposition before this.
14        MR. REISING: Oh, you said his prior
15    deposition.
16        MR. FELTY: No, I said 'the' prior.
17        MR. REISING: 'The' prior deposition.
18        MR. FELTY: Yes.
19        MR. REISING: All right.
20 Q  (BY MR. FELTY) Do you know the different categories of
21    medical calls for an ambulance?
22 A  What do you mean?
23 Q  When did you observe, or when did you become aware that
24    Mr. Merrill was unresponsive?
25 A  When he was in the back of the car and I was picking up

Page 127

1     taser cartridges.
2  Q  And where was your camera? Did you use your camera to
3     photograph a crack pipe and take a picture of Bobby?
4  A  It would have been in my car.
5  Q  Why did you want to take a picture of the pipe?
6  A  So that way later they could charge him with the drug
7     paraphernalia after he got out of the hospital.
8  Q  What did you do with the pipe?
9  A  I turned it over to Sergeant Carpenter, I believe, yeah.
10 Q  Did you pick it up off the ground?
11 A  I must have. Somebody did.
12 Q  Did you?
13 A  Yeah, I must have. And then I would have put it in an
14    evidence bag.
15 Q  Why did you take a picture of Bobby?
16 A  Because what we typically do with reports is we'll put a
17    photo of the suspect, or the victim -- or not victim --
18    but the suspect in with the crack pipe so we can say,
19    "This is who had it." That way if there was a false
20    identification, something later, we can say this is who
21    it was.
22 Q  Do you typically do that while they are laying on the
23    ground?
24 A  At that point, yes.
25 Q  Why.

Page 128

1  A  Because I wanted to get him out of traffic. And I wanted
2     to put where he was, you know, with the crack pipe and --
3  Q  Where was the camera in your car?
4  A  It would have been in my bag.
5  Q  All right. So you wanted to get him out of traffic. And
6     yet you went to the car, got a camera, and came back and
7     took a picture of the crack pipe and him laying on the
8     roadway?
9  A  Correct.
10 Q  It says in your report, "Due to the fact supervisors were
11    tied up at that time with an officer involved shooting, I
12    took the photographs for the report so we could move
13    Bobby out of the busy road for his safety and ours."
14 A  Yes.
15 Q  So, normally, would you take the photos?
16 A  Normally, we would call a supervisor over to take the
17    photos. But waiting ten minutes or 15 minutes wasn't an
18    option.
19 Q  Had you taken photos like that before?
20 A  Um-hum.
21 Q  Is that a yes?
22 A  Yes.
23 Q  All right. It says, "He was refusing to help officers
24    with getting him out of the road"?
25 A  Correct.

Page 129

1  Q  And how did he refuse?
2  A  Well, he refused to walk when we asked him to walk.
3     He -- when we stood him up, he went to dead weight. So
4     we were holding onto him. Picking his feet up.
5  Q  Were talking to him?
6  A  Um-hum.
7  Q  Is that yes?
8        MR. REISING: You have to answer out loud.
9        THE WITNESS: Sorry. Yes.
10 Q  (BY MR. FELTY) Was he talking back to you?
11 A  He, I believe, was talking to Officer Madaj. He wasn't
12    talking to me, no.
13 Q  Did you hear what he was saying?
14 A  He said something about, you know, I'm going to go like a
15    punk or something like that. Meaning he wasn't going to
16    help us.
17 Q  That's what he said to Madaj?
18 A  Correct.
19 Q  Did he say anything else to Officer Madaj?
20 A  Not that I -- not that I heard, no. But I know he told
21    Officer Madaj that he had smoked crack.
22 Q  How do you know that?
23 A  Because Officer Madaj relayed it to us.
24 Q  Where was Bobby Merrill when he told Officer Madaj that
25    he had smoked crack?

(Pages 126 to 129)