# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION


DOROTHY ANDERSON and DEMARQUION
MERRILL, as Co-Personal
Representatives of the Estate of
BOBBY MERRILL, deceased,

        Plaintiffs,

-v-

OFFICER JEFF MADAJ,
individually, OFFICER JUSTIN
SEVERS, individually, OFFICER
BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA,
individually,

        Defendants.
_____/

Case No. 13-11159

HON. THOMAS LUDINGTON


        The Deposition of STEVEN M. WIETECHA, taken before Timothy J. Boroski, RPR/CSR-2378 and Notary Public in and for the County of Clinton, acting in the County of Saginaw, State of Michigan, at the offices of Ripka, Boroski & Associates, 1 Tuscola Street, Suite 301, Saginaw, Michigan, on Thursday, April 24, 2014, commencing at or about 9:10 a.m.

Page 14

1  had deployed his taser and it had no affect on the
2  suspect.
3  Q  Okay. I'm looking at a copy of a report that appears to
4     have been authored by you. It looks like you heard over
5     the radio that there was breaking and entering in
6     progress on Glenwood?
7  A  Correct. That was unrelated.
8  Q  You went to assist. Started to head that way?
9  A  Correct.
10 Q  While en route, Officer Severs pulled onto South
11    Washington and Gilmore. Reference a man that was jumping
12    out in traffic and walking in the road?
13 A  Correct.
14 Q  All right. Is that what you understood that you were
15    going to be encountering?
16 A  While en route?
17 Q  Yes.
18 A  Yes.
19 Q  Then it says R/O, that's reporting officer?
20 A  Correct.
21 Q  "Heard shots fired over the radio, reference Glenwood
22    Street. Reporting officer then went emergency mode and
23    started toward Glenwood. Then heard Officer Severs
24    advise he needed officers to assist quickly."
25 A  Correct.

Page 15

1  Q  "R/O then went and started toward South Washington and
2     Gilmore." Is that what you recall?
3  A  Correct.
4  Q  Do you recall anything else about what you heard over the
5     radio?
6  A  No, not at this time I don't recall.
7  Q  Does that information that you wrote indicate that you
8     believe that there was a crime in progress?
9  A  Yes.
10 Q  What crime?
11 A  Well, he was obviously acting disorderly, okay? And
12    Officer Severs was asking for cars like to step it up.
13    Come quickly. If somebody is complying and acting
14    appropriately, an officer doesn't get over the air
15    distressed saying I need cars now.
16 Q  All right. Jumping out in traffic and walking in the
17    road. Walking in the road, is that a crime?
18 A  Yes.
19 Q  What's the crime?
20 A  Walking in the street where a sidewalk is provided is a
21    civil infraction in the State of Michigan.
22 Q  Are pedestrians precluded from walking on the street if
23    there is a sidewalk?
24 A  If there are sidewalks in the City of Saginaw -- in the
25    State of Michigan, yes.

Page 16

1  Q  What if they are crossing a street?
2  A  Then they can cross a street in designated crosswalk.
3  Q  Did you have any understanding en route whether
4     Mr. Merrill was doing anything inappropriate in being in
5     the street?
6  A  Well, there was multiple 911 calls from motorists
7     advising that he was in the road.
8  Q  Did you hear them?
9  A  No, central dispatch advised.
10 Q  Did you report that anywhere?
11 A  No, it's all -- in central, anything central dispatch
12    reports is documented.
13 Q  Okay. But what I'm asking is, did you hear what central
14    dispatch was reporting?
15 A  Yes.
16 Q  Okay. Why don't you document in your report what you
17    heard central dispatch report?
18 A  Because it's documented on their end if it's ever needed.
19 Q  What were they reporting?
20 A  I don't recall everything. That was over two years ago.
21    I mean, I'll try to remember everything I can.
22 Q  I'm wondering is, did you think that you were,
23    specifically, that I'm going -- because you said this was
24    obviously a disorderly person?
25 A  The way that Officer Severs was asking for more cars,

Page 17

1     yes.
2  Q  So was it the time that he asked for more cars that you
3     concluded there must be a disorderly person?
4  A  That there must be something wrong, yes. Someone is not
5     complying with something if he's asking for multiple
6     units in the way that he was asking, yes.
7  Q  Okay. Was it the tone of his voice?
8  A  The tone of his voice. The way he was asking for cars to
9     step it up. Get here now, quickly. When that happens,
10    we know to go now. Something is wrong.
11 Q  Something could be a person is hit by a car?
12 A  If somebody is hit by a car, you couldn't advise multiple
13    units to step it up. He would be advising central to
14    have a rig step it up. Not for more patrol units to
15    come.
16 Q  Now, in your training either on-the-job or in the
17    academy, were you trained that you would encounter
18    different types of people? And by that I mean maybe
19    somebody with a psychiatric condition?
20 A  Sure, yes.
21 Q  Maybe somebody that is under the influence of a
22    substance?
23 A  Correct.
24 Q  How does that affect your response to a situation such as
25    this where you're concluding that he was obviously

(Pages 14 to 17)

**Page 18**

1  disorderly?
2  A  I don't understand exactly what you're asking.
3  Q  Okay. Do you have a consideration when somebody is
4     obviously disorderly that perhaps there could be a
5     psychiatric condition, or that the person may be under
6     the influence of a substance?
7  A  Yes.
8  Q  Does that affect, that understanding or consideration,
9     affect how you respond to the situation?
10 A  Depending on the situation. It's hard to say yes or no
11    on that.
12 Q  Okay. What does it depend upon?
13 A  What crime has been committed? Who is at risk? You
14    know, who is in danger of any sort?
15 Q  All right. Who was in danger on April 10th of 2012, if
16    anybody?
17 A  Himself, other officers, motorists.
18 Q  Why were other motorists in danger, based upon what you
19    knew?
20 A  I was advised he reached into motorists' vehicles in an
21    attempt to gain access into them. I was also advised he
22    attempted to gain access into Officer Severs' patrol car.
23 Q  Who advised you that he tried to gain access into a
24    vehicle?
25 A  Either Officer Severs. I believe it would be him. I

**Page 19**

1     don't recall exactly.
2  Q  Were there any people on scene at any time during the day
3     that you interviewed or talked to that said that
4     gentleman tried to get into my vehicle?
5  A  I would have to refer to my prior -- I interviewed one
6     gentleman, Mr. Turner. (Examining document). He advised
7     he tried to get into Officer Severs' patrol car.
8  Q  Were there any private citizens that remained on scene
9     that said that gentleman had tried to get into my car?
10           MR. REISING: That this witness is aware of?
11           MR. FELTY: That he's aware of.
12           THE WITNESS: That I'm aware of, no. I didn't
13    interview anybody but the one gentleman.
14 Q  (BY MR. FELTY) Do you know of other people that were
15    interviewed, private citizens who said that --
16 A  I remember there was Dodge Avenger there with --  I
17    believe it was an Avenger. Don't me quote on that. Like
18    a small vehicle. I would have to assume that somebody
19    spoke with them.
20 Q  Do you know if it was a man or a woman?
21 A  I don't recall.
22 Q  All right. And Mr. Merrill, he was a danger to
23    himself --
24 A  Yes.
25 Q  -- potentially?

**Page 20**

1  A  Yes.
2  Q  Why was he a danger to himself?
3  A  Because he was in the roadway. That's a very busy road
4     in the middle of the day.
5  Q  All right. So when you responded, did you view the role
6     of the Saginaw Police Department to provide any type of
7     assistance to Mr. Merrill or did you view the role to
8     arrest Mr. Merrill?
9  A  I assumed the role to, basically, secure the scene and
10    make safe for all parties involved. My initial role was
11    backup as an officer was asking for assistance now.
12 Q  All right. I want to go back to the force continuum for
13    a minute. One of the things that you said about using a
14    taser was that the person starts running away?
15 A  You can use that on that, correct.
16 Q  Okay. Are you aware of Mr. Merrill at any time running
17    away?
18 A  Not running away, no.
19 Q  Did you ever put your hands-on Mr. Merrill?
20 A  During the course of the altercation?
21 Q  Yes.
22 A  Yes.
23 Q  You use altercation. What do you mean by altercation?
24 A  The fact that he was refusing to comply with commands.
25 Q  What commands that you gave did he refuse to comply with?

**Page 21**

1  A  When I first arrived on scene, I told him to show us --
2     put his hands up and get on the ground, and he refused to
3     do so.
4  Q  Had he been tased, to your knowledge, before you got on
5     the scene?
6  A  No. Well, Officer Severs deployed his taser, but he
7     advised to me that he had no -- there was no connection.
8     It did not work.
9  Q  Did you see leads?
10 A  Leads?
11 Q  Electrical wires from probes.
12 A  When I arrived on scene?
13 Q  Yes.
14 A  No.
15 Q  Do you know if -- you said they had been deployed, or he
16    told --
17 A  He advised he had deployed his cartridges and he was out.
18 Q  How many cartridges did your tasers at Saginaw Police
19    Department have?
20 A  One.
21 Q  So if one was fired, then you would have to reload it?
22 A  Correct.
23 Q  So was it your understanding that he deployed one
24    cartridge or one set of cartridges?
25 A  He deployed three cartridges.

(Pages 18 to 21)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 22

1  Q  And didn't hit any time?
2  A  He said it had no effect.
3  Q  Did he tell you -- you said that there was no connection?
4  A  What I would have to assume if there was no effect.
5  Q  But you never saw any leads whatsoever?
6  A  Not that I recall.
7  Q  Do you recall seeing any -- do you call them darts or
8     probes?
9  A  Probes.
10 Q  Do you recall seeing any probes?
11 A  Not at that time, no. I was focusing on a larger scale.
12 Q  What color were the probes?
13 A  They would be silver.
14 Q  Did you see probes at any time?
15 A  Yeah.
16 Q  When did you see probes?
17 A  When I had to deploy my taser and my probes -- after the
18    altercation was done.
19 Q  You deployed yours?
20 A  I did.
21 Q  Where did yours go? Where did they impact?
22 A  I don't know -- recall exactly where they impacted.
23 Q  Did you remove them?
24 A  I did not, no.
25 Q  Do you know who did?

Page 23

1  A  I would have to assume the medical personnel.
2  Q  Did you actually see the probes that you deployed even
3     though you don't recall specifically where they made
4     impact?
5  A  Did I see them?
6  Q  Yes.
7  A  No.
8  Q  At any time did you see any other probes?
9  A  Not that I recall.
10 Q  Do you recall a probe going into Mr. Merrill's shoe or
11    foot?
12 A  No.
13 Q  Are you saying it didn't happen or you don't recall?
14 A  I don't know. I don't know if it did or not.
15 Q  Do you know if his shoe came off?
16 A  I don't remember that.
17 Q  Do you know if anybody that observed the incident was
18    taken into custody?
19        MR. REISING: Anybody who observed the
20    incident?
21        MR. FELTY: Yes.
22        MR. REISING: Meaning a bystander?
23        MR. FELTY: Yes.
24        THE WITNESS: Not that I am aware of.
25 Q  (BY MR. FELTY) Other than video footage from patrol cars

Page 24

1     or the taser units themselves, are you aware of any video
2     of the incident that officers from the Saginaw Police
3     Department obtained?
4  A  Video? Not that I'm aware of.
5  Q  Have you seen any video?
6  A  Just from the -- my patrol car and my taser cam.
7  Q  When did you see the video from your patrol car?
8  A  It was days after the incident. I don't know. I'm not
9     sure of the timeline.
10 Q  What do you remember your patrol car showing?
11 A  Just the back seat.
12 Q  The back seat of what?
13 A  My patrol car.
14 Q  The video camera from your patrol car showed the back
15    seat?
16 A  Correct.
17 Q  Why did the video camera from your patrol car show the
18    back seat of your patrol car?
19 A  When it came on, that's what it was recording. The
20    camera was malfunctioning that day. It was supposed to
21    be on. Our cameras are supposed to go on when we turn
22    the emergency mode on and it's supposed to show up front.
23    My camera never turned on.
24 Q  How did it show the back seat?
25 A  I turned the camera on. And when it powered on, that's

Page 25

1     what came on. Not the front.
2  Q  Where is the lens located?
3  A  Just behind the cage. At least it was. I don't know
4     where they are mounding them now. I don't work there
5     anymore.
6  Q  So there was a camera lens showing the back seat and a
7     camera lens somewhere else on the car?
8  A  It would be on the windshield, a dash cam, pointing
9     forward.
10 Q  Had you had problems with your dash cam before that?
11 A  The whole -- yeah. There was problems with them.
12 Q  I mean yours, specifically. What car were you in?
13 A  That -- I drove different cars every day.
14 Q  That day, what car were you in?
15 A  1133 I believe it was. I'd have to refer to my report.
16    (Examining document). Correct, 1133.
17 Q  How often had you used that car? Strike that.
18        How often had you used that car before?
19 A  I don't know.
20 Q  Do you recall ever having problems with the dash cam with
21    that car?
22 A  Not that I recall.
23 Q  Where was your car facing that day?
24 A  When I arrived on scene?
25 Q  Yes.

(Pages 22 to 25)

Page 30

1  A  To them.
2  Q  -- to them?
3  A  Yes.
4  Q  Did you hear Officer Severs saying anything to Mr.
5     Merrill?
6  A  No, not at that time. Officer Severs yelled at me that
7     his taser cartridge didn't work.
8  Q  Did you know Bobby Merrill?
9  A  No.
10 Q  Had you ever seen him?
11 A  No, not that I recall.
12 Q  All right. So Officer Severs said his taser cartridge
13    did not work?
14 A  Correct. He said he deployed his taser -- he deployed
15    his taser. He's out of cartridges and it had no effect
16    on him. It did not work.
17 Q  Was Mr. Merrill still standing with his hands raised?
18 A  But when I got out of the car, he tucked his hands down
19    into his person.
20 Q  Did you say anything to him?
21 A  When I got out of the car, I -- I advised him to
22    either -- I thought -- I believe I told him to get on the
23    ground. Yeah, I advised him to get on the ground.
24 Q  As soon as you got out of the car?
25 A  Well, after -- pretty much simultaneously getting out,

Page 31

1     walking up. Officer Severs telling me. I'm observing
2     him as I'm basically yelling at him to -- giving him
3     verbal commands to get on the ground.
4  Q  All right. What happens first? You get out of your car?
5  A  Um-hum.
6  Q  And as you get out of your car, do you observe any
7     changes in what Mr. Merrill is doing?
8  A  Yeah, he pulled his hands in.
9  Q  Was that before or after you said get on the ground?
10 A  I don't recall the -- that would have been before,
11    actually. Because he did it like right as I got out of
12    my car.
13 Q  Where did he pull his hands down to?
14 A  Just into his body. Kind of in like a fighting stance in
15    front of his chest.
16 Q  What's a fighting stance? Describe the fighting stance.
17 A  Hands and fists in front of your chest.
18 Q  How far was Officer Severs from him at that point?
19 A  Maybe a few feet. A couple feet.
20 Q  Like within punching distance, or no?
21 A  No, I don't believe so.
22 Q  All right. Did you believe that Officer Severs was in
23    danger of being punched?
24 A  Potentially.
25 Q  And was Mr. Merrill facing at anybody in that fighting

Page 32

1     stance?
2  A  He was facing Officer Severs.
3  Q  Okay.
4  A  If I recall correctly, I believe he was.
5  Q  How were his legs positioned?
6  A  I don't remember that.
7  Q  Now, if somebody were getting down to the ground, would
8     you agree they would have to move their arms?
9  A  They have to move their arms, yeah.
10 Q  Down toward their chest?
11 A  Down towards below their waist as they're going to go
12    down and put their hands-on the ground.
13 Q  So down past the chest and towards the ground?
14 A  Correct. Not in towards their chest, though. It would
15    be down and out.
16 Q  But they would have to move their hands?
17 A  They would have to move their hands, yes.
18 Q  What caused you to yell, "Get down to the ground"?
19 A  The fact that he was not complying with Officer Severs.
20 Q  I thought you said you didn't hear Officer Severs say
21    anything?
22 A  He advised on the radio that --
23 Q  But that was before you got there?
24 A  Correct.
25 Q  All right. So you got there, and what you observed was

Page 33

1     him standing with his hands raised?
2  A  Correct.
3  Q  And you were getting out of the car and you saw him
4     tucking in his arms?
5  A  Correct.
6  Q  You hadn't heard Officer Severs say anything else; is
7     that true?
8  A  Not at that point.
9  Q  All right. So --
10 A  That I recall.
11 Q  -- you don't know whether Officer Severs had said 'get
12    down to the ground' or what commands he had given him?
13 A  I don't know what commands he had given him, no.
14 Q  All right. So how would you know to say get down to the
15    ground?
16 A  To gain control and resolve the problem at hand.
17 Q  How would you know that your command was consistent with
18    what Officer Severs may have said to him?
19 A  I don't.
20 Q  Okay. So if, for example, Officer Severs could have
21    said, turn around, put your hands-on your head or
22    something like that, right?
23 A  I guess he could have.
24 Q  And then you would say -- get on the scene and yelled get
25    down to the ground.

(Pages 30 to 33)

Page 34

1  A  I did, yes.
2  Q  And that could be confusing to the person who is getting
3     different commands?
4  A  I didn't hear Officer Severs give any commands at that
5     time, so the only commands that I recall he was
6     getting -- giving -- or getting, sorry, was mine.
7  Q  All right. What was it that necessitated him to get to
8     the ground?
9  A  He was refusing to comply with Officer Severs, which is a
10    felony.
11 Q  How do you know he was refusing to comply if you don't
12    know what Officer Severs was saying?
13 A  If Officer Severs deployed his taser, there was a reason
14    behind it.
15 Q  But it had already been deployed?
16 A  Correct.
17 Q  You didn't observe it be employed, correct?
18 A  No.
19 Q  Is that correct?
20 A  Correct, I did not.
21 Q  Did you have your -- when did you pull your taser out?
22 A  As I was telling him to get on the ground.
23 Q  How are you trained to use the taser? I mean, when
24    you're telling somebody -- you were telling him to get to
25    the ground and already pulling your taser out?

Page 35

1  A  I could be, yes.
2  Q  Why?
3  A  I don't understand, why?
4  Q  Well, there is a continuum, right?
5  A  Correct.
6  Q  First it's verbal?
7  A  Correct.
8  Q  And then it progresses to something such as either
9     passive or one of the, I can't remember, impact devices?
10 A  Um-hum.
11 Q  Is that right?
12 A  As you go up the force continuum, yes.
13 Q  All right. So if you're pulling your taser out at the
14    same time you're giving a verbal command, are you using
15    two degrees of force at the same time?
16 A  No, because the force is already escalated. Because
17    Officer Severs had already deployed his taser and was not
18    getting any compliance from him.
19 Q  But how do you know that? That's what I'm trying to
20    figure out, that he's not getting any compliance from
21    him.
22 A  He went over the air and said that, that he needed help
23    now.
24 Q  How long before you arrived was, "I need help now"?
25 A  A minute, maybe. I don't know the exact time frame.

Page 36

1  Q  Where were you when you heard "I need help now"?
2  A  I don't know. I don't know.
3  Q  Were you at the scene?
4  A  In my patrol car. No, I was driving.
5  Q  Were you at the scene of the shooting?
6  A  No.
7  Q  How far from the scene of the shooting were you when you
8     directed your car toward Gilmore and Washington?
9  A  The way I was heading, Gilmore and Washington would have
10    been in the direction of the shooting.
11 Q  All right. So the shooting would have been further?
12 A  Further.
13 Q  So you didn't have to change your route?
14 A  No.
15 Q  What did you know about the shooting?
16 A  All I knew is that it was a home invasion in progress and
17    I heard shots fired.
18 Q  Did you know if it was shots fired at a police officer?
19 A  At that time we didn't know.
20 Q  So was it a pretty tense situation as you were driving --
21 A  Very.
22 Q  -- to Gilmore?
23 A  Very.
24 Q  All right. So going back to the force continuum.
25    Verbal, okay, Mr. Merrill, you never observed him run?

Page 37

1  A  No.
2  Q  All right. He didn't strike anybody?
3  A  Not that I know of.
4  Q  All right. Did you see him move from the area where his
5     feet were planted when you saw his hands go down to his
6     chest?
7  A  Not that I remember.
8  Q  So he stayed in place, right?
9  A  I would -- I think so. I don't know.
10 Q  He didn't lunge at Officer Severs?
11 A  No, not I saw at that time.
12 Q  ==What did he do that was, other than moving his hands==
13    ==down, that led you to pull the taser out of your belt as==
14    ==you were telling him to get down to the ground; anything==
15    ==else?==
16 A  ==He was refusing to comply with Officer Severs, which is==
17    ==he was actively resisting him. So going in, I already==
18    ==knew that. I deployed my -- or pulled out, I didn't==
19    ==deploy at that time -- pulled out my department issued==
20    ==taser and advised him to get on the ground in hopes to==
21    ==defuse the situation at that point.==
22 Q  All right. He had been, to your understanding, actively
23    resisting Officer Severs --
24 A  Correct.
25 Q  -- before you got there, right?

(Pages 34 to 37)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 38

1  A  Correct.
2  Q  And then the force continuum would start with verbal
3     commands, correct?
4  A  Correct.
5  Q  And if verbal commands -- the goal of verbal commands is
6     to stop active resistance; is that correct?
7  A  Correct.
8  Q  And then the next level would be, what, the passive where
9     you use hands-on or what?
10 A  After verbal commands?
11 Q  Yes.
12 A  Yes.
13 Q  Okay. Had anybody, to your knowledge, used hands-on with
14    Mr. Merrill?
15 A  Not that I know of.
16 Q  All right. And then below hands-on, is that the impact
17    devices?
18 A  The --
19 Q  I'm saying below, like next.
20 A  Taser, yes.
21 Q  So hands-on, does that come before taser?
22 A  It doesn't have to, no.
23 Q  All right. When doesn't it have to? Is that like when
24    somebody is running?
25 A  True.

Page 39

1  Q  Okay. If somebody is standing there, is it appropriate
2     to -- when is it appropriate to use a taser if they are
3     standing there?
4  A  If they are not complying with you. You don't have to go
5     hands-on.
6  Q  What determinations are you trained to consider whether
7     to use hands-on or a taser, versus a taser?
8  A  Depends on the risk.
9  Q  Okay. What does it depend on? Give me examples of the
10    risk.
11 A  Any potential injury to officers and/or suspect.
12 Q  Okay, potential injury. And I take it that is potential
13    injury from a physical standpoint of hands-on?
14 A  Correct.
15 Q  As well as potential injury from the use of a taser?
16 A  Correct.
17 Q  And why in this circumstance did you believe it was
18    appropriate to remove your taser as opposed to attempting
19    hands-on with two officers and one gentleman?
20 A  Because he was -- at that point, I already knew that he
21    was not compliant. And Mr. Merrill was more than double
22    my size at that time. I could see that.
23 Q  All right. And just so we're clear, you knew that he had
24    been actively resisting? At least that's what you
25    believed?

Page 40

1  A  Correct.
2  Q  Okay. And active resistance that you personally observed
3     was what?
4  A  When I arrived on scene?
5  Q  Yes.
6  A  He was not -- I mean, not -- I guess I didn't see
7     anything at that time. He was standing in front of
8     Officer Severs. The only thing I knew at that time would
9     have been that he didn't comply with Officer Severs.
10    Because if he would have complied he would have either,
11    A, been in the patrol car, or B, calmly talking with
12    Officer Severs.
13 Q  But you didn't hear any conversation, did you?
14 A  Correct.
15 Q  So there is no aggressive conversation?
16 A  That I heard at that time. As I'm out of the patrol car
17    in the second set I was.
18 Q  Okay. Did you conceive of the possibility that perhaps
19    the situation was deescalating and whatever degree of
20    force had been used was starting to work by the time that
21    you arrived?
22 A  No.
23 Q  Why wouldn't you conceive of that possibility?
24 A  Just by looking at the officer on scene and the look -- I
25    mean, you can tell by looking at someone if there is

Page 41

1     still some sort of fear.
2  Q  Who had the fear?
3  A  You could tell Officer Severs was in some sort of fear.
4  Q  How could you tell he was in fear? What was it about him
5     that --
6  A  The look on his face.
7  Q  -- showed his fear?
8     What was the look?
9  A  It wasn't calm and collected.
10 Q  Did you think he was in immediate danger?
11 A  Potentially.
12 Q  What was the immediate danger?
13 A  Bobby Merrill was twice his size also. He was a big guy.
14 Q  But you didn't observe him gesture toward him?
15 A  No.
16 Q  You didn't observe any aggressive words?
17 A  No.
18 Q  You didn't see a weapon?
19 A  No.
20 Q  He didn't turn and try to run away?
21 A  No, not that I saw.
22 Q  Are hands-on techniques appropriate in close quarters?
23 A  Hands-on? Yeah, they can be.
24 Q  Give me examples of when you are trained to use hands-on.
25 A  As in like arm bars. And if someone is resisting and you

(Pages 38 to 41)

Page 50

1   officer shall not?
2 A No, I don't know that.
3 Q All right. Are you aware of any policy that says, if one
4   officer deploys a taser and it does work, another officer
5   should not?
6 A Not that I know of.
7 Q Were you trained either, at Saginaw or at the academy,
8   about the appropriateness of multiple tasing, or
9   multiple -- I guess I don't know the right word -- using
10  it multiple times on the same person?
11 A Say that again.
12 Q Any training that you received regarding the propriety or
13  appropriateness of using a taser on a person multiple
14  times?
15      MR. REISING: I only object to the question
16  because it assumes facts not in evidence, and it isn't
17  defined.
18      But go ahead. Answer the question if you can.
19      THE WITNESS: Not that I know of. I'm not
20  really understanding completely what you're looking for.
21  Like are you just asking, have we been trained not to use
22  a taser multiple times?
23 Q (BY MR. FELTY) Yes.
24 A Is that what you're basically asking?
25 Q Basically.

Page 51

1 A Not that I know of any training like that.
2 Q What training have you had regarding the use of a taser
3   on the same individual more than once, if any?
4 A None that I know of.
5 Q Have you had any training in the appropriateness of the
6   duration of the tasing; like the number of seconds?
7 A Well, it's a five second cycle.
8 Q Okay. It's a five second cycle?
9 A That's what -- yes.
10 Q All right. Any training or policies regarding the number
11  of cycles that are appropriate for a particular
12  individual?
13 A No.
14 Q How many times did you cycle on Mr. Merrill?
15 A The initial one? Once.
16 Q Okay. What does that mean, the initial one?
17 A I attempted a second one and it had no effect.
18 Q Did it make contact?
19 A I don't know.
20 Q So the first one you deployed the taser in dart or probe
21  mode?
22 A Correct.
23 Q And it did have an effect?
24 A Bobby Merrill went to the ground at that point, yes. So
25  I would have to assume that it did.

Page 52

1 Q All right. Is the purpose of using a taser to bring a
2   person to the ground?
3 A To gain control, yes.
4 Q All right. To get them to the ground?
5 A To gain control, yes.
6 Q Okay. Is it to get them to the ground?
7 A That's usually what happens, yes.
8 Q All right. Is there any other purpose for using the
9   taser, other than to gain control by getting the person
10  to the ground?
11 A That's the purpose, is to gain control of the suspect.
12 Q Is it to get them to the ground?
13 A Yes.
14 Q All right. Is there anything else that a taser is
15  designed to do other than to get the suspect to the
16  ground?
17 A It's also used for compliance.
18 Q When somebody is on the ground?
19 A If they are fighting on the ground and they are -- say
20  they are not giving you their hands. You don't know,
21  what -- obviously, they're resisting you. Then, yes, you
22  can use the taser.
23 Q Where were you trained that the taser is appropriate to
24  be used on the ground, when a person is on the ground?
25  Did anybody tell you that?

Page 53

1 A It's under the resisting.
2 Q But, I mean, have you had training regarding whether the
3   taser is designed to be used when a person is on the
4   ground?
5 A Not specifically to the ground, no.
6 Q What do you believe that the use of a taser on a person
7   on the ground is beneficial in doing?
8 A Pain compliance.
9 Q Pain compliance?
10 A Yes.
11 Q What does that mean?
12 A Basically, you deploy the taser to, basically, get the
13  person to rethink his actions and comply.
14 Q All right. If a person -- what do you understand -- or
15  what were you taught that the taser does?
16 A It immobilizes a person for a duration of a five second
17  cycle.
18 Q Are you taught that it cause muscles to contract?
19 A Correct.
20 Q As opposed to relax?
21 A Correct.
22 Q All right. So if you're trying to get somebody's hands,
23  do you think, or were you trained that a taser is an
24  appropriate method to gain control of the hands?
25 A Yes.

(Pages 50 to 53)

Page 54

1  Q  Why?
2  A  It's pain compliance.
3  Q  Why do you think that?
4  A  Because they are not giving you their hands. If you tase
5     them, they rethink their actions. And to prevent
6     further, they will bring their hands back and comply with
7     you.
8  Q  And you still, after using the taser when a person is on
9     the ground, if they are resisting by not giving you their
10    hands, you still have to go hands-on?
11 A  Correct.
12 Q  Okay. Are you trained whether it is appropriate to -- or
13    whether you should use a taser in stun mode or in the
14    dart/probe mode if a person is on the ground?
15 A  Are you asking if we should use one or the other when
16    they are on the ground?
17 Q  Yes.
18 A  No.
19 Q  Why would you use a taser in probe mode if a person is
20    already on the ground?
21 A  Why would you?
22 Q  Yes.
23 A  Same reason you would use it any other time. I don't
24    really understand what you're asking me here.
25 Q  Okay. Did you reload your taser and deploy it at

Page 55

1     Mr. Merrill while he was on the ground?
2  A  No, I only had one cartridge. I didn't carry a back up.
3  Q  Why did you say the first time them?
4  A  Because I attempted to use another cycle without any --
5     basically, any reaction.
6  Q  Did you think that it didn't work?
7  A  Yes.
8  Q  Why did you think it didn't work?
9  A  Because there was no reaction when I deployed it -- or
10    not deployed, sorry. Pulled the trigger.
11 Q  Did you think there was connection?
12 A  Fail. I believe there was a connection fail.
13 Q  Why do you believe there was a connection fail?
14 A  Because when I activated the taser again, there was no
15    reaction.
16 Q  Why did you activate it again?
17 A  Because once he was on the ground, he was refusing to
18    give his hands.
19 Q  Who was he going to give his hands to while he was on the
20    ground?
21 A  Behind his back. Just pull them out from under him.
22 Q  So you were standing some distance away?
23 A  We were in very close proximity.
24 Q  Okay. But did you believe you had a connection?
25 A  No, I believed my connection was lost. Well, are you

Page 56

1     asking before or after?
2  Q  Before you pushed it again.
3  A  I believed I did. Because the first deployment brought
4     Mr. Merrill to the ground. So, at that point, I believed
5     I still had a good connection.
6  Q  Okay. And how long between him going to the -- or the
7     first cycle, how long elapsed after that five second
8     cycle and the time that you attempted to deploy it a
9     second time?
10 A  I don't recall the exact time.
11 Q  Was it instantaneous?
12 A  No.
13 Q  What happens to a person, or what have you observed
14    happen to a person when they are tased and it's
15    effective?
16 A  And it is effective?
17 Q  Yes.
18 A  Their muscles contract and they tense up.
19 Q  All right. And do they freak out a little bit?
20 A  Yeah, sometimes.
21 Q  And is there a period of time designed to let them come
22    to after being tased, or realize what happened?
23 A  Once it's done, there is really no come-to time. I have
24    been tased, and once it's done, it's done.
25 Q  What happened to you when you were tased? What do you

Page 57

1     remember?
2  A  I remember that my muscles constricted. I had no control
3     over any of my extremities or my body, no movement. And,
4     basically, the five second cycle, I felt the pain in the
5     back. And once the five second cycle was done, it was
6     over.
7  Q  Did you go to the ground?
8  A  We trained where officers hold you and bring you to the
9     ground.
10 Q  So were you shot with a probe?
11 A  Correct.
12 Q  And where did your probes impact?
13 A  In my back and lower buttocks.
14 Q  So when it happened to you, it was one time or more than
15    once?
16 A  One. One five second cycle.
17 Q  You had officers holding you?
18 A  Correct.
19 Q  And they lowered you to the ground?
20 A  Correct.
21 Q  Had you used a taser on an individual before April 10th
22    of 2012?
23 A  Yes.
24 Q  How many times?
25 A  One for sure. I believe that was the only time I used

(Pages 54 to 57)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax(810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 66

1   Steve. You gave an answer that was affirmative, but
2   you've got to answer out loud with words.
3           THE WITNESS: Yes.
4           MR. REISING: Okay, thanks.
5   Q   (BY MR. FELTY) And is that because of the absence of
6       your observation of a response?
7   A   Correct.
8   Q   Is there any other reason that you think that it didn't?
9   A   Not at that time.
10  Q   At any time?
11  A   No.
12  Q   So what commands before attempting the second cycle were
13      given by either you or Officer Severs?
14  A   Just, "Give me your hands. Give me your hands."
15  Q   How many times?
16  A   I don't recall that.
17  Q   What did he do with his hands?
18  A   They were under his body.
19  Q   Did he move them under his body, or were they already
20      under his body?
21  A   I don't -- I don't remember.
22  Q   All right. Because if the cycle worked the second time,
23      would you expect, if his hands were under his body, that
24      they would contract and remain under his body?
25  A   Um-hum.

Page 67

1   Q   Is that yes?
2   A   Um-hum, yes.
3   Q   So the second cycle is attempted?
4   A   Attempted.
5   Q   All right. Where are you when the second cycle is
6       attempted physically in relation to Mr. Merrill?
7   A   We were on the ground and I was to -- would be his left
8       side.
9   Q   What part of his body?
10  A   Up by his arm, shoulder area.
11  Q   And where is Officer Severs?
12  A   I don't know. I don't recall that.
13  Q   Do you know if he was on the ground with you?
14  A   He was. And I believe Officer Guest was also.
15  Q   Do you know when Officer Guest approached during -- or
16      arrived at Mr. Merrill during the first cycle and your
17      attempt at the second cycle?
18  A   Pretty much simultaneously with me. He arrived within
19      seconds of me. I don't remember which way he ran up or
20      anything like that. I wasn't paying attention to him.
21  Q   Do you believe that Officer Guest was there in close
22      proximity to you when you cycled the taser the first
23      time, or when you deployed it?
24  A   I believe he was.
25  Q   All right. So you had three people there when you --

Page 68

1   A   You -- I don't know --
2   Q   -- deployed the taser?
3   A   I don't know exactly where Officer Guest was. I know he
4       pulled up simultaneous to me. Where he was when that
5       taser was deployed the first time, I don't know.
6           MR. REISING: First time or second time?
7           THE WITNESS: First time.
8           MR. FELTY: First.
9           MR. REISING: Okay, first time. Thank you.
10  Q   (BY MR. FELTY) But by the second time, the second
11      attempt, you believe he was there by your side?
12  A   I believe he was, yes.
13  Q   Where in relation to Mr. Merrill do you believe Officer
14      Guest was?
15  A   I don't remember that.
16  Q   Do you recall if he ended up on the left side of
17      Mr. Merrill or on the right side of Mr. Merrill?
18  A   I was on the left side of Mr. Merrill.
19  Q   Was anybody else with you at any time on the left side
20      with Mr. Merrill?
21  A   I don't remember that.
22  Q   You were on the left side by the shoulder?
23  A   Correct.
24  Q   All right. You don't know what Guest did, Officer Guest?
25  A   No.

Page 69

1   Q   Do you know if Officer Guest used the taser?
2   A   I don't know if he did or not. I believe he did.
3   Q   Did you get shocked?
4   A   No.
5   Q   Did any other officer get shocked?
6   A   I don't know.
7   Q   How many officers ultimately cuffed Mr. Merrill, or were
8       involved in the cuffing?
9   A   In the cuffing?
10  Q   Yes.
11  A   I believe that three other officers. I wasn't involved
12      in the cuffing.
13  Q   All right. And I don't know how to say the fourth
14      officer's name.
15  A   Madaj.
16  Q   Madaj. When did Officer Madaj arrive, to your
17      recollection?
18  A   I believe he arrived as we were attempting to take
19      Mr. Merrill into custody while we were on the ground. I
20      don't know exactly when he arrived.
21  Q   Do you believe it was --
22  A   It was quickly.
23  Q   Do you believe it was before or after you attempted the
24      second cycle of the taser?
25  A   I don't remember.

(Pages 66 to 69)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax(810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 70

1 Q Do you recall Officer Madaj or Officer Guest being on the
2   ground with you?
3 A When?
4 Q At any time during the --
5 A Yes.
6 Q Okay. At what point do you recall three other officers
7   being on the ground?
8 A What do you mean?
9 Q At what point after -- okay. There is the second attempt
10  at the cycling, right?
11 A Correct.
12 Q And do you believe there are three other officers there
13  to assist in the arrest or detention?
14 A When that second cycle was administered, I don't recall.
15 Q Okay. Were all three other officers, to your
16  recollection, there when Mr. Merrill was ultimately
17  handcuffed?
18 A All -- yes.
19 Q How long did the entire, to your recollection, did the
20  entire cuffing process take?
21 A It felt like a long time, but I'm sure it was maybe a
22  minute, two minutes. I don't know. In situations like
23  that, it feels longer than it really is.
24 Q All right. So you're at the left shoulder area of
25  Mr. Merrill after the second -- the attempt at the second

Page 71

1   cycle?
2 A Yes, I believe so.
3 Q All right. What did you do after the attempted cycling
4   the second time?
5 A Well, as soon as I determined that either, A, I lost a
6   connection or, B, my first connection didn't even work,
7   or one of the wires got caught, I just reholstered my
8   taser.
9 Q All right. You reholstered it and then what?
10 A We continued trying to get Mr. Merrill's hands out from
11  under him.
12 Q What did you do? What did you do to attempt to get his
13  hands out from under him?
14 A I attempted to pull them out. That was not working. I
15  gave commands to -- give me your hands. Give me your
16  hands. And then once that was not working and we were
17  struggling, I pulled out my department issued baton.
18 Q Did you use the baton?
19 A I did.
20 Q Where did you -- I take it when you used the baton, you
21  struck Mr. Merrill?
22 A I did, on his upper arm.
23 Q So is that the left upper arm?
24 A Yes.
25 Q How many times did you strike him?

Page 72

1 A I don't recall the number. A couple of times with no
2   effect. So I reholstered my baton.
3 Q Did anybody else strike him with the baton that you're
4   aware of?
5 A No.
6 Q What did you do after you reholstered the baton?
7 A We continued struggling with Mr. Merrill.
8 Q What did you do to attempt to gain compliance?
9 A Just I -- at that time we just grabbed his arms and were
10  finally able to get his hands behind his back.
11 Q Did you ever attempt pressure points?
12 A Not that I recall.
13 Q Okay. The baton, that is what kind of --
14 A Impact weapon.
15 Q That's impact?
16 A Um-hum.
17 Q Is that yes?
18 A Yes.
19 Q Before using the baton, are you aware of anybody using
20  any type of pressure point or striking --
21 A I'm not sure what the other officers were doing.
22 Q Do you know where your knee was when you were using the
23  baton?
24 A I don't remember that.
25 Q Did you use any knee strikes?

Page 73

1 A I would have to refer to my report. I don't remember. I
2   may have. (Examining document). Not that I recall.
3       MR. REISING: Have you looked at your report,
4   too?
5       THE WITNESS: I did. I looked at my report.
6       MR. REISING: Okay.
7 Q (BY MR. FELTY) Other than Mr. Merrill's arms being under
8   his body, what, if any, resistance was there?
9 A Before he was placed in custody?
10 Q Yes.
11 A Just refusing to comply with commands. And he was
12  under -- I mean, he was moving around. Like flailing a
13  little bit, but...
14 Q Well, flailing implies to me arms swinging around?
15 A Yeah, okay. So he was just kind of moving around.
16  Moving his feet a lot like in a sweeping motion.
17 Q What do you mean by a sweeping motion?
18 A Just side-to-side.
19 Q Was he trying to -- do you know if he was trying to get
20  himself up?
21 A I don't know what he was trying to do.
22 Q All right. So did his arms ever appear as if they were
23  attempting to strike anybody?
24 A No, I don't believe so.
25 Q All right. They were just under his body?

(Pages 70 to 73)

### Page 94

1. east side of the road by the sidewalk.
2. Q How many?
3. A There was a group. I don't recall how many. Multiple
4. people. Maybe five to ten.
5. Q Do you know who was yelling, men or women?
6. A I believe it was females, but I don't recall.
7. Q Was one of them his sister?
8. A Possibly. I didn't talk to any of them.
9. Q How did you know there was a crowd of people when you are
10. down --
11. A I could hear them.
12. Q -- going through the struggle?
13. A I could hear them.
14. Q It says, "After more struggle, Merrill was placed in
15. handcuffs by other officers"?
16. A Correct.
17. Q What is the "more struggle"?
18. A Just the way he was moving around actively resisting us.
19. Just pulling his hands.
20. Q So when you're talking about struggle, are you talking
21. about him moving his arms around?
22. A By struggle I mean failing to comply.
23. Q And by failing to comply, is that moving his arms around?
24. A Could be.
25. Q Is there anything -- this particular incident, the entire

### Page 95

1. time from you tasing him, let's say from the time he goes
2. down to the ground from your taser, struggle or
3. resisting, what, other than moving the arms around, are
4. you describing?
5. A When he was (indicating) like moving his feet around,
6. kicking his feet. Vigorously moving his hands back and
7. forth. Lifting his shoulders.
8. Q Now, the kicking, this was like what motion did you
9. describe it as?
10. A Like side-to-side, up and down.
11. Q Like going back and north?
12. A Um-hum.
13. Q Side-to-side?
14. A Moving rapidly (indicating).
15. Q Like wiggling?
16. A I guess you could describe it as wiggling. I mean --
17. Q I'm more interested in your description. I mean, I was
18. just using that as an example.
19. A Wiggling, I would -- no, I wouldn't describe it as
20. wiggling. It was like vigorous movements.
21. Q Okay. Vigorous movements of the arms and legs?
22. A Um-hum.
23. Q Is that yes?
24. A Yes.
25. Q But not striking anybody?

### Page 96

1. A Not that I'm aware of. I did not get struck.
2. Q Not saying, "I'm going to kill you"?
3. A No.
4. Q Not making threats to police officers?
5. A Not that I'm aware of, no.
6. Q Not biting?
7. A No.
8. Q No spitting?
9. A Not that I'm aware of.
10. Q Okay. It says in here, "Placed in handcuffs --"
11. A Um-hum.
12. Q "-- by other officers."
13. A Correct.
14. Q "Merrill continued screaming and kicking his feet while
15. he was handcuffed on the ground." Is that describing the
16. same type of motion?
17. A Correct.
18. Q He's not kicking an officer?
19. A I don't know if anyone got kicked I don't believe.
20. Q Did it appear to you in what you were doing that he was
21. attempting to kick somebody, or was he just moving?
22. A Could have been.
23. Q Well, I'm --
24. A He could have been. He -- it's hard to describe what he
25. was doing. I don't know exactly what his intentions

### Page 97

1. were.
2. Q Okay. Well, he's laying down on the ground still on his
3. chest, right?
4. A Correct.
5. Q And to kick, we generally think, or at least I generally
6. think of somebody making a forward type motion and
7. kicking somebody?
8. A Correct.
9. Q And I just want to be clear, you're not suggesting that
10. he was --
11. A No, because he was on his back. But you can still be
12. kicked by kicking up, to the side.
13. Q I get that. And are you describing, when you say that
14. he's doing that, was he directing a kick at anybody?
15. A Not that I know of.
16. Q Okay. So he's got him, it says, "Placed in handcuffs by
17. other officers." And then it says -- and this was
18. handcuffed on the ground? He's still on his chest,
19. right?
20. A Correct.
21. Q And then it says, "R/O then observed Officer --" please
22. say that again, Madaj.
23. A Madaj.
24. Q "-- Madaj and Officer Severs place another set of
25. handcuffs on Merrill."

(Pages 94 to 97)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 114

1  A  I do not.
2  Q  Did you ever leave Mr. Merrill's presence after he was
3     cuffed?
4  A  When I spoke with the witness.
5  Q  That was after he was already in the car?
6  A  Correct.
7  Q  What did you do after his feet were tied? What was your
8     role?
9  A  I didn't really have a role at that time.
10 Q  Did you go anywhere?
11 A  No.
12 Q  Did you stand then --
13 A  I was standing with them, yes.
14 Q  Standing with who?
15 A  The other officers and Mr. Merrill.
16 Q  Did you assist in transporting Mr. Merrill to the squad
17    car?
18 A  Yes.
19 Q  How did he get transferred, or how was he taken to the
20    squad car?
21 A  He was stood up and he started to walk. I don't remember
22    if he walked the whole way. I remember Officer Madaj
23    stating -- asked him if he was going to walk, or if he
24    was going to have to be carried. And I remember like
25    holding his left arm as we walked to the patrol car.

Page 115

1  Q  So did he walk?
2  A  He started to and I don't -- I don't remember exactly
3     what happened.
4  Q  All right. What did you do to assist him in getting him
5     to the car?
6  A  Just basically holding his left arm.
7  Q  You held his arm?
8  A  Correct.
9  Q  And was somebody holding his right?
10 A  Yes.
11 Q  Who was holding --
12 A  I don't remember which officer it was.
13 Q  How many officers were on-scene at that time?
14 A  Four.
15 Q  Were all four of you together?
16 A  Yes.
17 Q  So all four of you walked to the car?
18 A  I believe so.
19 Q  Whose car was it?
20 A  Mine.
21 Q  And he was put in the back of your car?
22 A  Correct.
23 Q  How was he put in the back?
24 A  I -- when we got at the door, because the door swings
25    open, I was on the left. There was no room for me. I

Page 116

1     backed up and he was put in the car by the other
2     officers. He was wide. He had to be turned just to get
3     in the car and then placed in the patrol car.
4  Q  He was put in what side, passenger or driver's side?
5  A  Driver's side.
6  Q  All right. And how was he positioned in the car?
7  A  On his right side, facing down, but turned on his right
8     side where his left shoulder was leaning on the cage.
9  Q  And he was alive at that time?
10 A  Yes.
11 Q  He was conscious?
12 A  Yes.
13 Q  Was he communicating?
14 A  He was still -- yeah, he was.
15 Q  Did he say anything more that you recall after talking
16    about being sodomized and raped?
17 A  Not that I recall exactly what he was saying, no.
18 Q  Do you recall him saying anything?
19 A  He was like speaking, yes. But I don't remember what he
20    was saying.
21 Q  Was he mumbling?
22 A  No.
23 Q  Do you know what he was speaking about?
24 A  No, I don't recall.
25 Q  Did you ask him any questions?

Page 117

1  A  No.
2  Q  Did you ever ask him how he was?
3  A  I did not, no.
4  Q  Did you hear anybody else asking him any questions?
5  A  No.
6  Q  Did anybody attempt to interview him while he was on the
7     ground in the street?
8  A  Not that I am aware of, no.
9  Q  You never left him on the ground?
10 A  No, I was there. We all were there.
11 Q  Okay. So he's put in the car and I take it -- your car,
12    right?
13 A  Correct.
14 Q  Was your car running at this time?
15 A  Yes.
16 Q  Is the camera on at this time?
17 A  I don't believe -- I don't know. I don't believe it was,
18    because I had turned it on after I moved the patrol car.
19    So I don't believe it was running at that time.
20 Q  All right. So did you move the car with him in it?
21 A  Yes.
22 Q  Where did you move it to?
23 A  Just off of Washington onto Gilmore. Literally, from
24    just pulling around the corner to get off the main road,
25    because traffic was backed up.

(Pages 114 to 117)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Page 118

1  Q  Which way was it backed up?
2  A  Both directions.
3  Q  How many cars were backed up?
4  A  I couldn't decipher on that. There was a line of
5     traffic.
6  Q  A long line?
7  A  I don't recall.
8  Q  How many people were on-scene, individuals from the
9     neighborhood, when you moved the car?
10 A  I don't remember.
11 Q  Was there a big crowd?
12 A  A crowd was starting to gather, yes. I don't remember
13    how many people and when exactly they showed up.
14 Q  All right. In your report it says "Merrill refused to
15    get up and walk over to the patrol car so officers had to
16    assist him."
17 A  Correct.
18 Q  Did he -- I'm not clear, did he walk --
19 A  When he got up --
20 Q  -- or did you carry him?
21 A  -- that's when Officer Madaj said, "Are you going to walk
22    or are we going to have to carry you?" We -- I don't
23    remember if he kind of did a shuffle or what. But we had
24    to -- I remember having a lot of weight on me and
25    carrying him over.

Page 119

1     So he was standing. I don't remember if he was
2     doing a little shuffle or what he -- I don't recall
3     exactly what he was doing.
4  Q  All right. So he's put in. The doors are closed?
5  A  Correct.
6  Q  This is after you moved the car? Then you moved the car?
7  A  Then I moved the car.
8  Q  And then what do you do after you move the car?
9  A  That's when the witness came up to me. I got out of the
10    car. When I moved the car and I was in it, after things
11    had settled down, that's when I observed my camera was
12    not on. The witness came up and said he wanted to give
13    me a statement. I wanted that on camera, so I turned the
14    camera on. That's when I got out and took the witness
15    statements.
16 Q  All right. How far away from the car did you take the
17    witness statement?
18 A  Half of the width of a side street.
19 Q  All right. So you were right by the car.
20 A  Fifteen feet, ten feet, yeah.
21 Q  Did anybody, any other officer go into your car?
22 A  Besides Officer Madaj? Officer Madaj did.
23 Q  When did Officer Madaj go in?
24 A  When he went to speak with Mr. Merrill and ultimately
25    realized he was in distress, or appeared unconscious.

Page 120

1  Q  Before Officer Madaj said that he appeared, or discovered
2     that he appeared to be unconscious, are you aware of any
3     officer going up to the car and going inside and having
4     any communication with Mr. Merrill?
5  A  I don't know. I was speaking to my witness. If one of
6     them did, I don't know that they did.
7  Q  All right. Well, you were speaking to your witness
8     within feet from the car?
9  A  Correct.
10 Q  Do you think you would have noticed if somebody was
11    trying to get in the car?
12 A  Not necessarily. Because it would have been unlocked.
13    So if they went to the passenger side of the car, my car
14    is facing west, I'm talking over here, they could have
15    went into the car and I wouldn't have known. I didn't
16    see anybody.
17 Q  The car would have been unlocked?
18 A  Correct.
19 Q  You would have left your car unlocked with a crowd of
20    people around and a suspect in it?
21 A  Yes.
22 Q  Wouldn't you be paying attention to make sure that nobody
23    in the crowd of people were attempting to get --
24 A  There was other officers around and there was no one
25    right by our patrol cars.

Page 121

1  Q  Do you know whether any officer went to your car other
2     than Officer Madaj?
3  A  Everyone -- I'm assuming the other officers were there,
4     but I don't recall if anyone went into my patrol car, no.
5  Q  Do you think you would have known if somebody went into
6     your patrol car?
7  A  Not necessarily.
8  Q  Would that be common for another officer to go in your
9     patrol car?
10 A  Yes.
11 Q  For what purpose?
12 A  To speak to people. To speak to a suspect. Check on
13    people. It's not uncommon practice.
14 Q  Were any of the other patrol cars moved?
15 A  I believe they were all moved out of the street.
16 Q  So you guys all got into your separate cars and moved
17    them?
18 A  I believe they -- we cleared the road. So, yes, they
19    would have had to.
20 Q  Do you know where the other cars were positioned?
21 A  I do not.
22 Q  You spoke with the witness and then what do you do?
23 A  After -- after I spoke with the witness, that's when
24    Officer Madaj advised that -- of what he observed with
25    Mr. Merrill and he needed to be taken out of the car and

(Pages 118 to 121)