## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

DOROTHY ANDERSON and
DEMARQUION MERRILL, as Co-Personal
Representatives of the Estate of BOBBY
MERRILL, deceased

      Plaintiffs,

-v-

                                   Case No.:13-11159
                                   Hon.  Thomas Ludington

OFFICER JEFF MADAJ, individually,
OFFICER JUSTIN SEVERS, individually,
OFFICER BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA, individually,

Defendants.

_____/

GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON, IV (P65351)
GARY N. FELTY, JR. (P55554)
*Fieger, Fieger, Kenney, Giroux*
*& Harrington, P.C.*
Attorneys for Plaintiffs
19390 W. Ten Mile Rd.
Southfield, MI 48075
(248) 355-5555
g.fieger@fiegerlaw.com
j.harrington@fiegerlaw.com
g.felty@fiegerlaw.com

H.WILLIAM REISING (P19343)
PLUNKETT COONEY
Attorney for Defendants
111 E. Court Street, Ste 1B
Flint, MI 48502
810-342-7004
wreising@plunkettcooney.com

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    *NOW COME* Plaintiffs, by and through their attorneys, **FIEGER, FIEGER, KENNEY,**

**GIROUX & HARRINGTON, P.C.,** and state the following in response to Defendants' Motion

for Summary Judgment:

    1.    Plaintiffs admit that they have filed this action alleging excessive force and

violations of the Fourth and Fourteenth Amendments.

2.      Plaintiffs deny the allegation that a Fourteenth Amendment claim cannot be brought for the reason that it is not true as stated in the attached brief.

3.      Plaintiffs deny that defendants are entitled to qualified immunity because that is not true.

4.      Defendants are not entitled to Summary Judgment pursuant to Fed. R. Civ. Pro. 12(c) or 56 for the reasons stated in the brief that accompanies this response.

5.      Plaintiffs do not concur in the relief requested.

**WHEREFORE** Plaintiffs request that this Honorable Court **DENY** Defendants' Motion for Summary Judgment.

Respectfully Submitted
**FIEGER, FIEGER, KENNEY, GIROUX
& HARRINGTON, PC**

By:      /s/ Gary N. Felty, Jr.
GEOFFREY N. FIEGER (P30441)
GARY N. FELTY, JR. (P55554)
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, MI  48075
248.355.5555
g.felty@fiegerlaw.com

Date:  October 10, 2014

<u>**Certificate of Service**</u>

I certify that on October 10, 2014, I electronically filed the foregoing papers with the Clerk of the Court using the electronic filing system for US District Court, which will send notification of such filing to the following:

H.WILLIAM REISING
111 E. Court Street, Ste 1B
Flint, MI 48502

/s/ Ashley N. Glassner

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOROTHY ANDERSON and
DEMARQUION MERRILL, as Co-Personal
Representatives of the Estate of BOBBY
MERRILL, deceased

       Plaintiffs,

-v-

OFFICER JEFF MADAJ, individually,
OFFICER JUSTIN SEVERS, individually,
OFFICER BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA, individually,

Defendants.
_____/

Case No.:13-11159
Hon. Thomas Ludington

GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON, IV (P65351)
GARY N. FELTY, JR. (P55554)
*Fieger, Fieger, Kenney, Giroux*
*& Harrington, P.C.*
Attorneys for Plaintiffs
19390 W. Ten Mile Rd.
Southfield, MI 48075
(248) 355-5555
g.fieger@fiegerlaw.com
j.harrington@fiegerlaw.com
g.felty@fiegerlaw.com
_____/

H.WILLIAM REISING (P19343)
PLUNKETT COONEY
Attorney for Defendants
111 E. Court Street, Ste 1B
Flint, MI 48502
810-342-7004
wreising@plunkettcooney.com

## PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## QUESTIONS PRESENTED

1.  Are defendants entitled to summary disposition based upon the doctrine of qualified immunity where the question turns upon disputed facts?

    | | |
    |---|---|
    | Plaintiffs answer: | NO. |
    | Defendants answers: | YES. |

2.  Does plaintiffs' 14th Amendment claim fail where the complaint alleges excessive force and deliberate indifference to the decedent's condition?

    | | |
    |---|---|
    | Plaintiffs answer: | NO. |
    | Defendants answers: | YES. |

3.  Is summary judgment appropriate?

    | | |
    |---|---|
    | Plaintiffs answer: | NO. |
    | Defendants answers: | YES. |

## CONTROLLING / APPROPRIATE AUTHORITY

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52; 106 S.Ct. 2505; 91 L.Ed.2d 202 (1986).

*Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001).)

*Farmer v. Brennan,* 511 U.S. 825, 834, 837, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994)

*Graham v Connor*, 490 U.S. 386, 394-95; 109 S.Ct. 1865; 104 L.Ed.2d 443 (1989).

*McCaig v. Raber*, 2012 WL 1032699 at 4 (W.D. Mich. Mar. 27, 2012)

*Morrison v. Board of Trustees of Green Tp.,* 583 F.3d 394, 404 (6th Cir. 2009)

*Morrison, supra*, 583 F.3d at 404 (citing *Phelps v Coy*, 286 F.3d 295, 301-302 (6th Cir. 2002).

*Phelps v. Coy,* 286 F.3d 295, 297, 301-302 (6th Cir. 2002).))

*Rodriguez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011)

*Rodriguez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011)

*Saucier v. Katz*, 533 U.S. 194, 201; 121 S.Ct. 2151; 150 L.Ed.2d 272 (2001)

*Scott v. Harris*, 550 U.S. 372, 376; 127 S.Ct. 1769, 1774; 127 S.Ct. 1769 (2007)

*Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998)

*Spears v. Ruth,* 589 F.3d 249, 254–55 (6th Cir.2009).

*Tolan v. Cotton,* ___ U.S. ____, ___; 134 S.Ct. 1861, 1866; 188 L.Ed.2d 895 (2014)

*U.S. v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-327 (6th Cir. 2013).

*United States v. Bibbs,* 2014 WL 3956127 at 6 (E.D. Mich. August 13, 2014

*Watkins v. Kanitz*, 2004 WL 3457634 at 6 (W.D. Mich. Sept. 24, 2004).

*Wysong v. City of Heath*, 260 F. App'x 848, 854-855 (6th Cir 2008)

3

## INTRODUCTION

This is a § 1983 claim involving the arrest of Plaintiff's Decedent, Bobby Merrill.  The defendant officers used excessive force on April 10, 2012 to arrest Mr. Merrill causing death. The alleged offense prompting the seizure, according to Defendant Justin Severs who was the first officer on the scene, was the civil infraction of walking in the street.  Rather than simply telling Mr. Merrill to get out of the street, Defendant Severs escalated the event, got out of his car, and called Mr. Merrill toward him.  Defendants claim that Mr. Merrill disobeyed the command.  He did not flee.  He did not make threats.  He did not brandish or even have a weapon.  He appeared confused, walking around.  Defendant Severs used the force of a taser eleven times to make an arrest.

The total force used included but was not limited to at least sixteen cycles of four different tasers, each defendant officer cycling his own; multiple baton strikes; fist strikes; knee strikes; foot pressure to the middle lower back; and, knee pressure to the middle upper back.  The pressure described was applied while Mr. Merrill was being held face-down on the concrete.  Mr. Merrill was handcuffed and hog-tied with hobble restraints, carried to Defendant Wietecha's patrol car, and put down on the back seat of the vehicle in the supine position.  He was allegedly discovered to be unresponsive in the backseat of the patrol car.  Mr. Merrill was dead; he was killed.

Plaintiffs and defendants have diametrically opposed versions of what transpired on April 10, 2012.  The events are captured in a series of videos that plaintiffs will submit as the following exhibits:

- **Exhibit 1:**   Defendant Justin Severs' *TASER* video;

- **Exhibit 2:**   Defendant Steven Wietecha's *TASER* video;

- **Exhibit 3:**   Defendant Brian Guest's *TASER* video;

4

- **Exhibit 4:**     Defendant Jeff Madaj's *TASER* video; and,

- **Exhibit 5:**     Eye witness iPhone video.

Plaintiffs believe that the videos go beyond showing a mere question of fact as to whether defendants violated the constitutional rights of plaintiffs' decedent and whether the right violated was clearly established.    Plaintiffs believe that the videos establish that defendants used excessive force causing death.  Defendants interpret the videos differently.

However, if the legal question of immunity is completely dependent upon which view of the facts the jury accepts, the district court should not grant summary judgment of the issue. *Rodriguez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011). "[S]ummary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force." *Id.*, quoting *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998).  This is, at minimum, such a case.

## STATEMENT OF FACTS

## BACKGROUND INFORMATION REGARDING THE TASER

One of the devices at issue is the *TASER X26*, manufactured by *TASER INTERNATIONAL*.[1]  It is a conducted energy device; or, "stun-gun."  It can be operated in two modes:  probe mode and drive-stun mode.  Probe mode acts like a handgun where two electrical probes (darts) are forcefully propelled by compressed nitrogen from the gun after the trigger is pulled.  The probes travel at a rate of approximately 160' per second.  The probes make contact with the subject and an electrical current is sent to the victim.  The current cycles for five seconds provided that the trigger is released. If the trigger is held in, the gun continues to cycle, delivering 50,000 volts of electricity through the target (**Exhibit 7**, pp 36-37, 48).

---

[1] *TASER INTERNATIONAL* material verifying the information is attached as **Exhibit 6**.  The City of Saginaw's taser training officer has confirmed his knowledge of much of the material information about the X26.  Excerpts of his deposition are attached as **Exhibit 7**.

5

Drive-stun does not involve forced gas-propulsion of the probes.  Rather, the gun and its probes are pushed into the victim by the operator. The trigger is pulled and the target electrocuted for five seconds as long as the trigger is released.  If however, the trigger is held, the electrocution lasts perpetually, for as long as it is depressed.

Contrary to the belief of the officers involved in this case, neither the darts (in probe mode) nor the electrodes in drive-stun mode need be in contact with the skin for the intended electrocution to occur.  Rather, the arc can go through up to 2" of clothing (**Exhibit 6 and Exhibit 7, p 39**).  According to *TASER*, studies show that a target can be electrocuted through body armor (**Exhibit 6**).  Furthermore, that a subject does not fall to the ground does not mean that he or she is avoiding the current.  *TASER INTERNATIONAL* and the individual officers are aware that the response of the victim depends upon many factors, including but not limited to the placement of the probes and the distance between them (**Exhibit 6**).

In this case, Defendant Severs opines that he was required to repeatedly cycle his weapon because it did not have the desired effect due to an alleged failure to make contact; however, he testified that it was possible that there was a connection despite his belief that the *TASER* did not have the desired effect (**Exhibit 8, p 78**).  Defendant Wietecha testified that he was aware that a *TASER* does not always have the desired effect upon a person that is under the influence (**Exhibit 9, p 78**).  Furthermore, he knew that *TASERS* could work without producing the desired effect of collapse (**Exhibit 9, p 79**).  Defendant Madaj testified that *TASERS* do not have the same effect upon everyone (**Exhibit 10, pp 224-227**).  In fact, he described the "naked guy" incident where a subject pulled the probes out of his body and fled after being tased twice.  The reason for the lack of collapse according to Defendant Madaj, is that if the probes are close together, they do not necessarily affect all of the muscles (**Exhibit 6 & Exhibit 10, p 235**).  Defendant Guest likewise understood that the closer the probes, the lesser the effect on the large

6

muscles (**Exhibit 11**, p 30).

*TASER INTERNATIONAL* trains and certifies instructors in the maintenance and use of their device. The company sends instructional materials to certified instructors at the respective police agency using its device (**Exhibit 7**, pp 6-8). Tom Hariter, a retired Saginaw police officer, and the individual responsible for bringing the taser to Saginaw, was the firearms and property management specialist employed by the Saginaw Police Department who was certified to instruct active Saginaw police officers in the proper use of the X26 (**Exhibit 7**, pp 6-8). He has testified that he trained officers straight out of the *TASER INTERNATIONAL* manual (**Exhibit 7**, pp 69-71).

Mr. Hariter also testified, consistently with *TASER* documents that It is well known that an electrical arc should not be administered for more than 5 seconds at a time (**Exhibit 6 & Exhibit 7**, pp 48-50). It is equally well known that a police officer must give a subject time to respond before administering a second burst of electricity (**Exhibit 6, Exhibit 7**, pp 85-88; *Instructor Hariter testifying that there must be a waiting period before deployments and that it is excessive force to cycle the TASER more than one time without waiting and giving time for compliance*). Furthermore, no more than three (3) five second-bursts of electricity should be administered (**Exhibit 6 & Exhibit 7**, pp 50-51). Contrary to popular yet unscientific belief, the reason is not because the electrocution might cause an arrhythmia. Indeed, the amperage of the X26 is thought to be too low to be a significant risk of sudden cardiac death. (*The science on the proposition is still out and up for debate*). What is well known is that the electrical surge delivered by the X26 stresses the muscles of the body and the heart is a muscle. Training Officer Hariter explained that each five (5) second burst of electricity is the equivalent of a **thirty minute workout** (**Exhibit 7**, p 41). Defendant Madaj acknowledged that stress is a factor and that care must be used in delivering a cycle particularly if one believes that the individual is

7

under the influence because the body is already under a lot of stress (**Exhibit 10,** pp 240-242). Instructor Hariter testified that shooting the chest area is off-limits, although he did not appear to understand that the heart is a muscle (**Exhibit 7,** pp 49-51). Defendant Wietecha testified; however, that he was instructed not to aim for the chest so the probes do not impact the heart (**Exhibit 9,** p 148). (Interestingly, Defendant Severs at one point aimed for the chest (**Exhibit 8,** p 83).)

In summary, given that each 5 second burst causes the body such a strain, the operator of the X26 is supposed to pull the trigger, let it go, and then re-evaluate before delivering a second shot (**Exhibit 6** and **Exhibit 7,** p 37). According to Officer Hariter, it is an excessive use of force to repeat a tase without giving a new warning and giving the subject an opportunity to comply (**Exhibit 7,** pp 86-87).

The videos and records demonstrate repeated and successive electrocutions without offering new warnings and giving Mr. Merrill the opportunity to react. These electrocutions are in addition to the other means of excessive force that were utilized after he collapsed to the ground. The force on the ground includes additional electrification while Mr. Merrill was subdued.

<u>**CHRONOLOGY OF EVENTS**</u>

The chronology of events is impossible to precisely state. This is because the clocks in the City of Saginaw's electronic police equipment that was used or was operational show different dates and/or different times. Dispatch logs state that a call came in at 4:06 p.m. on April 10, 2012 from a caller who indicated that a man was walking in traffic near the intersection of Washington and Hess in the City of Saginaw, (**Exhibit 12**).

Defendant Severs responded. He testified to the threat level by indicating that he was responding to an ordinance violation, a civil infraction; a man walking in the street (**Exhibit 8,** p

60). Defendant Guest testified that this is the kind of situation where he would have simply told the person to get out of the street and let him go (**Exhibit 11**, pp 35-40). Although the remaining defendants variously describe what they believe that the threat level could have been and what crimes Mr. Merrill could have committed, the fact is that none of them had any knowledge other than that a man was walking in the street and at some point Defendant Severs requested assistance. Defendant Wietecha thought there might be a disorderly person but all he knew was that dispatch advised that a man was jumping in and out of traffic and Defendant Severs requested assistance (**Exhibit 9**, pp 14-17, 32-33). Defendant Madaj's understanding of the events before he arrived on scene similarly came only from the radio (**Exhibit 10**, pp 216-220).

Returning to the chronology, Defendant Severs pulled into the intersection. Despite the fact that Mr. Merrill was allegedly walking toward him in a non-threatening fashion and all that Defendant Severs wanted him to do was get out of the street, he allegedly instructed Mr. Merrill from his patrol car to come toward him (**Exhibit 8**, pp 55-58). (Severs' in-car camera that would have likely shown all of the events was allegedly not working that day (**Exhibit 8**, pp 50-51. Defendant Wietecha's in car video was likewise non-functional (**Exhibit 9**, p 24).) Mr. Merrill was allegedly 20 to 25 yards from the officer and started to walk toward him but turned away, moving 20 to 25 feet, before coming back toward him (**Exhibit 8**, pp 56, 60-61). Defendant Severs says that he started to run but he did not attempt to flee; in other words, he was not taking off (**Exhibit 8**, pp 61, 70-71). It is difficult to conceive how someone could truly run 20 feet.

Defendant Severs has suggested, in police fashion, that there was a concern because Mr. Merrill allegedly had his left hand in his pocket when he pulled his car into the intersection. There was no such concern before Defendant Severs escalated by getting out of his car with *Taser* in hand because Mr. Merrill removed his hand from his pocket (**Exhibit 8**, p 63). Defendant Severs has admitted that he knew that Mr. Merrill did not have a weapon (**Exhibit 8**,

9

p 63). Mr. Merrill was not posing a threat. The various officers have described the decedent's conduct as "passive resistance."

Defendant Severs described passive resistance as ignoring commands, making threats, and walking away (**Exhibit 8,** p 19). Defendant Wietecha similarly described passive resistances as being non-compliant (**Exhibit 9,** p 10). He confirmed that Bobby was not actively resisting when he arrived on scene (**Exhibit 9,** p 40). Defendant Guest opined that these types of scenarios are situations where it is reasonable to reason with the person or just let him walk away (**Exhibit 11,** pp 34-41). Defendant Madaj testified that hand-held weapons cannot be deployed where a person is passively resisting (**Exhibit 10,** p 33). That is reserved for active resistance where a person is running away or being combative (**Exhibit 10,** p 34). Defendant Madaj testified that a person standing with his hands up but not following commands would be passively resisting (**Exhibit 10,** pp 40-41).

Nevertheless, Defendant Severs testified that he removed his taser from his belt because Mr. Merrill walked toward a moving SUV and then another car after being told to come toward the officer (**Exhibit 8,** p 61). Defendants have characterized these alleged observations as a possible car-jacking (**Exhibit 8,** pp 62-65). However, the alleged approach to the moving SUV is not captured on video and the vehicle never stopped. The approach to the second vehicle is captured on video (**Exhibit 1**) and does not evidence any threatening behavior. Furthermore, the driver of this vehicle knew Mr. Merrill and did not perceive any threatening behavior (**Exhibit 13,** pp 13-17). In addition, one of the officers who responded to the scene after the conclusion of the incident at issue has testified to what a car-jacking entails: intent to take an automobile by force or threat) (**Exhibit 14,** pp 77-78). These elements do not exist.

Defendant Severs claims that he decided to move his own car while Bobby was allegedly approaching the SUV (See video, **Exhibit 1 & Exhibit 8,** p 71).

10

An officer removing himself from the scene by entering his patrol car to reposition it are not the actions of an officer who truly believes that he needs to protect a private citizen.

As indirectly indicated above, when Defendant Severs activated his taser, video was turned on. The video runs for approximately 2 minutes and 25 seconds (**Exhibit 1**). One can hear Defendant Severs tell Bobby to get to the ground; however, Bobby appears to be confused. (Defendant Madaj arrived at the conclusion of the tasing by Defendant Severs that is to be described but has testified consistently with the interpretation of confusion by indicating that he concluded that Mr. Merrill had to be mentally disturbed (**Exhibit 10**, p 254, 263). Defendant Guest confirmed that when he approached he observed the decedent with a blank stare, not understanding what was happening, (**Exhibit 11**, p 67), Defendant Severs thought he might be under the influence of something (**Exhibit 8**, p 88).)

Defendant Severs did not tell Mr. Merrill that he intended to tase him for non-compliance (**Exhibit 8**, pp 80, 82-83. Defendant Severs deployed his taser in probe mode. Taser logs from the City of Saginaw indicate that Severs cycled the taser a total of 11 times, at least ten of which occur immediately before Mr. Merrill falls to the ground (**Exhibit 15**); (See also video in **Exhibit 1**, showing at least ten tasings and possibly capturing the 11th; and **Exhibit 2**, showing Mr. Merrill fall to the ground contemporaneously with probe deployments of Defendant Severs, Defendant Wietecha, and Defendant Guest).[2] The video demonstrates a near constant tasing of Mr. Merrill for the 2 minutes and 25 seconds captured by the camera.

Mr. Merrill does not fall to the ground as a result of the tasings delivered by Defendant Severs; however, **Exhibit 1** shows him responding to the tasings by attempting to avoid the pain, crying out in pain, and becoming more confused.

---

[2] The *TASER* logs do not show the correct date and time. The logs that defendants have identified as the tasings that are at issue are highlighted. Although not necessarily accurate, a copy of a portion of the State Police investigation of this incident that is an attempt to explain the reason for the incorrect timing is attached as **Exhibit 15**).

Defendants claim that the probes did not make contact or were ineffective. Plaintiffs submit that the claim is nonsense. The probes do not need to make contact; they electrify through two inches of clothing and body armor (**Exhibit 6**). What the officers mean by ineffective is that Mr. Merrill did not fall to the ground. However, the officers know that a subject does not necessarily fall to the ground in response to being tased. Defendant Severs repeatedly cycles the *TASER*, without any time for compliance, without further command, acknowledging that the decedent was not making threats (**Exhibit 8**, pp 72, 76, 79-81, 83-84, 86).

Please recall that Instructor Hariter described the pain from being tased from personal experience. He said it is like getting hit with a baseball bat (**Exhibit 7, p 54**). He also testified that each burst of electricity is the equivalent of a vigorous thirty-minute workout (**Exhibit 7, p 41**). Therefore, construing the facts in a light most favorable to Plaintiffs, a jury could conclude that up to this point, Mr. Merill received the equivalent of being beaten with a baseball bat ten times while being forced to perform a hard five-hour run for the offense of walking in traffic. The events did not end there.

Despite the fact that it is known that once a cycle is delivered, the subject must be given time to comply (**Exhibit 7, p 55**), Defendant Severs never gave Mr. Merrill the time to comply until after the tenth shot. The time for compliance was unintentional. The video in **Exhibit 1** shows Mr. Merrill turn with has back to Defendant Severs as the other defendants, Wietecha, Guest, and Madaj, are approaching. The video further shows Mr. Merrill raising his hands into the air. The reason for the pause in electrification is that Defendant Severs is re-loading his *TASER* (**Exhibit 8**, pp 83-84, 86, 93-94). Defendant Severs admits that he tased the decedent while he was standing still with his back facing him, hands in the air, and not threatening anyone (**Exhibit 8, p 94**).

The video in **Exhibit 2** starts approximately where the video in **Exhibit 1** ends. It shows Mr. Merrill's hands start to drop toward chest level. Defendants claim that his fists clench. They describe this as a "fighting stance," despite the fact that Merill is nowhere in fighting distance of any of them. Defendant Severs testified that the decedent was twenty feet from him on first deployment (**Exhibit 8**, p 72). The video shows the patrol car between the two upon Severs' last deployment. Defendant Wietecha testified that he was 10 to 15 feet from plaintiff when he first shot and that Defendant Guest was coming up with him; Defendant Madaj was not with them (**Exhibit 8**, pp 60, 63).

Plaintiffs submit that the facts establish that Defendant Severs shot the decedent in the back with his *TASER*, causing the change in position and turn of the body back toward Severs that can be seen in **Exhibit 1**. Instructor Hariter has testified that the taser causes the arms to go to the body and the fists to clench and that it actually inhibits compliance with police orders for some time after electification (**Exhibit 7**, pp 53-57).

To summarize the events thus far, defendants claim that Mr. Merrill started chasing Defendant Severs when the tasing began. The video in **Exhibit 1** tells a different story. The video shows Mr. Merrill crying out in pain. He is not offered any moment to respond to the repeated tasing. His confusion increases and he tries to walk away from the source of the electrification. Defendant Severs cycles the taser nine more times for a total of ten times as other offices approach in their cars. These cycles span most of the video with little break between them and no time for compliance. Some of the cycles last for more than five seconds at a time. The moment the tasing stops, Mr. Merrill stands still with his hands in the air.

Defendant Severs admits that Mr. Merrill is standing in place, that his hands are in the air, that he is not running off, that he is not holding any weapons; **that he has stopped any form of resistance** (**Exhibit 8**, p 94). He is not threatening anyone.

13

Defendant Severs did not attempt to make an arrest (**Exhibit 8**, p 96).  He reloaded and shot Mr. Merrill in the back with another probe (**Exhibit 8**, pp 94-97).  Mr. Merrill can be seen turning toward the shot as Defendant Severs' camera goes off.  This is punishment, not an attempt at compliance.

Defendant Wietecha's taser video camera takes over at nearly this point (**Exhibit 2**).  Defendant Guest's has some limited footage as well (**Exhibit 3**).  Both officers fire tasers at Bobby at roughly the same time as Defendant Severs fired his last shot (**Exhibits 2**).  They both claim to have fired the shot that achieved the take-down (**Exhibit 9**, p 51; **Exhibit 11**, pp **68, 71-72**).  At minimum, Mr. Merrill was being simultaneously electrified by two tasers when he fell.  It is more likely that he was being electrified by Defendant Severs in addition to the two separate shots fired by Defendants Wietecha and Guest.

It is clear that neither Defendant Wietecha nor Defendant Guest fully assessed the situation as they approached.  Defendant Wietecha admits that Mr. Merrill was not actively resisting as he approached but he fired anyway (**Exhibit 9**, p 40).  He did not warn that he was about to tase despite the fact that he knew that if a situation de-escalates so must the force (**Exhibit 9**, pp 44, 61-62, 144).  He knew that talking down a subject is the reasonable thing to do (**Exhibit 9** pp 40-45).  Defendant Wietecha did not stop with one shot; he cycled the taser a second time.  This is at minimum, the 14th cycle, and had to have occurred after Mr. Merrill was on the ground.

The defendants claim that Mr. Merrill resisted while he was on the ground by holding his hands at his chest, clenching his fists, and kicking his feet.  He was clearly subdued.  The decedent was not a threat while on the ground (**Exhibit 8**, pp 117-118, 122; **Exhibit 9**, p 73).  Video footage from Defendant Wietecha's camera shows that Bobby's hands were at his side (**Exhibit 2**).  Video footage from exhibits 3 and 4 show movement of Mr. Merrill's legs but not

kicking as defendants claim he was doing. In fact, both Defendants Severs and Wietecha have testified that they knew they were not in danger of being kicked while Mr. Merrill was being held down face-first to the concrete (**Exhibit 8**, pp 117-118, 122; **Exhibit 9**, p 73).

Defendant Madaj jumped while Mr. Merrill was being tased by Defendant Wietecha and being held down by the other three defendants. Taser logs show that he cycled his taser on Mr. Merrill twice while the decedent was being held to the ground (**Exhibit 16**) although he testified that he pulled the trigger at least four times and wrote that he might have done it six (**Exhibit 10**, pp 151-155; **Exhibit 17**). Defendant Madaj gave no warning (**Exhibit 10**, p 152). Cumulatively, at this point, the videos and logs show that Mr. Merrill was tased at least sixteen (16) times in the span of a couple of minutes without breaks for time to comply. They show him fall to the ground and writhe in pain. The defendants reluctantly acknowledge that Mr. Merrill was not kicking anyone. Their reports and testimony contain gratuitous phrases like "fighting stance" to attempt to justify their actions. No such activity is demonstrable.

Defendant Wietecha testified that he struck Mr. Merrill with a baton twice while he was on the ground (**Exhibit 9**, p 71-72). Video (**Exhibit 5**) reveals at least four or five baton strikes delivered in rapid succession while Defendant Madaj was busy delivering electrical currents to the decedent's back (See video, **Exhibit 4**). Use of force reports document that Mr. Merrill was also punched and kneed (**Exhibit 17**). Defendant Wietecha testified that he placed his knee in the middle of Mr. Merrill's upper back, holding him compressed to the ground (**Exhibit 9**, p 91). Video similarly shows a foot in the middle of the decedent's lower back pressing him to the ground (**Exhibit 4**).

All of the force applied while Mr. Merrill was on the ground was applied because he was allegedly resisting being cuffed by holding his hands with fists clenched under his body. The video evidence shows Mr. Merrill's hands at his sides contrary to these claims.

15

Furthermore, Instructor Hariter testified that one would expect this response if a person is being tased. He explained that the taser causes the arms to be pulled into the body and the fists to be clenched. The taser can actually inhibit compliance (**Exhibit 7**, pp 53-57).

Mr. Merill was ultimately cuffed and hog-tied before being carried to Wietecha's police car where he was laid across the back seat (**Exhibit 9**, p 116). The decedent was not hog-tied because of concern for anyone's safety; he was hog-tied to prevent him from kicking inside the patrol car (**Exhibit 8**, p 122). Video and testimony establish that Mr. Merrill was not perceived to be a threat by the officers when he was on the ground (**Exhibit 8**, p 122). He was subdued.

Mr. Merrill stopped breathing some time during the events; the police claim that it was while he was in the back of that police car. The police also claim that an ambulance was called as a matter of routine (**Exhibit 11**, p 106). However, the ambulance run sheet says priority 1 (**Exhibit 18**). Priority 1 means "critical," with lights and siren. The officers killed the decedent. Defendants claim that the autopsy report concludes with a finding that Mr. Merrill died from a cocaine overdose. It does not. Rather, it posits the presence of cocaethylene, an ineffective metabolite, in his blood and likewise identifies the *TASER* as a cause of death (**Exhibit 19**).

Mr. Merrill did not overdose. Dr. Werner Spitz has reviewed the autopsy report and pathology. Dr. Spitz concludes that the decedent had a small amount of alcohol in his system and was not under the active influence of cocaine (**Exhibit 20**). Cardiologist, Robert Stark, M.D., has also reviewed the case (**Exhibit 21**). Both Dr. Spitz and Dr. Stark have opined that Mr. Merrill's death was caused by over-exertion and positional asphyxia as a result of the beatings, being compressed into the ground, hog-tied and thrown into the backseat of a police car unattended.

16

## ARGUMENT

### Standard of Review

Defendants assert that they challenge Plaintiffs' claims on the pleadings alone and bring their motion pursuant to Fed. R. Civ. P. 12(c).  Plaintiffs do not contest that such a claim is assessed pursuant to the standard for a motion brought pursuant to Rule 12(b)(6); however, plaintiffs' assert that they have properly pled valid claims and the standard of review is that of a motion brought pursuant to Fed. R. Civ. P. 56.

A movant is entitled to summary judgment when it shows that there is no genuine dispute as to any material fact." *U.S. v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-327 (6th Cir. 2013).  The mere existence of a scintilla of evidence in support of the non-movant's claim is insufficient to overcome a motion; rather, there must be evidence on which a jury could reasonably find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52; 106 S.Ct. 2505; 91 L.Ed.2d 202 (1986).  Summary judgment is not appropriate when the evidence presents a sufficient disagreement to require submission to a jury.  *Id.*

The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Id.*  These rules must be applied in cases involving qualified immunity.  *Tolan v Cotton,* ___ U.S. ____, ___; 134 S.Ct. 1861, 1866; 188 L.Ed.2d 895 (2014).

### Analysis

*1.*      *Defendants are not entitled to qualified immunity because the question of immunity is completely dependent upon which view of the facts the jury accepts.*

Defendants clearly used excessive force.  They claim that they are shielded with qualified immunity.

17

A claim of excessive force under the Fourth Amendment requires that a plaintiff demonstrate that a seizure occurred, and that the force used in effecting the seizure was objectively unreasonable. *Graham v Connor*, 490 U.S. 386, 394-95; 109 S.Ct. 1865; 104 L.Ed.2d 443 (1989).

Qualified immunity is an immunity from suit rather than a mere defense to liability. *Scott v Harris*, 550 U.S. 372, 376; 127 S.Ct. 1769, 1774; 127 S.Ct. 1769 (2007) quoting *Mitchell v Forsyth*, 472 U.S. 511, 526; 105 S.Ct. 2806; 86 L.Ed.2d 411 (1985).

> In resolving questions of qualified immunity, courts are required to resolve a 'threshold question: [t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.' *Saucier v Katz*, 533 U.S. 194, 201; 121 S.Ct. 2151; 150 L.Ed.2d 272 (2001). If, and only if, the court finds a violation of a constitutional right, 'the next sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.' *Ibid.*" *Scott, supra*, 550 U.S. 377.

The plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Rodriguez v Passinault*, 637 F.3d 675, 689 (6th Cir. 2011). If the legal question of immunity is completely dependent upon which view of the facts the jury accepts, the district court should not grant summary judgment of the issue. *Id.* "[S]ummary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force." *Id.* quoting *Sova v City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998).

Defendants are not immune. The unjustified use of a taser has regularly been held to be an excessive use of force that violates a person's Fourth Amendment right to be free from an unreasonable seizure. The Sixth Circuit has consistently held that the "use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Morrison v Board of Trustees of Green Tp.*, 583 F.3d 394, 404 (6th Cir. 2009). "The reason for this is that once the detainee ceases to pose a threat to the safety of the officers or others, the legitimate government

interest in the application of significant force dissipates." *Morrison, supra*, 583 F.3d at 404 (citing *Phelps v Coy*, 286 F.3d 295, 301-302 (6th Cir. 2002).

Courts in this Circuit have likewise concluded that the use of a taser upon a suspect that is not actively resisting violates a clearly established right. "The law is clear in this Circuit that the use of force, including a Taser, on a suspect who has been subdued is unreasonable and a violation of a clearly established right." *Wysong v City of Heath*, 260 F. App'x 848, 854-855 (6th Cir 2008).

Furthermore, the officer must show that before he employed the force, he afforded the suspect a reasonable opportunity to comply with the commands that the subject allegedly disobeyed. *United States v Bibbs,* 2014 WL 3956127 at 6 (E.D. Mich. August 13, 2014), citing *Brown v Weber*, 555 Fed. App'x 550, 554-55 (6th Cir. 2012); *McCaig v Raber*, 2012 WL 1032699 at 4 (W.D. Mich. Mar. 27, 2012); and, *Watkins v Kanitz*, 2004 WL 3457634 at 6 (W.D. Mich. Sept. 24, 2004).

The evidence establishes that the force utilized by Defendant Severs was excessive from the outset. As soon as he deployed his taser, he deployed it nine more times without pause. Defendants will argue that the taser deployment was ineffective because the probes did not make contact with the decedent's skin but that is non-sense. The *TASER INTERNATIONAL* educational materials boast that its product is effective through two inches of clothing including body armor. Instructor Hariter knew this to be true. Furthermore, the individual officers knew that the probes will not always cause someone to go to the ground. That can be because the probes are too close together to produce the desired muscular response along with the baseball bat-like pain or because the target is under the influence of drugs or alcohol (factors which interestingly must be considered before applying force; see *Deorle v Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001).)

19

Defendant Severs gave no time for compliance.  Despite the fact that Decedent Merrill stopped and placed his hands in the air and Severs knew that three additional officers were approaching, he reloaded his stun-gun and shot him for the eleventh time.  This made Severs one of three officers who nearly simultaneously shot Mr. Merrill, taking him to the ground; delivering three bursts of electricity at once.

Like Severs, Defendants Wietecha and Guest gave Mr. Merrill no time for compliance. They just shot.  They did this while all agree that he was not actively resisting.  Then he fell. Mr. Merrill was subdued; he was not a threat to anyone when he was on the ground. Nevertheless, Defendant Wietecha repeatedly struck him with a baton.  (Gratuitous use of the baton violates a clearly established right.  *Phelps v Coy,* 286 F.3d 295, 297, 301-302 (6th Cir. 2002.))  Defendant Madaj engaged in more gratuitous use of the taser while Mr. Merrill was subdued.  He wrote that he cycled his taser in drive-stun mode 4 to 6 times.  The officers also kneed, kicked, and punched Mr. Merrill.  This is all based upon the false claim that he was clenching his fists in an attempt to avoid being hand-cuffed.  Instructor Hariter explained that such a responses is what would be expected if a person is being tased because it causes the fists to clench and the hands to go to the chest.  Moreove, the beating never stopped; there was never an opportunity for compliance.

The beating concluded with the "hobble-restraint."  This was not applied for officer safety.  No officer was fearful of being kicked.  Video clearly shows Mr. Merrill doing nothing more than writhing on the ground in pain secondary to the abuse coming from above.  Officer Severs admitted that this restraint was to protect the car not to protect people.

Mr. Merrill was then placed supine in the back of the squad car with his hands tied to his feet.  Dr. Spitz and Dr. Stark have concluded that these actions added insult to injury.  Mr. Merrill was put in a position where he could not adequately respirate after being stressed to a

point where increased respiration was required.

The level of force utilized was highly unreasonable.  Mr. Merrill was suspected of an ordinance violation, a civil infraction, walking in traffic.  This is an offense from which Defendant Guest opined that he acting alone would let the subject walk away.  Defendant Severs did not walk away despite the fact that Mr. Merrill did not pose a serious threat to anyone.

Defendants have testified that Mr. Merrill was either in mental distress, under the influence, or confused.  Defendant Severs has admitted that he did not give Mr. Merrill time to respond to commands. Defendant Wietecha has admitted that it is possible that when he arrived at the scene, the commands were conflicting (**Exhibit 9,** p 33).

The defendants believed that they encountered an individual that would have difficulty understanding commands. In addition to the knowledge they have testified having, the defendants were trained with *TASER INTERNATIONAL* materials.  *TASER* provided legal updates advising defendants what they already knew:  that an electrical cycle is an intermediate level of force; *Brian v. MacPherson*, 630 F.3d 805 (9th Cir. 2010); that electrifying a non-violent misdemeanant posing no immediate threat who was given no warning was an excessive use of force; *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010); a person must be given a reasonable opportunity to comply and that each application of a cycle is an independent use of force requiring time for composure; *Mattos v Agarano*, 661 F.3d 433 (9th Cir. 2011); multiple cycles cannot be justified on non-comliance absent indications of an immediate threat or flight because physical and emotional condition may affect capability of complying.  *Beaver v. City of Federal Way*, F.Supp.2d 1137 (W.D.Wash. 2007).  (See **Exhibit 22,** *TASER INTERNATIONAL* documents.)

Defendants' motion should be denied.  When the facts are viewed in the light most favorable to the plaintiffs, one cannot say that defendants are entitled to qualified immunity.

The determination of whether the force used was reasonable depends upon whose interpretation of the facts that one accepts. A jury could reasonably conclude that plaintiffs' decedent was not given an opportunity to comply with requests before being tased in rapid succession, hit with a baton repeated, and struck with knees, fists, and feet before being held to the ground. Plaintiffs therefore request that Defendants' motion be denied.

    **2.   *Plaintiffs' 14th Amendment claim is cognizable.***

Defendants argue that plaintiffs' 14th Amendment claim must be dismissed because the claim is duplicative of a more specific 4th Amendment excessive force claim. Defendant's motion is incorrect.

Plaintiffs' complaint alleges that defendants improperly hog-tied him, laid him supine and left him unattended in the back of a patrol vehicle where he was permitted to expire. Defendants placed the decedent in need of medical attention. Instead of keeping him in a position where he could be attended, he was placed in a position that caused or contributed to asphyxia and death.

To state a claim a plaintiff must show that the officers were deliberately indifferent to his or her "sufficiently serious" medical need. *See Farmer v. Brennan,* 511 U.S. 825, 834, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Spears v. Ruth,* 589 F.3d 249, 254–55 (6th Cir.2009). Deliberate indifference requires that an officer (1) "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (2) "draw the inference," and (3) "act or fail to act in a manner demonstrating 'reckless or callous indifference' toward the individual's rights."

Plaintiffs have pled facts establishing that the decedent was in jeopardy of serious harm and that the defendants knew it. Their actions increased the danger of serious harm. Rather than monitoring the decedent and keeping him in a safe position, defendants hog-tied him and laid

him supine in a car where he is alleged to have died. A deliberate indifference claim has been stated.

## CONCLUSION

There are material factual issues that preclude granting summary judgment to defendants based upon qualified immunity. Plaintiffs have pled facts to establish a deliberate indifference claim.

*WHEREFORE* Plaintiffs request that this Honorable Court **DENY** Defendants' Motion for Summary Judgment.

Respectfully Submitted,
*FIEGER, FIEGER, KENNEY, GIROUX
& HARRINGTON, PC*

By:  /s/ Gary N. Felty, Jr.
GARY N. FELTY, JR. (P55554)
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, MI  48075
248.355.5555
g.felty@fiegerlaw.com

Date:  October 10, 2014

### Certificate of Service

I certify that on October 10, 2014, I electronically filed the foregoing papers with the Clerk of the Court using the electronic filing system for US District Court, which will send notification of such filing to the following:

H.WILLIAM REISING
111 E. Court Street, Ste 1B
Flint, MI 48502

/s/ Ashley N. Glassner

23