# EXHIBIT 7

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOROTHY ANDERSON and DEMARQUION
MERRILL, as Co-Personal Representatives
of the Estate of BOBBY MERRILL, deceased,

                    Plaintiff,          NO:  13-11159

vs.                                     JUDGE LUDINGTON

OFFICER JEFF MADAJ, individually,
OFFICER JUSTIN SEVERS, individually,
OFFICER BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA, individually,

                    Defendants.
_____/

          The Deposition of THOMAS LEONARD HARITER, taken

before me, Daniel E. Ripka, CSR-2367, Notary Public, on

Thursday, July 31, 2014, at the offices of Ripka, Boroski &

Associates, LLC, One Tuscola Street, Suite 301, Saginaw,

Michigan, commencing at or about 12:58 P.M.

APPEARANCES:

     FIEGER, FIEGER, KENNEY, GIROUX & HARRINGTON, P.C.
     BY:  GARY N. FELTY, JR., ESQ.  (P55554)
     19390 West Ten Mile Road
     Southfield, Michigan  48075
     (248) 355-5555
     g.felty@fiegerlaw.com

                    Appearing on Behalf of Plaintiffs.

     PLUNKETT COONEY
     BY:  H. WILLIAM REISING, ESQ.  (P19343)
     111 East Court Street, Suite 1B
     Flint, Michigan  48502
     (810) 342-7001
     wreising@plunkettcooney.com

                    Appearing on Behalf of Defendants.

Ripka, Boroski & Associates, LLC          email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660          Firm Registration No. 008139

7f83a6ab-63eb-4702-82a7-f3a6f3cc34b3

Page 2

1
2                    INDEX
3  WITNESS: THOMAS LEONARD HARITER        PAGE
4  Examination by Mr. Felty        3
5        *   *   *   *   *
6           INDEX OF EXHIBITS
7  EXHIBIT                 PAGE
8  Deposition Exhibit Number 1        68
9  (Taser Log)
10  Deposition Exhibit Number 2        77
11  (TASER Instructor Certification Lesson
12  Plan - Version 12)
13  Deposition Exhibit Number 3        77
14  (Use of Force Policy and Procedure)
15        *   *   *   *   *
16
17
18
19
20
21
22
23
24
25

Page 3

1         Friday, July 25, 2014
2         Saginaw, Michigan
3         12:58 P.M.
4         THOMAS LEONARD HARITER,
5  a witness herein was called for examination, and after
6  having been sworn was examined and testified on his
7  oath as follows:
8               EXAMINATION
9  BY MR. FELTY:
10  Q.  Would you state your full legal name?
11  A.  Thomas Leonard Hariter.
12  Q.  Are you employed by the City of Saginaw?
13  A.  No.
14  Q.  Are you employed?
15  A.  No.
16  Q.  Were you employed by the City of Saginaw?
17  A.  Yes.
18  Q.  What was your last capacity of employment?
19  A.  My title was firearms and property management specialist.
20  Q.  When did you function in that capacity?
21  A.  I'm sorry?
22  Q.  When did you function in that capacity?
23  A.  When did I start doing that, when did I last?  I'm sorry.
24  Q.  Both, yes, time frames.
25  A.  January 9th, 1993 is when I started that position, and

Page 4

1         July 17th, 2014 is when I terminated.
2  Q.  So you retired a couple weeks ago?
3  A.  Two weeks ago today.
4  Q.  Have you been deposed before?
5  A.  Yes.
6  Q.  So is it necessary to go over any of the preliminary
7       instructions?
8  A.  I don't believe it.
9  Q.  What were your job responsibilities as the firearms and
10      property management specialist for the City of Saginaw?
11  A.  Weapons training and maintenance, and the maintenance of
12      the indoor firing range, and property management referred
13      to abandoned vehicles.
14  Q.  Did you have any responsibility for maintaining weapons on
15      behalf of the department?
16  A.  Yes.
17  Q.  What were your responsibilities in that regard?
18  A.  Make sure they were all in working order and a yearly
19      maintenance.
20  Q.  What is your current address?
21  A.  My current address?
22  Q.  Yes.
23  A.  2830 Schemm, S-C-H-E-M-M, Street, Saginaw, 48602.
24  Q.  Prior to becoming the firearms and property management
25      specialist for the City of Saginaw were you a police

Page 5

1       officer?
2  A.  Yes, sir.
3  Q.  When did you start as a police officer?
4  A.  July the 7th, 1969.
5  Q.  Did you start with the City of Saginaw?
6  A.  Yes, sir.
7  Q.  And when you -- Did you retire from that position?
8  A.  I retired on January the 8th, 1993.
9  Q.  What was your rank when you retired?
10  A.  Patrol officer.
11  Q.  What was your rank when you started?
12  A.  Patrol officer.
13  Q.  Were you assigned to any particular divisions throughout
14      the course of your career?
15  A.  I worked patrol division, I worked the identification
16      section, crime scene unit, I worked investigation, and
17      also firearms training section.
18  Q.  When did you start working at the firearms training
19      section?
20  A.  Actively it would have been two or three years before I
21      switched jobs.
22  Q.  In your capacity as the firearms and property management
23      specialist was it your responsibility to train officers in
24      the use of tasers?
25  A.  Yes, sir.

                              2  (Pages 2 to 5)

Ripka, Boroski & Associates, LLC          email:  rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810)  234-0660      Firm Registration No. 008139

                                          7f83a6ab-63eb-4702-82a7-f3a6f3cc34b3

Page 6

1  Q. When were tasers, if you know, introduced to the City of
2     Saginaw Police Department?
3  A. 2003.
4  Q. Do you remember the model that was introduced?
5  A. The X26.
6  Q. I guess this is a good time to ask you, did you review
7     anything before coming to your deposition today?
8  A. I went through a training manual that I used to use.
9  Q. Did you go through anything else?
10 A. No.
11 Q. Were you responsible for training officers in the use of
12    tasers in April of 2012?
13 A. Yes, sir.
14        In April of 2012?
15 Q. Yes.
16 A. No.
17 Q. When did you cease having responsibility of training
18    officers in the use of tasers?
19 A. My instructor certificate ran out in April, on April 8th,
20    2010. And I was looking at retirement then and I never
21    got recertified.
22 Q. Did somebody take over the process for you?
23 A. I believe... Well, we had -- I was not the only
24    instructor, and there were others that were there to cover
25    the gap, I guess.

Page 7

1  Q. Who were the other instructors?
2  A. Officer Tim Fink, and I believe Jeff Madaj was an
3     instructor at the time.
4  Q. Do you know who would have been instructing officers in
5     the use of tasers in 2012?
6  A. In 2012 I really can't tell you, 'cause once I let that go
7     I kind of washed my hands of it.
8  Q. All right. You have a TASER X26 manual that you brought
9     with you?
10 A. Yes, sir.
11 Q. Are those the materials that you used when you were
12    instructing officers?
13 A. Yes, sir.
14 Q. Do you know what edition of the TASER manual that is?
15 A. This is Version 12 dated November 2004.
16 Q. Were those updated by TASER International?
17 A. TASER periodically would send a CD, compact disk with
18    updates and...
19 Q. What would you do with them when you got the compact disks
20    with updates?
21 A. We would update the training to whatever changes they
22    made.
23 Q. Okay. Did you have any 2010 updates when you were still
24    responsible for instructing?
25 A. I don't recall. It's possible, but that stuff might be

Page 8

1     still in my desk regarding that, but I'm not really sure.
2         We were pretty current on this, so, I mean, most
3     likely it's in my desk if it was...
4  Q. All right. After your certification expired did you still
5     receive updates from TASER International?
6  A. They came in the mail and I would file them with the rest
7     of my stuff.
8  Q. Where would you file them?
9  A. It would have been in my office.
10 Q. Would you give them to anybody that was doing training
11    classes?
12 A. All the instructors got their own copies of them, and
13    usually we got extras and I would just put it in the file
14    to make sure we had current information.
15 Q. How did you train an officer in the use of a taser? If
16    you could just explain to me what the City of Saginaw did.
17    Was there a classroom setting?
18 A. We did a classroom setting with the officers and used this
19    training program.
20 Q. And the training program is the --
21 A. TASER.
22 Q. -- TASER --
23 A. Provided by TASER.
24 Q. Okay. That's the TASER International Instructor
25    Certification Lesson Plan?

Page 9

1  A. Yes, sir.
2  Q. And your copy was from 2004?
3  A. Well, that's what it's dated. Whether it's from 2004, it
4     could be, or could be even newer, but that's what it's
5     dated.
6  Q. Okay. Like part of your program -- For instance, I have
7     one from Volume 18 of the X26 user course and it looks
8     like, like a PowerPoint slide. Did you have documents
9     like that?
10 A. I've not seen that. I don't recognize that at all.
11 Q. Okay. And the reason I'm asking --
12 A. That's probably after I give it up.
13 Q. Okay. This is copyright 2011 and they're dated on the
14    bottom pages, and I'm wondering if your course manual has
15    any updates?
16 A. I don't recognize that.
17 Q. I mean just in general. Would you take -- If there was an
18    update would you update your training manual?
19 A. Yes.
20 Q. All right. So you would take new pages and put them in
21    there?
22 A. Well, up until 2010.
23        What I did with the disk, when I got a disk I
24    just stuck it in the file. I was... I was not certified
25    to do anything until the law changed where civilian

3 (Pages 6 to 9)

Page 34

1   A.  The battery was at 99 percent.
2   Q.  All right.  And then 19 degrees centigrade, you were
3       saying you believe that to be the internal --
4   A.  Internal temperature of the unit.
5   Q.  Was there a normal internal temperature of the unit?
6   A.  I don't recall.
7   Q.  Do you know if the internal -- if there is any
8       significance to the internal temperature?
9   A.  I don't specifically recall.
10  Q.  All right.  And then when you say the duration, when you
11      were referencing the duration does that mean the number of
12      seconds that the unit was deployed?
13  A.  Yes, sir.
14  Q.  So assuming this was, this incident happened -- What this
15      line to the best of your knowledge is conveying on
16      April 10th, 2012 this particular unit was conveyed for
17      five seconds with 99 percent battery power, 19 degree
18      internal temperature on April 10th?
19  A.  That's 19 degrees centigrade.
20  Q.  Nineteen degrees centigrade on April 10th, 2012?
21  A.  That's correct.
22  Q.  And if I didn't say this, at 4:19:34 for five seconds?
23  A.  Yes, sir.
24  Q.  Okay.  And then similarly, I don't know what unit -- Is
25      there any way to tell that you're aware of what unit?

Page 35

1   A.  Or what taser it was?
2   Q.  Yes.
3   A.  On the heading, if I recall right, there should be the
4       taser serial number.
5   Q.  What do you mean on the heading?
6   A.  Very first page on the report there should be a...
7           MR. REISING:  Now, are you speaking of the
8       report that Mr. Felty is holding, or are you talking about
9       what you're used to?
10          THE WITNESS:  I'm talking about the taser report
11      right from the unit.
12          Like I said, that one looks like a spreadsheet,
13      something that's converted to a spreadsheet.
14  Q.  (BY MR. FELTY):  So internally if you were to run a report
15      at the department there would be a heading that would tell
16      you what taser it was?
17  A.  I believe it.  Yeah, I believe it.
18  Q.  All right.  And then did all of the tasers on April 10th,
19      2012 to the best of your knowledge have video cameras?
20  A.  I don't recall.  I was past that, and...
21  Q.  Do you have any idea what it means if the report is
22      indicating that a particular unit was heating up
23      internally?
24  A.  Well, it would be a higher, higher degree on that
25      centigrade reading.

Page 36

1   Q.  Do you know if there's any significance to that?
2   A.  I can't tell you, no.
3   Q.  Okay.  Do you know what battery power was required for the
4       taser to function properly?
5   A.  TASER advocated that the batteries be changed out at 20
6       percent.
7   Q.  Okay.
8   A.  And the reason for that was to ensure you always had a
9       fresh battery, and then take the batteries with the 20
10      percent reading and use them for training.
11  Q.  Okay.  I have a question about the X26 from my own
12      reading.  I understand if you pulled the trigger and
13      deployed, and regardless of whether it was in probe or
14      stun mode, if you pulled the trigger while deploying it it
15      would automatically run for five seconds?
16  A.  If you held the trigger down it would run longer.
17  Q.  Okay.  So if you did -- If you shot the probes and pulled
18      the trigger one time and released there'd be a
19      five-second --
20  A.  That's correct.
21  Q.  -- electrical current?
22          That's right?
23  A.  Yes.
24  Q.  But if you held the trigger down it would continue to
25      deliver the electrical current?

Page 37

1   A.  Yes, sir.
2   Q.  Were you taught at TASER whether there was an appropriate
3       amount of time for the electrical current to cycle?
4   A.  I don't recall any training or indications of holding that
5       trigger down.  Pull the trigger, let it go, let it run for
6       five seconds and reevaluate.
7   Q.  Okay.  Did you teach officers not to hold the trigger once
8       the unit was deployed?
9   A.  We informed them what would happen if they held the
10      trigger down.
11  Q.  What did you inform them would happen?
12  A.  It would run longer than five seconds and then they're off
13      in a territory they don't want to be in.
14  Q.  What does that mean, they're off in a territory they don't
15      want to be in?
16  A.  Well, the thing is designed for a five-second deployment.
17      The training is you take and deploy five seconds,
18      evaluate, see where you're at, if you have to do it again
19      then you do it again.  But you just don't continually hold
20      that trigger down, because you don't have the opportunity
21      to evaluate what you're doing after five seconds.
22  Q.  If you release the trigger was there an automatic wait
23      period for the taser to recycle?
24  A.  Well, if you released it -- pulled the trigger, released
25      it, it run five seconds, you could immediately pull the

10  (Pages 34 to 37)

Page 38

1  trigger again.
2  Q. At the end of the five seconds?
3  A. Yes.
4  Q. Did you teach the officers to have a wait time to assess?
5  A. Well, we taught you take and deploy it for five seconds
6     and evaluate what you're doing at that point. Do you need
7     another application or not?  If it is working, when you
8     pull the trigger is it working?
9            Now, the phrase silence is golden here.  When
10    you have a proper hookup you don't get any noise out of
11    it.  When you don't have a proper hookup you get a loud
12    cracking noise, indicates an open circuit.  That means you
13    don't have a good connection.
14 Q. All right.  Now, when there is a connection, you said
15    silence is golden, you don't get any noise.  You get some
16    noise, right?
17 A. Yes, but it's really noticeably quieter.
18 Q. Did you ever see video of the incident?
19 A. No.
20 Q. Do you know on these reports if there's any way to tell if
21    there was a good connection?
22 A. No, because there's no way to...  All it does is indicate
23    that the trigger was pulled.
24 Q. All right.  Were you taught whether the darts must pierce
25    the skin when it's in -- that would be probe mode or dart

Page 39

1  mode.  Dart or probe mode, is that interchangeable?
2  A. Dart, probes, whatever you want to call them.
3  Q. All right.  Do you know if they have to actually pierce
4     the skin?
5  A. No, they do not.
6  Q. So let's say the darts go through the clothing and they
7     don't pierce the skin, they can still make contact and
8     deliver a current?
9  A. Yeah, it will arc up to one inch.  You have a collective
10    two-inch capacity of where it will arc through two inches
11    of clothing, and that equates like one inch on each side.
12 Q. So, in other words, like if I was shot in the dart or probe
13    mode and the front of my jacket was hit, the darts were in
14    there, although not piercing through my shirt, as long as
15    they were within a two-inch range to your understanding it
16    would be making contact?
17 A. Yes, sir.
18        That would also leave burn marks.
19 Q. On the clothing?
20 A. On the skin.
21 Q. What kind of burn marks?
22 A. You would have like a first degree burn red mark.  It
23    would be noticeable.
24 Q. You said like a first degree burn.  Do you know what a
25    first degree burn is?

Page 40

1  A. Yes, sir.  Reddening of the skin.  Second degree is
2     blistering and third degree is skin charring.
3  Q. Where did you learn that you would have a first degree
4     burn?
5  A. That was TASER.
6  Q. Okay.  Now, in stun mode that's where the person operating
7     the device depresses it against the subject and creates a
8     current?
9  A. Yes.  It's a pain compliance at that point.
10 Q. That's pain compliance?
11 A. Yes, sir.
12 Q. Meaning you're not expecting an overt muscular response?
13 A. That's correct.
14        I've experienced one of them too and they hurt
15    like hell.
16 Q. Were you taught on the number of times by TASER to use the
17    unit in stun mode for pain compliance that is acceptable?
18 A. In the stun mode I don't recall a minimal or a maximum
19    number.
20 Q. What did you learn about the effectiveness of using the
21    taser via pain compliance?
22 A. I mean, it's an alternative method to the probe.  If you
23    don't have a good hookup you can immediately go to the
24    stun, drive-stun without reloading the cartridge.
25 Q. Now, we were talking about the five-second cycles of

Page 41

1  electricity.  You recall that, right?
2  A. Yes, sir.
3  Q. Were you taught anything...  You mentioned if you hold the
4     trigger in and you go over five seconds the officer is in
5     a place they don't want to be?
6  A. Well, it adds questions.  "Why did you do this?"
7  Q. Were you taught whether it adds safety concerns for the
8     subject?
9  A. Most likely.  And the reason I say most likely is because
10    the five-second exposure when you have a proper hookup
11    equals the same physical exertion that you would have in a
12    30-minute workout.  That's what your muscles experience.
13    And this is taught by TASER.
14        So what happens, you start going over that five
15    seconds so obviously you have more stress.
16 Q. Did you communicate that to officers?
17 A. Yes.
18 Q. Do you believe that a cycle of more than five seconds is
19    excessive force?
20 A. More than -- You're asking for my opinion?
21 Q. Yes.
22 A. I would have to see what the total circumstances are
23    before I'd answer that question.  That's the way I would
24    answer that.  I want to see the whole picture, why is this
25    being done, and, you know, just...

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

7f83a6ab-63eb-4702-82a7-f3a6f3cc34b3

Page 46

1    of the three.
2    Q.  Between 2010 and 2012 do you know if there were formal
3        training sessions?
4    A.  I know every time I got a training bulletin I sent it out,
5        I passed it on.
6    Q.  Do you know if you would have received the 2000 and -- I
7        mean, beyond the 2004?
8    A.  I would have to look at my e-mails, 'cause I kept them
9        all.
10   Q.  How did you keep all your e-mails?
11   A.  They're on the computer.
12   Q.  At the department?
13   A.  Yes, sir.
14   Q.  Do you know approximately how frequently you would get
15       updates from TASER?
16   A.  There was no like the first of every month, no, none of
17       that.  I mean, we'd get one, I passed it on.
18   Q.  Would you get an entire new manual?
19   A.  No.  I had not gotten a...
20   Q.  You didn't via e-mail like get the thing that I showed you
21       like the Volume 18?
22   A.  Volume 19 is a current issue.
23   Q.  Did you get Volume 19?
24   A.  No.
25   Q.  Did you get Volume 18?

Page 47

1    A.  Once my certificate expired I got an e-mail from TASER
2        telling me my certificate expired, and then I didn't hear
3        anything anymore from them.
4    Q.  All right.  But that was 2010?
5    A.  Yes, sir.
6    Q.  So did you have a Volume 17?
7    A.  I don't believe it.
8    Q.  Do you know if the department had a Volume 18?
9    A.  If it did I don't know where it is.
10   Q.  Would you get -- This is Volume 18 from January 2012
11       course.  Do you know if this was ever received?
12   A.  If it was it was by somebody else other than me.
13   Q.  All right.  Now, I was going back regarding the taser, and
14       I had asked you the question about more than a five-second
15       cycle being excessive, and you indicated that
16       circumstances you would want to know before concluding
17       whether force was excessive.  And I just want to be clear,
18       the issue of whether they were high on PCP or bath salts
19       would not have been a consideration in your tenure, or it
20       would have been?
21   A.  No.
22   Q.  Okay.  So it would not have been?
23   A.  That's correct.
24   Q.  What circumstances would you want to know -- Five seconds,
25       more than five-second cycle of electricity would have been

Page 48

1    against what you taught; is that fair?
2    A.  Okay.  You pull the trigger, let the trigger go, five
3        seconds it quit.  You hold the trigger down and it keeps
4        running.  If you let it go after six seconds, seven
5        seconds, eight seconds, all right, somewhere in there, you
6        know, I'm not going to make any kind of statement whether
7        that's excessive force because I don't know the situation.
8        I know what it does go against training that you five
9        seconds and evaluate.
10   Q.  And you pull the trigger once and release it is what you
11       taught your officers?
12   A.  Yes.
13   Q.  You taught them do not hold the trigger in?
14   A.  Yes, sir.
15   Q.  You taught them if you hold the trigger in you will be
16       giving more than a five-second --
17   A.  That's correct.
18   Q.  -- burst of electricity?
19       That's fair?
20   A.  Yes, sir.
21   Q.  Did you tell them that that was dangerous to give more
22       than a five-second burst of electricity?
23   A.  No, I didn't tell them it was dangerous, I told them it
24       was against policy.  Five-second exposure and you evaluate
25       the situation.

Page 49

1    Q.  Why was it against policy?
2    A.  Well, you got to have someplace that you got to control.
3    Q.  And you indicated that you were taught that a five-second
4        cycle of electricity --
5    A.  That's TASER's training.
6    Q.  And they taught you that that was the equivalent of a
7        30-minute workout?
8    A.  Yes, sir.
9    Q.  All right.  So if you gave six second, seven seconds or
10       eight seconds you would be incrementally increasing the
11       stress on the muscle?
12   A.  Yes, sir.
13   Q.  You were taught by TASER that the heart is a muscle and
14       that is something that would be stressed by the use of
15       electricity?
16   A.  The heart is a part of the auto nervous system, I believe,
17       there.  Auto... It doesn't increase the heart rate.
18   Q.  But you knew that it was a muscle or you were taught that
19       the heart is a muscle --
20   A.  Now, the taser electricity travels across the surface
21       of the skin, causes the muscles to contract.
22       Now, even if you put a probe dead center of your
23       chest, took the other one in the middle of your back,
24       electricity is going to go around the surface of the skin
25       to the other probe, it's not going to go through.  It's

13  (Pages 46 to 49)

Page 50

1    not going to contact the heart, it's going to contact the
2    muscles on the surface.
3            The only way that you can get the muscle -- or
4    the heart muscle directly involved in that is if the
5    probes are in contact with the heart.
6    Q.   They taught you that at TASER International?
7    A.   Yes.
8    Q.   Did they teach you that the heart was a muscle that would
9    be stressed by the use of electricity?
10   A.   Well, your heart rate... No, I don't recall anything of
11       that nature.
12   Q.   What did they teach you about chest shots?
13   A.   You mean on what?
14   Q.   Shooting the probes in close proximity to the location of
15       the heart?
16   A.   The chest area, neck area, and face area were off limits
17       according to our policy and procedure. So you had an area
18       like this that were off limits.
19   Q.   Why was the chest area off limits?
20   A.   That's just because of the probe spread you ended up in
21       the chest area, you're going to end up in the throat,
22       you're going to end up in the face.
23   Q.   Did it have anything to do with the heart?
24   A.   I don't believe it.
25   Q.   Did you or were you taught anything by TASER International

Page 51

1    about the number of times that were appropriate to deploy
2    an electrical current?
3    A.   I don't recall any maximum number.
4    Q.   Was there an acceptable number?
5    A.   I guess the acceptable number was once you got compliance.
6    Q.   All right. Does the number three ring a bell, or was
7        there any --
8    A.   Well, I think that was afterwards they changed that, that
9        you take three exposures and if you don't get compliance
10       then you evaluate other means.
11   Q.   What do you mean by evaluate other means?
12   A.   Well, look to other means of... I mean, you have hookup,
13       and this would have been after my time expired there. I
14       mean, you have to take and evaluate what you're doing.
15   Q.   How far after was this update?
16   A.   I don't recall. Like I said, after my certificate expired
17       I was looking in other directions and this stuff all
18       became history.
19   Q.   Did you stop reading things after your certification
20       expired?
21   A.   Not really. I mean, I stopped really paying attention to
22       it.
23   Q.   Why didn't you recertify?
24   A.   Because I was looking at retiring and the things that I
25       planned on doing didn't involve this anymore.

Page 52

1    Q.   Did you during your tenure read documents like the U.S.
2        Department of Justice bulletin regarding the use of force,
3        tasers and other less lethal weapons?
4    A.   No, I've never seen that.
5    Q.   Okay. What did you teach officers when you were in about
6        the number of times?
7    A.   It was never, "Okay. Six times." You didn't do that. It
8        was -- I've never heard of an instance up until that point
9        where, you know, one or two times, and most of the time
10       the first time was enough to gain compliance.
11   Q.   Okay.
12   A.   If you had hookup.
13   Q.   Now, the course materials that you used, did they involve
14       references to case law and decisions regarding the use of
15       force?
16   A.   I believe so.
17   Q.   Okay. Like, for instance, I'm looking at one of the notes
18       from TASER International in 2011 that says, "Any decision
19       to apply multiple ECD applications must take into
20       consideration whether a suspect is capable of complying
21       with officers' commands." Is that something that you
22       taught?
23   A.   2011? No, I was already done with it by then.
24   Q.   Well, I'm saying that this is documented 2011. What I'm
25       asking is during the time that you were teaching --

Page 53

1    A.   Well, that is only a commonsense thing there. If you got
2        some guy that's hooked up on that taser how can he
3        reply -- you know, "How can I comply when you got me
4        jammed up with this?"
5    Q.   That's a good point. You said that you were exposed to
6        the taser, correct?
7    A.   Yes, sir.
8    Q.   Were you exposed to the X26 or the M26?
9    A.   X26.
10   Q.   All right. So you knew what it felt like?
11   A.   Yes, sir.
12   Q.   And somebody gave you a five-second cycle --
13   A.   Yes, sir.
14   Q.   -- or was it less?
15           And when it happened to you did you have other
16       officers or other individuals holding you so that you
17       didn't fall to the ground?
18   A.   I started out on my knees when he did that.
19   Q.   And did you have officers holding you up?
20   A.   Yes.
21   Q.   Bracing you?
22   A.   Yes.
23   Q.   All right. What was the experience when you had the --
24       Well, I guess before we get to that, was it in drive-stun
25       or probe mode?

14 (Pages 50 to 53)

**Page 54**

1  A.  Probe mode.

2  Q.  What was the experience in probe mode?

3  A.  Well, let's put it this way, I don't want to do it again.

4  Q.  Painful?

5  A.  The initial experience I refer to like somebody took a

6      baseball bat with a full swing hit me across the back with

7      it.  I was on my knees, and I did that because I had a hip

8      replacement and I didn't want to take a chance on falling

9      on that hip.

10     A hit in the back with the thing, I immediately

11     went over on my face, went face forward, and I had my

12     hands like this on the carpet and my face in the carpet.

13 Q.  All right.  You said you had your hands like this on the

14     carpet.  You had --

15 A.  My fists, like my hands were in a fist like this and they

16     were supporting my upper body.

17 Q.  Okay.  So your hands were in a fist down below your chest?

18 A.  Yes, sir.

19 Q.  Did you put them that way, or is that the way you ended

20     up?

21 A.  That's the way I ended up.

22 Q.  Did you close your fists or do you believe --

23 A.  They were closed.

24 Q.  Do you believe that was a manual decision to close or a

25     conscientious decision to close your fists or did your

**Page 55**

1      fists close after you got --

2  A.  I don't know.  I can't answer that.

3  Q.  Was there a recovery period or a period where you were not

4      immediately cognizant of what was going on?

5  A.  I was well aware of what was going on.  The longest five

6      seconds of my life.

7  Q.  What did you do during that five seconds?

8  A.  Just... I did nothing.

9  Q.  I mean, you were gesturing like you were raising clenched

10     fists up to your face.

11 A.  I did nothing.  I mean, I was on my face on the floor, and

12     I did nothing.  I mean, I didn't say anything, I didn't do

13     anything.

14 Q.  And what happened after the electricity stopped going

15     through your body, what was your experience then?

16 A.  Wow.

17 Q.  And what were you doing with your body?

18 A.  I didn't have any residual effects at all.

19 Q.  Did it give you an appreciation of... that experience, did

20     that give you an appreciation of a period of waiting and

21     reassessing before redeploying?

22 A.  Well, yes.  I... I'm a firm believer if you're going to

23     operate that equipment, the ECD stuff, you should know

24     what it's capable of by personal experience.

25 Q.  Why did it give you an appreciation of a delay before

**Page 56**

1      redeploying?

2  A.  Well, that wasn't a prime consideration of delay between

3      redeploying at that time, it was more just the use of, all

4      right, what is this?  What is it capable of doing?  I know

5      what it is, I know what it feels like.

6          All right.  If I want to use a taser on this

7      gentleman here I know what I'm going to do to him, I know

8      how he's going to feel with this.  I mean, it's just

9      responsibility, I guess.

10 Q.  Okay.  Now, when I made the reference to before -- You

11     know what an ECD is, right?

12 A.  Yes.  Electronic control device.

13 Q.  Before using an electronic control device I referenced

14     taking into consideration whether a suspect is capable of

15     complying with officers' commands, and you referenced that

16     as kind of being commonsensical; is that --

17 A.  That's correct.

18 Q.  All right.  What did you teach or what did you teach

19     officers to do to ensure that a suspect is capable of

20     complying with commands before deploying the ECD?

21 A.  I don't recall anything specific addressing that issue.

22     Like I said before, it's a commonsense issue.  If you've

23     got a guy hooked up on that and he can't respond to your

24     commands how can you expect him to when he cannot control

25     himself?

**Page 57**

1          I mean, the crux of that is the officer knowing

2      what he's doing here.  I mean, how can you expect somebody

3      to comply when they're not physically able?

4          Why do I have to tell you that?  I mean, that's

5      a commonsense thing.

6  Q.  What about mentally capable?

7  A.  Mentally capable?

8  Q.  Yeah.  Intoxicated, or whatever.

9  A.  The taser bypasses all of the on-board problems, goes to

10     muscular, and -- Should be if he was intoxicated he

11     should -- He's going to let you know one way or another

12     what's going on.

13 Q.  Did you teach the officers anything about when it was

14     appropriate to use the taser in probe mode?

15 A.  Use of force continuum that we used it was at the same

16     level at the point that you put hands on people is the

17     point where you could use your taser is what we taught

18     them.

19 Q.  When is it appropriate to put hands on?

20 A.  When you're going to effect an arrest.

21     I've always -- When I was a field training

22     officer I always taught other officers you don't touch

23     anybody unless you're going to effect an arrest.

24 Q.  Okay.

25         All right.  Looking at some TASER documents, and

15 (Pages 54 to 57)

Page 66

1    disturbed persons?
2    A.  That's correct.
3    Q.  Okay.
4           Did you show videos OC versus EMD?
5    A.  Yes.
6    Q.  And that is pain compliance versus incapacitation?
7    A.  That's correct.
8    Q.  And what was the essence of pain compliance versus
9        incapacitation?
10   A.  Well, taser is cleaner.  You don't have any residual
11       effects to the officers, the suspect.  If you use OC spray
12       on a suspect you've got probably half an hour, 45 minutes
13       of residual before they air out enough to...
14   Q.  Okay.  Now, you used the phrase milliamps before.
15   A.  Yes.
16   Q.  Looking at page 27 it says, "Low amperage M26 and X26 is
17       less than .004 amps."
18   A.  Yes.
19   Q.  All right.  So it wasn't milliamps, it was amps?
20   A.  I believe that's the M26?
21   Q.  It says --
22   A.  You get further into the... It's X26, it's down to that
23       .0035 number that I gave you.
24   Q.  All right.  But you used milliamps.
25   A.  Yes.

Page 67

1    Q.  Okay.  So down here it says "Advanced TASER M26 output is
2        3.6 six milliamps, average current .0036 amps"?
3    A.  Yes.
4    Q.  And the X26 output is --
5    A.  Well, that's what that .00035 is, milliamps.
6    Q.  According to this it says .0036 amps and 3.6 milliamps.
7        Just so we're using the right terminology.
8    A.  Well, I thought I was on the right terms with that, but...
9    Q.  Well, you can look at it.
10          MR. REISING:  Why don't you take a look at it,
11       Tom, and see if you agree with what's being said there.
12          THE WITNESS:  "Advanced TASER M26 is 3.6
13       milliamps."  Right here.
14   Q.  (BY MR. FELTY):  Right.  Or .0036 amps.
15   A.  Right.
16   Q.  Okay.
17   A.  It's the same thing what I was talking about.
18   Q.  But earlier I think you said there were point, then three
19       zeros, and then 36 milliamps.
20   A.  Isn't that what that says?
21   Q.  No, it says .0036 amps.
22   A.  Well, I had one more zero in there then.
23          MR. REISING:  Well, let's make sure we've got it
24       right.
25          THE WITNESS:  Two zeros.  Four numbers instead

Page 68

1    of five.
2    Q.  (BY MR. FELTY):  Amps?
3    A.  Right.  Milliamps.
4    Q.  Is that your understanding?
5    A.  Right here 3.6 MA is milliamps, average current, or .0036.
6        This is the same as that.
7    Q.  All right.  Three point six milliamps is the same as .0036
8        amps?
9    A.  Yes.
10   Q.  Okay.
11          MR. REISING:  I'm sorry.  What page was that on,
12   Mr. Felty?
13          MR. FELTY:  Twenty-seven.
14          MR. REISING:  Thank you.
15          THE WITNESS:  You don't have a copy of that
16   book?
17   Q.  (BY MR. FELTY):  Not your copy.  I have the current one.
18          Actually I have the one that was in effect in
19   2011 and 2012.
20          MR. FELTY:  Let's take a break.
21          MR. REISING:  Sure.
22          (Discussion off the record.  Recess taken
23          at 3:31 P.M.  Deposition resumed at or
24          about 3:39 P.M.)
25          (Deposition Exhibit Number 1 was marked for

Page 69

1          identification by the reporter.)
2    Q.  (BY MR. FELTY):  I'm going to have this marked and copied
3    A.  Okay.
4    Q.  So first of all I've identified what's been marked as
5        Exhibit 1.  Just for the record purposes these are the
6        taser logs that I was showing you in the spreadsheet
7        format; is that right?
8    A.  Yes, sir.
9    Q.  Okay.  I'm going to mark your manual as Exhibit 2,
10       exclusive of the certificates, and we'll do that in a bit,
11       and then I'll have it -- somebody here can copy it, I take
12       it.
13          (A brief discussion was had off the
14          record.)
15          MR. FELTY:  All right.  I guess we can go back
16       on.
17   Q.  (BY MR. FELTY):  I want to be clear.  I'm going to mark
18       the binder that you brought as Exhibit 2, and that's the
19       TASER International instructor materials; is that right?
20   A.  Yes, sir.
21   Q.  Is this what you taught, used to teach the officers, or is
22       this what you used to learn about the --
23   A.  That is the instructor's manual.
24   Q.  So this is what you taught, used to teach the officers?
25   A.  I believe it.

18 (Pages 66 to 69)

Page 70

1 Q.  Okay.  And you said that you had like three or four more
2      of these?
3 A.  Yes.
4 Q.  And what are the three or four more?
5 A.  Different versions.
6 Q.  So you do have different versions?
7 A.  Yes.
8 Q.  And this one is 2004, so do you have more recent versions?
9 A.  I took one off the pile, to be honest with you, and didn't
10     really look at it to see which...  I'll have to look at
11     the other ones.
12 Q.  So what do you mean you took one off the pile?
13 A.  I had -- I think I've got four of them.
14 Q.  All right.  Now, did you take them off of a pile at the
15     department or did you take them off of a pile at home?
16 A.  I had...  That one was at the department.
17 Q.  Did you take it off -- When did you take it off the pile?
18         THE WITNESS:  When was the first time we talked?
19         MR. REISING:  Oh, when we first met a couple of
20     weeks ago?
21         THE WITNESS:  Yeah.
22 Q.  (BY MR. FELTY):  Okay.  Do you know if there are more
23     recent ones?
24 A.  I would have to look.
25 Q.  Okay.  Needless to say, or regardless, we'll copy this one

Page 71

1      and we've agreed that the court reporter will take it and
2      make a copy and return it to Mr. Reising who will return
3      it to you.  Is that fair?
4 A.  Fine.
5 Q.  I've given you your certificates back?
6 A.  Yes.
7 Q.  All right.  I'm looking at page 121 of what will be marked
8      as Exhibit 2, and it shows a download of the X26.  In
9      this looks like kind of like in a Windows format where it
10     shows the serial number as Greenwich Mean Time, local
11     time.  Is that the form that you're accustomed to seeing
12     when the taser material is downloaded?
13 A.  Yes, sir.
14 Q.  All right.  And that, you had the capacity at the
15     department to do that?
16 A.  I did.  I no longer do -- The equipment to do that I no
17     longer possess.
18 Q.  But, I mean, on April 10th of 2012 the department had the
19     capacity to print out reports like that?
20 A.  Yes, sir.
21 Q.  Do you know if they did?
22 A.  No, sir.
23 Q.  You don't know?
24 A.  I do not know.
25 Q.  Okay.

Page 72

1          On page 143 of the book you've highlighted
2      a portion, it says, "Note that 86 percent of the agencies
3      deploying TASER have placed it before or equal to aerosol
4      chemical agents."  Why is that highlighted?
5 A.  I don't remember.
6 Q.  All right.
7 A.  Those highlighted were bright orange when I did them.
8 Q.  And this is orange?
9 A.  Well, not bright orange.
10 Q.  All right.  Did you --
11         MR. REISING:  I'm sorry, Mr. Felty, what page
12     did you say you're on?
13         MR. FELTY:  One forty-three.
14         MR. REISING:  Okay.  Thanks.
15 Q.  (BY MR. FELTY):  Did the department place the taser at a
16     level equal to pepper spray?
17 A.  I would have to look at the policy and procedure from that
18     time period.
19 Q.  All right.  You do have that, I think.  It was in this
20     volume.
21 A.  According to my chart here the force continuum doesn't
22     identify exactly what weapon to use, it just starts out
23     about the resistance levels, officer's reactions and
24     injury potentials.
25 Q.  All right.  According to page -- or Policy 1.4, I'm

Page 73

1      reading from Saginaw, and this looks like it was effective
2      on August 1st, 2009, it says, "The X26 taser is a
3      defensive weapon listed in the force continuum under
4      compliance controls.  The decision to use the X26 taser is
5      the same as the decision to use OC spray or a baton."
6          Is that your understanding?
7 A.  Just read it.  Yes, sir.
8 Q.  Hands on, does that come before baton or OC spray?
9 A.  It doesn't address hands on.  I don't see where it says
10     hands on before.
11 Q.  All right.  Well, let's look.  You referenced the force
12     options, the force continuum.
13         All right.  Officer presence, that's obviously
14     just a police officer being there, right?
15 A.  That's correct.
16 Q.  Then there's verbal direction?
17 A.  Yes, sir.
18 Q.  Then there are compliance controls?
19 A.  Yes, sir.
20 Q.  What are compliance controls?  Is that hands on?
21 A.  Could be.  Verbal, little more...  Well, compliance
22     controls, I guess you could call hands on at that point.
23     Whether or not you actually grab somebody or try to
24     physically subdue somebody I guess they could be
25     categorized as two different.

19 (Pages 70 to 73)

Page 82

1    wondering if the taser is simply used under those
2    circumstances is that excessive?
3  A.  I don't believe it.
4  Q.  Okay.  Now, the policy says, "Against persons passively
5    resisting a lawful full custody arrest when alternatives
6    to the use of force are not available to the officer."
7    What alternatives in a passively resisting situation is
8    that referencing?
9         MR. REISING:  If you know.
10         THE WITNESS:  I really don't know because... I
11    don't know.
12  Q.  (BY MR. FELTY):  Okay.  But you taught -- Did you teach
13    this policy as part of the taser usage?
14  A.  We went through the general orders.  Everybody was taught
15    the general order, what the general order was.
16  Q.  Okay.
17  A.  So everybody had to understand what this was.
18  Q.  Did you understand what alternatives is being referenced
19    in the use of lethal force?
20         MR. REISING:  In the use of less than lethal
21    force?
22         MR. FELTY:  Less lethal.  That's what it --
23         MR. REISING:  Well, that's what you
24    articulated all those words, that was my problem.
25         MR. FELTY:  Blended them together.

Page 83

1         THE WITNESS:  You know, if you want to pick this
2    apart...
3         Okay.  You know... Well, no, I ain't going to
4    go there.
5         MR. REISING:  What I'd like you to do, Tom, is
6    answer his question if you can.
7         THE WITNESS:  I'm trying to give him --
8         MR. REISING:  And if you can't, tell him you
9    can't.  That's okay.
10         THE WITNESS:  I'm sorry.  I can't answer that.
11  Q.  (BY MR. FELTY):  All right.  Alternatives to consider
12    before using pepper spray or a taser are verbal direction,
13    right?
14  A.  Yes, sir.
15  Q.  Okay.  And compliance controls?
16  A.  I guess you could call it that.
17  Q.  And compliance controls include, what, actually attempting
18    to make an arrest or grabbing a hand and putting it in a
19    position?
20  A.  Now, you're still referring to passive resistance,
21    correct?
22  Q.  Yes.  I'm trying to get a clear understanding of what
23    passive resistance is, because I don't have that clear
24    understanding.
25  A.  Well, the way I understand it passive resistance is when

Page 84

1    somebody is offering no resistance but are not complying
2    to your requests.
3  Q.  And that's where I'm having trouble.  What do you do as a
4    police officer, what do you train the officers to do under
5    those circumstances if somebody is just... And I think
6    the example that I used was you tell the person to put
7    their hands on their head and they don't.  What
8    alternatives do you use?
9  A.  Looking back on the things that I have taught it started
10    out verbally trying to reason with somebody, trying to
11    talk them into it before any kind of force is used.  And
12    then if they don't, still don't comply then you just start
13    moving up the force continuum until... do what you have to
14    do to get them to comply.
15         The passive resistance, I mean, I guess passive
16    resistance is just passive, you're not offering any real
17    force, no force, period.
18  Q.  At a bare minimum if you're going to deploy a taser, tell
19    me if this is correct as I'm understanding you, you tell
20    the person "If you don't put your hands on your head or
21    you don't do what I tell you then I'm going to deploy my
22    taser"; is that fair?
23  A.  Well, if I recollect right the way we did this was, "All
24    right.  I want you to do this.  You're under arrest.
25    You understand that.  You're under arrest.  You're going

Page 85

1    to go to jail.  No matter what you do you are going to
2    jail, plain and simple.  You can go the hard way, you can
3    go the easy way.  It's up to you," and try to talk them
4    into doing that.
5         And then, all right, if they don't want to do
6    that we call, we take the taser out, take the cartridge
7    off it, do a little spark thing on this.  "Look it, don't
8    make me use this."
9         It was not just, okay, taser, bang.
10  Q.  And I guess --
11  A.  Give them some leeway to make the decision to comply
12    voluntarily.
13  Q.  All right.  So you've described doing like a deployment of
14    it so that the person can hear the spark?
15  A.  Yes, sir.
16  Q.  All right.  So in a passive situation to simply go up to
17    -- to not attempt to reason, to not do the spark test and
18    deploy the taser, is that something that you would believe
19    to be excessive?
20  A.  Yes, sir, I would have to agree with that.
21  Q.  Okay.  And the force continuum goes both directions, as
22    the subject's behavior escalates so too can the officer's
23    escalate; is that fair?
24  A.  Yes.
25  Q.  When we're talking about the use of a taser, once the

22  (Pages 82 to 85)

Page 86

1    taser is deployed you've talked about a period of time
2    where you assess the situation; is that correct?
3    A.   Yes, sir.
4    Q.   All right. And the assessment -- One of the aspects of
5         assessment is to determine whether the subject is, I guess
6         it's not deescalating, declining in the level of
7         resistance; is that fair?
8    A.   One of the analogies that we used with deadly force is if
9         you were in a gun fight with somebody and shots were
10        traded back and forth and all of a sudden the guy stands
11        up, drops his gun, "Okay, I give up." At that point you
12        went from a deadly force situation right down to no force,
13        because the guy's standing there in a compliance mode.
14        You can no longer use deadly force. The guy's unarmed
15        himself, no longer a threat.
16   Q.   Okay.
17   A.   But it's the same principle with the lesser weapons.
18   Q.   All right. So, for instance, if the taser is deployed,
19        the person stops, puts their hands in the air, assessment
20        to be made. That's a deescalation?
21   A.   Yes, sir.
22   Q.   And it would be inappropriate to deploy the taser again
23        under those circumstances?
24   A.   If the person give up?
25   Q.   If the person puts their hands in the air and is standing

Page 87

1    still?
2    A.   No, I would not say it would be appropriate to do that
3         again.
4    Q.   Okay. That would be excessive to do it again?
5    A.   Yes, sir.
6    Q.   An officer -- at that point in time the scale is
7         declining, it would be incumbent upon the officer --
8    A.   Decline also.
9    Q.   -- to decline and assess the situation --
10   A.   Yes, sir.
11   Q.   -- before deploying again?
12            MR. REISING: Let him finish his question, Tom,
13        please.
14   Q.   (BY MR. FELTY): Is that fair? It would be --
15   A.   Yes, I would say so.
16   Q.   All right. At bare minimum the officer would need to say
17        something to the effect of "Okay. Have you calmed down?
18        Are you ready to comply"; is that fair?
19   A.   There would have to be some kind of verbiage in there.
20   Q.   All right. "Or if you don't comply I'm going to do this
21        again"?
22   A.   That's a warning.
23   Q.   Okay. So a warning would be required under those
24        circumstances before deploying it again?
25   A.   Be required, or should it be done?

Page 88

1    Q.   Should it be done?
2    A.   I would think it would have to be done.
3    Q.   And to not do it would be -- to not give a warning and use
4         the taser again, that would be excessive; is that fair?
5    A.   To do it without warning?
6    Q.   Yes.
7    A.   And the individual has basically given up?
8    Q.   Well, I'm saying the individual has stopped, put the hands
9         in the air and it's the assessment period that's the
10        circumstance that I'm asking about.
11   A.   And he just arbitrarily tased him again?
12   Q.   Well, without a warning or without saying that "I'm going
13        to tase you if you don't comply."
14   A.   I don't know why they would have tased him, or why they
15        would application when there's no resistance and the guy
16        give up.
17   Q.   That would be excessive if the taser was deployed?
18   A.   I would think so.
19   Q.   All right.
20            At that point in time when a person is -- if a
21        person is deescalating and the taser is used again, that
22        goes more into the area of punishment as opposed to
23        compliance; is that fair?
24   A.   Yes, I think that.
25   Q.   Okay.

Page 89

1            I'm going to take a look at this book, but on my
2    own after it's copied. I just want to ask you, and I'm
3    going to try to go through this pretty quickly, because I
4    am, in fairness I'm telling you I'm looking at Version 18
5    and I don't want to go through your pages to see if any of
6    this stuff is contained within your manual. I'm just
7    going to ask you if you recall being taught this or
8    teaching this to those that you were educating regarding
9    the use of the taser.
10           And I'm looking at a 2011 electronic control
11   weapon guideline issued by the U.S. Department of Justice.
12   And it says, "Personnel should use an ECW for one standard
13   cycle (five seconds) and then evaluate the situation to
14   determine if subsequent cycles are necessary."
15           Is that something you agree with and taught?
16   A.   Read that again, please.
17   Q.   "Personnel should use an ECW for one standard cycle (five
18        seconds) and then evaluate the situation to determine if
19        subsequent cycles are necessary."
20   A.   Yes.
21   Q.   You agree with that?
22   A.   Yes.
23   Q.   And that assessment includes observing what the person is
24        going to do or what the person might do?
25   A.   Well, observe the behavior at the time, not what they

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

7f83a6ab-63eb-4702-82a7-f3a6f3cc34b3