# EXHIBIT 8

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

DOROTHY ANDERSON and DEMARQUION
MERRILL, as Co-Personal
Representatives of the Estate of
BOBBY MERRILL, deceased,

      Plaintiffs,

                          Case No. 13-11159

-v-

                          HON. THOMAS LUDINGTON

OFFICER JEFF MADAJ,
individually, OFFICER JUSTIN
SEVERS, individually, OFFICER
BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA,
individually,

      Defendants.
_____/

      The Deposition of JUSTIN L. SEVERS, taken before Timothy J. Boroski, RPR/CSR-2378 and Notary Public in and for the County of Clinton, State of Michigan, at the offices of Progressive Insurance Company, 1 Tuscola Street, Suite 301, Saginaw, Michigan, on Thursday, April 24, 2014, commencing at or about 1:40 p.m.

Ripka, Boroski & Associates, LLC    email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
Firm Registration No. 008139
fd2017e7-6b18-443c-ac18-8d770742afda

Page 2

```
 1  APPEARANCES:
 2
    Fieger, Fieger, Kenney, Giroux & Harrington, PC
 3  BY: GARY N. FELTY, JR., ESQ., (P55554)
    19390 West Ten Mile Road
 4  Southfield, Michigan 48075
    248.355.5555
 5
       Appearing on behalf of Plaintiffs,
 6
 7
    Plunkett Cooney
 8  BY: H. WILLIAM REISING, ESQ., (P19343)
    111 East Court Street, Suite 1B
 9  Flint, Michigan 48502
    810.342.7001
10
       Appearing on behalf of Defendants.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            INDEX OF WITNESS

 2    WITNESS                              PAGE
 3
 4  JUSTIN L. SEVERS
 5     Examination by Mr. Felty              4
 6
 7
 8
 9
10
11            INDEX OF EXHIBITS
12
    EXHIBIT       DESCRIPTION       MARKED
13
14  Exhibit Number 1   Drawing         74
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              Saginaw, Michigan
 2              Thursday, April 24, 2014
 3              1:40 p.m.
 4              P R O C E E D I N G S
 5              JUSTIN L. SEVERS,
 6  having been duly sworn by the Reporter, was examined, and
 7  testified on his oath as follows:
 8              EXAMINATION
 9  BY MR. FELTY:
10  Q   Would you please state your full legal name?
11  A   Justin Lee Severs.
12  Q   Are you a police officer?
13  A   Yes.
14  Q   What department now?
15  A   Saginaw Township Police Department now.
16  Q   When did you started at Saginaw Township?
17  A   March 3rd, I believe it was, 2014.
18  Q   Very recently?
19  A   Yes.
20  Q   Where were you employed before Saginaw Township?
21  A   Saginaw city.
22  Q   When did you start at Saginaw city?
23  A   October 30th of 2009.
24  Q   Were you a patrolman?
25  A   Yes.
```

Page 5

```
 1  Q   Was that for the entire time up to around March 3rd,
 2      2014?
 3  A   March 2nd was the actual last day in the city, yes.
 4  Q   So you left the city on the 2nd and you started a new job
 5      on the 3rd?
 6  A   Correct.
 7  Q   No vacation?
 8  A   Nope.
 9  Q   How old are you?
10  A   Thirty.
11  Q   Can you tell me a bit about educational background? I'm
12      assuming you graduated high school?
13  A   Correct. I graduated high school from Birch Run. I went
14      on to Delta College. I have two associates degrees and I
15      have a bachelor's from Ferris.
16  Q   When did you graduate high school?
17  A   2002.
18  Q   Did you go from high school after a little break to
19      Delta?
20  A   Correct.
21  Q   And what did you study at Delta?
22  A   I started out with just general education for I think
23      about the first semester, maybe two.
24  Q   And you said you got two degrees there?
25  A   Correct.
```

2 (Pages 2 to 5)

Ripka, Boroski & Associates, LLC          email: rba@ripkaboroski.net
(800) 542-4531/(810) 234-7785/Fax( 810) 234-0660          Firm Registration No. 008139

fd2017e7-6b18-443c-ac18-8d770742afda

Page 18

1  A  Yes.
2  Q  What is a force continuum?
3  A  Basically, it's the -- the steps that we as police can
4     use to deescalate a problem that a suspect is displaying,
5     or the situation we are in.
6  Q  Are there a certain number of steps?
7  A  Yeah.
8  Q  Do you know how many there are?
9  A  Probably like five or six.
10 Q  Do you know what they are?
11 A  Officer presence; verbal commands.
12 Q  Okay, do this slowly: presence, verbal commands?
13 A  Passive resistance; active resistance; assaultive and
14    deadly force, I believe.
15 Q  And what you have described, including passive resistance
16    and active resistance, are these your actions or are they
17    in part describing the actions of the subject?
18 A  Describing the actions of the suspect.
19 Q  Okay. Presence is clearly the police are there, so
20    that's a police officer's presence?
21 A  Correct.
22 Q  And that's on the force continuum?
23 A  Correct.
24 Q  Okay. And then beyond mere presence is verbal command
25    and that's you as a police officer instructing a person

Page 19

1     to do something, correct?
2  A  Correct.
3  Q  And then passive resistance, that is an action of the
4     subject?
5  A  Yes.
6  Q  And what does passive resistance mean?
7  A  Ignoring your commands.
8  Q  By ignoring, what does that mean?
9  A  Not doing what they are told.
10 Q  Does it involve walking away?
11 A  Correct.
12 Q  And then active resistance means what?
13 A  Running. Basically, running. Not -- taking off.
14    Actively resisting. Which I guess would have included
15    the assaultive, because that's actively resisting.
16 Q  Okay. Now, assaultive, that's a separate level on the
17    force continuum?
18 A  It's, basically, when the guy assaults the officer.
19 Q  And that's striking?
20 A  Correct.
21 Q  What about threats? If I put -- somebody just says, and
22    forgive my language, "Fuck you, I'm not doing it"?
23 A  Passive.
24 Q  Okay. What about, "I'm going to kick your butt"? See, I
25    used the really bad word and then I say kick your butt.

Page 20

1  A  Are they -- how far away are they? Are they taking a
2     defensive stance? Are they -- there is a lot of --
3  Q  Okay. Not within swinging distance and just says, "If
4     you touch me, I'm going to kill you"? Or, "I'm going to
5     kick your butt"?
6  A  Are they taking a fighting stance at that time?
7  Q  What is a fighting stance? Good point.
8  A  Fist clenched. Acting like they are getting ready to
9     fight.
10 Q  Now, with the -- I guess is it Wietecha?
11 A  Correct.
12 Q  Officer Wietecha was here and I asked him about fighting
13    stance. Is that like a police -- is that something that
14    you're taught the term, like a police term of art?
15 A  No. Just it's -- I guess that it's -- what's the word
16    I'm looking for? It's things to look for in body
17    language. It's more the reading of the body language of
18    the guy.
19 Q  I guess what I mean by a term of art, you went through an
20    FTO process, right?
21 A  Correct.
22 Q  And part of the FTO process, to my recollection from
23    years ago, is that somebody actually goes over your
24    reports and helps you write them?
25 A  Correct.

Page 21

1  Q  All right. Now, the phrase fighting stance, is that, you
2     know, something that an FTO or another person said, "Hey,
3     you wrote a lot here. We use fighting stance"?
4  A  No.
5  Q  All right. What does fighting stance mean to you? Now,
6     you said fists up?
7  A  I said clenching fists. They can be down, too.
8     Clenching their fists.
9  Q  If a person -- and this hypothetical person is on the
10    sidewalk, and for whatever reason you have a lawful
11    reason to address this person. And in response to your
12    lawful request of them, they have their hands at their
13    side and clench their fist. Is that a fighting stance?
14 A  I would say yes.
15 Q  Okay. Now, you also described mannerisms or body
16    movements as a part of that fighting stance. Is there
17    anything -- are there levels, in your mind, I'm just
18    talking about you, of levels of fighting stance?
19 A  I guess I need clarification. Other signs?
20 Q  Sure.
21 A  Heavy breathing; clenching teeth; stuff like that.
22 Q  Did Mr. Merrill ever clench his teeth?
23 A  I don't recall.
24 Q  Now, you do have a report, and you have a copy in front
25    of you?

6 (Pages 18 to 21)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax(810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

fd2017e7-6b18-443c-ac18-8d770742afda

Page 50

1  Q  (BY MR. FELTY) I said, are you aware of any subject,
2     other than Mr. Merrill, dying within an hour or two of
3     the use of a taser?
4  A  In Saginaw?
5  Q  Yes, in Saginaw.
6  A  Not that I have ever heard of.
7  Q  Okay. Just wondered.
8  A  Oh.
9  Q  All right. So you were heading towards that incident
10    when what happened?
11 A  As I was -- I was -- it would be going east on Hess
12    Street right at -- basically, almost right at Washington.
13    Central put out a call for a male in the street jumping
14    in front of cars on Washington.
15 Q  Is that what you heard?
16 A  Yes.
17 Q  Okay. So you heard central dispatch -- and you didn't
18    have a partner, correct?
19 A  Correct.
20 Q  You were riding alone in your car?
21 A  Correct.
22 Q  Was your car video equipped?
23 A  I know it had one in there, but I know my car also the
24    video was down for a long time. So I don't remember
25    whether it was down this time or when the times it was

Page 51

1     down.
2  Q  Did you use the same car every day?
3  A  Yes.
4  Q  How long had you used that car?
5  A  I'd say the beginning of the year is when we change cars.
6     But I'm trying to think. I think I had it the year
7     before that, too.
8  Q  Did other officers vary in the cars that they used?
9  A  Um-hum.
10 Q  Is that yes?
11 A  Yes, sorry.
12 Q  Why did you have one that you always used?
13 A  We typically always used the same ones. But if your car
14    was down, you had to use another one. Community police
15    would use whatever was available. So patrol generally
16    had their own vehicle.
17 Q  If your video wasn't working, were you required to submit
18    any documentation or make a report to the department that
19    the video was down?
20 A  We would have had to tell somebody.
21 Q  How did you do that?
22 A  It was either verbally to the sergeant or -- let's see,
23    at that time I'm not sure if we had an email system that
24    we could write up, too. I'm not sure if that was
25    implemented at that time or if it was --

Page 52

1  Q  Would you do before your shift started or -- I shouldn't
2     say that -- before you went out on the read, would you do
3     an inspection of your vehicle? Is that something that
4     you had to do?
5  A  Um-um.
6  Q  Is that yes?
7  A  Yes. Sorry.
8  Q  And did the vehicle inspection include checking to see if
9     video was working?
10 A  Yes.
11 Q  Would you have any check lists that you followed?
12 A  No.
13 Q  Just routine and custom?
14 A  Yes.
15 Q  And if you noticed that the video or audio or something
16    wasn't working, is that when you would report it?
17 A  The first time. If this was weeks into it, I wouldn't,
18    because they knew it was down already.
19 Q  Did you have occasions where one day the video would work
20    and the next day it wouldn't?
21 A  Not in my car, no.
22 Q  Did other cars have that situation that you're aware of?
23 A  I would imagine.
24 Q  How did the video --
25    MR. REISING: Don't imagine, please. Don't

Page 53

1     guess.
2  Q  (BY MR. FELTY) How would the video -- how did the video
3     camera in your car work?
4  A  How would it turn on?
5  Q  Yes.
6  A  Either with my overhead lights or by manually flipping it
7     on.
8  Q  Did you have more than one camera in your car?
9  A  No.
10 Q  What would your camera videotape?
11 A  Out my -- well, I might have had two. I'm not sure. One
12    would be in the back seat and then one would be out the
13    front window.
14 Q  Do you know if they both operated at the same time?
15 A  You had to turn on the back seat one.
16 Q  Have you ever seen any video from your car on that day?
17 A  Not from my car, no.
18 Q  I just don't know if I asked this. Do you know if video
19    was working in your car?
20 A  I don't know.
21 Q  Have you ever seen any video from your taser?
22 A  Yes.
23 Q  When did you see the video from your taser?
24 A  Whatever day the reports were written. The day we came
25    back I seen it.

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
fd2017e7-6b18-443c-ac18-8d770742afda

Page 54

1  Q  Did you have to request it?
2  A  Yes.
3  Q  Did you request it to assist you in writing the report?
4  A  Yes.
5  Q  Have you seen it since then?
6  A  Not that I remember.
7  Q  Did you look at it at the department?
8  A  Yes.
9  Q  And take it with you and look at it on a disk or anything
10    like that?
11 A  It was on a CD that I had to turn back in after I left --
12    or when I left.
13 Q  When you left the department?
14 A  When I left that day.
15 Q  Oh, okay. So getting back to the incident, you heard
16    central call indicating that somebody was jumping in
17    front of cars?
18 A  Correct.
19 Q  All right. So what does that put in your mind as you're
20    going to the scene? What are you thinking you're
21    approaching?
22 A  That I'm going to tell this guy to get out of the road
23    and it was just going to be a typical routine call.
24 Q  Okay. You wrote in your report, "Central put out another
25    call for a male on Washington south of Hess walking in

Page 55

1     the middle of the road and jumping out in front of cars."
2     Is that what you recall hearing?
3  A  Correct.
4  Q  Did that make you think that perhaps there were mental
5     issues or intoxication issues with this individual?
6  A  No, not at that time.
7  Q  So your expectation was you would go, pull up and say,
8     "Hey, get out of the road," and move on?
9  A  Correct.
10 Q  So you turn, as I understand it, south onto Washington
11    from Hess --
12 A  Onto Hess from Washington -- or onto Washington from
13    Hess, correct.
14 Q  Okay. And it says you approached Gilmore and observed a
15    black man walking in the southbound -- walking southbound
16    in the center turn lane?
17 A  Correct.
18 Q  What did you see?
19 A  A male walking southbound in the center lane.
20 Q  All right. So what did you do?
21 A  I turned my overheads on and at that time he was turning
22    around walking back towards me towards my patrol car.
23 Q  Okay. So you saw him walk -- he's walking southbound?
24 A  Correct.
25 Q  And you're going southbound?

Page 56

1  A  Correct.
2  Q  So you're north of him?
3  A  Correct.
4  Q  And when you first turn your overheads on, is he looking
5     at you or going the other direction?
6  A  Probably turning around as I was pulling on as far as I
7     remember.
8  Q  Turning around toward you?
9  A  Turning around and coming back northbound.
10 Q  How far away from him were you at that point?
11 A  At that point, I was probably 20 yards.
12 Q  Did you stop the car?
13 A  Yeah.
14 Q  Did you put it in park?
15 A  Correct.
16 Q  Why did you stop it and put it in park?
17 A  Because I was going to call him towards me.
18 Q  Why did you want to stop, put it in park and call him
19    toward you?
20 A  To get him out of the road.
21 Q  Was it important that he come to you for you to tell him
22    to get out of the road?
23 A  At that time, yes.
24 Q  Did your car have an overhead speaker where you could go
25    into your microphone and broadcast, "Sir, get out of the

Page 57

1     road"?
2  A  I don't know if mine had one or not.
3  Q  Well, when you pull people over, do you ever like go
4     through a PA and tell them to stay in the car?
5  A  No.
6  Q  When you pull somebody over, if they have like a
7     concealed pistol license, when you were working for
8     Saginaw, would you know that before you saw the person?
9  A  No.
10 Q  It wasn't connected to their license plate?
11 A  It was, but I wouldn't run the plate right away usually.
12 Q  Have you ever had an occasion where you needed to tell
13    somebody to stay in the car?
14 A  Yeah, but I'm usually outside the car first. And I just
15    yell up to them.
16 Q  Did you yell up to Mr. Merrill?
17 A  Yes.
18 Q  From where?
19 A  My car.
20 Q  Were you in the car?
21 A  No, I was just standing outside with the door -- right by
22    the door, the driver's side door.
23 Q  Okay. And your intention was to call him toward you?
24 A  Correct.
25 Q  And did you call him toward you or was he already coming

15 (Pages 54 to 57)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
fd2017e7-6b18-443c-ac18-8d770742afda

Page 58

```
 1  toward you?
 2  A  He was walking my way.
 3  Q  All right. So you didn't need to tell him to come your
 4     direction?
 5  A  I needed to tell him to come to me. So that way he came
 6     directly to me rather than going anywhere else.
 7  Q  All right. So when you got out of the car, had he at
 8     least -- you hadn't asked him to do anything yet; is that
 9     correct?
10  A  When I got out of the car?
11  Q  Yes.
12  A  No.
13  Q  Is it correct?
14  A  Correct.
15  Q  So you got out of the car, he's turning around and
16     walking toward you?
17  A  Correct.
18  Q  Was this in any threatening manner?
19  A  No, except for he had his left hand in his pocket, which
20     I didn't know what he had in there.
21  Q  But you hadn't told him anything at that point?
22  A  I kept telling him to take his hand out of his pocket.
23  Q  At that immediate point? You get out of the car, he's
24     walking toward you, which is what you intend --
25  A  I kept telling him to come here.
```

Page 59

```
 1  Q  You intend for him to come toward you?
 2  A  Correct.
 3  Q  I'm talking before you say anything, he's already walking
 4     in your direction?
 5  A  Yes.
 6  Q  All right. He has his hand in his left pocket?
 7  A  (No audible response).
 8  Q  That's right?
 9  A  Um-hum.
10        MR. REISING: You have to answer out loud.
11        THE WITNESS: Yes.
12  Q  (BY MR. FELTY) And you haven't said anything?
13  A  I have been telling him to come over to me.
14  Q  Well, when did you start telling him to come to you?
15  A  Right when I got out of the car.
16  Q  All right. Had he already started toward you --
17  A  Yes.
18  Q  -- is what I'm getting at?
19        All right. When he started toward you, before
20     you said anything to him, was the hand in his pocket?
21  A  Yes.
22  Q  All right. So you got out and you told him to come
23     toward you first, or you told him to get the hand out of
24     the pocket first?
25  A  I said, "Come over here. Take your hand out of your
```

Page 60

```
 1     pocket."
 2  Q  Why did he need to come over to you?
 3  A  So I could find out why he was in the middle of the road.
 4     Because he was in the center lane. If he went left he
 5     was going to run into traffic. If he went right he was
 6     going to run into traffic. I had the center lane
 7     blocked.
 8  Q  Was he committing a crime when you pulled up?
 9  A  Yes.
10  Q  What crime?
11  A  Walking in the streets.
12  Q  That's an ordinance violation?
13  A  City of Saginaw, yes.
14  Q  Is it a misdemeanor or infraction?
15  A  I believe it's just a civil infraction in the city.
16  Q  Have you ever written that?
17  A  Yes.
18  Q  When is the last time you wrote one of those before this
19     incident?
20  A  I couldn't tell you.
21  Q  How many times before that incident would you say you
22     wrote one of those?
23        MR. REISING: Objection to relevance.
24        But go ahead and answer the question.
25        THE WITNESS: A handful.
```

Page 61

```
 1  Q  (BY MR. FELTY) All right. So you tell him to come
 2     toward you and take his hand out of his pocket?
 3  A  Correct.
 4  Q  Does he take his hand out of his pocket?
 5  A  No.
 6  Q  Never?
 7  A  No -- well, when he takes off running he did.
 8  Q  All right. And he ran like 20 to 25 feet?
 9  A  Correct.
10  Q  Where did he run to?
11  A  He ran right toward the intersection of Washington and
12     Gilmore on the west side of the road. And there was an
13     SUV that was turning onto Gilmore from Washington. He
14     ran to the driver's side door of that car -- of that SUV.
15  Q  What geographic direction did he run?
16  A  Northwest, yes.
17  Q  Okay. So -- all right. And he ran toward a what?
18  A  An SUV that was turning onto Gilmore.
19  Q  Okay. Do you know who was driving the SUV?
20  A  No clue. It was, I believe, a female. But other than
21     that, I don't -- I didn't get no names or anything, no.
22  Q  Did that person stick around?
23  A  No.
24  Q  They just drove off?
25  A  Well, they -- after he tried getting into the car, when
```

16 (Pages 58 to 61)

Ripka, Boroski & Associates, LLC          email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660          Firm Registration No. 008139

fd2017e7-6b18-443c-ac18-8d770742afda

Page 62

1  he turned around, they took off.
2  Q  Where -- was the SUV moving?
3  A  She stopped once he started tugging on the door handle.
4     It was moving, yes.
5  Q  So it was turning?
6  A  Correct.
7  Q  Turning off of Washington?
8  A  Turning west, which would be a right from Washington onto
9     Gilmore.
10 Q  And she's driving and he starts tugging on the door?
11 A  And she stopped.
12 Q  And then she stopped?
13 A  Correct.
14 Q  And the door was locked?
15 A  Must have been.
16 Q  Didn't open?
17 A  Didn't open.
18 Q  And then she drove off?
19 A  Correct.
20 Q  Did you think that perhaps Mr. Merrill was confused at
21    that point in time?
22 A  No.
23 Q  What did you think he was doing?
24 A  Trying to get that car. Take the car.
25 Q  You thought he was trying to take the car in your

Page 63

1     presence?
2  A  Correct.
3  Q  What led you to believe he was trying to take that car?
4  A  Why else would he try to get into the front seat of a
5     driver's seat?
6  Q  He was confused? By this time he had run 20 to 25
7     feet --
8  A  Correct.
9  Q  -- is that right?
10 A  Yes.
11 Q  And his hands were then -- or his left hand was out of
12    his pocket?
13 A  As I recall, yes.
14 Q  And his right hand was out of his pocket?
15 A  Correct.
16 Q  You didn't see any weapons in his hands?
17 A  No.
18 Q  Did you think he was trying to carjack a moving car? Is
19    that what you're saying?
20 A  Possibly, yes.
21 Q  Is that something you observed as a police officer,
22    people trying to steal a moving car?
23 A  I haven't observed it, but I have seen -- or heard of it
24    happening a lot in the city.
25 Q  And that's what you thought he was going to do?

Page 64

1  A  Yes.
2  Q  Okay. But that person, they stopped, he tugged on the
3     door --
4  A  He couldn't get in so she drove away.
5  Q  Did it appear that she recognized him?
6  A  No.
7  Q  And then she just drove away?
8  A  Correct.
9  Q  And then what happens next?
10 A  Then there was a car that was east on Gilmore at the
11    intersection of Washington and he went and jumped on the
12    trunk of that car.
13 Q  How did he jump on the trunk of that car?
14 A  Ran over and jumped on the trunk.
15 Q  Like when you say jump on it, he got up on his feet and
16    was jumping on the trunk?
17 A  No, he jumped and was kind of like sitting on the back of
18    the trunk on his hands and knees.
19 Q  So he climbed all the way up onto the trunk of the car?
20 A  Correct.
21 Q  And that car was stopped at a light?
22 A  At the stop sign.
23 Q  At the stop sign?
24 A  Yes.
25 Q  And what did that car do?

Page 65

1  A  It stopped.
2  Q  Did it stay there?
3  A  Yes.
4  Q  For the entire incident?
5  A  For most of it. Because then he tried to get into that
6     car.
7  Q  So he gets on the trunk of that car?
8  A  Correct.
9  Q  On his knees?
10 A  Correct.
11 Q  And how long does he stay on the trunk of this car?
12 A  A couple seconds until the car stopped.
13 Q  So he got onto the trunk of a moving car?
14 A  Correct.
15 Q  All right. So he gets on it and it stops?
16 A  Correct.
17 Q  At the stop sign?
18 A  Correct.
19 Q  And then he gets off once it stops?
20 A  Correct.
21 Q  Then what does the guy that is driving the car do?
22 A  I believe it was his driver's side window, he like tugged
23    on the back door, and then he reached through the
24    driver's side window trying to unlock the back door of
25    that car.

17 (Pages 62 to 65)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
fd2017e7-6b18-443c-ac18-8d770742afda

Page 70

1 MR. REISING: I don't think you're going to
2 find a lane is that wide.
3 But go ahead.
4 MR. FELTY: Maybe it's 12 feet.
5 Q (BY MR. FELTY) I mean, do you know?
6 A I don't know.
7 Q All right. But two --
8 A Two lanes of road.
9 Q So he's not within your reach?
10 A No.
11 Q You're not within his reach?
12 A No.
13 Q Is he making any threats toward you?
14 A Not that I recall, no.
15 Q Is he saying anything to you?
16 A Not that I remember.
17 Q Is he looking at you?
18 A Yes.
19 Q Was he staring at you?
20 A He's looking all around. Staring at me. Trying to get
21 into the car.
22 Q Looking every different direction?
23 A Correct.
24 Q Did he ever take off on a run?
25 A When he first went from the middle lane to the SUV he

Page 71

1 did.
2 Q That was the 20 to 25 feet?
3 A Correct.
4 Q And he stopped and went up to the SUV?
5 A Correct.
6 Q Were you issuing any commands to him at that point in
7 time?
8 A I was, when he took off running initially, I jumped back
9 in my car. That's when I backed up to go over onto
10 Gilmore. Because I didn't he was going to stop at the
11 SUV. And then when I see him stop at the SUV, I got out
12 of my car.
13 Q How far -- did you move your car at all?
14 A Maybe -- I went backwards maybe five feet, just started
15 to turn, and then he stopped at the SUV. So I got out
16 again.
17 Q All right. Looking at your report, "Bobby kept trying to
18 get in the vehicle." You're referring to the car that
19 was at the stop sign?
20 A Correct.
21 Q And you deployed your taser to attempt to stop him from
22 trying to get into the car?
23 A Correct.
24 Q Was his back toward you?
25 A He -- the first time I believe he was -- the car was

Page 72

1 here. He was reaching through the car with his left hand
2 and I hit him on the -- or I tased him on the right side.
3 Q Was his back toward you?
4 A His side was towards me.
5 MR. REISING: Which side, just so we're clear?
6 THE WITNESS: Right side.
7 MR. REISING: Thank you.
8 Q (BY MR. REISING) His right side was toward you?
9 A Correct.
10 Q Where are you in relation to the car that you wrote that
11 he was trying to get into?
12 A At what time? What point?
13 Q At the time that you deployed the taser in an attempt to
14 stop Bobby from --
15 A Say within 20 feet of him.
16 Q All right. And this car is on Gilmore?
17 A Correct.
18 Q Heading west?
19 A Yes -- no, east.
20 Q Okay.
21 A East.
22 Q Okay, the car is heading east. And you are where at in
23 the intersection?
24 A I am coming into the southbound lanes walking. Traffic
25 is stopped.

Page 73

1 Q The southbound lanes of Washington?
2 A Yes.
3 Q He's off on one of the sides?
4 A He is -- they are getting ready to turn onto Washington,
5 so their car is right at the intersection.
6 Q So you're saying that you hit him in the right side?
7 A With the taser, I believe, yes.
8 Q So he's not facing you?
9 A No.
10 Q He's kind of like your -- his back and to the right is to
11 you? You're behind him, or directly alongside?
12 A I believe I was right to the side.
13 Q Like along the car? Like by the trunk of the car?
14 A Whose trunk?
15 Q The car that you were trying to help or prevent him from
16 getting into.
17 A His back was towards the front of the car.
18 Q His back is towards the front of the car?
19 A Correct. So when I came around, I was on the side of
20 him.
21 Q You came around what?
22 A My car.
23 Q Maybe I need you to sketch this. Is that something you
24 can do?
25 A Do we have the video? We can see it.

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139

fd2017e7-6b18-443c-ac18-8d770742afda

Page 74

1  Q  I have the video, but not with me. And that's not really
2     what I want to see. I don't really want to see the
3     video. I want to see where you were, if you're capable
4     of sketching it. Actually, probably you should use a
5     pen.
6        I know as a police officer you're capable of
7     sketching an intersection.
8  A  (Indicating).
9        MR. REISING: Make sure you mark the north on
10    there, too.
11       MR. FELTY: You can certainly look at it before
12    I look at it.
13       THE WITNESS: (Indicating).
14       MR. REISING: So what are these two -- what
15    does that represent?
16       THE WITNESS: Me.
17       MR. REISING: That's you. So I want you to put
18    your initials -- print your initials right next to that.
19       THE WITNESS: (Indicating).
20       MR. REISING: There you go.
21       (Exhibit Number 1 marked for identification by
22       the reporter).
23 Q  (BY MR. FELTY) All right. Looking at what has been
24    marked a Exhibit 1, you have labeled north? You have
25    labeled Washington, right?

Page 75

1  A  Correct.
2  Q  And this is your patrol car?
3  A  In the turn lane, yes.
4  Q  All right. So your patrol car is heading northeast?
5  A  It would be facing that way.
6  Q  Okay. Your patrol car is facing southwest?
7  A  Southwest, yes, sir.
8  Q  And over here off to the west is Gilmore?
9  A  Correct.
10 Q  You have written the car that Bobby was by trying to get
11    in?
12 A  Correct.
13 Q  And this is you out in what lane?
14 A  I would say the curb lane, if I remember, or middle.
15    Right around the middle or the curb lane.
16 Q  All right. So the middle of the southbound lane?
17 A  Correct.
18 Q  And Bobby is looking what direction along the car?
19 A  The car is going that way. Bobby is facing that way.
20 Q  All right. And you're walking up to him?
21 A  That way, correct.
22 Q  And so that -- if I draw -- I'll let you draw a little
23    arrow.
24 A  (Indicating).
25 Q  And is that where you are when you deployed the taser?

Page 76

1  A  Yes.
2  Q  All right. How long are the leads on the --
3  A  Twenty-five.
4  Q  All right. Do you know about how far away you were when
5     you deployed it?
6  A  Twenty, maybe.
7  Q  All right. And what I was trying to establish is whether
8     Mr. Merrill, Bobby, was in any way facing you. And it
9     doesn't appear, based upon the sketch, that he was facing
10    you; is that correct?
11 A  No. He was facing the back of the car, but he was
12    looking at me.
13 Q  All right. So he had his head turned looking at you?
14 A  Correct.
15 Q  But his shoulder and right side was kind of toward you?
16 A  Correct.
17 Q  At any time had you seen him pick up anything, or have
18    anything in his hand up to this point?
19 A  No.
20 Q  Has he made any threat to you?
21 A  No.
22 Q  So what was your purpose of deploying the taser? Was
23    that to protect the driver from something?
24 A  To keep him from getting into that car.
25 Q  Okay. Did you hit Bobby with your probes?

Page 77

1  A  Obviously not, because it had no affect on him.
2  Q  What happened to your probes?
3  A  They -- I don't know. They must have got stuck in his
4     coat, because he had a coat on.
5  Q  And what did you aim at? His right side?
6  A  His right side, yes.
7  Q  Like his -- what area? Like the --
8  A  Upper torso.
9  Q  Okay. Did you see the probes go into his coat?
10 A  No.
11 Q  Are you aware of anybody else shooting probes into his
12    right side?
13 A  Not that I remember, no.
14 Q  So you shoot the probes. Do you find probes on the
15    ground?
16 A  I don't remember.
17 Q  Okay. And you said, obviously, it didn't work?
18 A  Correct.
19 Q  Why is it obvious that it didn't work?
20 A  Because it didn't have the desired effect of
21    incapacitating him and making him --
22 Q  All right. Now, when you say it didn't work, do you mean
23    that it didn't make a contact and didn't cycle?
24 A  Correct. Well, it cycled, but it didn't have contact
25    with him.

20 (Pages 74 to 77)

Page 78

1  Q  Because he didn't --
2  A  The probes didn't make contact.
3  Q  Because it didn't have the desired effect?
4  A  Correct.
5  Q  Now, are you aware of probes making contact and being
6     properly cycled and not having the desired effect --
7  A  Yes.
8  Q  -- on individuals?
9  A  Yes.
10 Q  How are you -- you have used the word obviously, and
11    that's why I'm asking you. So why are you saying
12    obviously it didn't work? Is it possible that they made
13    contact, that you cycled it and it just didn't cause him
14    to go down?
15 A  It didn't have the desired effect, that's why I put
16    obviously. It obviously didn't have the desired effect.
17 Q  Are you saying -- I just want to be clear. Are you
18    saying obviously the probes did not make contact?
19 A  No.
20 Q  Okay. So you don't know?
21 A  I don't know.
22 Q  It's possible that they made contact?
23 A  They could have.
24 Q  How many times did you cycle?
25 A  That taser cartridge?

Page 79

1  Q  Yes?
2  A  Twice.
3  Q  All right. You cycled that one twice, so that's ten
4     seconds?
5  A  Yes.
6  Q  Because it goes for five, shuts off, starts again, right?
7  A  Um-hum.
8  Q  Yes?
9  A  Yes, I'm sorry.
10 Q  How much, if any, time between -- well, let me clarify
11    this first. Once you cycle it the first time, how do you
12    know that its stopped cycling?
13 A  There is a countdown on it, and it also just stops. The
14    arcing of the electricity stops.
15 Q  Okay. So you can hear it?
16 A  Correct.
17 Q  And I'm guess at this point in time you're more listening
18    than looking at a countdown, right?
19 A  Exactly.
20 Q  So you know at some point in time it stops, right?
21 A  Um-hum. Yes.
22 Q  And then you pull it a second time?
23 A  Yes.
24 Q  And that goes for another five seconds?
25 A  I believe.

Page 80

1  Q  Did you wait any time between doing it?
2  A  I don't know.
3  Q  Were you trained to wait any time between?
4  A  No.
5  Q  Okay. So at that point you have cycled it twice?
6  A  Correct.
7  Q  You take that cartridge off?
8  A  Correct.
9  Q  And what do you do with that cartridge?
10 A  Drop it on the ground.
11 Q  All right. What is left of the cartridge? What does it
12    look like once you've shot the probes, the darts out?
13 A  It's just a plastic cartridge with wires coming out of
14    it.
15 Q  You throw that on the ground?
16 A  Correct.
17 Q  And you have another spare cartridge on your duty belt?
18 A  Correct.
19 Q  And you load the gun again?
20 A  Correct.
21 Q  What is Bobby doing while you load the gun?
22 A  I don't remember. I'd have to see the video.
23 Q  Why did you write Bobby as opposed to Mr. Merrill in your
24    report?
25 A  I typically just use first names.

Page 81

1  Q  Did you know him?
2  A  No.
3  Q  Was that your regular area?
4  A  No.
5  Q  So the vehicle -- he still is trying to get into this car
6     when you pull out the second probe?
7  A  I don't remember. I would have to see the video and
8     compare it.
9  Q  All right. At some point you do put the other -- you put
10    a new cartridge in?
11 A  Correct.
12 Q  And are there leads or anything? How does this work?
13    The first one you fire, there is a wire connected to your
14    gun and --
15 A  To the cartridge.
16 Q  To the cartridge, and then that goes to the probes
17    connected to him?
18 A  Correct, yes.
19 Q  So when you threw that on the ground, do you know where
20    the other end of it was?
21 A  No.
22 Q  And so you put the next one in?
23 A  Correct.
24 Q  And do you immediately fire it?
25 A  Yes.

21 (Pages 78 to 81)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
fd2017e7-6b18-443c-ac18-8d770742afda

Page 82

1  Q  All right. Now, before you fired the first time, did you
2     say anything to Bobby about, "I'm going to tase you"?
3  A  Before I fired the first time?
4  Q  Yes.
5  A  Not that I recall.
6  Q  Is that something you customarily do, warn somebody, "I
7     have got a taser. I'm going to tase you"?
8  A  Not necessarily.
9  Q  Why?
10 A  Because they can visually see it. And the presence alone
11    typically makes them comply.
12 Q  All right. Presence alone typically makes them comply.
13    That's presence of you?
14 A  Of the taser.
15 Q  Of the taser. Your effort is to de-escalate?
16 A  Correct.
17 Q  Do you take every reasonable approach to try to
18    de-escalate the situation?
19 A  At that point, I felt I did. I told him to get down. He
20    refused. He was not complying -- or listening to
21    commands.
22 Q  When did you tell him to get down?
23 A  I'd say while I was tasing him I told him.
24 Q  Before you started tasing him, did you tell him to get
25    down?

Page 83

1  A  I don't recall. I would have to see the video. It's on
2     the video.
3  Q  What did you aim for when you deployed the second
4     cartridge?
5  A  I believe just his front torso.
6  Q  All right. So like the chest?
7  A  Yes.
8  Q  Was he facing you at that point?
9  A  I believe so.
10 Q  So he's facing you. Does that mean he's not trying to
11    get into the car?
12 A  I don't remember at what point, but I do remember he
13    turned with his back towards the car and was reaching
14    through facing me trying to unlock the back door. But I
15    don't remember where.
16 Q  Had you moved your position by the time you fired the
17    second cartridge?
18 A  Possibly a couple feet, but nothing --
19 Q  Pretty much you're still in that --
20 A  I believe so, yes.
21 Q  -- lane?
22     All right. So you deploy the second cartridge?
23 A  Correct.
24 Q  How many times did you cycle?
25 A  Cycled the second cartridge? I don't recall. I know a

Page 84

1     couple, a few.
2  Q  Did anybody tell you how many times you cycled it?
3  A  No.
4  Q  All right. Now, when you say a couple, you mean two?
5  A  I would say more than that.
6  Q  How many do you think?
7  A  Four, five maybe.
8  Q  Had you an understanding that it would be appropriate to
9     cycle a cartridge five times if it was engaged in a
10    person?
11 A  But it had no affect on him, so it wasn't --
12 Q  All right. Well, let me ask you this: The first one you
13    threw off because you didn't believe it had a contact,
14    right?
15 A  Correct.
16 Q  So there is no point in continuing to cycle it unless you
17    believe there is a contact, right?
18 A  Correct.
19 Q  So when you cycled that four or five, or however many
20    times the report says that, you thought there was a
21    contact, right?
22 A  No.
23 Q  Why would you continue cycling it if you didn't think
24    there was a contact?
25 A  Because he was moving and I hoped a movement of -- maybe

Page 85

1     fell into his coat or something. I thought maybe a
2     movement that he was making could have made it have a
3     contact.
4  Q  So is it just very light contact, to your understanding,
5     that just needs to touch the skin?
6  A  I believe so.
7  Q  All right. So because the -- if you're in drive stun
8     mode, it's just a little metal prong that touches the
9     body, right?
10 A  Just the end of the taser.
11 Q  It doesn't penetrate the skin?
12 A  Correct.
13 Q  So sometimes, if I'm understanding, when the darts are
14    fired, sometimes they will actually penetrate and leave
15    marks in the skin?
16 A  Correct.
17 Q  And then other times they don't penetrate and leave marks
18    but can still make contact?
19 A  Correct.
20 Q  That's what you were hoping was happening?
21 A  Correct.
22    MR. REISING: Or would happen.
23    THE WITNESS: Or would, correct, by his
24    movements.
25 Q  (BY MR. FELTY) And you're assuming that contact wasn't

22 (Pages 82 to 85)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

fd2017e7-6b18-443c-ac18-8d770742afda

Page 86

1 made because he didn't go down?
2 A Correct.
3 Q At the time that you're cycling the taser, is there any
4   other officer on the scene that you're aware of?
5 A No.
6 Q Okay. So what is Bobby doing while you're cycling this
7   four or five times? Is he staying in place?
8 A No, he's trying to get into my driver's side of my patrol
9   car.
10 Q How does he make it from this car over in this area to
11   your patrol car?
12 A Walked.
13 Q What are you doing while he's walking?
14 A At that time I started backing up, getting on the
15   passenger side of my car to keep the car between us.
16 Q And you have locked the doors?
17 A I must have. I don't know when, but I must have.
18 Q And what does he do?
19 A Keeps trying to pull on the door handle to get in the
20   car.
21 Q All right. Was he in anyway threatening you?
22 A No.
23 Q So were you protecting property at that point in time
24   when he's walking over to your car?
25 A What do you mean?

Page 87

1 Q What is your role at this point in time? I mean, what is
2   your goal?
3 A To get him out of traffic.
4 Q Okay. Is he threatening anybody?
5 A Yes.
6 Q Who is he threatening?
7 A The two peoples' car that he tried to get into.
8 Q All right. But is that done with?
9 A At that point, yes.
10 Q All right. Is there anybody else around that is in
11   danger other than himself?
12 A Me.
13 Q What was your danger?
14 A Because I'm in the middle of traffic.
15 Q Was he presenting a danger to you?
16 A Yes, because he wasn't complying -- or he wasn't
17   listening to my commands.
18 Q All right. What was the danger that he was presenting to
19   you by not listening to a command?
20 A As in what?
21 Q Is there one? He was putting you in danger you said
22   because he wasn't listening to your commands. So what
23   was the danger that he was putting you in?
24 A Because I'm in the middle of traffic trying to get him to
25   comply and he wouldn't.

Page 88

1 Q All right. Was traffic driving by?
2 A I believe it was stopped, but I don't know. I know the
3   cars off Gilmore were going. Like the guy -- the first
4   car he tried to get into, or the second car, they were
5   going. So traffic was moving, but I don't know if it was
6   moving in the lanes.
7 Q At this point in time, do you think he's -- what are your
8   thoughts about his mental state?
9 A Mental? I don't know about mental.
10 Q Do you think he's acting normally?
11 A Under the influence of something.
12 Q Does that play any role in what you're doing at that
13   point in time?
14 A No.
15 Q Were you afraid for yourself?
16 A Yes.
17 Q What were you afraid of?
18 A Him coming after me.
19 Q How far are you keeping between you and him?
20 A Just the length or the width of the car.
21 Q But you've got the car between you?
22 A Correct.
23 Q And you don't think he's got a weapon on him?
24 A I'm not sure. Because I still don't know what is in his
25   left pocket.

Page 89

1 Q Did you ever see him go back into the left pocket?
2 A No.
3 Q Where are his hands when he's going around the car?
4 A Trying the door handles.
5 Q All right. So is he using both hands?
6 A I don't know. Whatever the video says.
7 Q Did you keep his hands in your view?
8 A Tried.
9 Q And were you able to?
10 A Yes and no.
11 Q Was there at any time that you thought that he had
12   acquired a weapon and was posing a threat to you?
13 A Still didn't know, because I don't know what's in his
14   left pocket. Why was he in his left pocket earlier?
15 Q That was earlier?
16 A Correct.
17 Q Are you continuing to give him commands as you're walking
18   around the car?
19 A I would imagine.
20 Q Do you recall what you were commanding him?
21 A No.
22 Q Were you watching the video as you were writing the
23   report?
24 A I would imagine.
25 Q Were you trying to write down the commands that you were

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

fd2017e7-6b18-443c-ac18-8d770742afda

Page 94

1  east side of the road by the sidewalk.
2  Q  How many?
3  A  There was a group. I don't recall how many. Multiple
4     people. Maybe five to ten.
5  Q  Do you know who was yelling; men or women?
6  A  I believe it was females, but I don't recall.
7  Q  Was one of them his sister?
8  A  Possibly. I didn't talk to any of them.
9  Q  How did you know there was a crowd of people when you are
10    down --
11 A  I could hear them.
12 Q  -- going through the struggle?
13 A  I could hear them.
14 Q  It says, "After more struggle, Merrill was placed in
15    handcuffs by other officers"?
16 A  Correct.
17 Q  What is the "more struggle"?
18 A  Just the way he was moving around actively resisting us.
19    Just pulling his hands.
20 Q  So when you're talking about struggle, are you talking
21    about him moving his arms around?
22 A  By struggle I mean failing to comply.
23 Q  And by failing to comply, is that moving his arms around?
24 A  Could be.
25 Q  Is there anything -- this particular incident, the entire

Page 95

1   time from you tasing him, let's say from the time he goes
2   down to the ground from your taser, struggle or
3   resisting, what, other than moving the arms around, are
4   you describing?
5  A  When he was (indicating) like moving his feet around,
6     kicking his feet. Vigorously moving his hands back and
7     forth. Lifting his shoulders.
8  Q  Now, the kicking, this was like what motion did you
9     describe it as?
10 A  Like side-to-side, up and down.
11 Q  Like going back and north?
12 A  Um-hum.
13 Q  Side-to-side?
14 A  Moving rapidly (indicating).
15 Q  Like wiggling?
16 A  I guess you could describe it as wiggling. I mean --
17 Q  I'm more interested in your description. I mean, I was
18    just using that as an example.
19 A  Wiggling, I would -- no, I wouldn't describe it as
20    wiggling. It was like vigorous movements.
21 Q  Okay. Vigorous movements of the arms and legs?
22 A  Um-hum.
23 Q  Is that yes?
24 A  Yes.
25 Q  But not striking anybody?

Page 96

1  A  Not that I'm aware of. I did not get struck.
2  Q  Not saying, "I'm going to kill you"?
3  A  No.
4  Q  Not making threats to police officers?
5  A  Not that I'm aware of, no.
6  Q  Not biting?
7  A  No.
8  Q  No spitting?
9  A  Not that I'm aware of.
10 Q  Okay. It says in here, "Placed in handcuffs --"
11 A  Um-hum.
12 Q  "-- by other officers."
13 A  Correct.
14 Q  "Merrill continued screaming and kicking his feet while
15    he was handcuffed on the ground." Is that describing the
16    same type of motion?
17 A  Correct.
18 Q  He's not kicking an officer?
19 A  I don't know if anyone got kicked I don't believe.
20 Q  Did it appear to you in what you were doing that he was
21    attempting to kick somebody, or was he just moving?
22 A  Could have been.
23 Q  Well, I'm --
24 A  He could have been. He -- it's hard to describe what he
25    was doing. I don't know exactly what his intentions

Page 97

1     were.
2  Q  Okay. Well, he's laying down on the ground still on his
3     chest, right?
4  A  Correct.
5  Q  And to kick, we generally think, or at least I generally
6     think of somebody making a forward type motion and
7     kicking somebody?
8  A  Correct.
9  Q  And I just want to be clear, you're not suggesting that
10    he was --
11 A  No, because he was on his back. But you can still be
12    kicked by kicking up, to the side.
13 Q  I get that. And are you describing, when you say that
14    he's doing that, was he directing a kick at anybody?
15 A  Not that I know of.
16 Q  Okay. So he's got him, it says, "Placed in handcuffs by
17    other officers." And then it says -- and this was
18    handcuffed on the ground? He's still on his chest,
19    right?
20 A  Correct.
21 Q  And then it says, "R/O then observed Officer --" please
22    say that again, Madaj?
23 A  Madaj.
24 Q  "-- Madaj and Officer Severs place another set of
25    handcuffs on Merrill."

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
75263246-fa6a-467f-838f-0933ace3aa20

## Page 114

1  Q  So is that painful?
2  A  Uncomfortable. I wouldn't say it was painful.
3  Q  Did you get a full five seconds?
4  A  Yes.
5  Q  And then once it was done, was there any recovery period
6     for you to get your bearings?
7  A  No.
8  Q  So just as soon as it stopped, you're fine and stand back
9     up?
10 A  Correct.
11 Q  Other than knee strikes and attempting to gain control of
12    Bobby's hands, did you have any other physical contact
13    with him?
14 A  Not that I remember, no.
15 Q  Did anybody hit him in the back of the head?
16 A  I have no clue.
17 Q  Did you see anybody else use physical methods?
18 A  I remember Officer Wietecha doing the baton strikes.
19 Q  What were you doing when the baton strikes were going
20    on?
21 A  I believe still trying to get his hand out from
22    underneath him.
23 Q  That was on the right side?
24 A  I was on the right side, correct.
25 Q  Wietecha was on the left side?

## Page 115

1  A  The left side, correct.
2  Q  Where in relation to Bobby's head was Wietecha standing?
3  A  He was, I believe, to his left torso area.
4  Q  So down on the side of his shoulder as opposed to being
5     over the top of him?
6  A  I believe.
7  Q  Over the top of his head?
8  A  I believe, yes.
9  Q  He was not over the top of his head?
10 A  Correct.
11 Q  Did you see where the baton struck?
12 A  No.
13 Q  Did you see anybody else knee Mr. Merrill?
14 A  No.
15 Q  Did anybody punch him?
16 A  I don't know. Not that I know of.
17 Q  Are you aware of any other physical methods that were
18    used on Mr. Merrill?
19 A  No.
20 Q  Was there any blood?
21 A  Not that I remember, no.
22 Q  Did you ever remember seeing blood on Mr. Merrill's face?
23 A  I don't remember it, no.
24 Q  What was it that you believe resulted in successfully
25    cuffing Mr. Merrill?

## Page 116

1  A  What do you mean?
2  Q  Well, at some point in time you guys were able to get his
3     hands and get them cuffed, correct?
4  A  Correct.
5  Q  Was there something that you believe was effective?
6  A  Just believe that there was enough of us there to finally
7     be able to take control of him.
8  Q  Do you believe that there was enough of you there to take
9     control of him before Officer Wietecha tased him?
10 A  No.
11 Q  Why?
12 A  Size difference. Just the way he was acting.
13 Q  Do you believe that there was enough of you present once
14    he was on the ground without Officer Madaj tasing him?
15 A  No, because he still wasn't listening, and there was four
16    of us then.
17 Q  All right. He's tased. I think Officer Madaj thought
18    that there were -- that he cycled it multiple times and
19    only a couple were effective. And I may be wrong. I
20    don't remember. But it appears that after Officer Madaj
21    deployed the taser, there was still a period of time
22    where you guys were trying to get his hands; is that
23    right?
24 A  From what I remember, yes.
25 Q  And you had had at least some experience before he was

## Page 117

1     tased by Officer Madaj with it appearing that the taser
2     was not effective?
3  A  Correct.
4  Q  And you communicated that to Wietecha before he deployed
5     it?
6  A  Yes. But I -- that was because I didn't know if I made
7     contact. Not that I --
8  Q  You didn't tell him that, did you?
9  A  Correct, no.
10 Q  You just said it wasn't effective?
11 A  Correct.
12 Q  All right. You said in your report that, after Bobby was
13    placed in handcuffs, he continued to flare his feet?
14 A  Kicking his feet.
15 Q  All right. He's face down?
16 A  Correct.
17 Q  Is he kicking at anybody?
18 A  Me and Guest were both down by his feet, so...
19 Q  Was he trying to kick you?
20 A  For all I knew, yeah. I mean --
21 Q  Or was he just sliding around?
22 A  Kicking his feet.
23 Q  Did he ever contact you with his feet?
24 A  I don't think so.
25 Q  Was the situation where he was laying on his chest, and

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
fd2017e7-6b18-443c-ac18-8d770742afda

Page 118

```
 1     if he's flaring his feet around and you thought they were
 2     getting too close to you, you could move?
 3  A  Yes.
 4  Q  Did you think you were in danger of great bodily harm
 5     from his feet?
 6  A  No.
 7  Q  So you saw Madaj trying to use the shoelaces from his
 8     shoes to restrain them?
 9  A  From Bobby's shoes.
10  Q  Did you ever observe his shoes coming off?
11  A  No.
12  Q  Did you observe Officer Madaj taking his laces out?
13  A  I just saw him trying to tie his shoelace. I don't know
14     if they were out or -- I don't believe they were.
15  Q  And this is when he kept trying to go to his butt area
16     you said?
17  A  Correct.
18  Q  Like reaching for his back pocket?
19  A  Pocket, butt, yes.
20  Q  Was there anything in his back pocket or his butt?
21  A  I don't know. I didn't check.
22  Q  Are you aware of anybody finding anything in his back
23     pocket?
24  A  There was a crack pipe that was found later. I don't
25     know if it came out of his pocket or where it came from.
```

Page 119

```
 1  Q  Did you ever see it in Bobby's hands?
 2  A  No.
 3  Q  Did anybody find any Cocaine on Bobby?
 4  A  No.
 5  Q  Did you hear Bobby say anything to you?
 6  A  He didn't directly to me, no.
 7  Q  All right. What kind of pants was he wearing?
 8  A  I don't remember.
 9  Q  Were they pants such that if you thought a weapon was in
10     a back pocket, or tucked into his pants, that it would
11     have been observable?
12  A  I don't remember. I don't remember what he had, so...
13  Q  It says, "While flaring arms," this is while he's
14     handcuffed --
15  A  Correct.
16  Q  "-- Bobby kept reaching." What does that mean 'while
17     flaring his arms while cuffed'?
18  A  He was laying down and he was just swinging them all
19     around and then he kept trying to get --
20  Q  He was moving around?
21  A  Correct.
22  Q  Is that simultaneously with his legs?
23  A  Yes.
24  Q  Was he just like wiggling or what?
25  A  No, he was kicking and throwing his arms -- or throwing
```

Page 120

```
 1     his arms up and feet up and --
 2  Q  He's not throwing them very far with cuffs behind his
 3     back, is he?
 4  A  No. No. But he also had two sets of cuffs on. So he
 5     has got a lot more distance in there.
 6  Q  That was a decision of the officers to use two sets?
 7  A  Correct.
 8  Q  That was because of his body size, right?
 9  A  Correct.
10  Q  Because his arms wouldn't go all he way together?
11  A  Correct.
12  Q  So how much room did it give him with two sets of cuffs
13     to move his arms around?
14  A  Well, I guess each cuff probably six inches. So he had
15     probably a foot of separation between his arms.
16  Q  So, basically, he's lifting them up off of his back?
17  A  Right. Lifting them up. Moving them around. Kicking
18     his feet.
19  Q  The situation now, when he's down on the ground, all four
20     of you have him down on the ground, right?
21  A  Yes.
22  Q  At that point while he's cuffed behind his back; is that
23     true?
24  A  Yes.
25  Q  And you, as an officer at the situation, if you believe
```

Page 121

```
 1     Mr. Merrill is posing a direct and immediate threat to
 2     any other officer, you wouldn't leave his side, would
 3     you?
 4  A  At that minute?
 5  Q  Yes.
 6  A  In regards to what?
 7  Q  In regards to if you believe that the person is posing a
 8     direct or immediate threat to an officer, you're going to
 9     stay there until the situation is under control, right?
10  A  Yes and no.
11  Q  What is the no part?
12  A  If there is officers there with him and I need to go get
13     something to control them.
14  Q  Okay. So you needed -- and you're anticipating me asking
15     you why you went to go get the rope, right?
16  A  Correct.
17  Q  It wasn't such a dangerous situation where you thought
18     you needed to be there? And you could get up and go and
19     unlock your door, go into your bag and get a rope and
20     come back?
21  A  I thought it was worthy of taking the extra ten seconds
22     to turn around than the alternative of somebody getting
23     kicked or him kicking through a patrol window and hurting
24     himself.
25  Q  Were you most concerned about the transport, once he got
```

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
fd2017e7-6b18-443c-ac18-8d770742afda

Page 122

1    in the car, of kicking?
2  A  Yes.
3  Q  Was that the purpose of the rope?
4  A  Yes.
5  Q  He was under control on the ground when you went and got
6     the rope?
7  A  Not really.
8  Q  Did you think he was able to get up and run with the four
9     of you there?
10 A  Oh, no.
11 Q  Did you think he was able to get up and hurt anybody?
12 A  No.
13 Q  All right. And I guess that the rope was not really
14    intended for any reason directly at that immediate scene;
15    is that fair?
16 A  Just to stop from kicking and for the transport purposes.
17 Q  Was he able to stand up?
18 A  Yes.
19 Q  Did he walk?
20 A  Could have. He didn't.
21 Q  How do you know he could have?
22 A  Because he was able to stand up and he refused to walk.
23    He went to dead weight.
24 Q  Did he stand up on his own?
25 A  No, we helped him.

Page 123

1  Q  Did you hold him up?
2  A  We were with him holding him, yes.
3  Q  Did he have a seizure?
4        MR. REISING: Did he have a what?
5        MR. FELTY: Seizure.
6        THE WITNESS: Not that I know of.
7  Q  (BY MR. FELTY) You're familiar with what they are?
8  A  Yes.
9  Q  Did it ever occur to you that he might had one?
10 A  No.
11 Q  The MMR, that's the Mobile Medical Response?
12 A  Correct.
13 Q  That was requested by Officer Guest?
14 A  Correct.
15 Q  Why was Mobile Medical Response requested?
16 A  Just to come check him out after the tasing incident,
17    after the physical altercation, just to make sure he was
18    okay.
19 Q  Whose idea was it to call Mobile Medical Response?
20 A  Either Guest or Madaj. I think Madaj was.
21 Q  Was there a protocol that required Mobile Medical
22    Response under these circumstances?
23 A  Not that I'm aware of, no.
24 Q  Did you think that it was appropriate to call Mobile
25    Medical Response?

Page 124

1  A  Um-hum.
2  Q  Is that yes?
3  A  Yes.
4  Q  Was it a suggestion that you made?
5  A  No.
6  Q  Did you just agree with it because somebody else
7     suggested it?
8  A  Yes.
9  Q  Did you guys talk about why Mobile Medical Response would
10    be requested?
11 A  Just said we needed MMR to come check him out.
12 Q  Who called it in? Who called?
13 A  Called who?
14 Q  You did it through dispatch, right?
15 A  911 or MMR?
16 Q  MMR.
17 A  Officer Guest did. He requested it through central
18    dispatch.
19 Q  Did you hear him make the request?
20 A  I'm sure I did, but...
21 Q  So it wasn't because, at the time that he was on the
22    ground, that there was a medical emergency?
23 A  No.
24 Q  Was there more than one call made for MMR?
25 A  I just heard -- or remember the one.

Page 125

1  Q  Did you go anywhere from the scene, or did you all stay
2     together --
3  A  (No audible response).
4  Q  -- the four of you?
5  A  During the entire time?
6  Q  Yeah.
7  A  After he was placed in the car, I started -- I left and
8     started picking up the tasers.
9  Q  Okay. But that was after Mobile Medical Response was
10    already called; is that correct?
11 A  Correct.
12 Q  Did you hear the call for Mobile Medical Response?
13 A  I believe. Like I said, I don't remember. I believe it
14    was right there. But I remember hearing Officer Madaj
15    telling them to call for 9 -- or call for MMR.
16 Q  Did you hear him say anything else?
17 A  Not that I remember.
18 Q  You didn't hear him say it's an emergency?
19 A  No.
20 Q  He didn't say when he called that the subject was
21    unresponsive?
22 A  Not at that time, no.
23 Q  Did he ever call and say the subject was unresponsive?
24 A  I think once they were on-scene. Once MMR was already
25    there.

32 (Pages 122 to 125)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
fd2017e7-6b18-443c-ac18-8d770742afda