# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

DOROTHY ANDERSON and DEMARQUION
MERRILL, as Co-Personal
Representatives of the Estate of
BOBBY MERRILL, deceased,

       Plaintiffs,

                            Case No. 13-11159

-v-

                            HON. THOMAS LUDINGTON

OFFICER JEFF MADAJ,
individually, OFFICER JUSTIN
SEVERS, individually, OFFICER
BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA,
individually,

       Defendants.
_____/

       The Deposition of STEVEN M. WIETECHA, taken before Timothy J. Boroski, RPR/CSR-2378 and Notary Public in and for the County of Clinton, acting in the County of Saginaw, State of Michigan, at the offices of Ripka, Boroski & Associates, 1 Tuscola Street, Suite 301, Saginaw, Michigan, on Thursday, April 24, 2014, commencing at or about 9:10 a.m.

Ripka, Boroski & Associates, LLC    email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660    Firm Registration No. 008139
75263246-fa6a-467f-838f-0933ace3aa20

Page 2

1  APPEARANCES:
2
    Fieger, Fieger, Kenney, Giroux & Harrington, PC
3   BY: GARY N. FELTY, JR., ESQ., (P55554)
    19390 West Ten Mile Road
4   Southfield, Michigan 48075
    248.355.5555
5
        Appearing on behalf of Plaintiffs,
6
7
    Plunkett Cooney
8   BY: H. WILLIAM REISING, ESQ., (P19343)
    111 East Court Street, Suite 1B
9   Flint, Michigan 48502
    810.342.7001
10
        Appearing on behalf of Defendants.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           INDEX OF WITNESS
2
    WITNESS                         PAGE
3
4   STEVEN M. WIETECHA
5     Examination by Mr. Felty        4
6
7
8
9
10
11          INDEX OF EXHIBITS
12
    EXHIBIT    DESCRIPTION    MARKED
13
14
          (NO EXHIBITS MARKED)
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                Saginaw, Michigan
2                Thursday, April 24, 2014
3                9:10 a.m.
4           PROCEEDINGS
5           STEVEN M. WIETECHA,
6   having been duly sworn by the Reporter, was examined, and
7   testified on his oath as follows:
8           EXAMINATION
9   BY MR. FELTY:
10  Q   Would you please state your full legal name?
11  A   Steven Michael Wietecha.
12  Q   Have you sat for a deposition before?
13  A   No.
14  Q   All right. There are a few ground rules. Maybe Bill has
15      gone over them with you. I think the most important one
16      is, if you don't understand a question that I ask, let me
17      know and I'll try to rephrase it.
18          Everything you can see is being transcribed.
19      Which means if I ask you a question, he's typing it down.
20      And then he's going to take down your answer as well.
21          There will be times you might assume or presume
22      what I'm going to ask you. Even so, try to do your best
23      to wait until I'm done so that we get a clean record.
24          If I ask you a yes or no question, or something
25      that you believe to call for a yes or no answer, try to

Page 5

1   stick to yes or no as opposed to uh-huh or unh-unh so
2   later on we know what your answer was. All responses
3   also need to be verbal.
4   A   Okay.
5   Q   Are you currently employed?
6   A   I am.
7   Q   Where are you employed?
8   A   Saginaw Township Police Department.
9   Q   When did you start at Saginaw Township?
10  A   September the 14th, 2012.
11  Q   Can you give me a little background as far as education?
12      I presume as a -- you're a police officer; is that
13      correct?
14  A   Correct;
15  Q   Is that a rank of like patrolman or --
16  A   A patrol officer, yes.
17  Q   I'm assuming to become a patrol officer, you have a high
18      school education?
19  A   I do.
20  Q   Where did you graduate from high school?
21  A   East Detroit High School.
22  Q   When did you graduate from East Detroit?
23  A   2006.
24  Q   Did you continue your education after you graduated?
25  A   I did.

2 (Pages 2 to 5)

Ripka, Boroski & Associates, LLC          email:  rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660          Firm Registration No. 008139

75263246-fa6a-467f-838f-0933ace3aa20

Page 10

1  Q  All right. And then what?
2  A  The use of deadly force would be the extreme.
3  Q  What does verbal mean?
4  A  Verbal commands.
5  Q  I mean, I know the definition, like speaking?
6  A  Um-hum.
7  Q  But, okay, verbal commands?
8  A  Um-hum.
9  Q  And then passive is what?
10 A  Basically, they are noncompliant.
11 Q  They are noncompliant?
12 A  Correct.
13 Q  All right. So what happens if a person that you
14    encounter is noncompliant?
15 A  That's when your soft hand technicians and/or use of
16    taser comes in.
17 Q  Soft hand or taser?
18 A  Correct.
19 Q  What is soft hand?
20 A  Basically, grabbing onto someone, arm bars. Basically,
21    just hands-on to gain control without strikes usually.
22 Q  So is aggression, does that include strikes?
23 A  That's correct. That's where you start using your impact
24    weapons if they become aggressive and start assaulting
25    you.

Page 11

1  Q  Is a taser an impact weapon?
2  A  Considered, yes.
3  Q  All right. You suggested that tasers were a part of
4     passive?
5  A  It's been trained that you -- taser comes before your
6     impact. Which, basically, after verbal commands,
7     noncompliance, is when you can deploy your taser.
8  Q  So a verbal command, can you give me some examples of
9     verbal commands?
10 A  Stop. Put your hands up. Get on the ground.
11 Q  Stop. Put hands up.
12 A  Show me your hands. Put your hands behind your back.
13    You're under arrest.
14 Q  So if you're utilizing the force continuum, if you tell a
15    person that you encounter to stop and they don't stop,
16    it's appropriate to use a taser?
17 A  Correct.
18 Q  Do you have to have a reason to tell the person to stop
19    before giving the command?
20 A  I don't understand what you're asking.
21 Q  Under -- I guess what I'm asking is, a person is walking
22    down the street and you say stop to person. Are there
23    circumstances that have to exist before you as a police
24    officer can tell somebody to stop?
25 A  We can talk to anybody. But for them to actually have a

Page 12

1     legal or lawful reason to stop somebody, yes.
2  Q  Okay. I understand you can talk to somebody.
3  A  I mean, just to go up to somebody and say stop, there is
4     a reason.
5  Q  Okay. And you don't just go up to somebody and say stop
6     and they keep walking and you pull out the taser and tase
7     them?
8  A  No.
9  Q  Okay. So there is a lawful reason for the command?
10 A  Correct.
11 Q  And if the person -- you have a lawful reason to tell
12    somebody to stop. Examples of that, say, maybe you see
13    somebody that is suspicious or something like that.
14    Would that be a lawful reason?
15 A  Depending on the circumstances.
16 Q  Okay. And if you say stop to a person that is walking on
17    the road and they just continue walking, is that a
18    circumstance where a taser may be used?
19 A  Again, it depends on the circumstances. If they are just
20    walking down the street. Now, if I got a, say, a B&E
21    report that just came in over central, and that
22    particular person matches the description, and you pull
23    up to them and say, "Stop, come here," and they take off
24    running, absolutely. You have a justified use of taser.
25 Q  All right. So is it taking off and running that

Page 13

1     justifies the use of the taser?
2  A  Just noncompliance in general.
3  Q  So how does it progress? Like can you give me an example
4     of your training? You have a lawful reason -- we can use
5     this case as an example. On April 12th of 2012, you did
6     respond to the scene involving Bobby Merrill; is that
7     right?
8  A  Correct, on April 10th.
9  Q  I have on -- oh, I'm sorry, April 10th, you're right.
10          On April 10th, 2012, what was your
11    understanding of what you were encountering?
12 A  I heard, on en route, transmissions over the central
13    dispatch from Officer Severs who was already on scene.
14 Q  Okay. What did you hear en route? What was the en route
15    transmission? What did you hear?
16 A  From Officer Severs?
17 Q  Yes.
18 A  That he needed assistance now. And he had one that
19    was -- when I heard it over the air, it was a male in the
20    roadway stopping cars. I don't remember the exact
21    transmission. That was over two years ago. Officer
22    Severs advised that he had -- he was failing to comply.
23    He needed assistance now. And I don't remember if it was
24    over the air when I got there.
25          He advised -- Officer Severs advised that he

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
75263246-fa6a-467f-838f-0933ace3aa20

Page 14

1  had deployed his taser and it had no affect on the
2  suspect.
3  Q  Okay. I'm looking at a copy of a report that appears to
4  have been authored by you. It looks like you heard over
5  the radio that there was breaking and entering in
6  progress on Glenwood?
7  A  Correct. That was unrelated.
8  Q  You went to assist. Started to head that way?
9  A  Correct.
10 Q  While en route, Officer Severs pulled onto South
11 Washington and Gilmore. Reference a man that was jumping
12 out in traffic and walking in the road?
13 A  Correct.
14 Q  All right. Is that what you understood that you were
15 going to be encountering?
16 A  While en route?
17 Q  Yes.
18 A  Yes.
19 Q  Then it says R/O, that's reporting officer?
20 A  Correct.
21 Q  "Heard shots fired over the radio, reference Glenwood
22 Street. Reporting officer then went emergency mode and
23 started toward Glenwood. Then heard Officer Severs
24 advise he needed officers to assist quickly."
25 A  Correct.

Page 15

1  Q  "R/O then went and started toward South Washington and
2  Gilmore." Is that what you recall?
3  A  Correct.
4  Q  Do you recall anything else about what you heard over the
5  radio?
6  A  No, not at this time I don't recall.
7  Q  Does that information that you wrote indicate that you
8  believe that there was a crime in progress?
9  A  Yes.
10 Q  What crime?
11 A  Well, he was obviously acting disorderly, okay? And
12 Officer Severs was asking for cars like to step it up.
13 Come quickly. If somebody is complying and acting
14 appropriately, an officer doesn't get over the air
15 distressed saying I need cars now.
16 Q  All right. Jumping out in traffic and walking in the
17 road. Walking in the road, is that a crime?
18 A  Yes.
19 Q  What's the crime?
20 A  Walking in the street where a sidewalk is provided is a
21 civil infraction in the State of Michigan.
22 Q  Are pedestrians precluded from walking on the street if
23 there is a sidewalk?
24 A  If there are sidewalks in the City of Saginaw -- in the
25 State of Michigan, yes.

Page 16

1  Q  What if they are crossing a street?
2  A  Then they can cross a street in designated crosswalk.
3  Q  Did you have any understanding en route whether
4  Mr. Merrill was doing anything inappropriate in being in
5  the street?
6  A  Well, there was multiple 911 calls from motorists
7  advising that he was in the road.
8  Q  Did you hear them?
9  A  No, central dispatch advised.
10 Q  Did you report that anywhere?
11 A  No, it's all -- in central, anything central dispatch
12 reports is documented.
13 Q  Okay. But what I'm asking is, did you hear what central
14 dispatch was reporting?
15 A  Yes.
16 Q  Okay. Why don't you document in your report what you
17 heard central dispatch report?
18 A  Because it's documented on their end if it's ever needed.
19 Q  What were they reporting?
20 A  I don't recall everything. That was over two years ago.
21 I mean, I'll try to remember everything I can.
22 Q  I'm wondering is, did you think that you were,
23 specifically, that I'm going -- because you said this was
24 obviously a disorderly person?
25 A  The way that Officer Severs was asking for more cars,

Page 17

1  yes.
2  Q  So was it the time that he asked for more cars that you
3  concluded there must be a disorderly person?
4  A  That there must be something wrong, yes. Someone is not
5  complying with something if he's asking for multiple
6  units in the way that he was asking, yes.
7  Q  Okay. Was it the tone of his voice?
8  A  The tone of his voice. The way he was asking for cars to
9  step it up. Get here now, quickly. When that happens,
10 we know to go now. Something is wrong.
11 Q  Something could be a person is hit by a car?
12 A  It somebody is hit by a car, you couldn't advise multiple
13 units to step it up. He would be advising central to
14 have a rig step it up. Not for more patrol units to
15 come.
16 Q  Now, in your training either on-the-job or in the
17 academy, were you trained that you would encounter
18 different types of people? And by that I mean maybe
19 somebody with a psychiatric condition?
20 A  Sure, yes.
21 Q  Maybe somebody that is under the influence of a
22 substance?
23 A  Correct.
24 Q  How does that affect your response to a situation such as
25 this where you're concluding that he was obviously

5 (Pages 14 to 17)

Page 22

1  Q  And didn't hit any time?
2  A  He said it had no effect.
3  Q  Did he tell you -- you said that there was no connection?
4  A  What I would have to assume if there was no effect.
5  Q  But you never saw any leads whatsoever?
6  A  Not that I recall.
7  Q  Do you recall seeing any -- do you call them darts or
8     probes?
9  A  Probes.
10 Q  Do you recall seeing any probes?
11 A  Not at that time, no.  I was focusing on a larger scale.
12 Q  What color were the probes?
13 A  They would be silver.
14 Q  Did you see probes at any time?
15 A  Yeah.
16 Q  When did you see probes?
17 A  When I had to deploy my taser and my probes -- after the
18    altercation was done.
19 Q  You deployed yours?
20 A  I did.
21 Q  Where did yours go?  Where did they impact?
22 A  I don't know -- recall exactly where they impacted.
23 Q  Did you remove them?
24 A  I did not, no.
25 Q  Do you know who did?

Page 23

1  A  I would have to assume the medical personnel.
2  Q  Did you actually see the probes that you deployed even
3     though you don't recall specifically where they made
4     impact?
5  A  Did I see them?
6  Q  Yes.
7  A  No.
8  Q  At any time did you see any other probes?
9  A  Not that I recall.
10 Q  Do you recall a probe going into Mr. Merrill's shoe or
11    foot?
12 A  No.
13 Q  Are you saying it didn't happen or you don't recall?
14 A  I don't know.  I don't know if it did or not.
15 Q  Do you know if his shoe came off?
16 A  I don't remember that.
17 Q  Do you know if anybody that observed the incident was
18    taken into custody?
19       MR. REISING:  Anybody who observed the
20    incident?
21       MR. FELTY:  Yes.
22       MR. REISING:  Meaning a bystander?
23       MR. FELTY:  Yes.
24       THE WITNESS:  Not that I am aware of.
25 Q  (BY MR. FELTY) Other than video footage from patrol cars

Page 24

1     or the taser units themselves, are you aware of any video
2     of the incident that officers from the Saginaw Police
3     Department obtained?
4  A  Video?  Not that I'm aware of.
5  Q  Have you seen any video?
6  A  Just from the -- my patrol car and my taser cam.
7  Q  When did you see the video from your patrol car?
8  A  It was days after the incident.  I don't know.  I'm not
9     sure of the timeline.
10 Q  What do you remember your patrol car showing?
11 A  Just the back seat.
12 Q  The back seat of what?
13 A  My patrol car.
14 Q  The video camera from your patrol car showed the back
15    seat?
16 A  Correct.
17 Q  Why did the video camera from your patrol car show the
18    back seat of your patrol car?
19 A  When it came on, that's what it was recording.  The
20    camera was malfunctioning that day.  It was supposed to
21    be on.  Our cameras are supposed to go on when we turn
22    the emergency mode on and it's supposed to show up front.
23    My camera never turned on.
24 Q  How did it show the back seat?
25 A  I turned the camera on.  And when it powered on, that's

Page 25

1     what came on.  Not the front.
2  Q  Where is the lens located?
3  A  Just behind the cage.  At least it was.  I don't know
4     where they are mounding them now.  I don't work there
5     anymore.
6  Q  So there was a camera lens showing the back seat and a
7     camera lens somewhere else on the car?
8  A  It would be on the windshield, a dash cam, pointing
9     forward.
10 Q  Had you had problems with your dash cam before that?
11 A  The whole -- yeah.  There was problems with them.
12 Q  I mean yours, specifically.  What car were you in?
13 A  That -- I drove different cars every day.
14 Q  That day, what car were you in?
15 A  1133 I believe it was.  I'd have to refer to my report.
16    (Examining document).  Correct, 1133.
17 Q  How often had you used that car?  Strike that.
18       How often had you used that car before?
19 A  I don't know.
20 Q  Do you recall ever having problems with the dash cam with
21    that car?
22 A  Not that I recall.
23 Q  Where was your car facing that day?
24 A  When I arrived on scene?
25 Q  Yes.

7 (Pages 22 to 25)

Page 30

1   A   To them.
2   Q   -- to them?
3   A   Yes.
4   Q   Did you hear Officer Severs saying anything to Mr.
5       Merrill?
6   A   No, not at that time.  Officer Severs yelled at me that
7       his taser cartridge didn't work.
8   Q   Did you know Bobby Merrill?
9   A   No.
10  Q   Had you ever seen him?
11  A   No, not that I recall.
12  Q   All right.  So Officer Severs said his taser cartridge
13      did not work?
14  A   Correct.  He said he deployed his taser -- he deployed
15      his taser.  He's out of cartridges and it had no effect
16      on him.  It did not work.
17  Q   Was Mr. Merrill still standing with his hands raised?
18  A   But when I got out of the car, he tucked his hands down
19      into his person.
20  Q   Did you say anything to him?
21  A   When I got out of the car, I -- I advised him to
22      either -- I thought -- I believe I told him to get on the
23      ground.  Yeah, I advised him to get on the ground.
24  Q   As soon as you got out of the car?
25  A   Well, after -- pretty much simultaneously getting out,

Page 31

1       walking up.  Officer Severs telling me.  I'm observing
2       him as I'm basically yelling at him to -- giving him
3       verbal commands to get on the ground.
4   Q   All right.  What happens first?  You get out of your car?
5   A   Um-hum.
6   Q   And as you get out of your car, do you observe any
7       changes in what Mr. Merrill is doing?
8   A   Yeah, he pulled his hands in.
9   Q   Was that before or after you said get on the ground?
10  A   I don't recall the -- that would have been before,
11      actually.  Because he did it like right as I got out of
12      my car.
13  Q   Where did he pull his hands down to?
14  A   Just into his body.  Kind of in like a fighting stance in
15      front of his chest.
16  Q   What's a fighting stance?  Describe the fighting stance.
17  A   Hands and fists in front of your chest.
18  Q   How far was Officer Severs from him at that point?
19  A   Maybe a few feet.  A couple feet.
20  Q   Like within punching distance, or no?
21  A   No, I don't believe so.
22  Q   All right.  Did you believe that Officer Severs was in
23      danger of being punched?
24  A   Potentially.
25  Q   And was Mr. Merrill facing at anybody in that fighting

Page 32

1       stance?
2   A   He was facing Officer Severs.
3   Q   Okay.
4   A   If I recall correctly, I believe he was.
5   Q   How were his legs positioned?
6   A   I don't remember that.
7   Q   Now, if somebody were getting down to the ground, would
8       you agree they would have to move their arms?
9   A   They have to move their arms, yeah.
10  Q   Down toward their chest?
11  A   Down towards below their waist as they're going to go
12      down and put their hands-on the ground.
13  Q   So down past the chest and towards the ground?
14  A   Correct.  Not in towards their chest, though.  It would
15      be down and out.
16  Q   But they would have to move their hands?
17  A   They would have to move their hands, yes.
18  Q   What caused you to yell, "Get down to the ground"?
19  A   The fact that he was not complying with Officer Severs.
20  Q   I thought you said you didn't hear Officer Severs say
21      anything?
22  A   He advised on the radio that --
23  Q   But that was before you got there?
24  A   Correct.
25  Q   All right.  So you got there, and what you observed was

Page 33

1       him standing with his hands raised?
2   A   Correct.
3   Q   And you were getting out of the car and you saw him
4       tucking in his arms?
5   A   Correct.
6   Q   You hadn't heard Officer Severs say anything else; is
7       that true?
8   A   Not at that point.
9   Q   All right.  So --
10  A   That I recall.
11  Q   -- you don't know whether Officer Severs had said 'get
12      down to the ground' or what commands he had given him?
13  A   I don't know what commands he had given him, no.
14  Q   All right.  So how would you know to say get down to the
15      ground?
16  A   To gain control and resolve the problem at hand.
17  Q   How would you know that your command was consistent with
18      what Officer Severs may have said to him?
19  A   I don't.
20  Q   Okay.  So if, for example, Officer Severs could have
21      said, turn around, put your hands-on your head or
22      something like that, right?
23  A   I guess he could have.
24  Q   And then you would say -- get on the scene and yelled get
25      down to the ground.

9 (Pages 30 to 33)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

75263246-fa6a-467f-838f-0933ace3aa20

## Page 38

1  A   Correct.
2  Q   And then the force continuum would start with verbal
3      commands, correct?
4  A   Correct.
5  Q   And if verbal commands -- the goal of verbal commands is
6      to stop active resistance; is that correct?
7  A   Correct.
8  Q   And then the next level would be, what, the passive where
9      you use hands-on or what?
10 A   After verbal commands?
11 Q   Yes.
12 A   Yes.
13 Q   Okay. Had anybody, to your knowledge, used hands-on with
14     Mr. Merrill?
15 A   Not that I know of.
16 Q   All right. And then below hands-on, is that the impact
17     devices?
18 A   The --
19 Q   I'm saying below, like next.
20 A   Taser, yes.
21 Q   So hands-on, does that come before taser?
22 A   It doesn't have to, no.
23 Q   All right. When doesn't it have to? Is that like when
24     somebody is running?
25 A   True.

## Page 39

1  Q   Okay. If somebody is standing there, is it appropriate
2      to -- when is it appropriate to use a taser if they are
3      standing there?
4  A   If they are not complying with you. You don't have to go
5      hands-on.
6  Q   What determinations are you trained to consider whether
7      to use hands-on or a taser, versus a taser?
8  A   Depends on the risk.
9  Q   Okay. What does it depend on? Give me examples of the
10     risk.
11 A   Any potential injury to officers and/or suspect.
12 Q   Okay, potential injury. And I take it that is potential
13     injury from a physical standpoint of hands-on?
14 A   Correct.
15 Q   As well as potential injury from the use of a taser?
16 A   Correct.
17 Q   And why in this circumstance did you believe it was
18     appropriate to remove your taser as opposed to attempting
19     hands-on with two officers and one gentleman?
20 A   Because he was -- at that point, I already knew that he
21     was not compliant. And Mr. Merrill was more than double
22     my size at that time. I could see that.
23 Q   All right. And just so we're clear, you knew that he had
24     been actively resisting? At least that's what you
25     believed?

## Page 40

1  A   Correct.
2  Q   Okay. And active resistance that you personally observed
3      was what?
4  A   When I arrived on scene?
5  Q   Yes.
6  A   He was not -- I mean, not -- I guess I didn't see
7      anything at that time. He was standing in front of
8      Officer Severs. The only thing I knew at that time would
9      have been that he didn't comply with Officer Severs.
10     Because if he would have complied he would have either,
11     A, been in the patrol car, or B, calmly talking with
12     Officer Severs.
13 Q   But you didn't hear any conversation, did you?
14 A   Correct.
15 Q   So there is no aggressive conversation?
16 A   That I heard at that time. As I'm out of the patrol car
17     in the second set I was.
18 Q   Okay. Did you conceive of the possibility that perhaps
19     the situation was deescalating and whatever degree of
20     force had been used was starting to work by the time that
21     you arrived?
22 A   No.
23 Q   Why wouldn't you conceive of that possibility?
24 A   Just by looking at the officer on scene and the look -- I
25     mean, you can tell by looking at someone if there is

## Page 41

1      still some sort of fear.
2  Q   Who had the fear?
3  A   You could tell Officer Severs was in some sort of fear.
4  Q   How could you tell he was in fear? What was it about him
5      that --
6  A   The look on his face.
7  Q   -- showed his fear?
8          What was the look?
9  A   It wasn't calm and collected.
10 Q   Did you think he was in immediate danger?
11 A   Potentially.
12 Q   What was the immediate danger?
13 A   Bobby Merrill was twice his size also. He was a big guy.
14 Q   But you didn't observe him gesture toward him?
15 A   No.
16 Q   You didn't observe any aggressive words?
17 A   No.
18 Q   You didn't see a weapon?
19 A   No.
20 Q   He didn't turn and try to run away?
21 A   No, not that I saw.
22 Q   Are hands-on techniques appropriate in close quarters?
23 A   Hands-on? Yeah, they can be.
24 Q   Give me examples of when you are trained to use hands-on.
25 A   As in like arm bars. And if someone is resisting and you

Ripka, Boroski & Associates, LLC         email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660         Firm Registration No. 008139

75263246-fa6a-467f-838f-0933ace3aa20

Page 42

1 feel that you can control them by grabbing onto them,
2 grabbing an arm bar, taking them to the ground. If they
3 are actively fighting you, you can obviously defend
4 yourself.
5 Q And you're trained to do that?
6 A Correct.
7 Q Is there a difference between using the passive
8 techniques to defend yourself versus passive techniques
9 to control the situation?
10 A I don't understand what you're asking.
11 Q You have described using like an arm bar and then you --
12 I also heard you say you can defend yourself. Now --
13 A As in deflect strikes if needed.
14 Q All right. That's if somebody is actually swinging at
15 you?
16 A Correct.
17 Q And that's what I'm getting at. You as a police officer
18 are trained that it is appropriate to use hands-on
19 techniques to secure the situation? Such as if somebody
20 is not putting their hands behind their back, you can use
21 an arm bar and move it?
22 A Correct.
23 Q And there are situations where if the person is striking
24 at you, you can defend yourself even before using a
25 hands-on technique to gain control; is that true?

Page 43

1 A True.
2 A There are two different purposes of a hands-on technique?
3 Is that a fair assessment?
4 A You can say that.
5 Q And I take it, before this day, April 10th of 2012, you
6 had had circumstances where you were in close proximity
7 with a suspect, detainee, arrestee, where you had to use
8 hands-on techniques to secure the person; is that
9 correct?
10 A Correct.
11 Q You were very close by the person when you used them?
12 A Correct.
13 Q Have you encountered in your career -- by this time at
14 the Saginaw Police Department, you had been on about two
15 years?
16 A Approximately.
17 Q Had you encountered situations where you had seen
18 somebody that you thought was aggressive and even though,
19 you know, maybe there had been some degree of force,
20 where the person is talked down?
21 A Yeah.
22 Q Is it appropriate to do that?
23 A Absolutely.
24 Q When do you do that?
25 A When you talk somebody down?

Page 44

1 Q Yeah. I mean, how are you trained to -- how are you
2 trained -- I guess what I'm asking is this way:
3 I have talked about a force continuum of a
4 progression of greater force.
5 A Um-hum.
6 Q And you agree that we have talked about a progression,
7 right?
8 A Correct.
9 Q Okay. Now, does it always have to be a progression or
10 does the continuum go back and forth? Are you trained to
11 have it go back and forth?
12 A You can go back and forth.
13 Q What are you trained about the force continuum going back
14 and forth?
15 A That if the situation deescalates, the force used
16 deescalates also.
17 Q All right. Did this situation, in your estimation,
18 deescalate?
19 A No.
20 Q Based upon what?
21 A The fact that he wasn't complying.
22 Q And is the noncompliance your command to get down?
23 A And Officer Severs', yes.
24 Q And Officer Severs' what?
25 A Commands.

Page 45

1 Q But you didn't hear any of those?
2 A Just what he advised on the radio.
3 Q Okay. How many times did you tell him to get down to the
4 ground?
5 A I yelled once loudly and I don't remember if I yelled
6 again.
7 Q Are you trained to yell one time before using a taser?
8 A We're trained to give verbal commands, but it doesn't
9 articulate how many times you need to give commands.
10 Q It's not uncommon for you as a police officer to give a
11 command on more than one occasion; is that correct?
12 A Correct.
13 Q Like, "Get down," and if the person doesn't get down, you
14 say, "Get down or I'm going to tase you"?
15 A Correct. You don't have to advise you're going to tase
16 them, though.
17 Q You don't have to?
18 A Nope.
19 Q Do you sometimes do that?
20 A Yeah. Sometimes that deescalates.
21 Q Did you tell Mr. Merrill if he didn't get down you were
22 going to tase him?
23 A I don't remember that.
24 Q If you did, would you report that?
25 A I would assume.

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

75263246-fa6a-467f-838f-0933ace3aa20

Page 50

1  officer shall not?
2  A  No, I don't know that.
3  Q  All right. Are you aware of any policy that says, if one
4     officer deploys a taser and it does work, another officer
5     should not?
6  A  Not that I know of.
7  Q  Were you trained either, at Saginaw or at the academy,
8     about the appropriateness of multiple tasing, or
9     multiple -- I guess I don't know the right word -- using
10    it multiple times on the same person?
11 A  Say that again.
12 Q  Any training that you received regarding the propriety or
13    appropriateness of using a taser on a person multiple
14    times?
15       MR. REISING: I only object to the question
16    because it assumes facts not in evidence, and it isn't
17    defined.
18       But go ahead. Answer the question if you can.
19       THE WITNESS: Not that I know of. I'm not
20    really understanding completely what you're looking for.
21    Like are you just asking, have we been trained not to use
22    a taser multiple times?
23 Q  (BY MR. FELTY) Yes.
24 A  Is that what you're basically asking?
25 Q  Basically.

Page 51

1  A  Not that I know of any training like that.
2  Q  What training have you had regarding the use of a taser
3     on the same individual more than once, if any?
4  A  None that I know of.
5  Q  Have you had any training in the appropriateness of the
6     duration of the tasing; like the number of seconds?
7  A  Well, it's a five second cycle.
8  Q  Okay. It's a five second cycle?
9  A  That's what -- yes.
10 Q  All right. Any training or policies regarding the number
11    of cycles that are appropriate for a particular
12    individual?
13 A  No.
14 Q  How many times did you cycle on Mr. Merrill?
15 A  The initial one? Once.
16 Q  Okay. What does that mean, the initial one?
17 A  I attempted a second one and it had no effect.
18 Q  Did it make contact?
19 A  I don't know.
20 Q  So the first one you deployed the taser in dart or probe
21    mode?
22 A  Correct.
23 Q  And it did have an effect?
24 A  Bobby Merrill went to the ground at that point, yes. So
25    I would have to assume that it did.

Page 52

1  Q  All right. Is the purpose of using a taser to bring a
2     person to the ground?
3  A  To gain control, yes.
4  Q  All right. To get them to the ground?
5  A  To gain control, yes.
6  Q  Okay. Is it to get them to the ground?
7  A  That's usually what happens, yes.
8  Q  All right. Is there any other purpose for using the
9     taser, other than to gain control by getting the person
10    to the ground?
11 A  That's the purpose, is to gain control of the suspect.
12 Q  Is it to get them to the ground?
13 A  Yes.
14 Q  All right. Is there anything else that a taser is
15    designed to do other than to get the suspect to the
16    ground?
17 A  It's also used for compliance.
18 Q  When somebody is on the ground?
19 A  If they are fighting on the ground and they are -- say
20    they are not giving you their hands. You don't know,
21    what -- obviously, they're resisting you. Then, yes, you
22    can use the taser.
23 Q  Where were you trained that the taser is appropriate to
24    be used on the ground, when a person is on the ground?
25    Did anybody tell you that?

Page 53

1  A  It's under the resisting.
2  Q  But, I mean, have you had training regarding whether the
3     taser is designed to be used when a person is on the
4     ground?
5  A  Not specifically to the ground, no.
6  Q  What do you believe that the use of a taser on a person
7     on the ground is beneficial in doing?
8  A  Pain compliance.
9  Q  Pain compliance?
10 A  Yes.
11 Q  What does that mean?
12 A  Basically, you deploy the taser to, basically, get the
13    person to rethink his actions and comply.
14 Q  All right. If a person -- what do you understand -- or
15    what were you taught that the taser does?
16 A  It immobilizes a person for a duration of a five second
17    cycle.
18 Q  Are you taught that it cause muscles to contract?
19 A  Correct.
20 Q  As opposed to relax?
21 A  Correct.
22 Q  All right. So if you're trying to get somebody's hands,
23    do you think, or were you trained that a taser is an
24    appropriate method to gain control of the hands?
25 A  Yes.

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax(810)234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
75263246-fa6a-467f-838f-0933ace3aa20

Page 58

1   it, actually.
2  Q  Was it effective?
3  A  It was.
4  Q  Was it in probe mode?
5  A  It was.
6  Q  What were the circumstances that you used it?
7  A  I was attempting to take a gentleman into custody and he
8     pulled away from me, pushed me and took off running. And
9     I tased him as he was running.
10 Q  And he fell to the ground?
11 A  He did.
12 Q  What happened after he fell to the ground?
13 A  He continued to fight more, and there was a struggle that
14    ensued, and, ultimately, he was taken into custody.
15 Q  Was he tased more than once?
16 A  Yes.
17 Q  How many cycles?
18 A  By me only once. Well, I take that back. I drive
19    stunned him, too. Myself, just two cycles. And I don't
20    believe anyone else used a taser.
21 Q  You said he continued to fight?
22 A  He did.
23 Q  How did he continue to fight?
24 A  In that situation, when he was on the ground as I was on
25    top and trying to get his hands, he was elbowing and

Page 59

1     pulling his hands under him and kicking and flailing.
2  Q  Were you taught, either in the academy or at the Saginaw
3     Police Department, about individual's responses to being
4     tased?
5  A  As in after the fact?
6  Q  Yes.
7  A  No.
8  Q  How many times, other than that one instance, have you
9     observed somebody else being tased?
10 A  Multiple times.
11 Q  What responses have you observed after a person has been
12    tased?
13 A  Usually they are compliant.
14 Q  In what regard? I mean, is it immediately?
15 A  Because they don't want it to happen again, usually.
16    They don't want it to happen again. Just don't tase me
17    gain. You know, I'll do what you need most of the time.
18 Q  Do they have a period of time where they move, roll, or
19    anything like that?
20 A  A lot of times. A lot -- most individuals that I have
21    observed have just kind of laid there and relaxed
22    afterwards.
23 Q  I'm not sure what you're saying. A lot of times you
24    observe movement and a lot of times they react, or am I
25    understanding that incorrectly?

Page 60

1  A  Everyone is different, you know. I don't --
2  Q  How do you determine whether a person's movements after
3     being tased are resistance versus simply a response to
4     being tased?
5  A  If they are -- the resistance would be if, you know, they
6     continue to keep their hands under them. Refusing, as
7     you're grabbing onto them, to put their -- into custody,
8     you know, pulling. Actively resisting.
9  Q  Is there any period of time that you typically wait
10    before attempting to effect an arrest or detention after
11    tasing somebody?
12 A  No, usually it's instantly, if you can.
13 Q  Does anything influence that decision?
14 A  Yes, sometimes, you know, size. The way certain
15    people -- it depends on the aggression that was shown.
16    If I'm by myself, and there is a larger gentleman and I
17    had tased him and he was actively fighting, I may just
18    hold him at taser and advise him, if he moves, I'll tase
19    him again until another officer arrives to assist me.
20 Q  How many officers were on scene when you tased
21    Mr. Merrill?
22 A  When I tased him?
23 Q  Yes.
24 A  Officer Severs and I and Officer Guest was just arriving.
25 Q  So was he walking up when you tased him?

Page 61

1  A  I don't know.
2  Q  So there were at least --
3  A  Two.
4  Q  -- two?
5  A  Potentially three.
6  Q  All right. After tasing Mr. Merrill, what, if anything,
7     did you do to deescalate?
8  A  We -- when he went to the ground, we went up to him in an
9     attempt to quickly get his arms out from underneath him.
10 Q  Did you tell him anything?
11 A  Just give me your hands. Give me your hands.
12 Q  Did you do that when you were on top of him -- or strike
13    that.
14          Did you go up to him immediately?
15 A  Yes.
16 Q  Did you apply any pressure to him?
17 A  Besides grabbing his hand -- or his arm, it would have
18    been his upper left arm.
19 Q  If it's grabbing his arm or --
20 A  I guess, yeah. There is some pressure, yeah.
21 Q  All right. Before approaching him and putting pressure
22    on him, were there any commands given to Mr. Merrill?
23 A  It was all pretty simultaneously. Just give me your
24    hands.
25 Q  All right. Between your first cycle and the attempted

16 (Pages 58 to 61)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

75263246-fa6a-467f-838f-0933ace3aa20

Page 62

1  second cycle, were there any commands?
2  A  I don't remember.
3  Q  Where were you when you, in relation to Mr. Merrill, when
4     you cycled the taser the second time, or you attempted to
5     cycle the taser the second time?
6  A  I was right next to him after. We were trying to get his
7     hands out. So I was, basically, right with him.
8  Q  Tell me the sequence of events, okay? You got out of the
9     car and you told him to get to the ground?
10 A  Correct.
11 Q  And that's as you were grabbing your taser?
12 A  Um-hum, as I was pointing it at him.
13 Q  So that's right?
14 A  I pointed it out and to get on the ground.
15 Q  How long did you give him to get on the ground?
16 A  A couple of seconds, maybe.
17 Q  All right. So within a couple of seconds of withdrawing,
18    or drawing, I should say, the taser, you activated it the
19    first time?
20 A  Correct.
21 Q  All right. It's a five second, automatically five
22    seconds?
23 A  Correct.
24 Q  Okay. He goes to the ground?
25 A  Correct.

Page 63

1  Q  How far away from him are you when the taser was engaged?
2  A  Ten, 15 feet, maybe.
3  Q  All right. So you're --
4  A  If that. If that.
5  Q  You're ten, 15 feet, maybe a little bit less away?
6  A  Um-hum.
7  Q  Is that right?
8  A  If I recall correctly, yes.
9  Q  Okay. You're not in any distance of being struck by
10    Mr. Merrill; is that correct?
11 A  He could have struck me if he lunged quickly.
12 Q  Ten or 15 feet?
13 A  People move fast.
14 Q  Okay. He didn't lunge?
15 A  No.
16 Q  All right. Where is Officer Severs at that point?
17 A  He's off kind of to the side of him?
18 Q  How far away?
19 A  Within feet.
20 Q  How many?
21 A  I don't recall exactly how many feet.
22 Q  Within an arm's length?
23 A  Arm's length or two. I don't know.
24 Q  All right. Was there any lunging toward Officer Severs
25    after it's deployed?

Page 64

1  A  No.
2  Q  All right. So Mr. Merrill goes directly down to the
3     ground?
4  A  When I'm tased him, yes.
5  Q  Okay. And then you do what?
6  A  We kind of quickly get to him.
7  Q  All right. Did you get to him before attempting the
8     second cycle?
9  A  Yes.
10 Q  And you said that the second cycle you don't believe
11    worked?
12 A  Correct.
13 Q  Have you seen any verification that it didn't work?
14 A  No.
15 Q  Do you know if the City of Saginaw keeps records of
16    whether the taser has cycled?
17 A  Yes.
18 Q  Has anybody shown you those?
19 A  No.
20 Q  Did the taser sound any differently the second time?
21 A  Not that know of.
22 Q  Did it sound like it made contact?
23 A  No. I mean, not sound. I don't know what it sounded
24    like to be honest with you. It was -- I didn't notice
25    any effect. As in, I was -- there was no muscle

Page 65

1     constriction. There was no shaking, jolting.
2  Q  Did you hear any difference in the sound that the taser
3     makes?
4  A  I don't recall that.
5  Q  Do you believe that a taser that has made contact sounds
6     any differently than a taser that has lost contact?
7  A  Yes.
8  Q  And what's the difference?
9  A  You'll hear a loud arcing noise if there is -- if the
10    probes -- basically, if the connection goes between them,
11    it's a loud arcing noise. Whereas if it's connected to
12    somebody, you really don't hear much -- anything except
13    for the clicking of the taser.
14 Q  Did you hear that loud arcing noise?
15 A  I don't remember that.
16 Q  When did you reach the -- I mean, have you actually
17    reached the conclusion that you had lost contact the
18    second time that the taser was attempted to be cycled?
19 A  Say than again.
20 Q  Have you actually reached the conclusion that the taser
21    didn't work the second time that --
22 A  Um-hum.
23 Q  -- you engaged it?
24 A  Um-hum.
25    MR. REISING: You have to answer out loud,

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
75263246-fa6a-467f-838f-0933ace3aa20

Page 70

1  Q  Do you recall Officer Madaj or Officer Guest being on the
2     ground with you?
3  A  When?
4  Q  At any time during the --
5  A  Yes.
6  Q  Okay. At what point do you recall three other officers
7     being on the ground?
8  A  What do you mean?
9  Q  At what point after -- okay. There is the second attempt
10    at the cycling, right?
11 A  Correct.
12 Q  And do you believe there are three other officers there
13    to assist in the arrest or detention?
14 A  When that second cycle was administered, I don't recall.
15 Q  Okay. Were all three other officers, to your
16    recollection, there when Mr. Merrill was ultimately
17    handcuffed?
18 A  All -- yes.
19 Q  How long did the entire, to your recollection, did the
20    entire cuffing process take?
21 A  It felt like a long time, but I'm sure it was maybe a
22    minute, two minutes. I don't know. In situations like
23    that, it feels longer than it really is.
24 Q  All right. So you're at the left shoulder area of
25    Mr. Merrill after the second -- the attempt at the second

Page 71

1     cycle?
2  A  Yes, I believe so.
3  Q  All right. What did you do after the attempted cycling
4     the second time?
5  A  Well, as soon as I determined that either, A, I lost a
6     connection or, B, my first connection didn't even work,
7     or one of the wires got caught, I just reholstered my
8     taser.
9  Q  All right. You reholstered it and then what?
10 A  We continued trying to get Mr. Merrill's hands out from
11    under him.
12 Q  What did you do? What did you do to attempt to get his
13    hands out from under him?
14 A  I attempted to pull them out. That was not working. I
15    gave commands to -- give me your hands. Give me your
16    hands. And then once that was not working and we were
17    struggling, I pulled out my department issued baton.
18 Q  Did you use the baton?
19 A  I did.
20 Q  Where did you -- I take it when you used the baton, you
21    struck Mr. Merrill?
22 A  I did, on his upper arm.
23 Q  So is that the left upper arm?
24 A  Yes.
25 Q  How many times did you strike him?

Page 72

1  A  I don't recall the number. A couple of times with no
2     effect. So I reholstered my baton.
3  Q  Did anybody else strike him with the baton that you're
4     aware of?
5  A  No.
6  Q  What did you do after you reholstered the baton?
7  A  We continued struggling with Mr. Merrill.
8  Q  What did you do to attempt to gain compliance?
9  A  Just I -- at that time we just grabbed his arms and were
10    finally able to get his hands behind his back.
11 Q  Did you ever attempt pressure points?
12 A  Not that I recall.
13 Q  Okay. The baton, that is what kind of --
14 A  Impact weapon.
15 Q  That's impact?
16 A  Um-hum.
17 Q  Is that yes?
18 A  Yes.
19 Q  Before using the baton, are you aware of anybody using
20    any type of pressure point or striking --
21 A  I'm not sure what the other officers were doing.
22 Q  Do you know where your knee was when you were using the
23    baton?
24 A  I don't remember that.
25 Q  Did you use any knee strikes?

Page 73

1  A  I would have to refer to my report. I don't remember. I
2     may have. (Examining document). Not that I recall.
3        MR. REISING: Have you looked at your report,
4     too?
5        THE WITNESS: I did. I looked at my report.
6        MR. REISING: Okay.
7  Q  (BY MR. FELTY) Other than Mr. Merrill's arms being under
8     his body, what, if any, resistance was there?
9  A  Before he was placed in custody?
10 Q  Yes.
11 A  Just refusing to comply with commands. And he was
12    under -- I mean, he was moving around. Like flailing a
13    little bit, but...
14 Q  Well, flailing implies to me arms swinging around?
15 A  Yeah, okay. So he was just kind of moving around.
16    Moving his feet a lot like in a sweeping motion.
17 Q  What do you mean by a sweeping motion?
18 A  Just side-to-side.
19 Q  Was he trying to -- do you know if he was trying to get
20    himself up?
21 A  I don't know what he was trying to do.
22 Q  All right. So did his arms ever appear as if they were
23    attempting to strike anybody?
24 A  No, I don't believe so.
25 Q  All right. They were just under his body?

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139

75263246-fa6a-467f-838f-0933ace3aa20

Page 78

1  Q  Did you think so at the time?
2  A  Not -- no, because, I mean, I didn't really feel so.
3     Because the taser -- after Officer Severs described that
4     his did not work, mine appeared not to have worked the
5     second time. Just in my head, some people, when they are
6     under the influence of narcotics, sometimes a taser does
7     not work. They don't feel the effects. And at that
8     point I didn't resort to my taser at that time.
9  Q  So had you observed that people that are under the
10    influence of narcotics don't feel the effect of -- not
11    feeling the effect?
12 A  I have observed that before.
13 Q  When had you observed it at that time?
14 A  I did not observe it in that incident.
15 Q  No, no, no. Before that particular incident, had you
16    observed somebody -- a taser used on somebody under the
17    influence of something where it didn't have an affect on
18    the individual?
19 A  Yes.
20 Q  Under what circumstances?
21 A  I don't recall the exact case. I don't know. I don't
22    even recall which officer it was. It was when I first
23    started. A gentleman actually pulled the probes from
24    him.
25 Q  Was this the naked guy?

Page 79

1  A  No. No.
2  Q  Are you aware of the naked guy?
3  A  I have heard the story.
4  Q  So is it known within the department that, even though a
5     taser probe -- the taser probes are properly connected,
6     that it is possible that the taser will not have effect
7     on some individuals?
8  A  In rare instances, yeah, it's possible.
9  Q  All right. In this instance, as you arrived on the
10    scene, did you have any understanding of whether Officer
11    Severs had used his taser when you arrived?
12 A  Yes.
13 Q  Your understanding was that he had?
14 A  He had used it, yes.
15 Q  Did you have any understanding of how many times he had
16    attempted to cycle the cycle?
17 A  Officer Severs advised -- I don't recall him saying how
18    many times he advised that he was out of cartridges and
19    it had no effect.
20 Q  Okay.
21 A  I don't remember if he said how many he had.
22 Q  Did you know how many cartridges an officer typically
23    had? Or was there a standard --
24 A  Some officers carried a pouch on their belt that had
25    extra taser cartridges. I did not. I don't know if

Page 80

1     Officer Severs did or did not that day.
2  Q  Officer Severs told you he had used at least one
3     cartridge, or was out of them?
4  A  I would have -- yeah, I assumed he used at least one,
5     because he said he was out of cartridges. And he said
6     cartridges, so...
7  Q  Did you assume before you deployed yours the first time
8     that he had used it on more than one -- or attempted to
9     use it more than once?
10 A  Correct.
11 Q  All right. So then you used yours initially?
12 A  Correct.
13 Q  And did you believe it had an effect?
14 A  I believe it did at that time, because he went to the
15    ground.
16 Q  All right. And then the second attempt you believe did
17    not have an effect?
18 A  Correct.
19 Q  Were you making an assumption at that point in time as to
20    whether this was an individual, one of the rare
21    individuals where a tasing might not have an effect, or
22    that connection was lost?
23 A  At that time, I just assumed the connection was lost,
24    because it had some effect.
25 Q  What do you assume now, if anything?

Page 81

1  A  I would assume now that the connection was lost.
2  Q  Why would you assume now the connection was lost?
3  A  Because it had no effect on him.
4  Q  And I think you said you don't know if he was tased while
5     on the ground by another officer; is that correct?
6  A  Yeah, I don't know if another officer -- yeah, I don't
7     recall that.
8  Q  Do you recall any other officers having their tasers out?
9  A  I believe Officer Guest did.
10 Q  Do you recall hearing it?
11 A  No, I don't recall hearing anything.
12 Q  Does it make a noise if it's in drive stun mode?
13 A  Yeah.
14 Q  Does it make the same noise?
15 A  The sparking noise?
16 Q  Yes.
17 A  Yes.
18 Q  Is it as loud or is there a different in degree?
19 A  It's louder. Unless it's, you know, in contact with
20    something.
21 Q  What does it sound like if it's in contact?
22 A  Very quiet. Like a ticking noise.
23 Q  All right. You talked about being trained as to
24    malfunctions of tasers as well?
25 A  Correct.

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email:  rba@ripkaboroski.net
Firm Registration No. 008139
75263246-fa6a-467f-838f-0933ace3aa20

Page 90

1    time that would be a good thing to have recorded.
2  Q  Do you always record witness statements?
3  A  Yes, I try to.
4  Q  What was the reason that you thought it would be a good
5     thing to have this individual recorded?
6  A  Just for clarification, I guess, purposes.
7  Q  Clarification of what?
8  A  Just what he fully says to supplement my report.
9  Q  And this person -- I'm looking at a redacted copy and I
10    may have a different one. The witness statement says
11    it's Turner?
12 A  Correct.
13 Q  You don't have his first name?
14 A  Adam.
15 Q  Did Adam Turner, to your recollection, ever go inside
16    your car?
17 A  No, he did not. I talked to him in the street.
18 Q  Did you talk to Officer Severs after the incident about
19    what happened?
20 A  Yes.
21 Q  Did Officer Severs tell you that Mr. Merrill attempted to
22    get into his car?
23 A  Yes.
24 Q  How did he attempt to get into his car?
25 A  He said he was pulling on the handle trying to get in,

Page 91

1     and we have key fobs and he locked his door.
2  Q  Do you know what door he was trying to get in?
3  A  He said the driver's door.
4  Q  Do you know where Officer Severs was when he was trying
5     to get in the door?
6  A  I don't know.
7  Q  All right. I'm looking back at your report. And you
8     looked and you didn't see any weapons in the buttocks
9     area?
10 A  Correct.
11 Q  I assume that means pockets?
12 A  Pockets, waistband.
13 Q  All right. And then says, "Reporting officer placed knee
14    on the upper back of Merrill in an attempt to gain
15    control on him"?
16 A  Correct.
17 Q  How did you do that? Where were you when you put your
18    knee on the upper back?
19 A  I just basically kneeled on him. Like I was off to his
20    side and put my knee on the center of his back.
21 Q  So was your left knee like on the ground and then you put
22    your right knee on his back?
23 A  I don't remember the exact stance.
24 Q  Well, you were on the left side?
25 A  Correct. I don't remember which way I was facing is what

Page 92

1     I'm getting at.
2  Q  Oh, okay. So you don't know if you were up by his head?
3  A  I was in -- like normally when I do it, it's the middle
4     of the upper back.
5  Q  No, but, I mean, like was your body --
6  A  Oh, no, I do not remember where my body was.
7  Q  Do you know if you used your right knee or your left
8     knee?
9  A  I don't recall that.
10 Q  How would putting your knee on his back -- or what was
11    the purpose of doing that?
12 A  Because when he was moving his arms, he was able to, you
13    know, lift his chest up. And wanted to keep him on the
14    ground so we can gain control so he, A, didn't get up,
15    or, B, had less mobility.
16 Q  How does putting the knee on the back assist in getting
17    his arms into the buttocks area to be handcuffed?
18 A  It keeps him from, A, again, being able to get up or, B,
19    moving around vigorously like he was.
20 Q  Where were his arms at the point in time that you put
21    your knee in his back?
22 A  I don't recall that. I don't know.
23 Q  Because, I mean, would they have been behind him?
24    Because it seems if you were --
25 A  Or off to the side or --

Page 93

1  Q  But if they were off to the side, would that obstruct
2     cuffing him if your knee was in his back?
3  A  No.
4  Q  If his arms were off to the side, how would you get him
5     cuffed with your knee in his back?
6  A  It wouldn't have been in front of my body. I wouldn't --
7  Q  But wouldn't you have been in the way?
8  A  Depending on how he had his arms.
9  Q  And Merrill was -- it says, "Merrill was screaming
10    comments like he was being sodomized and raped"?
11 A  Yes.
12 Q  Was that recorded on any device that you're aware of?
13 A  I don't know. I don't know whose camera systems were
14    working or not.
15 Q  How many times did he -- or what other -- it says,
16    "Merrill was screaming comments like he was being
17    sodomized and raped." What other comments were there?
18 A  They are raping me. They're -- sodomy, sodomy. Just --
19 Q  How many times did he do that?
20 A  Multiple times.
21 Q  Does this have anything to do with resisting?
22 A  No.
23 Q  And you said, "Reporting officer heard from a crowd that
24    was gathering people telling BJ to stop fighting"?
25 A  Correct. There was persons on the -- it would be the

24 (Pages 90 to 93)

Page 114

1  A   I do not.
2  Q   Did you ever leave Mr. Merrill's presence after he was
3      cuffed?
4  A   When I spoke with the witness.
5  Q   That was after he was already in the car?
6  A   Correct.
7  Q   What did you do after his feet were tied? What was your
8      role?
9  A   I didn't really have a role at that time.
10 Q   Did you go anywhere?
11 A   No.
12 Q   Did you stand then --
13 A   I was standing with them, yes.
14 Q   Standing with who?
15 A   The other officers and Mr. Merrill.
16 Q   Did you assist in transporting Mr. Merrill to the squad
17     car?
18 A   Yes.
19 Q   How did he get transferred, or how was he taken to the
20     squad car?
21 A   He was stood up and he started to walk. I don't remember
22     if he walked the whole way. I remember Officer Madaj
23     stating -- asked him if he was going to walk, or if he
24     was going to have to be carried. And I remember like
25     holding his left arm as we walked to the patrol car.

Page 115

1  Q   So did he walk?
2  A   He started to and I don't -- I don't remember exactly
3      what happened.
4  Q   All right. What did you do to assist him in getting him
5      to the car?
6  A   Just basically holding his left arm.
7  Q   You held his arm?
8  A   Correct.
9  Q   And was somebody holding his right?
10 A   Yes.
11 Q   Who was holding --
12 A   I don't remember which officer it was.
13 Q   How many officers were on-scene at that time?
14 A   Four.
15 Q   Were all four of you together?
16 A   Yes.
17 Q   So all four of you walked to the car?
18 A   I believe so.
19 Q   Whose car was it?
20 A   Mine.
21 Q   And he was put in the back of your car?
22 A   Correct.
23 Q   How was he put in the back?
24 A   I -- when we got at the door, because the door swings
25     open, I was on the left. There was no room for me. I

Page 116

1      backed up and he was put in the car by the other
2      officers. He was wide. He had to be turned just to get
3      in the car and then placed in the patrol car.
4  Q   He was put in what side; passenger or driver's side?
5  A   Driver's side.
6  Q   All right. And how was he positioned in the car?
7  A   On his right side, facing down, but turned on his right
8      side where his left shoulder was leaning on the cage.
9  Q   And he was alive at that time?
10 A   Yes.
11 Q   He was conscious?
12 A   Yes.
13 Q   Was he communicating?
14 A   He was still -- yeah, he was.
15 Q   Did he say anything more that you recall after talking
16     about being sodomized and raped?
17 A   Not that I recall exactly what he was saying, no.
18 Q   Do you recall him saying anything?
19 A   He was like speaking, yes. But I don't remember what he
20     was saying.
21 Q   Was he mumbling?
22 A   No.
23 Q   Do you know what he was speaking about?
24 A   No, I don't recall.
25 Q   Did you ask him any questions?

Page 117

1  A   No.
2  Q   Did you ever ask him how he was?
3  A   I did not, no.
4  Q   Did you hear anybody else asking him any questions?
5  A   No.
6  Q   Did anybody attempt to interview him while he was on the
7      ground in the street?
8  A   Not that I am aware of, no.
9  Q   You never left him on the ground?
10 A   No, I was there. We all were there.
11 Q   Okay. So he's put in the car and I take it -- your car,
12     right?
13 A   Correct.
14 Q   Was your car running at this time?
15 A   Yes.
16 Q   Is the camera on at this time?
17 A   I don't believe -- I don't know. I don't believe it was,
18     because I had turned it on after I moved the patrol car.
19     So I don't believe it was running at that time.
20 Q   All right. So did you move the car with him in it?
21 A   Yes.
22 Q   Where did you move it to?
23 A   Just off of Washington onto Gilmore. Literally, from
24     just pulling around the corner to get off the main road,
25     because traffic was backed up.

30 (Pages 114 to 117)

Page 142

1   A   Yes.
2   Q   Did you review it?
3   A   No.
4   Q   What did you tell Lieutenant Kendziorski about the
5       incident?
6   A   Basically, exactly what transpired. What we talked
7       about. What's in the report.
8   Q   And there was no administrative or grievance against you?
9   A   No.
10  Q   So no discipline?
11  A   No discipline.
12  Q   Do you know if there was discipline of any officer
13      involved?
14  A   No, there was not.
15  Q   Why did you leave the Saginaw department?
16  A   Why did I leave Saginaw City?
17  Q   Yeah.
18  A   Layoffs were talked about.
19  Q   Were you laid off?
20  A   No, I left before layoffs went out. There were layoffs,
21      yes, but I left prior to that. Better opportunities
22      elsewhere.
23  Q   When did you start at Saginaw Township?
24  A   September 14th of 2012.
25  Q   It was more eventful starting at --

Page 143

1   A   No, I remember. I got sworn in in Saginaw May 17th,
2       2010. I remember the day.
3   Q   I was just kidding.
4   A   I remember the day I started the road.
5           MR. FELTY: Off the record.
6           (Off the record).
7   Q   (BY MR. FELTY) Other than your attorney, are there any
8       other individuals that you have discussed this case with?
9   A   No.
10  Q   Have you had any, or did you have any discipline at the
11      Saginaw department?
12  A   Unh-unh, no.
13  Q   Were you ever involved or named in any other lawsuits?
14  A   No.
15  Q   As part of your discussions with the other officers, did
16      you guys discuss the possibility of being sued?
17  A   Yes.
18  Q   Is that something that concerned you?
19  A   I think it's always concerning.
20  Q   What did you guys discuss about a lawsuit? And I don't
21      mean with a lawyer. I mean, I'm talking about, you know,
22      the four of you together.
23  A   Just that it was a potential that it could happen. Which
24      is common in police work.
25          MR. REISING: That's correct.

Page 144

1   Q   (BY MR. FELTY) I want to ask you a little bit more in
2       detail about taser use. In this situation -- I don't
3       want to mischaracterize what you said, so I'm going to do
4       the best that I can -- you were getting out of the car
5       and you were making a command for Mr. Merrill to get down
6       to the ground and you were unholstering the taser. It
7       sounded like it was all kind of happening at once; is
8       that fair?
9   A   Yup.
10  Q   Is there anything that you do as a police officer after
11      you have drawn the taser to avoid its use?
12  A   To try to prevent having to use it?
13  Q   Yes.
14  A   Just a lot of times -- sometimes you can say, "Stop or
15      I'm going to tase you." But other than trying to avoid
16      it, I mean, at that point if they are failing to comply
17      with your verbal commands.
18  Q   Is there any time period for a person to comply that
19      you're trained to use before deploying the taser?
20  A   No, I don't believe there is a set standard.
21  Q   Is there a continuum?
22  A   If they comply.
23  Q   But, I mean, I don't think you could really describe how
24      much time elapsed between you saying get down to the
25      ground and using the taser. And if I'm wrong --

Page 145

1   A   Yeah.
2   Q   I mean, was there any period of time, or what period of
3       time did you allow Mr. Merrill to comply?
4   A   I gave him opportunity to get on the ground.
5   Q   And what was the length of it?
6   A   I don't know; a second, two seconds, three seconds. I
7       don't know.
8   Q   Do they teach you anything, either at Saginaw or in the
9       academy, about delaying use of the taser after making a
10      command, or after drawing it?
11  A   No.
12  Q   Now, have you had the unfortunate event of having to draw
13      a firearm on a subject --
14  A   Yeah.
15  Q   -- in your career?
16  A   Yeah.
17  Q   When you draw a firearm, is there anything that you do,
18      or are taught to do, to prevent the need for discharging
19      it?
20  A   Loud verbal commands.
21  Q   What does loud verbal commands?
22  A   If you're drawing your firearm, usually it's going to be
23      a weapon. So drop the weapon, let me see your hands,
24      stop, you know.
25  Q   Do you give one command and then fire, or is there

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139

75263246-fa6a-467f-838f-0933ace3aa20

Page 146

```
 1     something that you're taught to do to respond to that
 2     situation?
 3  A  It depends on the situation.
 4  Q  What are the variables that you consider once a firearm
 5     is drawn about the number of commands that you'll give?
 6  A  It all depends on what the suspect is doing.  I'm not
 7     going to wait too long and end up losing my life, you
 8     know.  Or waiting too long and somebody else's demise.
 9  Q  So if a person -- obviously, if a person has a firearm
10     pointed at you, there is --
11  A  Or somebody else, yes.
12  Q  -- I would -- you or somebody else, I would expect that
13     there would be maybe not even --
14  A  Correct.
15  Q  -- a command.
16  A  Yes.
17  Q  Because that's like imminent life and death?
18  A  Correct.
19  Q  All right.  Now, somebody has a firearm in their hand,
20     say down at their side.
21  A  Pointed down?
22  Q  Pointed down.  Is there something that you're taught to
23     do regarding use of deadly force at that point?
24  A  Order them to drop the weapon, drop the weapon.  Try to
25     take cover.  And if he raises it at any point or moves,
```

Page 147

```
 1     then you're permitted to fire.
 2  Q  Do you say drop the weapon one time, or is this loud,
 3     repeated, "Drop the weapon"?
 4  A  In a high stress situation, it's probably multiple drop
 5     the weapon, stop, drop it.
 6  Q  And by high stress, you mean what?  Like the potential of
 7     getting killed?
 8  A  Absolutely.  Just the adrenaline.  High stress.
 9  Q  Do you consider the taser to be deadly force?
10  A  No.
11  Q  You talked about -- I thought you said, and maybe I'm
12     wrong, that part of your training regarding the taser
13     involved dangers of its use.  Am I wrong or did you --
14  A  They --
15        MR. REISING:  Well, I would object to that,
16     because that assumes facts not in evidence.
17        But go ahead and answer the question if you
18     can.
19  Q  (BY MR. FELTY) Were you taught about dangers of --
20  A  Yes.
21  Q  -- using a taser?
22        Where were you taught about dangers of using a
23     taser?
24  A  At the academy.
25  Q  Were you taught in the Saginaw department about dangers
```

Page 148

```
 1     of using a taser?
 2  A  In our taser training, yes.
 3  Q  What were you taught at the academy about the dangers of
 4     using a taser?
 5  A  Just the potential of risk around water, persons falling.
 6     Certain areas that you tase.
 7  Q  So use around water?
 8  A  Um-hum.
 9  Q  Is that yes?
10  A  Correct.  Sorry.
11  Q  What is the danger of using a taser around water?
12  A  Just the -- as far as a conductor.  It's electricity.
13     Just potential for other persons to basically feel the
14     effects.
15  Q  Okay.  There are certain areas of the body that you were
16     taught?
17  A  Correct.
18  Q  What were you taught about certain areas of the body?
19  A  They try to teach you to try not to -- obviously,
20     sometimes you can't -- try not to tase across the chest.
21  Q  What was the reason that they taught you to try not to
22     tase across the chest?
23  A  So the impact isn't across the heart.
24  Q  Did they tell you to avoid impact across the heart?
25  A  If possible.
```

Page 149

```
 1  Q  Did they tell you of any risk of impact being across the
 2     heart?
 3  A  If it -- only if medical conditions, certain medical
 4     conditions.
 5  Q  What is the risks they taught you about?  Is it cardiac
 6     arrest?
 7  A  Yes.
 8  Q  Who taught you of the risk of cardiac arrest?
 9  A  Officer Sabuta in our training.
10  Q  And that's at the academy?
11  A  Correct.
12  Q  And you were taught you said only if there is, what, a
13     medical condition?
14  A  Correct.  A medical condition and/or narcotics in the
15     system could have an affect.
16  Q  Was the instruction don't shoot across the chest if
17     possible because a person could have a medical condition,
18     or could be on drugs?
19  A  Could be.
20  Q  I mean, is that what Sabuta was saying is recommended
21     regarding that?  And I'll tell you why I'm asking.
22        What I mean is, were you taught, if you can
23     observe a medical condition, you don't fire across the
24     chest, or you try to avoid firing across the chest
25     because of the possibility of their being an
```

38 (Pages 146 to 149)