# EXHIBIT 10

ANDERSON vs. MADAJ, et al. DEPO: OFFICER JEFFREY MADAJ     TAKEN: 11-20-13

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOROTHY ANDERSON and
DEMARQUION MERRILL, as
Co-Personal Representative
of the Estate of BOBBY
MERRILL, deceased,

    Plaintiffs,

vs.                              Case No.: 13-11159

                               Hon. Thomas Ludington

OFFICER JEFF MADAJ, individually,
OFFICER JUSTIN SEVERS, individually,
OFFICER BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA, individually,

    Defendants.
_____/

RECEIVED DEC - 3 2013
Fieger, Fieger, Kenney, Giroux and Danzig, P.C.

        The Deposition of OFFICER JEFFREY J. MADAJ, taken before David S. Ripka, CSR-2175 and Notary Public in and for the County of Genesee, acting in the County of Saginaw, State of Michigan, at the offices of Ripka, Boroski & Associates, One Tuscola Street, Suite 301, Saginaw, Michigan, on Wednesday, November 20, 2013, commencing at or about 12:56 p.m.

APPEARANCES:

    Fieger, Fieger, Kenney, Giroux, Danzig & Harrington, P.C.
    BY: ROSS A. BRUNETTI, ESQ. (P73080)
    19390 West 10 Mile Road
    Southfield, Michigan 48075
    (248) 355-9049

    Appearing on behalf of Plaintiffs,

ANDERSON vs. MADAJ, et al. DEPO: OFFICER JEFFREY MADAJ    TAKEN: 11-20-13
2

Page 2

1  APPEARANCES (Continued):
2  Plunkett Cooney
   BY: H. WILLIAM REISING, ESQ. (P19343)
3  111 East Court Street
   Suite 1B
4  Flint, Michigan 48502
   (810) 342-7001
5
6  Appearing on behalf of Defendants.

Page 3

INDEX OF WITNESS

| WITNESS | PAGE |
|---|---|
| OFFICER JEFFREY J. MADAJ | |
| Examination by Mr. Brunetti | 4 |

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Sketch of Incident Scene at Gilmore and S. Washington | 210 |
| Exhibit 2 | Defendant Jeff Madaj's Answers to Plaintiff's Request to Admit Directed to Defendant Officer Jeff Madaj | 153 |
| Exhibit 3 | Defendant Jeff Madaj's Answers to Plaintiff's First Set of Interrogatories and Request for Production of Documents | 153 |
| Exhibit 4 | Witness Sketch of Dog Leash | 210 |

Page 4

1   Saginaw, Michigan
2   Wednesday, November 20, 2013
3   12:56 p.m.
4   PROCEEDINGS
5   OFFICER JEFFREY J. MADAJ,
6   having been duly sworn by the Reporter, was examined, and
7   testified on his oath as follows:
8       MR. BRUNETTI: This is the deposition of
9   Saginaw Police Officer Jeff Madaj taken pursuant to
10  notice and the Federal Court Rules.
11      EXAMINATION
12  BY MR. BRUNETTI:
13  Q  Officer Madaj, how are you today?
14  A  Fine.
15  Q  My name is Ross Brunetti. I'm the attorney representing
16     the estate of Bobby Merrill in this case. Okay?
17  A  Yes.
18  Q  This is a deposition. It is basically a
19     question-and-answer session. I'm going to ask you
20     questions. You provide answers to the best of your
21     ability. Do you understand?
22  A  Yes.
23  Q  Okay. When I ask you a question, please give a verbal
24     yes, no, or another verbal response. Please refrain from
25     answering questions with yeahs, unh-hunhs or nods or

Page 5

1   shakes of your head. Do you understand?
2   A  Yes.
3   Q  And I realize you've probably testified in court before.
4      But just to make sure everything's out there, and that's
5      just because we have a court recorder who's recording
6      everything that we're saying, and we want to make sure
7      that we have the most accurate record that we can have.
8      Okay?
9   A  Yes.
10  Q  All right. Now, I'm not here to trick you today or to
11     try to engage in, you know, I guess, sneaky word play.
12     I'm just here asking questions to try to get the best --
13     to the best of your understanding what the truth is
14     regarding the incident on April 10th, 2012. Okay?
15  A  Yes.
16  Q  All right. If you don't understand a question that I
17     ask, it's perfectly acceptable to ask me to rephrase my
18     question, to tell me that you don't understand, and then
19     I'll rephrase it and try to ask it in a way that's
20     understandable. Okay?
21  A  Yes.
22  Q  Also, I'm going to ask that you wait until I finish
23     asking my question before you start answering. And,
24     likewise, I'll try to extend you the same courtesy and
25     allow you to finish your answer before I ask another

(Pages 2 to 5)

Ripka, Boroski & Associates, LLC                    email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660      Firm Registration No. 008139

ANDERSON vs. MADAJ, et al. DEPO: OFFICER JEFFREY MADAJ    TAKEN: 11-20-13

9

Page 30

1  A  No.
2  Q  Have you ever had your deposition taken before?
3  A  Yes.
4  Q  And what were the circumstances around having your
5     deposition taken before?
6  A  Honestly, I do not recall. I know it wasn't here that I
7     took it. It was when I first started.
8  Q  So, again, it was a while ago?
9  A  Oh, yes. It was on... hmm, off of State Street, State
10    and... I'm trying to think of the other crossroad there.
11 Q  Was the deposition related to your employment with the
12    City of Saginaw?
13 A  Yes.
14 Q  Were you a witness for something?
15 A  I believe I was a witness.
16 Q  Okay. So you weren't being sued; you weren't a party to
17    a lawsuit?
18 A  No.
19    MR. REISING: And there is a court reporter
20    office over in that area over on -- State Street by Dawn
21    Donuts?
22    THE WITNESS: Yes.
23    MR. REISING: There you go.
24    THE WITNESS: That's right where it was near.
25    I'm trying to think of -- I think the road starts with an

Page 31

1     "H," I believe.
2     MR. REISING: I know Dawn Donuts.
3     THE WITNESS: Yes, that's -- it was right by
4     there.
5  Q  (BY MR. BRUNETTI) Okay. I want to go back just a little
6     bit to your training at the Northeastern Basic Police
7     Academy. What kind of training did you receive at the
8     Northeastern Basic Police Academy?
9  A  You start, obviously, with law, criminal law, police
10    procedures. You have firearms training. You have --
11    they call it PPC tactics, which is -- I would compare it
12    similar to nonlethal in the military.
13 Q  Now, when you say PPC tactics, you're referring to
14    hand-to-hand training, right?
15 A  Yes.
16 Q  And so when you say nonlethal training, you're referring
17    to nonlethal hand-to-hand training, correct?
18 A  Correct.
19 Q  So these are the sort of like holds or physical takedowns
20    or physical managing of a suspect, correct?
21 A  Yes.
22 Q  Okay.
23 A  We also had physical fitness. Driving, techniques of
24    driving.
25 Q  At that time, were police departments issuing tasers?

Page 32

1  A  No.
2  Q  That's what I thought. So you didn't have any sort of
3     laser training when you initially went to the police
4     academy?
5  A  No.
6  Q  Okay. So it focused on, like you said, the basic stuff:
7     criminal law, probably criminal procedure, police
8     procedure, firearms training, hand to hand and physical
9     management of suspects and basically policies and
10    protocols, correct?
11 A  That's correct.
12 Q  Okay. Did they teach you about the force continuum?
13 A  Yes.
14 Q  And has it roughly stayed the same since that time frame
15    when you were with the Northeastern Basic Police Academy?
16 A  At this time, to my knowledge, it has. I don't believe
17    it's changed.
18 Q  Okay. What is your understanding of the force continuum?
19 A  The way that I understand it is, the police are -- the
20    way that I was instructed is that we could go one up,
21    meaning if somebody put their hands on us, we could
22    obviously put our hands on them. However, at the time,
23    we only had mace or pepper spray. So we could pepper
24    spray that person.
25    Then there's pressure points, obviously. You

Page 33

1     know, we're allowed, you know, the -- I don't know what
2     it's called. I can show you where they're at. I don't
3     recall the proper terms anymore. But we have pressure
4     points that we could deploy or use.
5  Q  To help me out to make sure that I understand the force
6     continuum, could you tell me, what's the bottom first
7     level of the force continuum?
8  A  I think there's passive resistance.
9  Q  And what are you allowed to do if someone is being
10    passively resistant?
11 A  We can detain that person, meaning if they're being
12    passive resistant, if they were blocking entry into,
13    let's say, the courthouse for that matter, if they were
14    protesting something at the courthouse, we can remove
15    that person. They're blocking the courthouse.
16 Q  Now, when you say remove, do you mean physically --
17 A  Yes.
18 Q  -- put hands on and remove?
19 A  Yes.
20 Q  Okay. For passive resistance, can you deploy any kind of
21    handheld weapon, like a baton, or some sort of other
22    management device?
23 A  I don't believe you can.
24 Q  So for passive resistance, it's pretty much just physical
25    management?

(Pages 30 to 33)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Case 1:13-cv-11159-TLL-CEB ECF No. 46-11, PageID.439 Filed 10/10/14 Page 5 of 18

ANDERSON vs. MADAJ, et al. DEPO: OFFICER JEFFREY MADAJ    TAKEN: 11-20-13
10

**Page 34**

1  A  Yes.
2  Q  So you can put your hands on them, physically move them,
3     do what you have to do to get them out of the area?
4  A  Yes.
5  Q  Okay. What's the next level after passive resistance?
6  A  Well, then you obviously have active resistance.
7  Q  And what are you allowed to do when someone is -- well,
8     first, let me ask you this: What is active resistance?
9  A  Active resistance means, to me, if a subject is running
10    away from me and there's a reason -- I have a legitimate
11    reason to chase, I can pursue that individual.
12 Q  Okay. So when you say running away, do you mean like
13    actively trying to get away from you? Is that what you
14    consider active resistance?
15 A  That would be one form, yes.
16 Q  Okay. What other forms can you think of for active
17    resistance?
18 A  (No response)
19 Q  So we've got running away.
20 A  If you go to handcuff somebody, they pull away from you,
21    if -- let's say you're at a domestic assault, the
22    husband's -- and the husband is the assaulter, and the
23    wife is the victim, and he's pushing her or hitting her
24    or slapping her, and you tell him to stop, he doesn't,
25    that would be active resistance.

**Page 35**

1  Q  Okay. And what sort of force are you allowed to use for
2     active resistance?
3  A  Once again, I can use physical force. I could use my
4     mace. I could use my department-issued ECD.
5  Q  What's an ECD?
6  A  Electronic control device.
7  Q  So is that a taser?
8  A  We had tasers. Now we have a different brand. I don't
9     even know the name of it, to be honest with you.
10 Q  But it functions in the same sort of way?
11 A  Yes.
12 Q  So it's a device that produces an electric charge that
13    transfers to the person you're putting the device on?
14 A  Correct.
15 Q  Okay. And you can use those, you're saying, for active
16    resistance?
17 A  Yes.
18 Q  All right. Anything else you're allowed to do for active
19    resistance?
20 A  No.
21 Q  Okay. What's the next step after active resistance?
22 A  Well, I believe it's deadly force. That would be the
23    next step to me, if you...
24 Q  So what would someone have to be doing in order to allow
25    you to use deadly force?

**Page 36**

1  A  Well, I'll give you an example. I've had an individual
2     that tried to run my partner over during a drug
3     investigation with their vehicle.
4        I've had an individual that's pointed a gun at
5     me.
6  Q  So in both of those situations, it sounds like the person
7     is using potentially deadly force against you or against
8     a partner?
9  A  Yes.
10 Q  So, in a situation in which deadly force is being used
11    against you or someone that you see, you believe it's
12    okay to use deadly force?
13 A  Yes.
14 Q  Okay.
15 A  I mean, even if you -- I was off duty one time. I
16    encountered a robbery at a 7-Eleven in progress.
17 Q  What did you do when you encountered the robbery at
18    7-Eleven?
19 A  I was driving past. I seen the individual behind the
20    counter. I turned my truck around. Drove up into the
21    lot. A female ran out and she was screaming, saying
22    that, "He has a gun, and he told me not to leave. I was
23    supposed to go with him." The clerk was still in there.
24       I reached for my off-duty gun. Unfortunately,
25    I didn't have it because I cleaned my truck that day, and

**Page 37**

1     the neighborhood I live in has a bunch of kids, and I put
2     it up on top of my refrigerator. So I dealt with him
3     using my truck and my cellphone.
4  Q  Now, when you say dealt with him using your truck, what
5     did you do with your truck?
6  A  I was able to get the clerk out of the store. I had the
7     clerk and that female, the other -- the two victims into
8     my truck. And I communicated on my cellphone with
9     Central Dispatch. And I used my truck to try to prevent
10    him from getting into his vehicle until the police could
11    arrive.
12 Q  How did you do that? How did you effectively try to
13    prevent him from getting into his vehicle?
14 A  Blocked his door.
15 Q  With your truck?
16 A  Yeah.
17 Q  So you pulled --
18 A  Positioned the front end of my truck so, you know, he
19    couldn't enter the passen -- the driver's side of that
20    vehicle. And then he was going to run away, so I blocked
21    his exit with my truck from running. And at that time,
22    the police were actually pulling onto the scene.
23 Q  When you say, "blocked his exit," so you pulled your
24    truck up, grilled his driver's side door?
25 A  Yes.

Case 1:13-cv-11159-TLL-CEB   ECF No. 46-11, PageID.440   Filed 10/10/14   Page 6 of 18

ANDERSON vs. MADAJ, et al. DEPO: OFFICER JEFFREY MADAJ          TAKEN: 11-20-13
                                                                              11

Page 38

1  Q  Okay. And then he tried to flee, so he tried running?
2  A  He was going to run northbound and go across the fence.
3     And I drove through the parking lot, and when he seen
4     what I was doing, he tried to get back to the car. But
5     it was too late for him because the units were pulling
6     on --
7  Q  Okay.
8  A  -- several units.
9  Q  So when you pulled your car through the parking lot, how
10    were you trying to prevent his escape with your truck?
11 A  Well, his car was on the east side of the building. I
12    was able to position my truck so he couldn't get in.
13    Then when he realized he couldn't get in, he started to
14    walk north through the parking lot towards the fence.
15    Which if he got over the fence, then it goes into an
16    apartment complex. I didn't want that.
17       So I drove my truck around by the fence area.
18    And when I did that, that pushed him back towards his
19    vehicle, which is what I wanted. And at the same time I
20    could hear the units pulling up.
21 Q  I got you. So you tried putting your truck between him
22    and the fence?
23 A  Yes.
24 Q  All right. And were you able to get your truck in
25    between him and the fence?

Page 39

1  A  Yes. I was able to have the desired effect. Because
2     when he seen what I was doing, he went and tried to get
3     back into his car.
4  Q  I got you. So he saw you moving in that area, and he
5     bolted back to the car?
6  A  Yes.
7  Q  Okay. And after he got back to the car, did the units
8     arrive?
9  A  Yes.
10 Q  And were they able to effectively take him into custody?
11 A  Yes.
12 Q  Did you do anything else at that point?
13 A  Well, no. I just obviously had to give a statement to
14    the officers.
15 Q  And when did this happen?
16 A  Oh, probably three or four years ago.
17 Q  And do you remember approximately when?
18 A  I believe it was in the summertime.
19 Q  So it would have been like May, June, July?
20 A  Yes.
21 Q  And did you ever have to go to court and testify for
22    that?
23 A  I went to court. The two victims did all the testifying
24    in that matter.
25 Q  Okay. So your testimony wasn't needed, but you were

Page 40

1     there?
2  A  That's correct.
3  Q  So you didn't actually get up on the stand and testify?
4  A  No.
5  Q  Okay. Did the person who effected the robbery ever try
6     claiming that you tried to hit him with your truck?
7  A  Not to my knowledge.
8  Q  Okay. All right. So we digressed briefly. I apologize
9     for that.
10       Getting back to the force continuum, if someone
11    is standing with their hands up, but they're not
12    listening to a verbal command, or not responding to a
13    verbal command, what sort of classification would you
14    give that on the force continuum?
15 A  I'm allowed to ask a question, correct?
16 Q  Sure. Go ahead.
17 A  It depends. And the reason that I say it depends, I
18    would have to have it clarified. What was the person
19    doing before that?
20 Q  Let's say that there had been no allegation that the
21    person was a threat, okay? But let's say that there was
22    an allegation that the person might have been disruptive,
23    okay? Hadn't tried hurting anyone, hadn't tried taking
24    anyone's property, okay? But for whatever reason, law
25    enforcement arrives on the scene because they have an

Page 41

1     assertion that someone has been disruptive. And when law
2     enforcement arrives, the person has their hands up but
3     doesn't respond to verbal commands.
4  A  Passive.
5  Q  You would call that passive?
6  A  Yes.
7  Q  And then what would you do in a situation like that if
8     someone were standing with their hands up and not
9     listening to a verbal command?
10 A  I would, first off, try to get that individual's
11    attention.
12 Q  How would you try to get their attention?
13 A  Communicating with verbal commands or me verbally asking
14    them, you know, "What's going on with you? Are you
15    okay?" You know, what you just stated, you may have a
16    person that doesn't speak, that's deaf.
17 Q  So that's the first thing that comes to your mind? If
18    someone's standing with their hands up, but they're not
19    responding to a verbal command, you indicated they might
20    be deaf?
21 A  Yes.
22 Q  Okay. And you indicated that the first thing that you
23    would do is you would try to communicate with them
24    further and ask them, "Hey, are you all right?" Sort of
25    trying to figure out what's going on, right?

(Pages 38 to 41)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

Case 1:13-cv-11159-TLL-CEB ECF No. 46-11, PageID.441 Filed 10/10/14 Page 7 of 18

ANDERSON vs. MADAJ, et al. DEPO: OFFICER JEFFREY MADAJ  TAKEN: 11-20-13

39

Page 150

1  A  No.
2  Q  But you know that he was on the right side of Bobby
3     Merrill?
4  A  He was like, yes, like kind of right behind me. But I
5     don't know what he was doing.
6  Q  Okay. So Severs was behind you at this point?
7  A  Yes.
8  Q  All right. As you approached, what did you do?
9  A  I went to his right side, attempted to get his right arm
10    out from under him. It did not work. At that time --
11 Q  I'm going to slow you down for a second.
12    How did you try to get the right arm?
13 A  Grab it, pull it out.
14 Q  Where was his right arm?
15 A  It was up in front, like right up in here, like up
16    towards the -- like his chest area, let's say.
17 Q  Was he still on his knees at this point?
18 A  Yeah.
19 Q  Okay. And I imagine, given that you said he was still
20    kind of facing the concrete earlier, is he kind of
21    hunched over his knees?
22 A  Yeah, he was kind of on his knees and hunched forward,
23    you know, not straight up but actually hunched forward.
24 Q  And you said that the left arm was tucked by the belt
25    line, and the right arm that you're grabbing at is up

Page 151

1     near the chest?
2  A  Yes.
3  Q  All right. When you grabbed Bobby's right arm, did you
4     tell anything to him -- tell him anything?
5  A  Just to, "Put your hands behind your back."
6  Q  Did he give any response?
7  A  No.
8  Q  Did you try talking to Bobby Merrill at this point?
9  A  Repeatedly, "Put your hands behind your back."
10 Q  So you repeated, "Put your hands behind your back. Put
11    your hands behind your back. Put your hands behind your
12    back"?
13 A  Yes.
14 Q  What was your manner of which that you told him that?
15 A  With authority: "Put your hands behind your back."
16 Q  Okay. So you used -- you were using an authoritative
17    tone to tell him that?
18 A  Yes.
19 Q  And you're saying that he didn't comply?
20 A  He did not comply.
21 Q  Did he ever give you a verbal response?
22 A  No, not that I recall.
23 Q  Okay. What happened after you couldn't get his right
24    arm?
25 A  I took out my department-issued taser, removed the

Page 152

1     cartridge from it and drive-stunned him.
2  Q  At this point, had Bobby Merrill tried to strike any of
3     the officers?
4  A  Not that I had observed.
5  Q  Okay. At this point -- well, strike that.
6     Before you drive-stunned Bobby Merrill, did you
7     let him know that you were going to stun him?
8  A  No.
9  Q  So you didn't say, "Put your hands behind your back or
10    I'm going to stun you"?
11 A  No.
12 Q  Okay. At the time that you drive-stunned Bobby Merrill,
13    was he still on his knees?
14 A  Yes.
15 Q  So he wasn't standing?
16 A  No.
17 Q  Was he still hunched over?
18 A  Yes.
19 Q  I apologize. Just give me one... I'm going to show you a
20    document. These are Requests for Admissions that were
21    directed toward you, I'm assuming answered by your
22    attorney. Did you ever see this document --
23 A  Yes.
24 Q  -- the Request for Admissions?
25    I would like to direct your attention to

Page 153

1  Request to Admit Number 8. It says, "Please admit that
2  Defendant Officer Jeff Madaj deployed his taser on the
3  decedent, Bobby Merrill, without first providing warning
4  or notification."
5     You denied that as untrue, correct?
6  A  That's correct.
7  Q  And here today you're testifying that you did not tell
8     Bobby Merrill that you were going to deploy your taser if
9     he didn't comply, correct?
10 A  That's correct.
11 Q  Okay.
12    MR. BRUNETTI: I'm going to ask this be marked
13 and admitted as Exhibit 2.
14    (Deposition Exhibit Number 2 was marked
15    for identification by the reporter)
16    MR. BRUNETTI: And I'm also going to have the
17 interrogatories marked and admitted as Exhibit 3,
18 probably. Why don't we just do that now, because we
19 referred to these earlier.
20    (Deposition Exhibit Number 3 was marked
21    for identification by the reporter)
22 Q  (BY MR. BRUNETTI) After you drive-stunned Bobby Merrill
23    with your taser, and that's -- just for clarification
24    again, that's where you take the cartridge off and you
25    actually take the body of the taser and put it up to the

(Pages 150 to 153)

Case 1:13-cv-11159-TLL-CEB ECF No. 46-11, PageID.442 Filed 10/10/14 Page 8 of 18

ANDERSON vs. MADAJ, et al. DEPO: OFFICER JEFFREY MADAJ    TAKEN: 11-20-13

40

Page 154

1   person, correct?
2 A That's correct.
3 Q Okay. Did he respond to that stun?
4 A None whatsoever.
5 Q Did he physically respond to that stun?
6 A No.
7 Q Did he cry out in pain?
8 A No.
9 Q Did his body go rigid?
10 A No.
11 Q What happened after that?
12 A I attempted to drive-stun him two to three more times
13   with no effect.
14 Q When you first drive-stunned him, what part of his body
15   did you put the taser on?
16 A Right between his shoulder blades.
17 Q So on his back?
18 A Yes.
19 Q When you drive-stunned him a second time, where did you
20   put the taser?
21 A Same -- same location.
22 Q Right between the shoulder blades?
23 A Yes.
24 Q When you drive-stunned him a third time, where did you
25   put the taser?

Page 155

1 A Same location.
2 Q Same location. And did you ever apply the taser to a
3   different portion of his body?
4 A Yes.
5 Q What other portion?
6 A It was his left arm --
7 Q Was that --
8 A -- near his hand.
9 Q And was that the last time you tased him?
10 A Yes.
11 Q Okay. Left arm near his hand. Could you show me on your
12   arm where you would have applied the taser.
13 A (Demonstrating) Approximately in between the elbow and
14   the wrist on the left arm.
15 Q Okay.
16 A It would have been the --
17 Q The outer edge of the left arm --
18 A Yes.
19 Q -- between the forearm and the -- between the elbow and
20   the wrist?
21 A Yes.
22 Q Okay. Did he respond to any of those taser encounters?
23 A No.
24 Q Did he ever cry out in pain in response to any of those
25   taser encounters?

Page 156

1 A No.
2 Q Did he ever say anything as this was going on?
3 A He was --
4 Q As the tasing was going on.
5 A Yes, he did. I do not recall what it was in specifics.
6   He was cussing. That I do know.
7 Q Okay.
8 A But whether it was a certain cuss word, I couldn't tell
9   you.
10 Q How much time elapsed between your first trying to get
11   Bobby Merrill's right arm out from under him and the last
12   taser application?
13 A (Counting with fingers) That was five seconds right
14   there, so -- what I just counted off. It would have
15   approximately been five seconds.
16 Q Okay. So at the time that you saw you couldn't get the
17   right arm out from under Bobby Merrill, you tased him
18   four times in five seconds?
19     MR. REISING: That's not what the witness said.
20     MR. BRUNETTI: I thought that's what he said.
21 I'm looking for clarification.
22     THE WITNESS: Okay. I counted -- what I just
23 counted off, I would have exactly thought that that was
24 about five seconds. Now, you have to understand --
25 Q (BY MR. BRUNETTI) Okay.

Page 157

1 A -- going back, you know, when you say, "tase him,"
2   drive-stun --
3 Q Right. Let me -- let me rephrase.
4 A Okay.
5 Q Let's try to do it this way. Because, really, I'm not
6   trying -- I don't want this to be inaccurate. I'm trying
7   to get as accurate a picture as I can. Okay?
8     The first application of the drive-stun taser
9   technique that you applied between his shoulder blades,
10   okay, how long after you had realized you're not going to
11   get his right arm out from under him until you tased him
12   in that position?
13 A Could you repeat it one more time.
14 Q Okay. The moment that you realized you weren't going to
15   get his right arm out from under him, okay?
16 A Yes.
17 Q At that moment, when you realized that wasn't going to
18   happen, how long did it take before you made that first
19   taser application?
20 A Approximately three to four seconds.
21 Q Okay. And that initial drive-stun between the shoulder
22   blades, how long did that application last?
23 A One second.
24 Q One second. Okay.
25   The second application between the shoulder

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOROTHY ANDERSON and
DEMARQUION MERRILL, as Co-Personal
Representatives of the Estate of BOBBY
MERRILL, deceased,

    Plaintiff,

        vs.                  Case No.: 13-11159
                                      Hon. THOMAS LUDINGTON
OFFICER JEFF MADAJ, individually,
OFFICER JUSTIN SEVERS, individually,
OFFICER BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA, individually,

    Defendants.
_____/

        The Deposition of JEFFREY MADAJ, taken before
me, Jeffrey D. Stupak, RPR, CSR 8314, Notary Public, on
Tuesday, March 18, 2014, at Ripka, Boroski & Associates, One
Tuscola Street, Saginaw, Michigan commencing at or about
1:03 p.m.

APPEARANCES:

    GARY N. FELTY, JR. (P55554)
    FIEGER, FIEGER, KENNEY, GIROUX & HARRINGTON, P.C.
    19390 West Ten Mile Road
    Southfield, Michigan  48075

        Appearing on Behalf of Plaintiffs.


    H. WILLIAM REISING (P19343)

    PLUNKETT COONEY, P.C.

    111 East Court Street, Suite 1B

    Flint, Michigan  48502


        Appearing on Behalf of Defendants.

Ripka, Boroski & Associates, LLC    email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax:( 810) 234-0660    Firm Registration No. 008139

c0fa7f7d-b5c6-4901-80d9-26c78aa476cb

Page 213

1         INDEX OF WITNESS
2   WITNESS: JEFFREY MADAJ                        PAGE
3   EXAMINATION BY MR. FELTY .............................214
4   EXAMINATION BY MR. REISING .........................306
5
6         INDEX OF EXHIBITS
7   EXHIBIT                                         PAGE
8       NO ADDITIONAL EXHIBITS WERE MARKED

Page 214

1                Tuesday, March 18, 2014
2                Saginaw, Michigan
3                1:03 p.m.
4         JEFFREY MADAJ,
5   a witness herein, was called for examination, and after
6   having been duly sworn was examined and testified on
7   their oath as follows:
8            EXAMINATION
9   BY MR. FELTY:
10  Q. Would you restate your name for the record?
11  A. Jeffrey, J-e-f-f-r-e-y, Madaj, M-a-d as in David -a-j.
12  Q. You're still a police officer working for the City of
13     Saginaw?
14  A. That's correct.
15  Q. What is your rank?
16  A. Patrolman.
17  Q. Now I know you've sat for quite a while on a prior
18     occasion, I have had an opportunity to read your
19     deposition transcript and I'm going to try not to
20     duplicate questions.
21  A. Okay.
22  Q. And hopefully be out of here in an hour or so. It looked
23     like when the deposition concluded that there was some
24     discussion regarding the circumstances after you found
25     Mr. Merrill in the back of the police car. Is that what

Page 215

1      you recall?
2   A. I recall that he had already been transported to
3      St. Mary's and that I was being relieved on scene and I
4      was already in the process of back at the Saginaw Police
5      Department.
6   Q. Okay?
7   A. When we concluded.
8   Q. Now I want to ask you a few things just because I don't
9      really know some of the police codes. Before you went
10     out to the scene, my understanding is you were at the
11     police station and you heard the call come over the
12     radio, I believe it was an Officer Severs requesting
13     assistance on scene; am I getting that correct?
14  A. I was actually on my way to another call. I had left the
15     department, I heard the calls go out, there's two calls
16     that pretty much went out simultaneously, so based on
17     those calls, I left the Saginaw Police Department and
18     started to travel towards... the other one was on
19     Glenwood, and it was a B and E in progress with an armed
20     assailant.
21  Q. I guess what I meant is were you physically in the
22     station when you heard the call, or were you already in
23     your car?
24  A. Well, they put out the gun call and they put out the
25     individual in traffic, which would have been the Merrill

Page 216

1      call, just prior to the gun call going out. So I was
2      aware that they were going on.
3   Q. Okay.
4   A. That those were -- and that's why I left the department.
5   Q. All right. What was your knowledge of what Officer, I
6      believe it was Officer Severs already on scene, and
7      that's who made the call; is that correct?
8   A. "Severs."
9   Q. Severs?
10  A. Yes.
11  Q. What was your understanding or what did you hear the call
12     to be?
13  A. The original call was for an individual in traffic, and
14     then Officer Severs arrived on scene. I'm specifically
15     recalling that he was asking for additional officers.
16  Q. Did you have any idea why, when you heard the call, that
17     he was asking for additional officers?
18  A. Well, because an individual down there was... I think he
19     put that he was on top of a vehicle and that he then
20     tried to get into a vehicle that was occupied.
21  Q. Did you listen to any of the... any of the phone call
22     transmissions from that day regarding Mr. Merrill and
23     what occurred on the street?
24  A. No.
25  Q. Were you aware of any?

2 (Pages 213 to 216)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

c0fa7f7d-b5c6-4901-80d9-26c78aa476cb

Page 217

1  A. I would imagine that there was phone calls that were made
2     because central dispatch, they would have had no way of
3     knowing what was going on. You know what I'm saying?
4     And there's no way that we would have known, unless you
5     had an officer that was there, but it was a 911-generated
6     dispatch call.
7  Q. All right.
8  A. Which means somebody called in.
9  Q. And I guess what I meant was were you aware of the
10    content of any calls?
11 A. I never familiarized myself with those.
12 Q. When you set out to the... respond to the scene where
13    Officer Severs was at, did you have any thought that
14    there was a dangerous situation going on?
15 A. Yes.
16 Q. What was your thought?
17 A. Well, my thought was the tone of Officer Severs' voice
18    saying that he needs somebody down there now. He needed
19    additional officers.
20 Q. Did you make any communication with him, via radio or
21    otherwise, asking about what was going on before you got
22    there?
23 A. No, because at that time we were in -- which means
24    they're holding the air. Those that are on scene, it is
25    their responsibility to brief us. We don't want to jump

Page 218

1     on the air and ask questions because we could be tying up
2     the radio when it could be, you know, whether it's the
3     one call was shots fired, the other one was he's asking
4     for help so there's no sense for us. It's just to get
5     there to assist the officer.
6  Q. Other than him requesting assistance before you arrived,
7     did you hear any other communication from Officer Severs?
8  A. No.
9  Q. Now I didn't hear your answer to this question, and maybe
10    I didn't even ask it. Did you ever listen to recordings
11    of any phone conversations regarding this incident?
12 A. No, I would imagine that central dispatch has phone
13    recordings because they record everything, and even our
14    radio traffic, but I never listen to it, no.
15 Q. All right. Did you see any of the video from either
16    patrol cars on scene, or from any of the Tasers?
17 A. Not that I recall.
18 Q. To your knowledge, the Tasers, I understand from reading
19    your transcript that you used your TASER, I think, four
20    times on the day that's at issue; is that right?
21 A. On my report I stated that I used it four times, but
22    since that report I learned that I used my TASER twice,
23    with both of the times it was for a one-second
24    deployment.
25 Q. Did you review reports from the Tasers, or did somebody

Page 219

1     just tell you that?
2  A. That was from the Michigan State Police. I was told that
3     from... it would have been, I believe it was Tom
4     Heritier, who's our... he's our master firearms
5     instructor, and he also was the one that downloaded the
6     Tasers, and I believe that that information was relayed
7     to him. But I thought I did it four times, but I since
8     found out that it was twice and it was for one second
9     each time.
10 Q. And the method of use that you employed is called the
11    what? The drive? Or...
12 A. The method that I used is call a drive-stun.
13 Q. Drive-stun?
14 A. Yes.
15 Q. And the reason I'm asking, I don't want you to describe
16    it or anything like that, but do you know if, when you
17    use the drive-stun mode, if it activates the camera?
18 A. I believe it does. I believe any time that you turn the
19    safety off, which would mean putting it in the fire mode,
20    that it records.
21 Q. At your last deposition you indicated, I think on a
22    couple of occasions during the course of the deposition,
23    that you had prior knowledge of Bobby Merrill; is that
24    correct?
25 A. Yes.

Page 220

1  Q. What was your prior knowledge of him?
2  A. I had worked for BAYANET, which is the Michigan State
3     Police drug concept team. During my course of
4     investigations on that narcotics team, we had done a drug
5     investigation into Bobby Merrill.
6  Q. Had you ever made an arrest of him?
7  A. I'm not going to speculate. I know that we generated
8     cases and I may have. I may have.
9  Q. You described a couple of people, Felix and Roosevelt, at
10    your last deposition, that you had knowledge of. I take
11    it from just working your district. Is that what you
12    call them?
13 A. Yeah, they're -- yeah, yeah. Yep.
14 Q. And you've seen those individuals on a number of
15    occasions?
16 A. Yes.
17 Q. Did you have any knowledge of Bobby Merrill like you had
18    of, say, Roosevelt, for example?
19 A. No.
20 Q. Did you have any reason to think that Bobby Merrill was a
21    violent individual?
22 A. None that I could recall.
23 Q. Now as I understand it, on the date of the incident the
24    department had been using Tasers for about three years;
25    does that sound right? 2008 to two-thousand or was it

3 (Pages 217 to 220)

Page 221

1  2012? I think it was 2010.
2  A. I think our department had been using them --
3  Q. I'm sorry, it was 2012. So about four years?
4  A. I think we were using them before that.
5  Q. All right. I thought you indicated last time that you
6     got them about around 2008. Is that --
7  A. Well, the reason I say that I believe that we had them
8     before that is because when I went to training, I
9     actually went to TASER International training to be an
10    instructor, and I was working on a narcotics team at that
11    time and I was in BAYANET from 2001 until 2005, came back
12    to the road for a little bit, then I went to FBI task
13    force. I think it would be fair to say around 2008,
14    2007, somewhere in there. I don't know the exact year.
15 Q. When did you become the Community or get designated as
16    the --
17 A. Community police officer?
18 Q. Community police officer?
19 A. I'd probably been there for a year, so 2011, maybe the
20    tail end of 2010.
21 Q. And was that your role up through the date of this
22    incident?
23 A. Yes, I was community police officer.
24 Q. Are you still?
25 A. No, I'm a patrolman now.

Page 222

1  Q. As a community police officer, was a TASER a regular part
2     of your uniform on a daily basis, or did you choose when
3     to have one issued to you?
4  A. On a daily basis. You're still a patrolman, even though
5     you're a community police officer, you're just more in
6     direct contact with citizens, trying to solve the minor
7     day-to-day problems that they consider important to them.
8  Q. When you, before being trained as an instructor, you had
9     some training through the department in the use of the
10    TASER?
11 A. Yes.
12 Q. Did officers get Tased during the training?
13 A. I did.
14 Q. You did?
15 A. Yes.
16 Q. Were you Tased in both the drive-stun mode and the probe
17    mode?
18 A. During the training I was... I used the... I was struck
19    with the probes.
20 Q. And what was your response when you were struck with the
21    probes?
22 A. Went right to the ground.
23 Q. Is it painful?
24 A. You ever stick your finger on a 110 when you were a kid?
25 Q. I just told you I tried to walk across the Detroit River.

Page 223

1     Now you want me to admit to that too?
2  A. Well, I guess if you... I guess, you know, there's
3     that... it's... it's an un... you can't control yourself.
4     You know, you can't control your -- your first thing is
5     to tense up and then you go down. Painful? I would call
6     it discomfort. I would call it uncomfortable.
7  Q. All right. You -- did you in fact tense up and then go
8     down to the ground?
9  A. Yes.
10 Q. Do you remember how you went down to the ground when you
11    were Tased?
12 A. I went down face first onto a mat.
13 Q. Was there a recovery period for you? In other words, did
14    you become disoriented?
15 A. No. No, as soon as the charge stopped, I was fine.
16 Q. What do you mean as soon as it charged up?
17 A. No, charge stopped. You know, we took the full
18    five-second deployment.
19 Q. And what was, when you were fine, I mean what were you
20    able to do immediately?
21 A. I could have got right up if I wanted to.
22 Q. When you arrived on the scene on April 10th of 2012, was
23    it your understanding that Mr. Merrill had been Tased
24    with a probe?
25 A. When I pulled up, I believe that he had been Tased, based

Page 224

1     on what I observed with his body.
2  Q. What did you observe with his body when you pulled up?
3     Was he standing when you pulled up?
4  A. He was standing, and he locked up and went down to the
5     roadway. Fell down to the roadway.
6  Q. Did you observe, as you were approaching, wires from the
7     probes?
8  A. I didn't pay attention to that. I, you know, with him
9     going down, me getting out of my vehicle, I didn't -- I
10    don't recall seeing any wires at that time.
11 Q. Prior to April 10th of 2012, had you had occasion to use
12    your TASER in the probe mode on individuals?
13 A. Yes.
14 Q. Do you know about how many times?
15 A. Just going to go through my head real quick. Six, eight?
16    Six to eight times.
17 Q. Did it have the same effect every time, I mean on the
18    different individuals?
19 A. No.
20 Q. What are the different effects that you observed?
21 A. One individual, when I Tased him, he had on a heavy
22    leather jacket and the one dart penetrated his pant leg
23    but the other one didn't penetrate the jacket so there
24    was no, we call it a "hookup." The TASER did not
25    function properly because it didn't have skin-to-skin

4 (Pages 221 to 224)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

c0fa7f7d-b5c6-4901-80d9-26c78aa476cb

```
                                              Page 225
 1      contact with both probes.
 2   Q. And so did it have any effect?
 3   A. No.
 4   Q. All right, what else have you observed?
 5   A. On other occasions, the other ones with the dart being
 6      deployed, the one individual actually reached back and --
 7      was naked, reached back and pulled one of the darts right
 8      out of his back and kept right on going.
 9   Q. And was it your understanding that contact had been made
10      with both probes?
11   A. Well, yeah. Yes.
12   Q. And do you know how long you were able to administer the
13      charge when the naked individual pulled it out of his --
14      before he pulled it out of his back?
15   A. It was... I would say it was probably two, two and a half
16      seconds that the... you know, you could hear the... the
17      TASER makes the noise, I guess you would call arcing.
18   Q. Any other, other than somebody going immediately down,
19      any other experiences when you've used the TASER?
20   A. Well, and when the darts are deployed; correct?
21   Q. Correct. I'm talking just the probe mode.
22   A. Yeah. Well, other than that the other ones had the
23      desired effect, they were Tased, they had good hookup,
24      they went down on the ground and we were able to take
25      them into custody.
```

```
                                              Page 226
 1   Q. When you were in training or from your own experience,
 2      was it your understanding that the probes could make
 3      contact without taking an individual down?
 4   A. Yes.
 5   Q. Did you learn that from TASER International?
 6   A. No, I learned that from my own experience. That, even
 7      though you could have a deployment, if the wire breaks
 8      coming out, you know, you don't have that... you could
 9      actually hit them with both darts, but if there's a
10      separation of the wire where there's a break in the wire,
11      you're not going to have the hookup that... you're not
12      going to have... the TASER's not going to function.
13   Q. All right. When it doesn't function, does it make the,
14      what you called, the arcing noise?
15   A. Yes, and it actually makes like a different type of
16      arcing noise. You'd have to, in order to describe it,
17      you'd have to fire a cartridge that has a hookup and fire
18      one that maybe the wire's broke, and you can tell the
19      difference.
20   Q. The naked guy, did the wires break?
21   A. I don't know what happened on that. That guy, that
22      individual was... we didn't, when we Tasered him, we
23      didn't have any more cartridges, we only had two
24      cartridges, each of us had a cartridge, we both fired,
25      so... and then after that it was we had to go hands-on
```

```
                                              Page 227
 1      with him.
 2   Q. Did you both hit that individual?
 3   A. Yes.
 4   Q. And did you both Tase that individual, to your knowledge?
 5   A. My partner Tased him first, and we tried to get him into
 6      custody, he was all greased up and -- anyhow, we tried to
 7      get him into custody, he jumped up and took off running,
 8      and I Tased him a second time.
 9   Q. Do you know --
10   A. And he just reached back and... and we chased him down
11      the road and were finally able to get him into custody
12      with additional help from other officers.
13   Q. Do you remember who your partner was with that
14      individual?
15   A. Doug Stacer.
16   Q. To your recollection on that occasion, do you know if
17      Doug's TASER made contact with both probes?
18   A. I believe it did.
19   Q. And do you know how long he sent a current?
20   A. I would have... I believe it was five seconds.
21   Q. Once the TASER is deployed, if a TASER is deployed and a
22      person -- strike that.
23           Are you aware of other occasions where the
24      probes were deployed, made contact, and the person didn't
25      go down, other than with the naked guy?
```

```
                                              Page 228
 1   A. Well, like the individual that I Tased in the... when he
 2      was... he had the heavy jacket on. Even though the
 3      probes hit him, the one didn't penetrate through to go to
 4      the skin, so.
 5   Q. I guess what I mean is with the naked guy, obviously if
 6      they hit him they penetrated the skin?
 7   A. Yes.
 8   Q. All right. Are you aware of other occasions where skin
 9      penetration has been made, at your department, where the
10      person didn't go down, despite a current?
11   A. No.
12   Q. Did you ever, when you... in any of your training,
13      whether it was to use the TASER or to become an
14      instructor when you were, whether it was with TASER
15      International or through the department, was that issue
16      discussed, or did you receive any education in that area?
17   A. Yes.
18   Q. What education did you receive?
19   A. With TASER International, and even during our period of
20      instruction at the department, if you have one dart that
21      makes contact with the skin and you're able to come up on
22      the individual with the cartridge still connected to the
23      TASER, like let's say if I had one in your lower buttocks
24      and I came up to you and was able to put it in between
25      your shoulder blades and if I were to pull the trigger on
```

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

c0fa7f7d-b5c6-4901-80d9-26c78aa476cb

Page 233

1  question?
2  Q. Did you guys ever sit together, and let's talk about
3     before the reports were written, and discuss what
4     happened that day?
5  A. No.
6  Q. All right. Did the -- did you ever see any reports or
7     documents, whether it be the autopsy report or anything
8     else, that indicated how many probes hit Mr. Merrill?
9  A. I never seen a -- I have no clue how many probes hit him.
10 Q. Do you know if there was any determination made by the
11    department as to how many times current made it into the
12    system of Mr. Merrill?
13 A. The only portion that I know is what I was told, that I
14    Tased him for two one-second Tasings. Based on that, I
15    would assume that the department does have the
16    documentation or report that would indicate --
17 Q. But no one --
18 A. -- so and so used his TASER three times, or so and so
19    drive-stunned twice. Somebody obviously Tased him when
20    I pulled on. I don't know what officer that was. I
21    don't recall which officer Tased him. When he finally
22    went to the ground as I pulled on, I couldn't tell you
23    what officer that was.
24 Q. And you didn't see the video?
25 A. No.

Page 234

1  Q. Do you know what kind of clothing Mr. Merrill was wearing
2     on the day of the incident?
3  A. When I made contact with him, he had on a pair of white
4     tennis shoes, he had on a pair of jeans, I don't know if
5     they were black or blue, and he had on a T-shirt.
6  Q. Did he have any type of clothing on, based upon your
7     experience in using the TASER, that you believe would
8     have prevented a probe from making contact with his skin?
9  A. No.
10 Q. Did any officer that was involved tell you that they
11    deployed their TASER and failed, in probe mode, and
12    failed to make contact with Mr. Merrill?
13 A. The only thing that I recall is Officer Severs said that
14    he had attempted to Tase him and it had no effect on him.
15 Q. Did he say that the probes did not make contact?
16 A. No, I don't... I don't recall him making a comment about
17    that.
18 Q. Based upon -- you've used the drive-stun technique other
19    than with respect to Mr. Merrill; is that correct?
20 A. That's correct.
21 Q. To your knowledge, is the effect on the human muscle
22    system any different in drive-stun mode, versus probe
23    mode?
24 A. No, it's not, because I've drive-stunned somebody that
25    had ahold of me and I got... the current went right

Page 235

1     through his body, right back around into my body.
2  Q. And did it knock you down?
3  A. Didn't knock me down. But it halted what I was
4     attempting to do because you don't have that control, and
5     it's like you've gotta let go of the trigger here.
6  Q. If I was understanding what you were saying earlier is,
7     and you tell me if I'm wrong, and I'm based upon -- this
8     can be either on what you've learned or what you've
9     observed. If the probes are further apart, is it less
10    effective at taking somebody down?
11 A. It's more effective. The further the spread, the more
12    effective.
13 Q. Okay. So I think what you were indicating then, and I'm
14    no scientist, which is why I went to law school, but if
15    they're closer together, there's a shorter current and it
16    might not be affecting the rest of the muscles?
17 A. That would be a correct statement.
18 Q. But the current, as long as you pull the trigger, is
19    still sending electricity through the body?
20 A. Yes, if you pull that, with a -- when the probe mode --
21    unless you shut it off, it's a five-second stun.
22 Q. And okay, so if you pull the trigger and hold it, it will
23    go for five seconds and stop?
24 A. If I fire the TASER, boom, it goes off, I release the
25    trigger, it's still going to cycle for five seconds

Page 236

1     unless I turn the safety off.
2  Q. And what happens after five seconds if you don't turn the
3     safety off?
4  A. It will rearm itself where you can pull the -- where you
5     could pull the trigger again if need be.
6  Q. So you pull the trigger again. It won't just
7     continuously go?
8  A. No.
9  Q. That's correct?
10 A. That's correct.
11 Q. And the drive-stun mode, I've never actually physically
12    held one of this type, the drive-stun mode, I take it it
13    has two probes or something on the instrument itself?
14 A. No, you have to remove, if I'm going to drive-stun
15    somebody, I have to physically remove the cartridge.
16    Because if I don't remove the cartridge and I push it up
17    against your body the doors won't open. But the minute
18    somebody were to pull away, the doors are going to come
19    open and the probes are going to deploy. So I take the
20    cartridge off and it's just whatever that arc is,
21    whatever causes it to arc, you know, there's an
22    electrical current bouncing from one conductor to another
23    right at the tip of that, and so if I touch you with --
24    if I turn it on, I can turn it off right away and it'll
25    stop.

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139

c0fa7f7d-b5c6-4901-80d9-26c78aa476cb

Page 237

1  Q. All right?
2  A. And that's why I think I had the one second. I think I
3     put it on him and turned it off right away.
4  Q. You mean with which individual?
5  A. With Mr. Merrill.
6  Q. Okay. If you're in the drive-stun mode, does the gun
7     shut off after -- I'm calling it a gun. Does the
8     instrument shut off like it does in the probe mode after
9     five seconds? Or if you hold the trigger, will it just
10    keep going?
11 A. Huh, I don't know. That's a good question. I've never
12    done that. I know that I could turn it off instantly by
13    turning the safety off, but I... boy, I don't know.
14    That's something I'd have to check out later on because I
15    don't know the answer to that one.
16 Q. Whether you, during the time -- you only went to TASER --
17    did you go to TASER International for training?
18 A. They came here to... I went up, I think it was in
19    Kalkaska where I went to school.
20 Q. All right?
21 A. They came here and, you know, they have their -- they
22    have instructors all over the United States, and the
23    individual that instructed us was employed by TASER but
24    he was also a police officer somewhere here down in the
25    southeast part of the state.

Page 238

1  Q. All right. The instruction that you received by the
2     person employed by TASER, was that for you to become a
3     trainer?
4  A. Yes.
5  Q. And that's a two-year certification?
6  A. Yes.
7  Q. Is that something, to your knowledge, that TASER does,
8     they certify you for two years, or is that what your
9     department requires?
10 A. That's TASER International.
11 Q. And you did that in what year? I know you answered that
12    before.
13 A. I would like to say it was around 2008, but I know that
14    our department had Tasers for probably a good year and a
15    half to two years before I went to school.
16 Q. But that was to be an instructor?
17 A. Yes.
18 Q. You, your instruction in use was at the department by the
19    individual whose name I can't remember?
20 A. I had Tom Heritier and Tim Fink had put our school on at
21    the department.
22 Q. Did you have more than one school at the department, or
23    just the one?
24 A. Just the one. And, actually, it was at the FOP lodge. I
25    say "our department," but we put it on at the FOP lodge.

Page 239

1  Q. During either of those courses, did the subject of
2     consequences or hazards of use get discussed?
3  A. Yes, it did.
4  Q. Was there any discussion about the use of Tasers
5     potentially being associated with a cause of a heart
6     attack?
7  A. Well, I can tell you what TASER told us is that there's
8     no documented proof that a TASER's ever caused anyone's
9     death.
10 Q. And did they tell you that when you went to the school?
11 A. Yes. Up in Kalkaska.
12 Q. What else if anything was discussed about Tasers causing
13    death?
14 A. Well, we talked about it amongst ourselves. I mean I
15    don't know how fast that dart's coming out, but I guess
16    if -- you know, it was brought up you're not going to
17    Tase anybody in the head because potentially that things
18    coming out of there, you hit somebody in the temple and
19    that could cause death. Obviously the face, you know,
20    you could cause blindness, you know, if you deployed that
21    on somebody's face.
22 Q. Did TASER International talk anything about electrocution
23    or heart failure as a result of being Tased?
24 A. No electrocution. And I think it was just the recent
25    class where they talked about, because we just had

Page 240

1     training again. But prior that, no.
2  Q. What did they talk about in the recent class?
3  A. Well, they changed their program quite a bit.
4  Q. How did the program change?
5  A. Well, they talked about, what is that, when you have a
6     pacemaker, individuals with pacemakers, it may disrupt
7     that. Excited delirium now.
8  Q. What do you understand an excited delirium to be?
9  A. Well, we'll use this case in point. Individual that is
10    under the influence of drugs, their actions when somebody
11    is... just to give a case in point. If you have an
12    individual that smokes one or two rocks of crack cocaine,
13    most of the time they're going to be able to function,
14    they're not going to be acting out the ordinary other
15    than, you know, they might show some signs of being a
16    slight buzz.
17       But excited delirium now, taking the totality
18    of the circumstances, is you have an individual that's...
19    we'll use Mr. Merrill. He's in traffic, he's jumping on
20    the backs of cars, he's trying to get into an occupied
21    car, he's refusing to obey a police officer, he's not
22    compliant, and even he made the comment to me that he
23    smoked 20 rocks of crack cocaine that day; that would be
24    excited delirium.
25       And I've also had the opportunity with another

8 (Pages 237 to 240)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139

c0fa7f7d-b5c6-4901-80d9-26c78aa476cb

Page 241

1   individual, similar circumstances not too far from there,
2   that was the same thing where he was in the middle of the
3   roadway and we had to Tase him and he was -- we called,
4   just like we did here, we called MMR, which is our Mobile
5   Medical Response, which is the ambulance service to take
6   him to the hospital, to have him evaluated, which is what
7   we were going to do with Mr. Merrill.
8   Q.  Okay.  What did they tell you about excited delirium and
9       use of TASER?
10  A.  Oh, they didn't go into in-depth like I just did.  They
11      just said that there's a potential is there now, and that
12      you need to be aware of excited delirium.
13  Q.  The potential of what?
14  A.  Individuals that you may come in contact with could be in
15      that excited delirium state because of excessive drug
16      use.
17  Q.  And what do you need to be aware of with respect to that?
18  A.  How they're behaving, how they're acting.
19  Q.  Well you, before going to the... or having the recent
20      education about it, you, I take it, you had experienced
21      people that were under the influence, maybe in traffic,
22      jumping on cars, trying to get into a car, not being
23      compliant; right?
24  A.  That's correct.
25  Q.  Okay.  So whether it's called "excited delirium" or not,

Page 242

1   that's something that you were already familiar with; is
2   that fair?
3   A.  That's fair.
4   Q.  Okay.  So what did it have to do, that concept have to do
5       with the use of a TASER?  Were they telling you the
6       person is more susceptible to injury?  Less susceptible
7       to injury?  Were they --
8   A.  No, they telling -- we needed to be aware of that because
9       the body's already going through a tremendous amount of
10      exertion.
11  Q.  So what do you need to be aware of it about?
12  A.  That that condition exists.
13  Q.  They told you the body's going through a tremendous
14      amount of exertion?
15  A.  They didn't use those words.  Those are my words.
16  Q.  Okay?
17  A.  But the body is, you know, it's stressed at that point in
18      time.
19  Q.  The body is stressed, you need to be aware of that, and
20      what do you need to be aware of and why?
21  A.  Because of the condition that they're in.
22  Q.  Was TASER International saying that if you encounter a
23      person in those circumstances, that the body is stressed
24      and you should use caution in Tasing them because it can
25      pose a hazard to them?

Page 243

1   A.  It wasn't TASER didn't -- I guess we should -- let's -- I
2       guess let's make this clear.  The last class that I had,
3       it was a TASER class, the Saginaw Township instructor's
4       the one that had put the class on.
5   Q.  Okay.  It was a Saginaw Township instructor?
6   A.  Well, MacDonald, yep.
7   Q.  Who was that?
8   A.  Jim MacDonald.
9   Q.  Jim MacDonald.  When did this one happen?
10  A.  We just had the course probably a month ago.
11  Q.  So that was 2014?
12  A.  Yes.
13  Q.  Did Jim MacDonald explain to you and the others attending
14      the class that the body is stressed, therefore caution
15      should be used in using a TASER?
16  A.  I think we should make this clear.  Jim MacDonald did not
17      use those words, neither did TASER.  This is what I took
18      from my training.  The exact wordage I couldn't tell you
19      what it was, but that's what I've taken from the
20      training.
21  Q.  Do you remember approximately what the exact wordage was?
22  A.  No.
23  Q.  Do you use more caution now in -- have you had an
24      occasion since going to that class to use your TASER,
25      either in probe mode or drive-stun?

Page 244

1   A.  No.
2   Q.  Have you had an occasion where you've encountered
3       somebody in the excited delirium since then?
4   A.  Yes.
5   Q.  Was there a reason why the TASER wasn't used at that
6       point in time?
7   A.  I didn't deploy my TASER because one had already been
8       deployed.
9   Q.  Okay.
10  A.  So there was no need.  The individual, we had taken the
11      individual into custody.
12  Q.  Do you use more caution yourself?
13  A.  We just recently got purchased Tasers so the other ECD
14      device that we had, or electric control device that we
15      had, none of us had faith in it so we didn't carry it.
16  Q.  Okay.  I guess what I'm trying to figure out, and --
17  A.  I haven't fired my TASER since.  I haven't used a TASER
18      since that incident took place.
19  Q.  Is it because there was never a circumstance where you
20      thought it was appropriate?
21  A.  That's correct.
22  Q.  Did you ever have a circumstance similar to what you
23      encountered with Mr. Merrill, where you used your TASER?
24  A.  I did.  Prior to Mr. Merrill.
25  Q.  No, I'm talking about afterward.  Did you have a

9 (Pages 241 to 244)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
c0fa7f7d-b5c6-4901-80d9-26c78aa476cb

Page 253

1  A. Okay.
2  Q. 1618, that would be like 4:18; is that right?
3  A. 4:18 p.m., yes.
4  Q. Where it says clear, and I'm looking at this Incident
5     Recall, it looks like it says "clear air per 720"?
6  A. That means they can clear the air. Which means they were
7     holding the air, like I was talking about, that I
8     wouldn't be saying anything as I'm driving down. So he
9     would come back, say he cleared the air, which means they
10    can open the airways back up to dispatch other calls, so
11    on and so forth.
12 Q. Okay. And then right below that, and again I'm looking
13    at this log, it says at 1621 MMR one to two minutes.
14    Does that mean somebody's reporting that they're one to
15    two minutes out?
16 A. I believe I asked where MMR was.
17 Q. All right. Is that you? Because I see SA25 below that?
18 A. That would have been me, 25 would have been me, because I
19    was the Area 2 CPO at that time.
20 Q. Okay. Do you remember from the time you arrived to the
21    time that the ambulance arrived on scene what radio
22    communication was offered or given?
23    MR. REISING: By this witness?
24    BY MR. FELTY:
25 Q. By all the officers responding?

Page 254

1  A. Well, I will tell you this, I know that I told one of the
2     three officers to -- as soon as he was in custody, to
3     call for a rig, because he was going to be evaluated,
4     based on his actions that day, even though the crime had
5     been committed, he was going to be mentally evaluated
6     because his demeanor and his actions weren't that of a
7     normal person acting you under normal circumstances.
8  Q. What was the crime committed?
9  A. One, you have felony R & O, resisting and obstructing a
10    police officer. And two, you have him attempting to get
11    inside the vehicle, which would be considered carjacking.
12 Q. Whose vehicle did he attempt to get inside?
13 A. I don't know who that person was.
14 Q. Do you know if he attempted to get inside a vehicle?
15 A. Yeah, Officer Severs actually... I believe that even came
16    out maybe with some of the radio traffic.
17 Q. Trying to jump into cars on the back of a vehicle? Did
18    you -- were you aware of anything other than trying to
19    jump into cars on the back of a vehicle?
20 A. I know that he was jumping in and out of cars and that he
21    was -- that he jumped on the back of a vehicle at one
22    point and --
23 Q. How do you know that?
24 A. Well, I don't know that. But I'm going to tell you this,
25    that it went out over the air. So and Officer Severs is

Page 255

1     the one that put that out over the air.
2  Q. From a police officer's standpoint to arrest somebody for
3     carjacking, what is a carjacking?
4  A. You overtake the individual, jerk them out of their car.
5     If you had a weapon, you could use a weapon to order them
6     out of their car.
7  Q. Did this individual, Mr. Merrill, to your knowledge,
8     order anybody out of a car?
9  A. I wasn't there.
10 Q. All right. So did you in your mind think when you
11    arrived at the scene that you were responding to a
12    carjacking situation?
13 A. Yeah.
14 Q. Why?
15 A. Because of what he was doing and what was reported over
16    the air.
17 Q. What was he doing that led you to think that you were
18    responding to a carjacking situation?
19 A. I'm taking my basis off of what Officer Severs reported
20    on the radio.
21 Q. All right, now these logs on the Incident Recall?
22 A. Uh-huh, yes.
23 Q. Are these an accurate, I mean are these like a verbatim
24    type, a verbatim statement of what goes over the air?
25 A. I believe everything is recorded with central dispatch,

Page 256

1     so... and I'm assuming that that's where that log
2     actually came from was from Saginaw County Central
3     Dispatch, so I'm not going to speculate, I don't know, I
4     think you'd have to find out from Saginaw County Central
5     Dispatch if that is actually a verbatim.
6  Q. All right, here's what this report says. It says 410 --
7     it says 120410, meaning April 10th, 2004 [sic], 1605,
8     that's 4:05 p.m.?
9  A. Yes.
10 Q. All right, it says between East and Hess, black male -- I
11    don't know what "LSW" means?
12 A. Last seen wearing.
13 Q. Black leather jacket and jeans, running around in middle
14    of road. To your knowledge, is that referring to Mr.
15    Merrill?
16 A. Yes.
17 Q. Did you have that knowledge before you set out to the
18    scene?
19 A. Yes.
20 Q. Did that suggest anything to you, that there was a
21    carjacking in progress?
22 A. You can... it heightened my suspicions that something
23    wasn't right. I guess that's my best way that I can
24    answer that as a police officer. Because having worked
25    here for going on 18 years, there's a lot of things that

12 (Pages 253 to 256)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
c0fa7f7d-b5c6-4901-80d9-26c78aa476cb

Page 261

1  A. I do not. And I don't ever recall seeing Kyle Brandon
2     there. He may have came in after the fact when we were
3     leaving, but I don't know who the officers were that
4     relieved us when we left.
5  Q. All right. When there's no... on these other ones
6     there's some, you know, like we talked about where
7     there's communication over the radio, these others where
8     it just doesn't really say anything, just a unit number,
9     do you know what's going on there?
10 A. Well, I'm wondering if there is -- there had to be some
11    kind of conversation if this is from central dispatch.
12    Because otherwise why would they even... it's not like
13    we're in our cars writing on our computers where they're
14    gonna track that. There be had to be some type of
15    conversation that was being conversed over the air.
16 Q. Do you know how these get transcribed, or does somebody
17    have to input them, or how it works?
18 A. No, I don't. I'm just thinking if they have that on
19    there -- this is off the top of my head -- it would seem
20    like common sense there must have been some type of radio
21    traffic for them to even have that individual listed on
22    there.
23 Q. All right. At 16, who a K. Bucholtz?
24 A. Kyle Bucholtz, he's a... he's no longer with our
25    department. He's a conservation officer now.

Page 262

1  Q. Was Kyle Bucholtz on scene?
2  A. He may have been one of the officers that relieved us
3     when we were relieved from the scene. But I don't recall
4     seeing him.
5  Q. All right. It looks like 4:15 p.m. request MMR?
6  A. Okay.
7  Q. And it says SA26. Do you know who SA26 was?
8  A. No.
9  Q. That wasn't you, though?
10 A. I should have been 25. 25. So 26, I don't know who that
11    is. I'm not the one that called for MMR. I told one of
12    those guys to call for MMR.
13 Q. Let's see if this says. I thought I had a list in here.
14       Now when you... other instances where you used
15    the TASER, is it common for you to call for an ambulance,
16    or do you just, once you get the person in custody,
17    handcuffed in the back of the car, take them to the
18    hospital?
19 A. If the probes were used and if the -- I should say if it
20    was deployed with the probes, I have removed the probes
21    right at the scene, had MMR come by take a look, make
22    sure he's okay. They may wash him with an alcohol swab
23    or whatever, maybe put a Band-Aid on it, then they would
24    go... basically, they would say they're fine, and off to
25    jail they would go.

Page 263

1  Q. How far were you guys from... would it have been, is
2     St. Mary's where you would typically take people?
3  A. Covenant, he would have been going for the mental
4     evaluation.
5  Q. How far was Covenant from where you were at?
6  A. Covenant would be, let's say at the most, two miles.
7  Q. All right, so --
8  A. Even though St. Mary's is closer, they don't have the
9     facility there. Community Mental Health is actually
10    stationed at Covenant.
11 Q. If you were two miles at the most from Covenant in a
12    squad car, you probably could have gotten Mr. Merrill to
13    the hospital in less than two minutes or about
14    two minutes?
15 A. No, not driving the speed limit, and not getting out of
16    that traffic. I guess I don't understand your question.
17 Q. Okay.
18 A. Can you be specific with your question --
19 Q. Sure.
20 A. -- why you're asking it in the manner in which you are?
21 Q. Can I be specific as to why I'm asking it in the -- is
22    that what you're -- why I'm asking it in the manner in
23    which I am?
24 A. Yeah, I guess.
25 Q. Sure, I can. Was this an emergent situation after he was

Page 264

1     in handcuffs?
2  A. No.
3  Q. Okay. So to take him to the hospital, was an ambulance
4     required?
5  A. Yes.
6  Q. Why?
7  A. Well, because, number one, MMR's going to come on the
8     scene, they're going to assess the situation, they're
9     going to brief the doctors right directly at the hospital
10    and let the doctors know what they have. And then
11    they're going to also brief the security at the hospital
12    that the police just got done fighting with this
13    individual, so they're going to want -- the hospital's
14    going to want to have that information so that they can
15    get the hospital prepped for when he arrives.
16 Q. So you as police officers are going to communicate what
17    just happened to EMS attendants, and then they're going
18    to drive the person to the hospital, who are going to
19    tell the security guards and the triage what happened on
20    the scene?
21 A. They call ahead. MMR, the MMR personnel, which is
22    normal, their protocol is to call ahead, inform the
23    hospital of what they have, you know, so that when they
24    arrive, normal protocol is security's outside waiting for
25    the individual, the doctors know what's going on, crisis

14 (Pages 261 to 264)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

c0fa7f7d-b5c6-4901-80d9-26c78aa476cb