# EXHIBIT 11

**ANDERSON vs. MADAJ, et al. DEPO: OFFICER BRIAN D. GUEST**          TAKEN: 11-21-13

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

*/3680*
RECEIVED

DEC - 3 2013
Fieger, Fieger, Kenney,
Giroux and Danzig, P.C.

DOROTHY ANDERSON and
DEMARQUION MERRILL, as
Co-Personal Representative
of the Estate of BOBBY
MERRILL, deceased,

        Plaintiffs,

                                         Case No.:   13-11159

vs.
                                         Hon. Thomas Ludington
OFFICER JEFF MADAJ, individually,
OFFICER JUSTIN SEVERS, individually,
OFFICER BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA, individually,

        Defendants.
_____/


        The Deposition of OFFICER BRIAN D. GUEST, taken

before David S. Ripka, CSR-2175 and Notary Public in and for

the County of Genesee, acting in the County of Saginaw, State

of Michigan, at the offices of Ripka, Boroski & Associates,

One Tuscola Street, Suite 301, Saginaw, Michigan, on Thursday,

November 21, 2013, commencing at or about 12:56 p.m.


APPEARANCES:

        Fieger, Fieger, Kenney, Giroux, Danzig & Harrington, P.C.
        BY:  ROSS A. BRUNETTI, ESQ.  (P73080)
        19390 West 10 Mile Road
        Southfield, Michigan  48075
        (248) 355-9049


            Appearing on behalf of Plaintiffs,

ANDERSON vs. MADAJ, et al. DEPO:  OFFICER BRIAN D. GUEST     TAKEN: 11-21-13

2

**Page 2**

1  APPEARANCES (Continued):
2  Plunkett Cooney
   BY:  H. WILLIAM REISING, ESQ.  (P19343)
3  111 East Court Street
   Suite 1B
4  Flint, Michigan  48502
   (810) 342-7001
5
6       Appearing on behalf of Defendants.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1       INDEX OF WITNESS
2
       WITNESS                    PAGE
3
4  OFFICER BRIAN D. GUEST
5  Examination by Mr. Brunetti          4
6
7
8
9
10
11
12
13
14       INDEX OF EXHIBITS
15  EXHIBIT    DESCRIPTION      MARKED
16
17  Exhibit 1   Defendant Brian Guest's Answers    137
             to Plaintiff's Request to Admit
18           Directed to Defendant Officer
             Brian Guest
19
20
21
22
23
24
25

**Page 4**

1          Saginaw, Michigan
2          Thursday, November 21, 2013
3          12:56 p.m.
4       P R O C E E D I N G S
5       OFFICER BRIAN D. GUEST,
6  having been duly sworn by the Reporter, was examined, and
7  testified on his oath as follows:
8       MR. BRUNETTI:  This is the date and time of the
9  deposition for Officer Brian David Guest taken pursuant
10  to notice and in conformity with the Federal Rules of
11  Civil Procedure.
12       EXAMINATION
13  BY MR. BRUNETTI:
14  Q   Officer Guest, my name is Ross Brunetti.  I'm the
15       attorney on behalf of the estate of Bobby Merrill.
16       How are you today?
17  A   Good.  How are you?
18  Q   Doing well.  Thanks.
19       I'm sure your attorney has already talked to
20  you a little bit about this.  All right?  A deposition is
21  basically a fancy name for just a formal question-answer
22  session.  Okay?
23  A   Sure.
24  Q   So I'm going to ask you questions.  You provide answers.
25  Understand?

**Page 5**

1  A   Yes.
2  Q   All right.  When you provide answers, please provide
3       answers with a clear yes, no, or a verbal response.
4       Reason being, the court recorder cannot record yeahs,
5       uhs, unh-unhs or nonverbal shakes or nods of your head.
6       Do you understand?
7  A   Yes.
8  Q   Okay.  Also, please refrain from answering a question
9       until I've finished asking the question.  Likewise, I'll
10       try to offer you the same courtesy of not starting the
11       next question or speaking over you while you're
12       answering.  Okay?
13  A   Okay.
14  Q   And, again, the reason being, we have our court recorder
15       here, and we have to make sure that the record is
16       perfectly clear so that we can understand it when we go
17       back later on and read it.  All right?
18  A   Sure.
19  Q   Okay.  Also, if you don't understand a question that I
20       ask, it is perfectly acceptable to say, "I don't
21       understand your question.  Could you please rephrase your
22       question," or give me some indication that you don't
23       understand.  And I'll do my best to ask it in a way that
24       makes sense.  Okay?
25  A   Okay.

(Pages 2 to 5)

**Ripka, Boroski & Associates, LLC**
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

ANDERSON vs. MADAJ, et al. DEPO: OFFICER BRIAN D. GUEST     TAKEN: 11-21-13

9

Page 30

1   silhouette?

2   A   I think so, yeah. But I don't remember exactly. Just

3       remember a silhouette.

4   Q   Were you ever instructed as to the distances from the

5       target that you're supposed to deploy the taser?

6   A   Yes. There's different cartridges that you could have.

7       I think the ones that we had at the time were either 15

8       or 20 feet cartridges, as far as maximum distance. And I

9       think that they prefer that you don't shoot somebody

10      within, I don't know, one or two feet.

11  Q   So they want you take a shot from further back than two

12      feet?

13  A   Yes, it's preferred. Because it'll have more of an

14      effect. The farther the probes are spread apart, the

15      more of an application can be applied on somebody. The

16      closer they are, then it's not going to be as strong.

17  Q   Were you ever told anything about the dangers of shooting

18      from further distance? So let's say if the max distance

19      is 20 feet on those cartridges, shooting from 18 or 19

20      feet, is there an issue with shooting near the max range

21      of the cartridge?

22  A   No. I think there would be less of an issue with that

23      than even close range. It's just your accuracy is going

24      to be, you know, less the farther back you go.

25  Q   When you deploy the probes, so not drive-stun mode, but

Page 31

1   the probes in the cartridge, when you deploy the probes,

2   after the probes make contact with the target, do you

3   have the option of preventing a charge from going

4   through, or once you fire the probes, is a charge

5   automatically going to go through if it hits the target?

6   A   Can you repeat that?

7   Q   That was kind of a bad question.

8           Let's say hypothetically you're aiming your

9       taser at a target, okay?

10  A   Okay.

11  Q   An individual. You deploy the probes, and the probes

12      strike the target.

13  A   Okay.

14  Q   You follow me?

15  A   Yes.

16  Q   After the probes strike the target, does the charge

17      automatically transfer through the wires to the probes,

18      or do you have to actively keep the trigger held down in

19      order to deploy a charge?

20  A   It'll automatically -- once you pull that trigger, it's

21      going to give a charge no matter if you keep your finger

22      on it or not.

23  Q   Okay. So if the probes hit in an area that you didn't

24      want them to hit, you couldn't stop them --

25  A   Right.

Page 32

1   Q   -- from emitting a charge?

2   A   You could try to take the cartridge off the end of it.

3   Q   Okay. But you couldn't do something --

4   A   No.

5   Q   -- as simple as just take your finger off the trigger?

6   A   No.

7   Q   All right.

8   A   And when I say those areas that you don't want to --

9       that's just preferable that you don't hit those. It's

10      going to -- you know, it could happen.

11  Q   Right. It's going to hit where it's going to hit?

12  A   Right. How accurate they are. They're fairly close, but

13      I've seen some that I don't -- that aren't as accurate as

14      others, just like a firearm.

15  Q   Right. So how often would you say -- well, let me ask

16      you this: How accurate would you say those tasers are?

17  A   More accurate than the second ones we got.

18  Q   Really? So the X26 was better than whatever they were

19      replaced with?

20  A   I think they were more accurate, personally. But they

21      were fairly -- fairly accurate. You've got to remember,

22      when you're aiming, your first dart is going to be where

23      you're aiming. Your second one is going to drop below.

24  Q   Right.

25  A   And depending on how far you are it's how far it's going

Page 33

1   to drop, so --

2   Q   Right. Because, obviously, depending on the angle, the

3       farther you are, it's got more room to, again, drop?

4   A   Right. And in the heat of the moment, I mean, sometimes

5       you've got to use your taser quick, so it's more

6       difficult.

7   Q   Yeah. Are you familiar with the term "the force

8       continuum"?

9   A   Yes.

10  Q   Could you explain to me what the force continuum is.

11  A   It's force continuum that law enforcement has designed to

12      train police officers.

13  Q   What is the purpose of the force continuum?

14  A   To let officers know what level of force they could use.

15  Q   How many levels are there?

16  A   I couldn't tell you exactly the amount of levels they

17      have.

18  Q   Is it more than one?

19  A   Yes.

20  Q   Okay. So I imagine the purpose of the force continuum is

21      to make a big distinction between when it's acceptable to

22      use deadly force an when it's acceptable to use nondeadly

23      force, correct?

24  A   Right.

25  Q   And then within that exception of nondeadly force, then

(Pages 30 to 33)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

ANDERSON vs. MADAJ, et al. DEPO: OFFICER BRIAN D. GUEST        TAKEN: 11-21-13
10

**Page 34**

1   you probably have multiple levels of nondeadly force
2   levels, correct?
3   A   Correct.
4   Q   Okay. Do you know to what extent -- can you tell me what
5   is the least amount of force that an officer can use?
6   A   Officer presence.
7   Q   Okay. And when is an officer expected to just use
8   officer presence?
9   A   Just when he arrives on scene or he has any contact with
10  anybody.
11  Q   And what sort of behavior that a subject, person of
12  interest, suspect, what have you, what behavior of that
13  person is sufficient to just use officer presence?
14  A   I don't know if I understand that question, but --
15  Q   Well, let me ask it this way: At what point would you
16  elevate your response from your presence to the next
17  level?
18  A   To verbal commands?
19  Q   Yes.
20  A   There's many situations you could use for that. It's
21  hard to give a -- I mean, I could give you a couple
22  specific examples, but, I mean --
23  Q   What's the sort of -- is there a tipping point at which
24  point you would start using verbal commands?
25  A   Yeah, there's a lot of them.

**Page 35**

1   Q   What is the most basic tipping point you can give me?
2   A   Oh, I don't know. I mean, if somebody's putting their
3   hands in their pockets, and I say, you know, "Take your
4   hands out of your pockets," or, "Can I see your driver's
5   license and registration?"
6   Q   Okay. And so then if someone failed to respond to those
7   verbal commands, what is the next step?
8   A   Maybe nothing. It just depends on what kind of situation
9   you have.
10  Q   Right. Let's say that someone... let's say that someone
11  is behaving -- you've got a complaint that someone is
12  behaving in a disorderly manner.
13  A   Okay.
14  Q   Okay? And you arrive on scene, and you look at this
15  person, okay? And you give them an instruction. You
16  say, "Sir, stop what you're doing," okay? And that
17  person stops what they're doing, but they start to walk
18  away from you. What would your next move be?
19  A   Maybe nothing. Maybe I'll let them walk away.
20  Q   Okay. If were you concerned about the behavior that they
21  had been exhibiting before you arrived, like someone
22  called and said they were doing something a little funny,
23  what would you do if they were walking away and you
24  wanted to have -- and you wanted to sort of investigate?
25  A   Walk up to them and start talking to them.

**Page 36**

1   Q   Okay. That would be your response? You would start
2   talking to them?
3   A   Mm-hmm.
4   Q   Is that a yes?
5       MR. REISING: You have to answer out loud,
6   Brian.
7       THE WITNESS: Yes.
8       MR. REISING: That's okay. Thanks.
9   Q   (BY MR. BRUNETTI) And so you wouldn't at that point
10  issue another command. You'd try to get their attention
11  to see if you could talk to them?
12  A   Sure. Depending on the person, yeah.
13  Q   Okay. If you walked up to them and you tried talking to
14  them, and they didn't respond, they just kept walking
15  away, what would you do?
16  A   I mean, if I wasn't going to make an arrest, I would just
17  let them walk away --
18  Q   Okay.
19  A   -- and be on my way.
20  Q   What if you thought that person was under the influence
21  of an intoxicating substance?
22  A   Doesn't make a difference to me.
23  Q   All right. So you wouldn't try to apprehend them at that
24  point?
25  A   I don't know what I would apprehend them for, no.

**Page 37**

1   Q   Okay.
2   A   Based on that, just what you said, no, I wouldn't.
3   Q   All right. So at that point, would you agree with me
4   that if someone is walking away without saying anything
5   threatening or doing anything threatening, that trying to
6   put your hands on them would be excessive force?
7   A   If there's no other circumstances than what you just gave
8   me, no, I still wouldn't say that it's excessive force.
9   But, I don't know, it's hard to give scenarios. And for
10  me to -- I mean, what does the guy look like? What's his
11  demeanor? I don't -- I don't know. I mean, it's hard
12  for me to give an example of --
13  Q   Okay. Let me try to give a little better example. Let's
14  say that you've got a guy who... let's say you've got a
15  guy who's stopping traffic in the middle of the street,
16  okay?
17  A   (Nodding head affirmatively)
18  Q   Follow me?
19  A   Yes.
20  Q   Okay. Let's say there's a complaint that he's stopping
21  traffic in the middle of the street, but at this point
22  he's not hurting anybody. He's not -- at this point, the
23  biggest danger he is is possibly to himself and not other
24  people.
25  A   Okay.

(Pages 34 to 37)

ANDERSON vs. MADAJ, et al. DEPO: OFFICER BRIAN D. GUEST     TAKEN: 11-21-13
11

Page 38

1  Q  Okay? You arrive on the scene, all right?
2  A  (Nodding head affirmatively)
3  Q  You get out of the car, and you look at him, and you give
4     him an instruction: "Sir, get out of the street." Is
5     that the first thing that you would do?
6  A  Sure.
7  Q  What if he didn't respond?
8  A  Then I would have to take him out of the street somehow.
9  Q  Okay. What would you do if, as you approached, he put
10    his hands up and kind of shuffled away from you?
11 A  That's hard to say what I would do. I mean, I'd have to
12    get him out of the street. I mean, they're going to have
13    to go hands on or -- I don't have a lot of time to play
14    with -- if the street's busy, you know. If it was just a
15    residential area, I would have a little bit more
16    leniency, but --
17 Q  Okay. Let's say that traffic's stopped, okay? So
18    traffic's stopped. They see the guy. At this point,
19    even though he's in the street, he's not in imminent
20    danger of getting hit, okay?
21 A  Okay.
22 Q  He's standing with his hands up, and he starts to shuffle
23    away from you. What's your response?
24 A  I'm going to continue giving him verbal commands.
25 Q  That's what you're going to do, you're going to give him

Page 39

1     verbal commands?
2  A  Yes.
3  Q  Are you going to try to reason with the guy?
4  A  I'm going to try, yeah.
5  Q  Okay. What are you going to do if you can't reason with
6     him?
7  A  I mean, is he still just keeping his hands up, shuffling
8     away? I mean --
9  Q  His hands are up, and he's shuffling away.
10 A  He's in the street still?
11 Q  He's still in the street?
12 A  I mean, I'm pretty patient. I'm going to probably give
13    him some verbal commands. But at the point that I
14    realize he's not going to listen to my verbal commands,
15    I'm going to have to do something, whether it's hands on,
16    activate my taser, something to get him out of the
17    street.
18 Q  Okay. Would you agree that while he has his hands up and
19    is shuffling that he's not a danger to you?
20 A  If he's shuffling away from me with his hands up?
21 Q  Yes.
22 A  At that point in time, I would say no, he's not.
23 Q  Okay. At that point in time, would you say that he's a
24    danger to somebody else other than himself?
25 A  Not at that point in time, no. I would say he's not.

Page 40

1  Q  Okay. Would you say that in that situation that it would
2     be excessive force to draw your gun and use deadly force
3     on him?
4  A  Yeah.
5  Q  Okay. Would you say in that situation that it would be
6     excessive force to draw a taser and use a taser before
7     you tried a lesser means of force?
8  A  No.
9  Q  Okay. So you're saying that it wouldn't be excessive
10    force to use a taser before you approached him and tried
11    to reason with him, maybe take him by the arm and pull
12    him out of the street?
13 A  Beforehand?
14 Q  Yes.
15 A  I mean, as far as our department policy and training
16    goes, it's not excessive force. But I personally would
17    try to reason with him verbally.
18 Q  Because that's what seems reasonable to you, right?
19 A  Yeah, it must be, because that's what I do.
20 Q  Okay. But you're saying at that point, if he's not a
21    physical threat to you, and he's not a physical threat to
22    other people, that it would be appropriate to deploy your
23    taser?
24 A  Yes. At that point, if he was out in the street, and he
25    wasn't listening to verbal commands, depending on -- I

Page 41

1     mean, there's going to be more circumstances. Do I think
2     that this guy's got some mental issues? Do I think maybe
3     he has a weapon? There's a lot of I don't knows.
4  Q  Would you do anything to make sure that he did or did not
5     have a weapon before you deployed the taser?
6  A  Given that scenario, I don't think I would approach him,
7     because I don't know if he does have a weapon. It would
8     probably be the safest thing to activate your taser and
9     then check.
10 Q  And then check?
11 A  Yes.
12 Q  Okay. Would you... strike that.
13        Do you treat anyone differently if you think
14    they're under the influence of an intoxicating substance?
15 A  Yes.
16 Q  How do you treat someone differently?
17 A  I try to be a little more patient. Because sometimes
18    people under the influence only hear what they want to
19    hear. I treat everybody differently depending on what
20    the situation is.
21 Q  Okay. Do you have any policies or procedures within the
22    police department that tell you how you're supposed to
23    treat somebody if they're under the influence of a
24    substance?
25 A  No.

(Pages 38 to 41)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

ANDERSON vs. MADAJ, et al. DEPO: OFFICER BRIAN D. GUEST          TAKEN: 11-21-13

18

Page 66

1  Q  So you indicated his hands were by his chest. What did
2     his hands look like? Were they open hand? Were they
3     closed hand?
4  A  I don't recall. You've got to remember, I mean, this
5     happened pretty quick.
6  Q  I understand. I'm just trying to get to the best of your
7     recollection what you can remember.
8  A  Sure.
9  Q  All right?
10    So you looked at him. You said he was walking
11    towards you?
12 A  Yes.
13 Q  As you were pulling up, you said you also saw Officer
14    Severs with a taser drawn, correct?
15 A  Yes.
16 Q  All right. So as you're getting out of the car, and you
17    see this guy with his hands up, okay, coming toward you,
18    did Officer Severs do anything to him as this is going
19    on?
20 A  No.
21 Q  You didn't see Officer Severs deploy his taser?
22 A  I don't think so, no. I think he already had it deployed
23    on him.
24 Q  Did this black male suspect -- did you ever learn his
25    name?

Page 67

1  A  Yes.
2  Q  What's his name?
3  A  Bobby Merrill.
4  Q  Okay. Did Bobby ever say anything to you after you told
5     him to get on the ground?
6  A  I don't recall. I remember him saying things. But at
7     that point in time, I don't remember if he said anything
8     or not. I think he was. I don't remember what he said,
9     though.
10 Q  Okay. Did he appear to be lucid at the time that you
11    told him to get on the ground?
12 A  What's lucid?
13 Q  Did he appear to be of clear mind?
14 A  No.
15 Q  Why would you say he wasn't?
16 A  He just -- it's hard for me to explain, but --
17 Q  To the best of your ability.
18 A  It looked like anything I was telling him, it didn't
19    matter. He had a blank stare, a thousand-yard stare.
20 Q  So you saw him with a blank stare?
21 A  That's what it looked like to me, yes.
22 Q  Did you interpret that stare to mean anything?
23 A  Yeah. Be careful.
24 Q  Did you believe that he, based on the way that he looked,
25    that he was on any kind of a substance?

Page 68

1  A  I didn't know that, no.
2  Q  Did you suspect that?
3  A  No. I didn't even think about that at the time.
4  Q  Did it look like anything that you had said, that he had
5     even heard it?
6  A  I know he heard it, but I don't know -- it didn't -- it
7     didn't click with him. He either didn't care or he
8     wasn't listening.
9  Q  Okay. So after he is standing there in this what you
10    described as a fighting stance, okay, and you instructed
11    him to get on the ground, and he didn't comply, what did
12    you do next?
13 A  Pulled my taser out.
14 Q  And your taser is on your utility belt at this point?
15 A  Yes.
16 Q  What did you do after that?
17 A  Well, first Officer Wietecha tasered him, but --
18 Q  So as you're pulling your taser out, Officer Wietecha
19    tasered him?
20 A  Mm-hmm.
21 Q  And you actually saw that?
22    MR. REISING: Excuse me. You've got to say --
23    give a verbal answer.
24    MR. BRUNETTI: Yeah.
25    MR. REISING: I think your answer is yes, but I

Page 69

1     want to --
2     THE WITNESS: Yes.
3     MR. REISING: -- get the answer.
4     Okay. Thanks.
5     MR. BRUNETTI: Thank you, Counsel.
6  Q  (BY MR. BRUNETTI) When Officer Wietecha deployed his
7     taser, did he deploy it in stun mode, or did he deploy
8     the barbs, the probes?
9  A  Probes.
10 Q  How far away was Officer Wietecha standing from Bobby
11    Merrill?
12 A  I don't know.
13 Q  Was he closer to Bobby Merrill than you were?
14 A  I don't know.
15 Q  How close were you to Bobby Merrill?
16 A  Ten feet maybe. I'm just guessing.
17 Q  Were you further away than we're sitting --
18 A  Yes.
19 Q  -- right now?
20    And we are sitting approximately three
21    and-a-half feet away from each other?
22 A  Approximately, yeah.
23 Q  And your best estimate right now is that you were about
24    ten feet away from Mr. Merrill?
25 A  Or more, yes.

(Pages 66 to 69)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

ANDERSON vs. MADAJ, et al. DEPO:  OFFICER BRIAN D. GUEST          TAKEN:  11-21-13

19

## Page 70

1  Q   When Officer Wietecha deployed his taser on Bobby
2      Merrill, did you see where the barb struck?
3  A   Yeah.
4  Q   Where?
5  A   Somewhere in his jacket, his chest area.
6  Q   Did both of them strike there?
7  A   I don't know if both of them did. I know one did. I
8      knew it didn't do anything.
9  Q   Why do you know it didn't do anything?
10 A   Because it never penetrated him. It hit his jacket.
11 Q   What kind of jacket was he wearing?
12 A   Leather jacket.
13 Q   Do you remember what color it was?
14 A   No.
15 Q   Do you remember the style of jacket?
16 A   No. I mean, it was just a leather jacket. It wasn't
17     a long -- you know, it was down to about waist length. I
18     could tell that neither Officer Severs or Officer
19     Wietecha's probes had made contact with him. His
20     clothing was to thick.
21 Q   So at that point, you believe he was still wearing a
22     jacket?
23 A   Yes.
24 Q   All right. Did you see a shirt under the jacket?
25 A   Yeah.

## Page 71

1  Q   What color was the shirt?
2  A   I don't know. I don't remember.
3  Q   Was he wearing pants or shorts?
4  A   Pants.
5  Q   Do you remember what color they were?
6  A   Blue jeans, I think.
7  Q   So you think they were jeans?
8  A   Yes.
9  Q   Do you remember what kind of shoes he was wearing?
10 A   No.
11 Q   All right. So what happened after Officer Wietecha
12     deployed his taser on Bobby Merrill?
13 A   Didn't do anything. He was still -- it was not effective
14     to him.
15 Q   And, again, why do you say it was not effective?
16 A   Because I don't think any of the probes -- I don't think
17     the probes had penetrated him at all.
18 Q   When I say how do you know it was not effective, did he
19     respond at all --
20 A   No.
21 Q   -- to the taser device?
22 A   No.
23 Q   So what happened next?
24 A   I continued to give him verbal commands, and then I
25     activated my taser on him.

## Page 72

1  Q   Okay. Did Officer Wietecha tell Bobby Merrill he was
2      going to deploy his taser?
3  A   I don't know.
4  Q   What verbal commands did you give Bobby Merrill after you
5      saw that the taser deployed by Wietecha didn't work?
6  A   I don't know. I think I just told him to keep getting on
7      the ground, something like that.
8  Q   Were you shouting or talking?
9  A   Probably shouting.
10 Q   At this point, you indicated that you had pulled your
11     taser, correct?
12 A   Yes.
13 Q   As you were giving these instructions, where was your
14     taser pointed?
15 A   Probably at him. I don't know. Maybe I had it down by
16     my side.
17 Q   What would you typically do in a situation like that?
18 A   As far as where I would put my taser?
19 Q   Where would you -- yeah, where would you direct it as you
20     were giving an order?
21 A   Probably right at him.
22 Q   Okay. And do you remember how many times you told him to
23     get on the ground?
24 A   No.
25 Q   How long after Officer Wietecha attempted to deploy his

## Page 73

1      taser did you deploy your taser?
2  A   Pretty quickly.
3  Q   About how long in time, if you can give an estimate?
4  A   I can't. I really don't know. Pretty quick, though.
5  Q   How many times -- Scratch that. You've already said you
6      don't know.
7  A   I could see where his probes had hit him, and I knew that
8      it didn't penetrate him. So, I didn't waste a lot of
9      time. I aimed for his leg, because I knew there would be
10     a better chance of it penetrating his leg.
11 Q   And did you actually strike him in the leg with the taser
12     barbs?
13 A   Yes.
14 Q   Did you see the taser barbs strike him in the leg?
15 A   One of them, yeah.
16 Q   All right. And did he respond to that deployment of the
17     taser?
18 A   Yeah, he fell down on the ground.
19 Q   Where was he standing at the point that he fell on the
20     ground?
21 A   He kind of took a few steps before he fell down. He
22     started to walk around, started to tumble in front of
23     Officer Wietecha's vehicle, the front end. And then he
24     kind of fell around the side of it, like in the middle of
25     Washington Street, kind of by his driver's side door.

(Pages 70 to 73)

ANDERSON vs. MADAJ, et al. DEPO:  OFFICER BRIAN D. GUEST          TAKEN: 11-21-13

28

Page 106

1   A   Yes.
2   Q   Are you the only officer that called MMR?
3   A   Yes.
4   Q   Why did you call MMR?
5   A   Because of his behavior, I thought that he needed to be
6       evaluated.
7   Q   When did you decide that MMR needed to be called?
8   A   As soon as he was safely secured, I called.
9   Q   So as soon as he was in the patrol car?
10  A   No, before that. He was on the ground. I would have
11      called as soon as possible. Whenever I got -- when --
12      the first free chance I got, I called.
13  Q   So did you call MMR before or after Bobby Merrill's legs
14      were bound?
15  A   Might have been during. I'm not sure. I didn't -- I
16      didn't bind those. So once his -- once he was cuffed
17      from behind, at some point in time I called.
18  Q   Are you sure that you called them before he was moved to
19      the car?
20  A   Yeah, I think so.
21  Q   You think so?
22  A   Yeah, I think so. I remember standing in the street, and
23      I was getting ready to call MMR, and I asked Officer
24      Madaj, I'm like, "You want to get MMR coming here?" And
25      he didn't answer.

Page 107

1           I said, "He probably needs to be evaluated,
2       right?" And he's, like, "Yeah." So I remember calling
3       them.
4   Q   All right. So you're taking statements from these
5       witnesses. You turn and you see MMR. And what other
6       officers are by the car while MMR is there?
7   A   Well, he's -- Bobby Merrill's out on the ground on the
8       grass by the time I turned my back.
9   Q   Okay.
10  A   And I see Officer Madaj there, and I think Officer Severs
11      was standing next to him, and then MMR personnel. But
12      then this is the point where I really needed to crowd
13      control because people were trying to get in there. So I
14      had to keep people back and stuff.
15          I mean, I kind of looked over. I was shocked.
16      I could see that they were giving CPR to him.
17  Q   Who was giving CPR?
18  A   I think Officer Madaj was.
19  Q   What was the emergency medical team doing?
20  A   Assisting.
21  Q   Okay. Do you know how long CPR was administered?
22  A   No.
23  Q   How long was Bobby Merrill out of the car and on the
24      ground?
25  A   I don't know.

Page 108

1   Q   How long after MMR got there did MMR leave with Bobby
2       Merrill?
3   A   I don't know. I didn't really have a lot of contact with
4       the other officers once he was placed in the car.
5       Because I kind of assumed responsibility of keeping
6       everybody back.
7           And, matter of fact, I was the last officer to
8       leave the scene from that group of officers. Because it
9       didn't -- supervisors didn't even realize I had taken any
10      part in the incident.
11  Q   What time did you leave the scene?
12  A   I don't know. I don't even know if I advised Central. I
13      just had a supervisor -- I had my lieutenant come up to
14      me and say, "Hey, what happened here?" And she already
15      knew anyways and --
16  Q   What is your lieutenant's name?
17  A   Luty, Lieutenant Luty.
18  Q   Can you spell that?
19  A   L-U-T-Y.
20  Q   Okay.
21  A   And she says, "Were you involved?" I said, "Yeah." She
22      said, "Why are you still here?" I said, "Well, I haven't
23      been relieved of duty yet."
24  Q   Was she the only supervisor who was on scene?
25  A   No.

Page 109

1   Q   Who were the other supervisors on scene?
2   A   Sergeant Carpenter. He's a lieutenant now, I think.
3   Q   Anyone else?
4   A   There was some -- none of mine. I know there was the
5       state police there.
6   Q   You said state police were there as well?
7   A   Yeah. I don't know their names, though. They might have
8       been the investigating officers.
9   Q   Do you remember any other officers that you know being
10      there?
11  A   Yeah.
12  Q   Who?
13  A   Officer Bucholtz showed up.
14  Q   Spell that.
15  A   I'm going to have to write it. I think it's B-U-C-H --
16      or maybe C-K, holtz.
17  Q   Is it Buchold?
18  A   Bucholtz.
19  Q   Colts, with a "T"?
20  A   Yes.
21  Q   And either an "S" or a "Z"; is that --
22  A   It's a "Z."
23  Q   Okay. Any other officers?
24  A   Yeah. Officer -- well, Officer Llewellyn, he took my
25      spot.

(Pages 106 to 109)