# EXHIBIT 14

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOROTHY ANDERSON and DEMARQUION
MERRILL, as Co-Personal Representatives
of the Estate of BOBBY MERRILL, deceased,

        Plaintiff,         NO: 13-11159

vs.                        JUDGE LUDINGTON

OFFICER JEFF MADAJ, individually,
OFFICER JUSTIN SEVERS, individually,
OFFICER BRIAN GUEST, individually, and
OFFICER STEVEN WIETECHA, individually,

        Defendants.
_____/

        The Deposition of RANDY E. MUDD, taken before me, Daniel E. Ripka, CSR-2367, Notary Public, on Friday, July 25, 2014, at the offices of Ripka, Boroski & Associates, LLC, One Tuscola Street, Suite 301, Saginaw, Michigan, commencing at or about 12:56 P.M.

APPEARANCES:

    FIEGER, FIEGER, KENNEY, GIROUX & HARRINGTON, P.C.
    BY:  GARY N. FELTY, JR., ESQ.  (P55554)
    19390 West Ten Mile Road
    Southfield, Michigan  48075
    (248) 355-5555
    g.felty@fiegerlaw.com

        Appearing on Behalf of Plaintiffs.

Ripka, Boroski & Associates, LLC    email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660    Firm Registration No. 008139

f65782dd-5cb7-41e4-9b1f-d0f18a842467

Page 2

```
 1   APPEARANCES, CONTINUED:
 2   PLUNKETT COONEY
     BY: H. WILLIAM REISING, ESQ. (P19343)
 3   111 East Court Street, Suite 1B
     Flint, Michigan 48502
 4   (810) 342-7001
     wreising@plunkettcooney.com
 5
             Appearing on Behalf of Defendants.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2   WITNESS: RANDY E. MUDD                PAGE
 3   Examination by Mr. Felty               4
 4          *   *   *   *   *
 5         INDEX OF EXHIBITS
 6   EXHIBIT                               PAGE
 7   Deposition Exhibit Number 1            5
 8   (Follow-up Report)
 9   Deposition Exhibit Number 2            6
10   (Less Lethal Force Policy)
11   Deposition Exhibit Number 3           18
12   (Diagram)
13   Deposition Exhibit Number 4           80
14   (Use of Force and Firearms Policy)
15          *   *   *   *   *
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1               Friday, July 25, 2014
 2               Saginaw, Michigan
 3               12:56 P.M.
 4                  RANDY E. MUDD,
 5   a witness herein was called for examination, and after
 6   having been sworn was examined and testified on his
 7   oath as follows:
 8                   EXAMINATION
 9   BY MR. FELTY:
10   Q.  Would you state your full legal name?
11   A.  Randy E. Mudd.
12   Q.  What does the E stand for?
13   A.  Just it's a middle initial. There's no middle name.
14   Q.  Have you been deposed before?
15   A.  Yes, I have.
16   Q.  Do you need any deposition reminders regarding the court
17       reporter and speaking audibly?
18   A.  No.
19   Q.  On April 13th, 2012 I understand that you were employed by
20       the Saginaw Police Department. Is that correct?
21   A.  Yes, I was.
22   Q.  And you were a detective?
23   A.  Yes.
24   Q.  Were you assigned to a particular bureau?
25   A.  The identification bureau.
```

Page 5

```
 1   Q.  And what is the identification bureau?
 2   A.  We deal with crime scenes.
 3   Q.  What do you do when you deal with crime scenes? What does
 4       that mean?
 5   A.  I am the evidence -- Well, I'm the evidence technician
 6       where I would go out to the crime scene, take photographs
 7       of the crime scene, collect evidence, measure evidence and
 8       do diagrams, and then also generate a report.
 9   Q.  I have put in front of you...
10          MR. FELTY: I don't know, did we mark it?
11             (Deposition Exhibit Number 1 was marked for
12             identification by the reporter.)
13   Q.  (BY MR. FELTY): I'm going to show you what I've marked as
14       Exhibit 1 and I want to know if that is a report that you
15       generated relative to an incident involving Bobby Merrill
16       on April 13th, 2012?
17   A.  This is a -- It is a report that I generated on
18       April 13th. I was responding to a scene at Washington and
19       Gilmore reference a subject by the name of Bobby Merrill.
20       By Merrill. I don't know... I can't... 'Cause I don't
21       have the victim or the suspect information on this. This
22       is just my copy of the report. All the victim and suspect
23       information are on a different report.
24   Q.  Okay.
25   A.  I have to say yes, it is, because Merrill is the last
```

2 (Pages 2 to 5)

Ripka, Boroski & Associates, LLC          email: rba@ripkaboroski.net
(800)542-4531/(810)234-7785/Fax( 810) 234-0660       Firm Registration No. 008139

f65782dd-5cb7-41e4-9b1f-d0f18a842467

Page 74

1  A. Well, you would... You may try to assess it, but you
2     can't tell if someone's intoxicated on drugs or if they
3     have a mental illness, or something, sometimes.
4  Q. And I understand. It could be one or the other?
5  A. Yeah, it could be one or the other. Alcohol, you can
6     pretty much smell the alcohol on the person when you're
7     dealing with them.
8  Q. Okay.
9  A. But as far as drugs, no.
10 Q. If you thought somebody was either mentally ill or on
11    drugs and they were being disorderly did you have a manner
12    of approach as a patrol officer?
13 A. Yes. It would probably change, yes.
14 Q. Okay. How would you typically approach that situation?
15    MR. REISING: Objection. Irrelevant.
16    But go ahead and answer the question, Randy.
17    THE WITNESS: You know, I don't know. It's like
18    the issue is every situation is different. You can't just
19    generalize one situation.
20    I don't know what the officers were thinking or
21    what they were doing at that particular incident or what
22    had happened at that incident.
23    You have to treat every incident differently.
24    So I can't really answer that question point-blank.
25 Q. (BY MR. FELTY): I just mean did you have a custom when

Page 75

1     you approached somebody under those circumstances?
2  A. It would depend on the incident. It would depend on the
3     situation at that time.
4  Q. I take it any officer approaching somebody that's
5     disorderly would start with some type of oral statement?
6  A. There would be some type of commands maybe that you would
7     ask them, or just even ask them, "Hey, what's going on?"
8     or "Hey, how you doing? Are you okay? What's going on?"
9     It just depends on what the situation -- how the situation
10    presented itself.
11 Q. With respect to a -- Well, first of all, during your
12    investigation, what you did, was it your responsibility in
13    any regard to determine whether Mr. Merrill had committed
14    a crime?
15 A. Yes.
16 Q. Did you determine whether he --
17 A. Oh, you mean during this?
18 Q. Yes.
19 A. No, it was not. I'm sorry. I thought you were talking in
20    general again about other incidents.
21    It's not my job to -- Like I said, my job on
22    this was to collect evidence, take photographs, and that
23    was my entire job on this, this incident.
24 Q. It wasn't your job to determine whether the police were
25    responding to the commission of a violent felony?

Page 76

1  A. No.
2  Q. It wasn't your job to determine if he was perhaps guilty
3     of a misdemeanor or disorderly conduct?
4  A. No.
5  Q. Did you ever make that determination?
6  A. I did not, no.
7  Q. Okay. So we can't agree based upon your knowledge here
8     that when the police responded Mr. Merrill wasn't engaged
9     in the commission of a violent felony?
10    MR. REISING: I'm sorry. We can agree?
11    MR. FELTY: Cannot.
12    MR. REISING: We cannot agree.
13 Q. (BY MR. FELTY): Based upon your foundation.
14 A. That's correct. No, I can't.
15 Q. As a detective was it your responsibility to issue charges
16    for people that committed carjackings?
17 A. I did not -- That's one thing I did not do is carjackings.
18 Q. What about as a patrol officer, would you arrest people
19    for those types of activities?
20 A. As a patrol officer if there was enough information, yes,
21    it would be.
22 Q. Do you know what --
23 A. I would arrest, write the report, and then it would be up
24    to the detective to seek a warrant on that person.
25 Q. Did you learn... did you ever learn what is essential or

Page 77

1     what information must be proven to -- Strike that.
2     Did you ever learn what is required to seek a
3     warrant as a detective for somebody believed to be
4     involved in a carjacking?
5  A. I did not deal with carjackings.
6  Q. I understand you didn't deal with them.
7  A. So... But, yes. Yes.
8  Q. What was required or what is required in Saginaw to seek a
9     warrant for arrest for carjacking?
10    MR. REISING: If you know.
11    THE WITNESS: You know, I'll be honest, I don't
12    remember.
13 Q. (BY MR. FELTY): Does it require a forceful threat?
14 A. Yes.
15 Q. Does it require an intent to take somebody's --
16 A. Take somebody's car, yes.
17 Q. Based upon force or threat?
18 A. Yes.
19 Q. Are you aware of any force or threat in this particular
20    situation?
21 A. Like I said, I wasn't involved in the investigation of the
22    crime or whatever happened itself. My total dealing with
23    this investigation was to go to the scene, collect
24    evidence and go to the autopsy and take photographs.
25 Q. And I understand that was your role, I just wondered if

20 (Pages 74 to 77)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660

email: rba@ripkaboroski.net
Firm Registration No. 008139

f65782dd-5cb7-41e4-9b1f-d0f18a842467

Page 78

1 you were aware of any force or threat with intent to take
2 somebody's automobile?
3 A. No.
4 Q. Did you receive any training or education regarding the
5 use of tasers involving people under the influence of
6 alcohol or drugs?
7 A. No, I did not.
8 Q. So you were not taught whether it was more or less
9 dangerous to use a --
10 A. Not that I remember, no.
11 Q. Do you know what the object of the taser is or what it's
12 purpose is?
13 MR. REISING: In what mode?
14 MR. FELTY: Either.
15 THE WITNESS: To get compliance.
16 Q. (BY MR. FELTY): How did you learn that or where did you
17 learn that the object of taser is to obtain compliance?
18 A. That's in the force continuum.
19 Q. Do you believe or were you taught whether it was
20 appropriate to deploy a taser in order to obtain
21 compliance with a command?
22 MR. REISING: I'm sorry, I didn't hear.
23 MR. FELTY: To obtain compliance with a command.
24 THE WITNESS: You would always do commands first
25 and then deploy whatever it would be, whether it's the

Page 79

1 taser, baton, pepper spray.
2 Q. (BY MR. FELTY): So I just want to see if I understand.
3 If just hypothetically a person is instructed to put their
4 hands up and they don't, do you believe in the city of
5 Saginaw it would be considered appropriate to deploy a
6 taser under those circumstances, failing to comply with
7 that request?
8 A. It would depend on the situation.
9 Q. Just that, "Put your hands up" and the person doesn't.
10 A. No.
11 Q. It would not be appropriate?
12 A. No.
13 Q. Is any type of force appropriate to obtain compliance with
14 that type of command?
15 A. Hands on somebody would. But it just depends on the
16 situation.
17 Q. Okay. And by hands on what do you mean?
18 A. The officer grabs the person and places him in his
19 custody. But it depends on the situation.
20 Q. You've mentioned the force continuum?
21 A. Yes.
22 Q. What is your understanding of what the force continuum is?
23 A. The force -- There's less than lethal force all the way up
24 to deadly force.
25 Q. Do you have or were you provided a copy of the City of

Page 80

1 Saginaw's policy regarding the use of force or the force
2 continuum?
3 A. As far as the use of force, yes. It's... well, part of it
4 is marked as Exhibit 2.
5 Q. What I was provided is on page 17 of...
6 A. Yes. I would have gotten this, yes.
7 Q. Okay. And the levels of force described by Saginaw Police
8 Department policy and procedures is A Guide for Escalation
9 and De-escalation of Subject Control has subject actions,
10 inactive resistance. Is that something you used?
11 A. Yes.
12 Q. What does inactive resistance mean?
13 A. Inactive resistance?
14 Q. Yes.
15 A. Can I see it?
16 Q. Yeah. You can have that copy.
17 We can mark that one if you want.
18 MR. FELTY: Let's mark that one.
19 (Deposition Exhibit Number 4 was marked for
20 identification by the reporter.)
21 Q. (BY MR. FELTY): And just for clarification, Exhibit 4, to
22 the best of your understanding is that the use of force
23 policy effective August 1st, 2009 for the City of Saginaw?
24 A. Yes.
25 Q. Okay. And the last page of that page, or PP-01.17 is the

Page 81

1 force continuum?
2 A. Yes.
3 Q. All right. And I was asking you what is inactive
4 resistance?
5 A. Inactive resistance to me would be that there's no
6 compliance whatsoever and it's just my presence there.
7 Q. And what defines passive resistance?
8 A. Passive resistance would be that you've actually gave a
9 verbal direction and they're just either walking away or
10 not compliant to you.
11 Q. Okay. So that's like walking away?
12 A. Right.
13 Q. All right. And then active resistance is what?
14 A. Active resistance would mean maybe that they're walking
15 towards me and they've been told not to, or stop, or stay
16 where they're at, or something in that nature.
17 Q. And what is active aggression?
18 A. Is where they're actually resisting arrest or using
19 something to... You know, they're resisting arrest, or
20 running away, or coming at me and say, "I'm going to
21 assault somebody or assault myself."
22 Q. Which one was that?
23 A. Active aggression.
24 Q. So active aggression is resisting arrest?
25 A. No, it's that they're actually aggressive towards

21 (Pages 78 to 81)

Ripka, Boroski & Associates, LLC
(800)542-4531/(810)234-7785/Fax( 810) 234-0660
email: rba@ripkaboroski.net
Firm Registration No. 008139
f65782dd-5cb7-41e4-9b1f-d0f18a842467